# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Teliah C. Perkins, Individually and as Parent and Natural Guardian of D.J., a Minor,<br><br>Plaintiff,<br><br>v.<br><br>Kyle Hart and Ryan Moring,<br><br>Defendants. | Civil Action No. 2:21-CV-00879<br><br>Judge:<br><br>Magistrate Judge:<br><br>*Jury Trial Demanded* |

## COMPLAINT

Plaintiff Teliah C. Perkins, individually and in her capacity as parent and natural guardian of her minor son, D.J., brings claims against Defendants Kyle Hart and Ryan Moring, and respectfully alleges as follows:

## INTRODUCTION

1.     Teliah C. Perkins, a 37-year-old Black woman and resident of Slidell, Louisiana, was violently arrested in her own driveway on May 5, 2020. The arrest arose from two alleged traffic offenses that Ms. Perkins did not commit and, in any event, could have been resolved through the mere issuance of a citation. Instead, Ms. Perkins was manhandled, jailed, and left with a criminal record and long-term injuries. To make matters worse, Ms. Perkins' minor son, who was just 14 years old, sustained psychological trauma after he was pushed and threatened with a Taser by law enforcement as they tried to block him from recording his mother's violent arrest.

2.     During the incident, which lasted approximately thirty minutes, two white deputies from the St. Tammany Parish Sheriff's Office, Defendants Kyle Hart and Ryan Moring, forced

Ms. Perkins to the ground—pressing her face into the pavement and digging their knees and elbows into her back and legs. Deputy Hart in particular kept Ms. Perkins pinned to the ground and pressed his forearm into her windpipe as she gasped "you're choking me!"

3.     Ms. Perkins' minor son, D.J., observed the entire incident and used his phone to record the Deputies' abuse and arrest of his mother.

4.     D.J. kept recording even as Deputy Moring stepped in front of him to block the camera, shoved D.J. in the chest, and aimed his Taser directly at D.J. When D.J. objected, saying "you can't tase a child," Deputy Moring responded: "watch me."

5.     Defendants had no reason to brutalize Ms. Perkins, or to openly threaten her minor son with violence. Ms. Perkins had not broken any laws when Defendants targeted her. Nor did Ms. Perkins present any threat to the officers or try to flee at any point. Instead, police records show that the only reason that Defendants traveled to Ms. Perkins' residential street that day was because an anonymous caller had reported a woman riding a motorcycle without a helmet—a minor "traffic" offense under St. Tammany Parish law, punishable by a $50 fine.

6.     Defendants took Ms. Perkins to the St. Tammany Parish Jail, where she was detained overnight. Ms. Perkins was ultimately charged with resisting a police officer with force or violence, battery of a police officer, driving a motorcycle with no proof of insurance, and driving a motorcycle with no safety helmet. Each of these charges is baseless and, with the exception of the resisting charge, each has been dropped.

7.     Ms. Perkins is one of too many Black people who endure excessive force by police, only to face criminal charges stemming from that very same incident. Law enforcement officers commonly use "cover charges," such as resisting arrest, to justify their use of unreasonable and

excessive force against people of color.[1] As a result, Black people like Ms. Perkins not only suffer from the physical and psychological trauma of police violence, but they must also confront a criminal justice system that views them not as victims, but as criminals, resulting in long-lasting barriers to employment, housing, and education.

8.      During the incident in question, Defendants caused severe harm to Ms. Perkins and D.J. After being released from jail, Ms. Perkins was treated at the Ochsner Medical Center Northshore emergency room for the injuries that Defendants caused. Ms. Perkins was diagnosed with a left hand injury, left knee injury, neck strain, and upper back strain. She was also prescribed medications for inflammation and pain, and was instructed to follow up with an internist and orthopedic surgeon. Nearly one year later, Ms. Perkins still suffers from severe back pain for which she receives physical and occupational therapy and is prescribed pain relief medication. Prior to her assault and unlawful arrest, Ms. Perkins was a home healthcare provider and spent much of her time caring for her bed-ridden cousin. Since the incident, she has been unable to work because her back pain prevents her from moving or repositioning her patients. She has also been unable to run—a passion of hers before the incident. The frivolous charges filed against her have also caused Ms. Perkins to suffer from depression, anxiety, and lack of sleep. D.J., too, was deeply traumatized by seeing his mother violently abused and restrained by the police, in her own driveway, and by Deputy Moring's threats of violence against him. D.J. has been diagnosed with post-traumatic stress disorder and sees a therapist regularly.

---

[1] *See, e.g.,* Lisa Cacho & Jodi Melamed, *How Police Abuse the Charge of Resisting Arrest,* Boston Review, June 29, 2020, http://bostonreview.net/race-law-justice/lisa-cacho-jodi-melamed-how-police-abuse-charge-resisting-arrest; Scott Holmes, *Resisting Arrest and Racism – The Crime of "Disrespect",* 85 UMKC L. Rev. 625 (2017); Jonah Newman, *Chicago police use 'cover charges' to justify excessive force,* Chicago Reporter, Oct. 23, 2018, https://www.chicagoreporter.com/chicago-police-use-cover-charges-to-justify-excessive-force/.

**PARTIES**

9.      Plaintiff Teliah C. Perkins is a 37-year-old woman domiciled in the State of Louisiana within the Eastern District of Louisiana. She is the parent and natural guardian of her minor son D.J., who is also domiciled in the State of Louisiana within the Eastern District of Louisiana. Ms. Perkins and D.J. are Black.

10.     Ms. Perkins and D.J. are citizens of the United States of America.

11.     Defendant Kyle Hart is currently, and was at the time of the incident described in this Complaint, a deputy with the St. Tammany Parish Sheriff's Office. Deputy Hart is white. He is sued in his individual capacity.

12.     Defendant Ryan Moring is currently, and was at the time of the incident described in this Complaint, a deputy with the St. Tammany Parish Sheriff's Office. Deputy Moring is white. He is sued in his individual capacity.

13.     Defendants Hart and Moring are persons for purposes of 42 U.S.C. § 1983. Defendants Hart and Moring were, at all relevant times, acting under the color of state law in their capacity as deputies for the St. Tammany Parish Sheriff's Office and their acts or omissions were conducted within the scope of their official duties or employment.

**JURISDICTION AND VENUE**

14.     Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1343 because the controversy arises under the U.S. Constitution and 42 U.S.C. § 1983. Plaintiff also invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) over state law claims.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to Ms. Perkins' claims happened within this district.

4

16.     Declaratory relief is authorized by 28 U.S.C. § 2201. A declaration of law is necessary to determine the rights and duties of the parties.

## FACTUAL ALLEGATIONS

### A. Defendants Approach Ms. Perkins at Her Home for Purported "Dirt Bike" Violations

17.     Teliah Perkins has lived in Slidell, Louisiana for the last 10 years. Ms. Perkins has one child, her 14-year-old son, D.J. Before the incident, Ms. Perkins worked as a home healthcare provider, while also caring for her bedridden cousin. Ms. Perkins is a former track-and-field athlete and has a passion for running.

18.     On May 5, 2020, at about 3:20 p.m., Ms. Perkins was at her home in Slidell. She was with D.J. and her nephew, also a minor.

19.     While sitting and eating on her porch with her nephew, Ms. Perkins observed Defendants riding down the street on marked police motorcycles. Curious to see what was going on, Ms. Perkins walked to the end of her driveway to get a better look.

20.     After first passing Ms. Perkins' house, Defendants turned their motorcycles around and drove back to Ms. Perkins' driveway. Ms. Perkins and her nephew began walking back to the porch, and the nephew continued inside. Defendants parked their motorcycles on the street in front of Ms. Perkins' house and dismounted.

21.     One of the Defendants shouted, "Hey come here," which Ms. Perkins willingly did. Deputy Moring then said that they had received a call from an undisclosed source about someone riding a "dirt bike" without a helmet. Ms. Perkins responded, "sir, I have no idea what you're talking about."

22.     Ms. Perkins does not own a "dirt bike." Other residents of Ms. Perkins' neighborhood own dirt bikes, which are generally not street legal, and often ride them recklessly

through the street without helmets. On information and belief, the police do not generally stop or arrest these residents.

23.     Ms. Perkins owns a sport-bike type motorcycle, which could not be mistaken for a dirt bike and at the time was turned off and parked in her driveway. She is trained and licensed to operate a motorcycle, and she wears a helmet when doing so. Still, local law enforcement had been to Ms. Perkins' house twice before, responding to reports of someone operating a motorcycle without a helmet. Each prior visit was resolved without issue.

24.     Ms. Perkins did not ride her motorcycle without a helmet on May 5, 2020, the day of the incident.

**B. Ms. Perkins Cooperates Despite Defendants' Unlawful Basis for the Stop**

25.     After Ms. Perkins told the Defendants she didn't know anything about a helmetless dirt bike rider, Defendants inquired about Ms. Perkins' motorcycle. Defendants demanded— without reasonable suspicion that Ms. Perkins had committed any crime, as required by La. Code Crim. Pro. art. 215.1—to see her driver's license, registration, and proof of insurance, even though Ms. Perkins was not operating the motorcycle at the time. Defendants did not ask to feel the motorcycle to see if it was hot from recent use. Defendants did not conduct any further investigation of the identity of the supposed helmetless dirt bike rider nor did they speak to the person who made the initial 911 call to ascertain their credibility.

26.     Intending to fully cooperate with the Defendants' request and knowing she had done nothing wrong, Ms. Perkins willfully and voluntarily provided her registration and driver's license to Defendants. She additionally told them that she had not been operating her motorcycle without a helmet.

27.    Ms. Perkins possessed insurance coverage for her motorcycle but had not yet received an insurance card because the motorcycle was a recent purchase. Ms. Perkins explained this to Defendants and sent a text message to her insurance agent requesting that a digital copy of her insurance card be emailed to her.

28.    While handing over her license and registration, Ms. Perkins told Defendants about the prior police visits concerning reports of someone riding without a helmet and asked whether these repeated and false reports were racially motivated.

**C. Defendants Needlessly Escalate the Situation with Threats and Profanity**

29.    Deputy Hart responded: "Shut the fuck up! This call ain't fucking about race!" Ms. Perkins' concern about being the target of her neighbors' racial prejudice appeared to inflame Defendants' tempers, and the interaction took a sharp, hostile turn.

30.    When an elderly neighborhood friend approached the house, Deputy Moring yelled at her: "Get the fuck back! Do not come any closer, or you'll be fucking arrested!"

31.    Despite not establishing reasonable suspicion to prolong their investigative stop, as the complaint was uncorroborated by the evidence at hand, Defendants continued to detain and question Ms. Perkins. Eventually, Ms. Perkins became frustrated and asked to speak with Defendants' supervising officer. When Defendants refused, Ms. Perkins decided to call 911 herself to request that a supervising officer be dispatched to the house.

32.    Defendants were visibly upset by this, and so Ms. Perkins called for D.J. and her nephew, who were inside the house, to come out to the driveway and start recording video with their cell phones.

33.     Defendants immediately instructed D.J. and Ms. Perkins' nephew to walk back to the porch. Ms. Perkins responded that this was their driveway, and so they didn't need to go to the porch. Ms. Perkins' commands to her son and nephew enraged Defendants.

**D. Defendants Unlawfully Arrest and Assault Ms. Perkins in Her Own Driveway**

34.     Without a warrant and without establishing reasonable suspicion, let alone probable cause for arrest, Deputy Hart declared "that's it, right now you're being placed under arrest," and Defendants stormed up the driveway to handcuff Ms. Perkins.

35.     In a warrantless arrest scenario, under La. Code Crim. Pro. art. 218 and St. Tammany Sheriff's Office Standard Operating Procedure ("SOP") 0200:02.125, Defendants were required to inform Ms. Perkins of the cause of her arrest prior to placing her under custody. However, neither Defendant did so. Instead, both entered Ms. Perkins' property, walked up the driveway, and violently seized Ms. Perkins by her arms, and told her to give them her hands so they could place her in handcuffs. Ms. Perkins pleaded that she was waiting on her insurance and tried to hand off her phone to her son, but Defendants forced her to the ground, muttering that she was "fucking slippery." Defendants, together, then leaned on Ms. Perkins' back and neck with their knees and elbows, pulled her hair, and forced her face against the driveway pavement while wrenching her arms behind her back.

36.     D.J., shocked and alarmed, watched his mom struggle as Defendants shoved her to the ground.  He asked them why they were sending his mom to jail. Apparently recognizing that there was no basis to initiate the arrest, one of the deputies responded, "resisting now"—even though Ms. Perkins was in no way using or threatening force or violence when Defendants approached her. In the following still shots taken from the video of the incident, Deputy Moring can be identified by his shaved head. The other officer is Deputy Hart.





37.     Ms. Perkins yelled that Defendants were hurting her and, justifiably, tried to pull her arms away.  But Ms. Perkins never struck either Defendant and never tried to run from them.

**E. Deputy Moring Threatens D.J. with a Taser While Attempting to Block Filming**

38.     After noticing that D.J. was recording the incident on his phone, Deputy Moring stood up and moved directly between D.J. and his mother, blocking D.J.'s camera. Deputy Moring shoved D.J. backward and drew his Taser, pointing it directly at the 14-year-old. When D.J. rightfully insisted on continuing to record the incident, saying, "you can't tase a child," Deputy Moring responded threateningly: "watch me." Deputy Moring kept his Taser aimed at D.J. as Deputy Hart's abuse of Ms. Perkins continued.



**F. Deputy Hart Violently Detains Ms. Perkins**

39.     During D.J.'s interaction with Deputy Moring, Deputy Hart continued to pin Ms. Perkins face-first into the pavement by jamming his knees into her thighs and pushing Ms. Perkins' handcuffed hands into her lower back. Deputy Moring successfully blocked D.J.'s ability to record much of the incident. However, Ms. Perkins' nephew also recorded the incident from a different angle. It is this video that shows Deputy Hart pressing his forearm against Ms. Perkins' throat,

then wrapping his hand around her neck and leaning on it.  No doubt fearful of choking to death, Ms. Perkins can be seen gasping on camera, "you're choking me!"



      40.     Deputy Hart then lifted Ms. Perkins to her feet from behind by her arms and pushed her toward the street, as seen in the image below. Deputy Hart attempted to push Ms. Perkins' arms backwards upwards over her head, which forced Ms. Perkins to the ground again. After a few minutes, Ms. Perkins was pushed into the back of a patrol car, without having had the opportunity to receive medical attention or speak to a supervisor.



41.    Ms. Perkins was then transported and booked into St. Tammany Parish Jail, where she was illegally detained overnight. To make matters worse, Ms. Perkins was never offered nor given any attention for the injuries to her back, neck, wrists, and knee, caused by the Deputies' excessive force.

42.    Furthermore, after Ms. Perkins was arrested, her motorcycle was illegally seized, towed away, and impounded by the St. Tammany Parish Sheriff's Office, despite having been parked on her private property and there being no evidence of any offense. The day she was released from jail, Ms. Perkins was forced to pay $204 for the release of her motorcycle from police impound. Ms. Perkins was returned her driver's license when she was processed out of the jail, but the Sheriff's Office never returned her registration papers, forcing her to obtain new ones for an additional fee.

**G. Ms. Perkins Receives Treatment for Her Injuries**

43.     The day after being released from jail, Ms. Perkins went to the Ochsner Medical Center Northshore emergency room to obtain treatment for the injuries to her neck, back, knees, fingers and wrists caused by Defendants.

44.     Ms. Perkins has continued to receive treatment for these injuries, including physical and occupational therapy. She is in pain each day. Before this incident, Ms. Perkins was employed as a home care provider—a job that requires a significant amount of lifting. Because of her injuries, she cannot meet the physical requirements of that job, and so has not been able to work. And her pending felony charge makes it difficult to find other employment.

45.     D.J. was not physically injured by Defendants but has suffered significant psychological harm from being subjected to Deputy Moring's threats and from witnessing his mother's violent and unnecessary arrest. He has been diagnosed with post-traumatic stress disorder for which he has been prescribed medication by a psychiatrist and for which he regularly sees a counselor.

**H. Defendants File False and Misleading Reports and Affidavits**

46.     To add insult to injury—and, upon information and belief, to justify his unlawful actions—Deputy Hart filed a "Complaint Arrest Affidavit" and an "Affidavit for Probable Cause of Arrest" that are riddled with falsehoods. For instance:

a.      Deputy Hart reported that Defendants "observed Perkins operating the motorcycle in the middle of the roadway without a helmet." This is false. Ms. Perkins did not operate her motorcycle at all in Defendants' presence.

13

b.     Deputy Hart reported that Ms. Perkins "went into her house after handing her license and registration to Deputy Moring." This is false. Ms. Perkins never entered her house after the Deputies arrived at her driveway.

c.     Deputy Hart reported that Defendants requested Ms. Perkins remain on the scene and not enter her home for "officer safety reasons" due to "not knowing if she was entering the residence to retrieve a weapon." This is unreasonable and, upon information and belief, false.

d.     Deputy Hart reported that, "[a]t no time, did Perkins explain her intent to produce information on the motorcycle (registration/insurance)." This is false. Ms. Perkins provided Defendants with her motorcycle registration and repeatedly stated that she was waiting on her insurance documentation.

e.     Deputy Hart reported that Ms. Perkins "began to walk away from the scene," and Defendants attempted to place her in handcuffs rather than simply issue her a citation "to prevent Perkins from fleeing the scene."  Video evidence shows that this assertion is false. Ms. Perkins never attempted to leave the scene.

**I. Defendants' Actions Have Life-Altering Consequences**

47.     Even though she was the true victim of Deputy Hart and Deputy Moring's excessive force, Ms. Perkins was charged on May 6, 2020 with resisting a police officer with force or violence (a felony); battery of a police officer (a misdemeanor); driving a motorcycle with no proof of insurance (a misdemeanor); and driving a motorcycle with no safety helmet (a misdemeanor), even though Defendants did not observe her operating the motorcycle and her motorcycle did not meet the description given by the anonymous caller.

48.     Ultimately, all the harm and damage caused by Defendants could have been avoided as it had been during Ms. Perkins' two previous interactions with deputies regarding her motorcycle. Defendants were initially called for what is essentially a traffic violation—riding a motorcycle without a helmet—that only carries a $50 fine under La. Stat. Ann. § 32:190. Under La. Code Crim. Pro. art. 211, an officer can simply issue a citation for this violation rather than make an arrest.  Deputies Hart and Moring could have taken this approach. Yet, without any good or lawful reason, Defendants decided to escalate the situation by unlawfully arresting Ms. Perkins without probable cause or a warrant; using excessive force, which included a method—the chokehold—that has so notoriously caused the deaths of other Black people at the hands of the police[2]; and causing her child to fear not only for his mother's life but his own.

49.     Defendants' actions needlessly made Ms. Perkins' life miserable. She can no longer physically perform the job she loved (caring for the sick), and she can no longer do the things that brought her enjoyment, like running, because of the constant pain caused by the injuries to her back and knee.

50.     While the underlying traffic and battery charges have been dismissed or unindicted, Ms. Perkins is still being prosecuted on the charge of "resisting a police officer with force or violence." She has found herself wrongfully entangled in the criminal justice system without an end in sight, facing the full weight of local law enforcement and a felony charge that has extremely serious consequences, including jail time, all because Defendants chose to arrest Ms. Perkins for a crime that she did not commit, Defendants did not witness, and, in any event, could have been resolved with a $50 ticket.

---

[2] *See* Katie Wedell, Cara Kelly, Camille McManus & Christine Fernando, *George Floyd is not alone. 'I can't breathe' uttered by dozens in fatal police holds across U.S.,* USA TODAY, Jun. 13, 2020, https://www.usatoday.com/in-depth/news/investigations/2020/06/13/george-floyd-not-alone-dozens-said-cant-breathe-police-holds/3137373001/

51.     Ms. Perkins' trial was initially set for November 30, 2020.  Because of the ongoing COVID-19 public health crisis, the trial date has been repeatedly delayed.

**COUNT ONE**
**False arrest in violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983**
(Teliah C. Perkins against both Defendants)

52.     Ms. Perkins incorporates and re-alleges the above allegations in full.

53.     The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable search and seizure by law enforcement officers.

54.     The Fourteenth Amendment of the U.S. Constitution protects citizens against arbitrary deprivation of life, liberty, or property by the state.

55.     It was clearly established at the time of Ms. Perkins' arrest that the Fourth and Fourteenth Amendments prohibits arrest without probable cause.

56.     Defendants arrested Ms. Perkins without probable cause. The lack of probable cause to arrest Ms. Perkins would have been evident to any reasonable person based on the facts and circumstances within Defendants' knowledge at the time. Defendants did not witness Ms. Perkins break any law, nor did they have any reason to believe that she had broken any law. Defendants had no reason to believe that the report of a woman recklessly operating a motorcycle on Jay Street was credible, and Defendants did not give Ms. Perkins a chance to prove that she had motorcycle insurance.

57.     By arresting her without probable cause, Defendants violated Ms. Perkins' clearly established Fourth and Fourteenth Amendment rights.

58.     Any reasonable police officer would have known that arresting Ms. Perkins under these circumstances would violate her clearly established constitutional rights.

59.     Defendants are not entitled to qualified immunity for their conduct, because their arrest of Ms. Perkins violated Ms. Perkins' clearly established constitutional rights and was objectively unreasonable.

60.     As a direct and proximate result of this false arrest, Ms. Perkins suffered actual physical, emotional, and economic harm.

61.     Ms. Perkins is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

62.     Ms. Perkins is also entitled to punitive damages against each Defendant under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless or wanton disregard of Ms. Perkins' constitutional rights.

## COUNT TWO
### Excessive force in violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983
#### (Teliah C. Perkins against both Defendants)

63.     Ms. Perkins incorporates and re-alleges the above allegations in full.

64.     The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable search and seizure by law enforcement officers.

65.     The Fourteenth Amendment of the U.S. Constitution protects citizens against arbitrary deprivation of life, liberty, or property by the state.

66.     It was clearly established at the time of Ms. Perkins' arrest that the Fourth and Fourteenth Amendments prohibit law enforcement officers from using an unreasonable level of force during an arrest.

67.     By forcing Ms. Perkins to the ground and applying extreme pressure to her back, legs, and throat, Defendants violated Ms. Perkins' clearly established Fourth and Fourteenth Amendment rights.

17

68.     The level of force used by Defendants against Ms. Perkins was objectively unreasonable because: (a) the offenses that Defendants accused Ms. Perkins of committing were mere traffic violations; (b) Ms. Perkins was in her own driveway and objectively posed no threat to Defendants, herself, or anyone else at any point during the arrest; and (c) Ms. Perkins did not resist arrest. At most, Ms. Perkins resisted Defendants' illegal use of excessive force with a level of resistance permitted by state law.

69.     Any reasonable law enforcement officer would have known that using this level of force to arrest Ms. Perkins would violate her clearly established constitutional rights.

70.     Defendants are not entitled to qualified immunity for their conduct, because their use of force against Ms. Perkins violated Ms. Perkins' clearly established constitutional rights and was objectively unreasonable.

71.     As a direct and proximate result of Defendants' excessive force, Ms. Perkins suffered actual physical, emotional, and economic harm.

72.     Ms. Perkins is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

73.     Ms. Perkins is also entitled to punitive damages against each Defendant under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless or wanton disregard of Ms. Perkins' constitutional rights.

### COUNT THREE
**Unlawful seizure in violation of the Fourth Amendment, 42 U.S.C. § 1983**
(Teliah C. Perkins against both Defendants)

74.     Ms. Perkins incorporates and re-alleges the above allegations in full.

75.     The Fourth Amendment of the U.S. Constitution protects citizens against unlawful seizure of their person or property by law enforcement officers.

76.     It was clearly established at the time of Ms. Perkins' arrest that the Fourth Amendment prohibits law enforcement officers seizing a citizen's vehicle without legal justification.

77.     Because Defendants had no probable cause to believe that Ms. Perkins had broken any law, they had no basis to seize Ms. Perkins or her motorcycle, driver's license, and registration. By doing so, Defendants violated Ms. Perkins' clearly established Fourth Amendment rights.

78.     Any reasonable law enforcement officer would have known that seizing Ms. Perkins and her property in this context would violate her clearly established constitutional rights.

79.     Defendants are not entitled to qualified immunity for their conduct, because seizure of Ms. Perkins and her property violated Ms. Perkins' clearly established constitutional rights and was objectively unreasonable.

80.     As a direct and proximate result Defendants' unlawful seizure, Ms. Perkins suffered actual economic harm.

81.     Ms. Perkins is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

82.     Ms. Perkins is also entitled to punitive damages against each Defendant under 42 U.S.C. § 1983 because Defendants' actions were malicious, willful, or with reckless or wanton disregard of Ms. Perkins' constitutional rights.

## COUNT FOUR
**Excessive force in violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983**
(Teliah C. Perkins, as parent and natural guardian of D.J., against Defendant Moring)

83.     Ms. Perkins incorporates and re-alleges the above allegations in full.

84.     The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable search and seizure by law enforcement officers.

85.     The Fourteenth Amendment of the U.S. Constitution protects citizens against arbitrary deprivation of life, liberty, or property by the state.

86.     It was clearly established at the time Deputy Moring threatened to tase D.J. that the Fourth and Fourteenth Amendments prohibit law enforcement officers from using an unreasonable level of force during an arrest.

87.     By threatening to fire his taser at D.J., Deputy Moring violated D.J.'s clearly established Fourth and Fourteenth Amendment rights.

88.     The level of force used by Defendant against D.J. was objectively unreasonable because: (a) D.J. was in his own driveway and objectively posed no threat to Defendants, himself, or anyone else at any point during his mother's arrest; (b) D.J. had not committed any crimes; (c) D.J. was exercising his First Amendment rights and documenting the unlawful arrest and excessive force being used upon his mother; and (d) D.J. is a child.

89.     Any reasonable law enforcement officer would have known that this level of force against a child would violate the child's clearly established constitutional rights.

90.     Defendant is not entitled to qualified immunity for his conduct, because his use of force against D.J. violated D.J.'s clearly established constitutional rights and was objectively unreasonable.

91.     As a direct and proximate result of Defendant's excessive force, D.J. suffered actual physical, emotional, and economic harm.

92.     D.J. is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

93.     D.J. is also entitled to punitive damages against Deputy Moring under 42 U.S.C. § 1983 because Defendant's actions were malicious, willful, or with reckless or wanton disregard of D.J.'s constitutional rights.

**COUNT FIVE**
**First Amendment retaliation, 42 U.S.C. § 1983**
(Teliah C. Perkins, as parent and natural guardian of D.J., against Defendant Moring)

94.     Ms. Perkins incorporates and re-alleges the above allegations in full.

95.     The First Amendment of the U.S. Constitution protects the rights of citizens to engage in certain constitutionally protected activity. Recording interactions with police is one example of protected activity.

96.     It was clearly established at the time of the incident that recording an interaction with police in your own driveway is a protected activity, and that the First Amendment prohibits law enforcement officers from retaliating against a citizen engaging in that activity.

97.      At the time of the incident, D.J. had a clearly established constitutional right under the First Amendment to record his interaction with Defendants.

98.     Deputy Moring shoved D.J., threatened D.J. with his Taser, and stood in front of D.J.'s camera, all to force him to stop recording. In doing so, Deputy Moring violated D.J.'s clearly established First Amendment rights.

99.     Deputy Moring's actions would chill a person of ordinary firmness from continuing to record an interaction with the police. Moreover, Deputy Moring's actions were substantially motivated against D.J.'s exercise of his constitutional right to record the interaction.

100.     Any reasonable law enforcement officer would have known that this conduct would violate D.J.'s clearly established constitutional rights.

101.    Deputy Moring is not entitled to qualified immunity for his conduct, because his retaliation against D.J. violated D.J.'s clearly established constitutional rights and was objectively unreasonable.

102.    D.J. has been diagnosed with post-traumatic stress disorder and has been in treatment with a therapist since his encounter with Deputy Moring. This medical care has been necessary for D.J. to manage the emotional distress caused by Deputy Moring.

103.    As a direct and proximate result of Deputy Moring's retaliation, D.J. suffered actual emotional harm.

104.    D.J. is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

105.    D.J. is also entitled to punitive damages against Deputy Moring under 42 U.S.C. § 1983 because Deputy Moring's actions were malicious, willful, or with reckless or wanton disregard of D.J.'s constitutional rights.

## COUNT SIX
### False arrest (state law)
(Teliah C. Perkins against both Defendants)

106.    Ms. Perkins incorporates and re-alleges the above allegations in full.

107.    Ms. Perkins' arrest was unlawful because there was no probable cause for the arrest. Defendants had no reasonable basis to believe that she had broken any law.

108.    The facts and circumstances within Defendants' knowledge during their interaction with Ms. Perkins would not have caused a reasonable person to conclude that Ms. Perkins had committed or was in the process of committing any offense.

109.    Defendants did not witness Ms. Perkins drive her motorcycle without a helmet or without insurance.

110.    Defendants had no reason to believe that the report of a woman recklessly operating a motorcycle on Jay Street was credible.

111.    Even if Defendants had good reason to believe that Ms. Perkins had committed the traffic offenses that she was accused of, the appropriate response under Saint Tammany Parish Sherriff's Office Standard Operating Procedure 0200:02:240 should have been to issue her a citation, especially given that Ms. Perkins was not dangerous or a threat to flee.

112.    As a direct and proximate result of this false arrest, Ms. Perkins suffered actual physical, emotional, and economic harm.

## COUNT SEVEN
### Excessive force/battery (state law)
(Teliah C. Perkins against both Defendants)

113.    Ms. Perkins incorporates and re-alleges the above allegations in full.

114.    Defendants used an unreasonable and unnecessary amount of force when arresting Ms. Perkins. Defendants pinned Ms. Perkins to the ground and applied extreme pressure to her back, legs, and throat with their elbows, knees, and arms. Based on the totality of facts and circumstances presented, and compared with the force that any ordinary, prudent, and reasonable person would have considered necessary, this amount of force was objectively excessive.

115.    Defendants had no reason to believe that Ms. Perkins would become violent or was in any way a danger to them.

116.    Ms. Perkins never tried to flee from the driveway where she was arrested.

117.    Defendants did not face any danger from anyone else nearby.

118.    Defendants are larger and stronger than Ms. Perkins and were equipped with pistols and Tasers.

119.    The offenses that Defendants accused Ms. Perkins of committing were traffic infractions. There was no need to arrest Ms. Perkins at all, much less to employ such a severe level of force to do so, in her own driveway.

120.    As a direct and proximate result of Defendants' excessive force, Ms. Perkins suffered actual physical, emotional, and economic harm.

## COUNT EIGHT
### Excessive force/battery (state law)
(Teliah C. Perkins, as parent and natural guardian of D.J., against Defendant Moring)

121.    Ms. Perkins incorporates and re-alleges the above allegations in full.

122.    Deputy Moring used an unreasonable and unnecessary amount of force by threatening to tase D.J. Based on the totality of facts and circumstances presented, and compared with the force that any ordinary, prudent, and reasonable person would have considered necessary, this amount of force was objectively excessive.

123.    Deputy Moring had no reason to believe that D.J. would become violent or was in any way a danger to him.

124.    Deputy Moring is larger and stronger than D.J. and was equipped with pistols and Tasers and should be trained in how to deal with bystanders without resorting to physical threats.

125.    D.J. was not interfering in his mother's unlawful arrest but was merely exercising his First Amendment rights by imploring the Defendants to stop assaulting his mother, and by documenting his mother's unlawful arrest and the Defendants' use of excessive force on her. There was no need to employ such a severe level of force on a child who was not interfering with the officers' unlawful actions.

126.    As a direct and proximate result of Deputy Moring's excessive force, D.J. suffered actual physical, emotional, and economic harm.

## COUNT NINE
### False imprisonment (state law)
(Teliah C. Perkins against both Defendants)

127.   Ms. Perkins incorporates and re-alleges the above allegations in full.

128.   Ms. Perkins was detained in the St. Tammany Parish Jail overnight without probable cause for her arrest. Her detention was therefore unlawful.

129.   Defendants caused this unlawful detention by arresting her without probable cause.

130.   As a direct and proximate result of her unlawful detention, Ms. Perkins suffered actual physical, emotional, and economic harm.

## COUNT TEN
### Malicious prosecution (state law)
(Teliah C. Perkins against both Defendants)

131.   Ms. Perkins incorporates and re-alleges the above allegations in full.

132.   Ms. Perkins was charged with the following offenses arising out of her May 5, 2020 arrest: resisting a police officer with force or violence (a felony), battery of a police officer (a misdemeanor), driving a motorcycle with no proof of insurance (a misdemeanor), and driving a motorcycle with no safety helmet (a misdemeanor).

133.   Each of these charges was directly and maliciously caused by Defendants. Defendants' malice is shown by the lack of probable cause for the charges, all of which are baseless.

134.   Defendants furthered the prosecution of Ms. Perkins by submitting false and misleading statements. For example, the Complaint Arrest Affidavit sworn to by Deputy Hart falsely stated that Defendants witnessed Ms. Perkins operate her motorcycle without a helmet that Defendants were forced to arrest Ms. Perkins to prevent her from fleeing before Defendants could issue her a traffic citation.

135.    The only charge that has not been dropped is for resisting a police officer with force or violence.

136.    As a direct and proximate result of this malicious prosecution, Ms. Perkins suffered actual physical, emotional, and economic harm.

## COUNT ELEVEN
### Intentional infliction of emotional distress (state law)
(Teliah C. Perkins against both Defendants)

137.    Ms. Perkins incorporates and re-alleges the above allegations in full.

138.    Defendants' conduct, including the excessive force used on Ms. Perkins during her arrest and the decision to charge her with two misdemeanors and two felonies despite the lack of probable cause, was extreme and outrageous.

139.    Defendants intended that their conduct would cause Ms. Perkins severe emotional distress, or knew that their conduct was certain or substantially certain to cause Ms. Perkins severe emotional distress.

140.    Ms. Perkins has been diagnosed with depression and anxiety as a result of Defendants' conduct, and has been unable to sleep normally.

141.    As a direct and proximate result of Defendants' conduct, Ms. Perkins suffered actual emotional and economic harm.

## COUNT TWELVE
### Negligent infliction of emotional distress (state law)
(Teliah C. Perkins against both Defendants)

142.    Ms. Perkins incorporates and re-alleges the above allegations in full.

143.    Each Defendant owed a duty to Ms. Perkins to stop the other officer from using an excessive amount of force on Ms. Perkins in his presence or otherwise within his knowledge.

Additionally, Defendants were duty bound to choose a course of action which was reasonable under the circumstances.

144.    Defendants breached those duties.

145.    Defendants' breach of their duty was a cause-in-fact of Ms. Perkins' severe emotional distress. Ms. Perkins has been diagnosed with depression and anxiety as a result of Defendants' conduct, and has been unable to sleep normally.

146.    As a direct and proximate result of Defendants' conduct, Ms. Perkins suffered actual emotional and economic harm.

## COUNT THIRTEEN
### Assault (state law)
### (Teliah C. Perkins, as parent and natural guardian of D.J., against Defendant Moring)

147.    Ms. Perkins incorporates and re-alleges the above allegations in full.

148.    Deputy Moring threatened D.J. with violence, specifically by pointing his Taser directly at D.J. and verbally threatening to use it, in response to D.J. making a video recording of the deputies' assault on his mother.

149.    Deputy Moring had the ability to carry out his threats. D.J. was therefore placed in reasonable apprehension of receiving injury.

150.    An ordinary, prudent, and reasonable person in the same position as Deputy Moring would not have made these threats of violence against D.J.

151.    D.J. has been diagnosed with post-traumatic stress disorder and has been in treatment with a therapist since his encounter with Deputy Moring. This medical care has been necessary for D.J. to manage the emotional distress caused by Deputy Moring.

152.    As a direct and proximate result of this assault, D.J. suffered actual emotional and economic harm.

**COUNT FOURTEEN**
**Intentional infliction of emotional distress (state law)**
(Teliah C. Perkins, as parent and natural guardian of D.J., against Defendant Moring)

153.    Ms. Perkins incorporates and re-alleges the above allegations in full.

154.    Deputy Moring's conduct, including abusing D.J.'s mother, shoving D.J., and threatening D.J. with the use of his Taser, was extreme and outrageous.

155.    Deputy Moring intended that his conduct would cause D.J. severe emotional distress, or knew that his conduct was certain or substantially certain to cause D.J. severe emotional distress.

156.    D.J. has been diagnosed with post-traumatic stress disorder and has been in treatment with a therapist since his encounter with Deputy Moring. This medical care has been necessary for D.J. to manage the emotional distress caused by Deputy Moring.

157.    As a direct and proximate result of Deputy Moring's conduct, D.J. suffered actual emotional and economic harm.

**COUNT FIFTEEN**
**Negligent infliction of emotional distress (state law)**
(Teliah C. Perkins, as parent and natural guardian of D.J., against both Defendants)

158.    Ms. Perkins incorporates and re-alleges the above allegations in full.

159.    Deputy Hart owed a duty to D.J. to stop Deputy Moring from threatening to shoot D.J. with his Taser.  Additionally, both Defendants were duty bound to choose a course of action which was reasonable under the circumstances.

160.    Defendants breached those duties.

161.    Defendants' breach of their duty was a cause-in-fact of D.J.'s severe emotional distress. D.J. has been diagnosed with post-traumatic stress disorder and has been in treatment with a therapist since his encounter with Defendants.

162.    As a direct and proximate result of Defendants' conduct, D.J. suffered actual emotional and economic harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against each of the Defendants, and award the following relief:

A.  Declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the United States Constitution;

B.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.  Compensation for economic losses on all claims allowed by law in an amount to be proven at trial;

D.  Punitive damages on all claims allowed by law in an amount to be determined at trial;

E.  Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

F.  Pre- and post-judgment interest at the lawful rate; and

G.  Any other relief that the Court deems just and proper.


Dated: May 3, 2021                              Respectfully submitted,
                                                /s/ Stephanie Willis                    _
                                                Stephanie Willis
                                                swillis@laaclu.org
                                                LA. Bar No. 31834
                                                Nora Ahmed (*pro hac vice*
                                                *application forthcoming*)
                                                Nahmed@laaclu.org
                                                ACLU FOUNDATION OF LOUISIANA

1340 Poydras St., Suite 2160
New Orleans, Louisiana 70112
Telephone: (504) 522-0628


Keith Y. Cohan *(pro hac vice forthcoming)*
Ryan M. Goldstein *(pro hac vice forthcoming)*
Sean D. Johnson *(pro hac vice forthcoming)*
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel.:  512.647.6100
kcohan@reidcollins.com
rgoldstein@reidcollins.com
sjohnson@reidcollins.com


Vincenzo A. Novelli *(pro hac vice forthcoming)*
REID COLLINS & TSAI LLP
810 Seventh Avenue, Suite 410
New York, NY 10019
Tel.:  212.344.5200
vnovelli@reidcollins.com


*Counsel to Plaintiff Teliah C. Perkins*

**JURY DEMAND**

Ms. Perkins hereby requests a jury trial in this matter.


Dated: May 3, 2021                          Respectfully submitted,

                                            /s/ Stephanie Willis                    _____
                                            Stephanie Willis
                                            swillis@laaclu.org
                                            LA. Bar No. 31834
                                            Nora Ahmed (*pro hac vice
                                            application forthcoming*)
                                            Nahmed@laaclu.org
                                            ACLU FOUNDATION OF LOUISIANA
                                            1340 Poydras St., Suite 2160
                                            New Orleans, Louisiana 70112
                                            Telephone: (504) 522-0628


                                            Keith Y. Cohan (*pro hac vice forthcoming*)
                                            Ryan M. Goldstein (*pro hac vice
                                            forthcoming*)
                                            Sean D. Johnson (*pro hac vice forthcoming*)
                                            REID COLLINS & TSAI LLP
                                            1301 S. Capital of Texas Hwy
                                            Building C, Suite 300
                                            Austin, Texas 78746
                                            Tel.:  512.647.6100
                                            kcohan@reidcollins.com
                                            rgoldstein@reidcollins.com
                                            sjohnson@reidcollins.com


                                            Vincenzo A. Novelli (*pro hac vice
                                            forthcoming*)
                                            REID COLLINS & TSAI LLP
                                            810 Seventh Avenue, Suite 410
                                            New York, NY 10019
                                            Tel.:  212.344.5200
                                            vnovelli@reidcollins.com


                                            *Counsel to Plaintiff Teliah C. Perkins*