## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TELIAH C. PERKINS, INDIVIDUALLY** | * | **CIVIL ACTION NO. 21-879** |
| **AND AS PARENT AND NATURAL** | * | |
| **GUARDIAN OF D.J., A MINOR** | * | |
| **Plaintiff** | * | **JUDGE VITTER** |
| | * | |
| **VERSUS** | * | |
| | * | **MAG. JUDGE CURRAULT** |
| **KYLE HART, AND RYAN MORING** | * | |
| **Defendants** | * | |
| | * | **JURY DEMAND** |

**************************************************************************

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

**NOW COMES**, through undersigned counsel, Defendants, St. Tammany Parish Sheriff's Deputies Kyle Hart and Ryan Moring, who respectfully submit this memorandum in support of their motion for summary judgment pursuant to Rule 56:

### I.  ALLEGATIONS OF FACT

On Tuesday May 5, 2020, at approximately 3:10 p.m., Deputies Ryan Moring and Kyle Hart ("Defendants") were conducting a routine motorcycle patrol in Slidell, Louisiana, when Deputy Moring received a dispatch to Jay Street in Slidell, in reference to a female recklessly operating a motorcycle in the vicinity.[1]

As Defendants turned west on Jay Street from Thompson Road, they began to patrol the area looking for a female on a motorcycle. While passing the residence located at 2018 Jay Street, they

---

[1] The actual dispatch to Deputies Hart and Moring is memorialized in the St. Tammany Parish Sheriff's Office Event History Details Report, a copy of which is attached as Exhibit "A."  Defendants would note to this Honorable Court that their dispatch referred only to a female "speeding" and "running stop signs" who lives at 2018 Jay Street.  There was no mention of the individual's race.

observed a female, later identified as Teliah Perkins, standing next to a motorcycle in front of the residence. After passing Plaintiff, they continued west to Pheasant Street.

Once at the intersection of Pheasant Street and Jay Street, Deputy Moring contacted central dispatch to confirm the address of the complaint, which dispatch confirmed as 2018 Jay Street. After turning around, Defendants observed Plaintiff operating the motorcycle in the roadway without a helmet. As Defendants approached, Plaintiff began to back her motorcycle into the driveway with the motor still running.

Defendants then dismounted their patrol motorcycles and engaged Plaintiff who was also dismounting her motorcycle. The encounter with Plaintiff began as a custodial stop commenced by Deputy Moring. It was his intention to issue a simple citation. Deputy Hart was assisting.  Before Defendants could explain the reason for their presence at her residence, Plaintiff immediately became hostile, agitated, and began yelling, "Y'all just here cause my neighbors are racists and they always be calling y'all on me." Deputy Hart explained to Plaintiff that they were there in response to a complaint of a female operating a motorcycle in a reckless manner.

While Defendants tried to have a conversation with Plaintiff, she ignored them and began calling people on her cell phone, telling those whom she called to come to her residence because the police were there again. During this time, Deputy Moring requested her driver's license, proof of insurance, and registration for the motorcycle for the lawful "stop" of operating a motorcycle without a helmet.

After handing her driver's license and a piece of paper to Deputy Moring, Plaintiff turned, walked away, and went inside the residence. Deputy Moring could hear Plaintiff yelling at someone inside the house to come outside and video the interaction. Shortly after Plaintiff returned outside,

two males exited the residence and began to apparently record the interaction between Plaintiff and the Defendants.

Plaintiff then approached the Defendants who once again requested the proper paperwork for the motorcycle and explained to her that she could not operate a motorcycle on the roadway without a helmet. Plaintiff replied, "I'm waiting on my insurance company to e-mail me a copy to my phone and my helmet is in the house." At that time, she yelled to one of the males to bring her helmet to her, which he did, and set it on the ground next to the motorcycle.

Instead of contacting her insurance company, Plaintiff began to call various other individuals, telling them to come to her assistance because the police were present. During this time, Plaintiff became more irate, continuously verbally attacking Deputy Hart. Deputy Hart tried to deescalate the situation, but Plaintiff only became more verbally abusive.

While Deputy Hart was trying to speak with Plaintiff, an unidentified female approached the scene and stood between Deputy Moring and the Plaintiff.  Deputy Moring advised the female not to approach, but she ignored his commands.  Deputy Moring then advised this individual that she was interfering with a police investigation and if she did not move away, she would be arrested. Deputy Moring had to repeat this command several times until, finally, the female backed away from the scene.

While backing up, the female produced a cell phone and she appeared to be recording the interaction between the Plaintiff and Defendants. While Deputy Moring was speaking with that female, another female came outside from the residence next door to observe the interaction from her front yard.  After the first female moved away from the Defendants, Deputy Moring again asked Plaintiff to produce proof of insurance for the motorcycle. Several minutes passed, with Plaintiff continuing to become more agitated. Plaintiff was unable to produce proof of insurance and the

situation became more hostile. Defendants requested central dispatch to contact the next wrecker off the wrecker rotation log, which was A-1 Wrecker, in order to have the motorcycle impounded pursuant to LSA – R.S. 32:863.1.

Deputy Hart returned to his motorcycle to retrieve his clipboard which contained a wrecker sheet and citation forms. After retrieving the forms and clipboard, he relocated to the rear of Deputy Moring's motorcycle to begin filling out the citation. As he began to fill out the citation, he noticed that two males were beginning to approach the Defendants. Deputy Hart then requested that the males stay on the porch if they wished to record the interaction. At that time, both Defendants observed Plaintiff walking towards the front door of her residence, at which point she said something to the effect of "fuck y'all, I'm going inside."

At this point, the Plaintiff was still subject to a custodial stop and thus she was not free to leave. Further, and for officer safety reasons, Deputy Moring requested that Plaintiff remain on scene and not enter her residence. This request was made due to Plaintiff's highly agitated state and the unknown variable of Plaintiff potentially entering the residence to retrieve a weapon.

At no time did Plaintiff explain that her intent to enter the residence was to produce information on the motorcycle. Plaintiff was given verbal commands by both Defendants to remain on scene. Plaintiff ignored these lawful commands and began to walk away from the scene while Deputy Hart was in the process of issuing her citations. As Plaintiff was now attempting to flee a lawful custodial stop, Deputy Hart informed the Plaintiff that she was under arrest and moved towards her in order to place her in handcuffs.

While attempting to place the Plaintiff's hands behind her back, Plaintiff pulled away from Deputy Hart, and he again tried to place her in handcuffs while she was still resisting. At that time, Deputy Moring approached and tried to assist in placing her in custody. As Plaintiff was continuing

to resist this lawful arrest, and continued to ignore the deputies' commands to stop resisting, Deputy Hart decided to place Plaintiff on the ground in order to overcome her resistance and to place her in handcuffs.

While on the ground, Plaintiff continued to resist arrest by thrashing her body from side to side. While Deputies Hart and Moring were attempting to place her into custody, the males began to approach the deputies again. They continued to struggle with Plaintiff, attempting to place her on her stomach so that they could get her hands behind her back and then place her in handcuffs.

After getting Plaintiff on her stomach, Deputy Hart was finally able to place handcuffs on Plaintiff. After Plaintiff was placed in handcuffs, Deputy Hart doubled locked the handcuffs for the Plaintiff's own safety so they would not close any further and restrict her circulation. While doing this, the two males approached again, at which point Deputy Moring stood up and ordered the men to back up and to not interfere with this lawful arrest of the Plaintiff.

Deputy Hart then tried to stand up, but as he did so, Plaintiff flipped over onto her back and kicked Deputy Hart in the legs, causing him to lose his balance and fall on top of her. Plaintiff continued to thrash back and forth while Deputy Hart tried to stand. After regaining his balance, he was able to stand and help Plaintiff to her feet. Unsure of the intentions of the two males, Deputy Hart placed Plaintiff in a handcuffed escort position and moved her away from the males and towards the street.

While Plaintiff was waiting (handcuffed) near the street, Deputy Moring noticed the two males beginning to approach them again. Deputy Moring then raised his open hand in a "stop" motion and informed the two males, for the second time, that they needed to film from the porch of the residence. At that point, one of the males slapped Deputy Moring's hand away and continued to walk towards the scene of the arrest. After refusing to comply with Deputy Moring's verbal

commands and slapping his hand away, Deputy Moring drew his service taser, as a display of force, to prevent the two males from approaching any further. The two males eventually complied and returned to the porch of the residence and continued to apparently film the arrest of the Plaintiff.

After a brief time, Deputy Benjamin Rushing arrived, and Plaintiff was placed in the rear seat of Deputy Rushing's patrol unit. Once Ms. Perkins was placed in the patrol unit, Deputy Hart advised Plaintiff of her Miranda rights, which she verbally stated she understood but did not sign due to being placed in handcuffs.

While Deputy Hart was trying to complete paperwork relative to the incident, Plaintiff continued with her abrasive language and displayed a violent nature. She was heard screaming and observed kicking the doors of Deputy Rushing's unit. At that time, Plaintiff was warned not to damage the unit and she was then transported to the St. Tammany Parish Jail for booking.

Plaintiff was arrested for the following: L.R.S. 14:108.2 (Resisting a police officer with force or violence); L.R.S. 14:34.2 (Battery of a police officer); L.R.S. 32:863.1 (No proof of insurance); and L.R.S. 32:190 (No safety helmet).[2]

On July 26, 2021, the District Attorney's Office for the 22nd Judicial District Court for the Parish of St. Tammany amended Ms. Perkins' bill of information to "R.S. 14:108 Resisting an Officer."[3] Following the amendment to the bill of information, the trial of Teliah Perkins for violation of LSA – R.S. 14:108 proceeded before the Honorable Vincent Lobello. After the conclusion of the evidence, Ms. Perkins was found guilty as charged.[4]

---

[2] See attached Affidavits of Deputies Ryan Moring and Kyle Hart, attached hereto as Exhibits "B" and "C," respectively.

[3] A certified and true copy of the bill of information is attached to this motion as Exhibit "D."

[4] A certified and true copy of the minutes from this July 26, 2021, trial is attached to this motion as Exhibit "E."

Relevant to this motion, Plaintiff alleges that she was "violently arrested in her own driveway" by the Defendants.[5] Thereafter, Plaintiff alleges that her "arrest arose from two alleged traffic offenses that Ms. Perkins did not commit and, in any event, could have resolved through the mere issuance of a citation."[6]

Plaintiff also alleges that "Ms. Perkins had not broken any laws when Defendants targeted her. Nor did Ms. Perkins present any threat to the officers or try to flee at any point."[7] Plaintiff goes on to describe a series of events that suggest the Defendants drove by her home and decided to simply target her because of her race. Plaintiff also claims, on behalf of her minor son, that by displaying his taser and ordering the minor to stay back, Deputy Moring violated the minor's civil rights.[8] Plaintiff also alleges various state law claims against both deputies arising out of the same events, e.g., false arrest, battery, false imprisonment, malicious prosecution, intentional infliction of emotional distress and negligent infliction of emotional distress.[9]

Notwithstanding these contentions raised by the Plaintiff, individually, and on behalf of her minor son, all of her claims must be dismissed for the following reasons.

## II.  LAW AND ARGUMENT

### A.  Standard for Granting Summary Judgment

Federal Rule of Civil Procedure 56 governs the motion for summary judgment in federal court. The rule mandates that a granting of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10]

---

[5] Rec.Doc. 1, P.1
[6] Rec.Doc. 1, P.1
[7] Rec.Doc. 1, P.2
[8] Rec.Doc. 1, P.20
[9] Rec.Doc. 1, Pgs. 22 - 28
[10] Fed. R. Civ. P. 56(a); *See also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Poole v City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

As a general rule, the moving party has the initial burden to establish that there are no issues of material fact and that the mover is entitled to judgment in its favor as a matter of law.[11] Only disputed facts that might affect the outcome of the lawsuit under governing law will preclude summary judgment.[12] If the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, then no genuine issue of material fact exists.[13] A fact is material only when it might affect the outcome of the suit under the governing law.[14] In other words, the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion.

In practice, the Fifth Circuit requires the nonmoving party to tender what it has called "significant" and "probative" evidence to rebut a properly-supported summary judgment motion.[15] This burden placed on the non-mover to offer countervailing evidence is a heavy one. In fact, one court has expressed, in rather blunt terms, that summary judgment is the stage of the proceedings for parties "to put up or shut up."[16]

---

[11] *Breen v. Texas A&M University*, 485 F.3d 325, 331 (5th Cir. 2007); *Rivera v. Houston Independent School District*, 349 F.3d 244, 246-47 (5th Cir. 2003).

[12] *Condiff v. R.D. Werner Company, Inc.*, 2003 WL 21977167, *1 (E.D. La. 2003).

[13] *New Orleans Assets v. Woodward*, 278 F. Supp. 2d 776, 780 (E.D. La 2003).

[14] *Fordoche, Inc. v. Texaco, Inc.,* 463 F.3d 388, 392 (5th Cir. 2006); *see also Thomas v. Barton Lodge II, Ltd.,* 174 F.3d 636, 644 (5th Cir. 1999) "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

[15] *Whitt v. Stephens County,* 529 F.3d 278, 283 n. 8 (5th Cir. 2008).

[16] *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2nd Cir. 2000*); see also, Ankum v. White Consolidated Industries*, 1992 WL 236961, *5 (E.D. La. 1992) (Sear, J.) ("The party moving for summary judgment need not negate an element necessary for the other's case; he simply can ask the other party to 'put up for shut up.' The opposing party then must go beyond the pleadings and offer proof of his claim.").

### B.  **Plaintiff's Claim of Unlawful Seizure and Excessive Force**

#### a.  **Plaintiff's Unlawful Seizure Claims**

An officer seizes a person when he, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."[17]  Defendants concede that when Ms. Perkins was arrested, and she was therefore "seized," however, since her arrest resulted in a conviction, for the reasons more fully set forth below, her claims of an "unlawful seizure" must be denied.

#### b.  **Necessary Elements for an Excessive Force Claim**

To prevail on an excessive force claim, the plaintiff must show all of the following: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.[18] Inquiries regarding whether a use of force was "clearly excessive" or "clearly unreasonable" are often intertwined, and courts determine those questions together.[19]

Any claim for excessive force is necessarily fact-intensive, and whether the force used is "excessive" or "unreasonable" depends on "the facts and circumstances of each particular case."[20] In determining if force used was excessive, a court should consider the totality of the circumstances.[21] The "reasonableness" of the use of force administered by an officer must be judged from the perspective of a reasonable officer who is present on the scene, and not with the 20/20 vision of hindsight.[22] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are

---

[17] *Flores v. City of Palacios,* 381 F.3d 391, 396 (5th Cir. 2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968))

[18] *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

[19] *Id.*at 728 (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)).

[20] *Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).

[21] *Id.* at 728-29.

[22] *Id.* (quoting *Graham,* 490 U.S. at 396).

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[23]

As discussed previously, on May 5, 2020, at 3:09 p.m., Defendants were dispatched to 2018 Jay Street in Slidell, Louisiana, in response to reports of a "female on a dirt bike…speeding up and down [road] running stop signs."[24] As reflected in the Event History Details report, at the time that they were dispatched, Defendants had not been provided any information on the race of the individual who was allegedly operating the motorcycle recklessly – only that the operator was a female and the address was that of the Plaintiff.  It was only after the initiation of the traffic stop that Defendants first learned of Plaintiff's race. Again, as noted on the Event History Details Report, Plaintiff's race is first reflected only after Defendants obtained her identification and initiated an NCIC search through dispatch at 3:24 p.m.  Soon thereafter, as Defendants were in the process of issuing the Plaintiff citations for violations of LSA – R.S. 32:863.1 (No proof of insurance) and LSA – R.S. 32:190 (No safety helmet), Plaintiff made the unilateral and unlawful decision to terminate the traffic stop and go back into her home.  She then began to walk back up her driveway in the direction of her home.

It was at this point that Deputy Hart informed the Plaintiff that she was under arrest, and he began to follow her up the driveway in order to place her in custody. As soon as Deputy Hart caught up to the Plaintiff and attempted to place her in handcuffs, she immediately began to actively resist being arrested. Defendants then utilized that level of lawful force necessary to overcome her resistance, and the Plaintiff was then placed in handcuffs and transported to the St. Tammany Parish Jail.

---

[23] *Id.* (quoting *Graham,* 490 U.S. at 396-97).
[24] See attached STPSO Event History Details attached as Exhibit "A"

The use of force by the Defendants was ultimately reviewed by the Internal Affairs Division of the St. Tammany Parish Sheriff's Office which found that the level of force was appropriate.[25]  The use of force by the Defendants in this case was also reviewed by Defendant's expert, John Ryan, who also concluded the Defendants' actions were appropriate.[26]  Finally, the use of force portion of the Plaintiff's encounter with the Defendants was captured on video, which was presumably filmed by the Plaintiff's son, and this video was ultimately obtained by the Defendants. There are two copies of the video of this encounter, one of which has been clearly edited by someone other than the Defendants.[27]

A review of the ostensibly unedited video demonstrates that the level of force utilized by the Defendants was neither "clearly excessive," nor was it "clearly unreasonable."[28] Accordingly, Plaintiff's claims should be dismissed on this basis alone.

### c.   Plaintiff, Teliah Perkins' Claims are Barred by *Heck v. Humphrey*

In addition to the fact that the evidence in this case clearly shows a lack of excessive force, Plaintiff cannot establish a claim for excessive force related to her encounter with law enforcement on the afternoon of May 5, 2020, due to the fact that Ms. Perkins' claims are barred by application of the doctrine of *Heck v. Humphrey.*[29]

Under *Heck, supra,* a plaintiff seeking to recover for alleged constitutional violations with respect to conviction, imprisonment, or other harms caused "whose unlawfulness would render a conviction or sentence invalid must prove that the conviction or sentence has been reversed on

---

[25] The Internal Affairs Report from the St. Tammany Parish Sheriff's Office is attached as Exhibit "F"
[26] A copy of John Ryan report is attached as Exhibit "G," *in globo,* along with Schedules "A," "B" and "C" to his report.
[27] The copy of the ostensibly unedited video is attached as Exhibit "H," and copy of the clearly edited video is attached as "I."
[28] *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).
[29] *Heck v. Humphrey,* 512 U.S. 477 (1994)

direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck* at 486-87 (1994). The "core of *Heck* is a proscription against allowing a civil tort suit to cast doubt on a criminal conviction."[30]  If the civil claim would contradict the conviction or sentence and the plaintiff has failed to satisfy the *Heck* requirements, the Fifth Circuit directs lower courts to dismiss the party's claims "with prejudice to their being asserted again until the Heck conditions are met."[31]

Prior to the filing of the instant action, the District Attorney for the 22nd Judicial District Court instituted a criminal proceeding against Plaintiff for violation of La. R.S. 14:108.2 (Resisting a police officer with force or violence) related to the encounter on May 20, 2020 under criminal docket number 2842-F-2020.[32]

On July 26, 2021, Plaintiff appeared in open court represented by counsel, Claiborne Brown. At this July 26, 2021, hearing, the State of Louisiana amended the bill of information to Resisting an Officer, and following a bench trial before the Honorable Vincent J. Lobello, Plaintiff was found "Guilty of Resisting a Police Officer."[33]

The Fifth Circuit has recognized that "certain convictions will prevent a plaintiff from bringing an excessive force claim."[34]  For example, "a Louisiana conviction for battery of an officer – a crime for which justification is an affirmative defense – prevents the plaintiff from suing for excessive force in connection with the incident."[35] Therefore, "the Heck determination of whether such claims are barred is analytical and fact-intensive, requiring us to focus on

---

[30] *Bush v. Strain*, 2004 U.S. Dist. LEXIS 9358, *11 (E.D. La. 2004)
[31] *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 657 (5th Cir. 2007).
[32] A certified and true copy of the bill of information is attached to this motion as Exhibit "D."
[33] A certified and true copy of the minutes from this July 26, 2021 is attached to this motion as Exhibit "E."
[34] *See Arnold v. Town of Slaughter*, 100 Fed. Appx. 321, 323 (5th Cir. 2004)
[35] *Arnold v. Town of Slaughter*, 100 Fed. Appx. 321, 323 (5th Cir. 2004), *citing Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996))

whether success on the excessive force claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction."[36]

In *Arnold*, the plaintiff was convicted of resisting an officer, which is a violation of LSA – R.S. § 14:108.[37] Although the statute "provides many ways of committing the offense, the judge in the criminal trial found that Arnold resisted an officer by being hostile and threatening and by initiating confrontation."[38] Despite the judge's determination that the plaintiff was hostile, belligerent, and initiated a physical confrontation with the police, the plaintiff brought a lawsuit for the use of excessive force and alleged that he did nothing wrong and was "viciously attacked for no reason."[39] Considering the plaintiff's conviction of resisting an officer, the District Court determined that his excessive force and false arrest claims were improper challenges to his state-court conviction.[40] On appeal, the Fifth Circuit affirmed and noted that the suit "squarely challenges the factual determination that underlies his conviction for resisting an officer. If Arnold prevails, he will have established that his criminal conviction lacks any basis. Therefore, this lawsuit challenges the validity of Arnold's conviction and is barred by Heck."[41]

In *Deleon, supra,* the plaintiff attempted to plead a claim of excessive force; however, the plaintiff had previously confessed and plead guilty to a charge of aggravated assault of a police officer. Even in spite of this guilty plea, Deleon's complaint maintained that "he did nothing wrong, that he simply defended himself, against mace, baton, and then gun, as the violence escalated."[42] On appeal, the Fifth Circuit found that there was "no alternative pleading or theory

---

[36] *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008)
[37] *Arnold*, supra, 100 Fed. Appx. at 323
[38] *Id.*
[39] *Id.*
[40] *Id. at 322*.
[41] *Id*. at 324-25.
[42] *DeLeon, supra,* 488 F.3d at 656.

of recovery that would allow this claim for excessive force to proceed without interfering with the Texas proceeding against Deleon for aggravated assault on an officer."[43] Therefore, the Court affirmed the District Court's decision applying *Heck* to Deleon's claims.

Here, just as in *Arnold* and *Deleon*, Teliah Perkins has alleged a cause of action for excessive force under the Fourth Amendment related to the encounter on May 20, 2020. Ms. Perkins has also attempted to plead claims of violations of the First Amendment under 42 U.S.C. 1983, along with various state law causes of action for both intentional and negligence acts; however, because the core facts of these additional claims all mirror the claim for excessive force, any application of *Heck* necessarily will apply to all claims.[44]

LSA – R.S. § 14:108 requires the State to prove a defendant's "intentional interference with, opposition or resistance to an individual acting in his official capacity and authorized by law to make a lawful arrest when the offender knows or has reason to know that that the [officer] is acting in his official capacity. LSA – R.S. § 14:108(A). Therefore, Ms. Perkins' guilty adjudication to the crime of resisting an officer contains an implicit legal conclusion: the deputies had probable cause to effect this arrest.[45]

Ms. Perkins was found guilty of the crime of resisting an officer related to the events at issue; therefore, just as in *Arnold*, Ms. Perkins' suit "squarely challenges the factual determination that underlies [her] conviction for resisting an officer. If [she] prevails, he will have established that his criminal conviction lacks any basis. Therefore, this lawsuit challenges the validity of

---

[43] *Id.*
[44] *See Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000); *Foster v. City of Addis*, 2014 U.S. Dist. LEXIS 156426 (M.D. La. 2014) (holding that Heck barred a plaintiff's assault and battery claims because they were inconsistent with her conviction for resisting an officer).
[45] *See Johnson v. Thibodaux City,* 887 F.3d 726, 733 (5th Cir. 2018).

[Perkins'] conviction and is barred by Heck."[46]  Accordingly, all claims by Ms. Perkins against Defendants, Moring and Hart, should be dismissed with prejudice.

### C.  <u>All Claims of the Minor, D.J., Must Also Be Dismissed</u>

### a.  D.J.'s claims for Excessive Force

As noted above, the Fourth Amendment's protection against unreasonable search and seizures requires that officers refrain from using excessive force when effectuating an arrest.[47] The Supreme Court has described this inquiry for assessing the use of excessive force as a broadly based, objective inquiry. As noted above, the Court in *Graham v. Connor* held that the paramount consideration is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.[48] Further, an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.[49]

In the Fifth Circuit "[i]t is clearly established law . . . that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable."[50] The Fourth Amendment's reasonableness standard "requires a careful balancing of the 'nature and quality of the intrusion

---

[46] *Id.* at 324-25*; see also Price v. City of Rayne*, 2016 U.S. Dist. LEXIS 27909 (W.D.La. Mar. 3, 2016) ("[W]hen a plaintiff contends that he did not resist arrest, that is, that he committed no offense and was instead unjustly victimized, the Fifth Circuit has uniformly concluded that his excessive force claim is Heck barred because the excessive force claim necessarily attacks the validity of the conviction for resisting arrest.")
[47] *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).
[48] *Id.* at 397
[49] *Id.*
[50] *United States v. Brugman*, 364 F.3d 613, 616 (5th Cir. 2004) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 487 (5th Cir.2001)).

on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."[51]

In this case, the Plaintiff's minor son, D.J., alleges that Defendant, Deputy Ryan Moring, used excessive force, in violation of D.J.'s rights under the Fourth and Fourteenth Amendments, by displaying and threatening to deploy his departmental taser. The Supreme Court has noted "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[52] The officer's actions must be "objectively reasonable" to satisfy the Fourth Amendment.[53]

In this case, Deputy Moring was assisting Deputy Hart in effectuating the arrest of Plaintiff, Teliah C. Perkins, who was actively resisting arrest after an extended period. Once the struggle between Deputy Hart and the Plaintiff transitioned to the ground, Deputy Moring noticed two males beginning to approach the scene, again, after already being told to film the incident from the porch. Deputy Moring raised the palm of his hand to signal to the two males to stop approaching the scene of an active arrest. D.J. then slapped Deputy Moring's hand away and continued to approach.[54] Deputy Moring was then left no choice but to actively show a display of force by displaying his taser and repeating his commands to stay back.  Deputy Moring did not actually fire his taser at any point during his encounter with the Plaintiff and her son.

Deputy Moring's actions were objectively reasonable considering: (1) he warned the minor, D.J., on more than one occasion to backup; (2) the minor, D.J., slapped Deputy Moring's hand away; (3) Deputy Moring only displayed, he did not fire his taser at any point during the

---

[51] *Graham,* 490 U.S. 386, 396 (citing *Tennessee v. Garner,* 471 U.S. 1, 8(1985)).
[52] *Id.*
[53] *Id.* at 397.
[54] Recorded Administrative Investigation by Capt. Michael Ripoll, Jr. June 25, 2020, 9:05 – 11:35

encounter with the minor, D.J., and (3) Deputy Moring's objective goal was to secure the scene and protect his fellow deputy from any potential threats.

This conclusion is supported by the jurisprudence.  For example, in *Bellote v. Edwards*, the Fourth Circuit analyzed excessive force claims brought by family members of a man whose house was searched incident to a warrant.[55] The Court, relying on its earlier decision in *Taft v. Vines*[56], held that "[i]nvestigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop.[57] The court concluded that "although approaching a suspect with drawn weapons is an extraordinary measure, such a police procedure has been justified in this circuit as a reasonable means of neutralizing potential danger to police and innocent bystanders."[58] Finding against the Plaintiffs, the court reasoned that the police had good reason to fear for their safety because they were walking into an unsecured room and that no excessive force was used when pointing their weapons.

Here, Deputy Moring's actions are well within the "objectively reasonable" standard set forth in *Bellote* and *Vines.* Not only did Deputy Moring not display "deadly force," he, unlike the officers in *Bellote*, did not initially resort to any display of force until he was compelled to by the D.J.'s actions.  Deputy Moring's momentary display of a non-lethal force was neither "clearly excessive," nor was it "clearly unreasonable."[59]

Looking to other circuits, the district courts of the Second Circuit still maintain that "the vast majority of cases within the Second Circuit hold that merely drawing weapons when

---

[55] *Bellottte v. Edwards*, 629 F.3d 415, 424 (4th Cir. 2011).
[56] *Taft v. Vines,* 83 F.3d 681 (4th Cir. 1996).
[57] *See* Bellote, 629 F.3d at 425.
[58] *Id.*
[59] *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

effectuating an arrest does not constitute excessive force as a matter of law."[60]  Additionally, the Eleventh Circuit in *Courson v. McMillian* held that officers are allowed display their, "weapons when approaching and holding individuals for an investigatory stop…when reasonably necessary for protecting an officer or maintaining order."[61] Moreover, trial courts within the Eleventh Circuit have held that line of reasoning in rejecting claims of excessive force based only on the pointing of guns while being detained.[62]

Considering that Plaintiff, Teliah C. Perkins, was still actively resisting arrest at the time of the display of the taser, Deputy Moring's actions in displaying a potential use of non-lethal force cannot be said to be either "clearly excessive," or "clearly unreasonable," and thus these claims must also be dismissed.[63]

### b.  D.J.'s Claims for Bystander Recovery

Plaintiff, Ms. Perkins, on behalf of her minor son, D.J., also asserts claims against Deputy Moring for both the intentional and negligent infliction of emotional distress under La. Civ. Code

---

[60] *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 U.S. Dist. LEXIS 133814, at *43 (S.D.N.Y. Sept. 30, 2015) (quoting *Cabral v. City of New York*, No. 12 Civ. 4659, 2014 U.S. Dist. LEXIS 131342 at *28 (S.D.N.Y. Sept. 17, 2014) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law.")); *Mittelman v. County of Rockland*, No. 07-CV-6382, 2013 U.S. Dist. LEXIS 46382, at *37 (S.D.N.Y. Mar. 26, 2013) ("Likewise insufficient is [the][p]laintiff's assertion that the offic¬ers pointed guns at him. A threat of force does not constitute excessive force."); *Askins v. City of New York*, No. 09 Civ. 10315, 2011 U.S. Dist. LEXIS 40435, at *10 (S.D.N.Y. Mar. 25, 2011) ("While the Second Circuit has noted that 'circuit law could very well support a claim that a gunpoint death threat issued to a restrained and unresisting arrestee repre¬sents excessive force,' [the] plaintiff's assertion that a gun was pointed at his head cannot be the basis of a claim for excessive force." (quoting *Mills v. Fenger*, 216 F. App'x 7, 9 (2d Cir. 2006) (alterations omitted)); *Aderonmu v. Heavey*, No. 00 Civ. 9232, 2001 U.S. Dist. LEXIS 640, at *10 (S.D.N.Y. Jan. 26, 2001) (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct").
[61] *Courson v. McMillian*, 939 F.2d 1479, 1494-95 (11th Cir. 1991).
[62] *See*, e.g., *Raby v. Baptist Med. Ctr.*, 21 F. Supp. 2d 1341, 1350 (M.D. Ala. 1998) (holding that the police officer's actions of sticking his pistol through the window of the plaintiff's car and pointing it at the plaintiff's head was not excessive force and stating that "where the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming . . . excessive force" (citations omitted)); see also *Roberts v. City of Hapeville*, No. 1:05-CV-1614-WSD, 2007 U.S. Dist. LEXIS 10508, at *20 n.12 (N.D. Ga. Feb. 15, 2007) (holding that the plaintiff's allegation that an officer pointed a gun at his neck during the course of an arrest was insufficient to state a claim for excessive force).
[63] *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

art. 2315.6, which provides a cause of action for so-called "bystander" emotional damages. The article provides for a child "who view[s] an event causing injury to [his mother], or who come[s] upon the scene of the event soon thereafter, [to] recover damages for mental anguish or emotional distress that [he] suffer[s] as a result of [his mother's] injury."[64] However, the injured mother "must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable."[65]

In its analysis of La. Civ. Code art. 2315.6, the Louisiana Supreme Court has described the core consideration as "whether [the bystander claimant] experienced severe and debilitating distress specifically from the shock caused by the perception of the especially horrendous event."[66] The Court in *Trahan v. McManus* observed that although the Louisiana Legislature intended to allow the recovery of bystander damages in some instances, it was "not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances."[67] Thus the bystander damage inquiry, "focus[es] on whether [the bystander claimant] experienced severe and debilitating distress specifically from the shock caused by the perception of the especially horrendous event."[68]

In this case, the injurious event was not sufficiently disturbing such that a person in Mr. D.J.'s position would reasonably suffer severe and debilitating emotional distress. As in *Lockett*, the Plaintiff, Teliah C. Perkins, suffered no severe physical injury as a result of her arrest. Further, the type of injuries alleged by Ms. Perkins, would not reasonably cause D.J. to suffer debilitating

---

[64] La. Civ. Code art. 2315.6(A)
[65] *Lockett v. New Orleans City,* 639 F. Supp. 2d 710, 749 (E.D. La. 2009) (citing La. Civ. Code art.2315.6 (B)).
[66] *Trahan v. McManus*, 728 So.2d 1273, 1279 (La. 1999).
[67] *Lockett*, 639 F. Supp.2d 749. (quoting *Trahan*, 728 So.2d 1279).
[68] *Id*.

emotional distress. Ms. Perkins resisted arrest and after a brief struggle she was subdued and placed in a transport vehicle. Both deputies only used the minimum amount of force required to handcuff an individual who did not want to be handcuffed. Any alleged minor injuries sustained by Ms. Perkins as a result of her civil disobedience could not reasonably calculated to inflict severe emotional damage. Moreover, there is no allegation, much less any record evidence, that any alleged distress experienced by D.J. was severe and debilitating.

Support for this conclusion is also found in the case of *Irvin v. Foti*, in which the court denied a mother's claims for bystander damages under La. Civ. Code art. 2315.6 based on the mother's witnessing of her daughter's arrest, which eventually led to the daughter's death in jail due to complications of diabetes.[69] In denying the claim for bystander damages, the *Irvin* court elaborated that "witnessing an arrest of a [relative], while traumatic, is simply not the kind of injury contemplated by Article 2315.6."[70] Although witnessing his mother's arrest was likely a disturbing experience, this Honorable Court should find that it nevertheless does not provide a basis to warrant bystander damages under Louisiana law. Therefore, we conclude that based on the jurisprudence of this Court, the Plaintiff's claims should be dismissed with prejudice.

Finally, Defendants would note that the Fifth Circuit has held that a plaintiff may not bring a section 1983 claim under La. Civ. Code art. 2315.6 "bystander" statute because it is not anticipated by section 1983, and, furthermore, as no party in this case has a cognizable bystander claim.[71] Accordingly, these claims asserted by D.J. should also be dismissed.

---

[69] *Irvin v. Foti*, 1999 U.S. Dist. LEXIS 11515 (E.D. La. July 13, 1999).
[70] *See Lockett*, 639 F. Supp.2d 749, 750. (*quoting Irvin,* 1999 U.S. Dist. LEXIS 1515, at *13).
[71] *Grandstaff v. City of Borger*, 767 F.2d 161, (5th Cir. 1985).

### D.  <u>Qualified Immunity</u>

a.  **Summary Judgment Standard for Qualified Immunity**

Defendants have asserted the affirmative defense of qualified immunity.  The general rules regarding summary judgment are even further manifest when dealing with claims asserted under § 1983 where the defendant raises qualified immunity as a defense, as Defendants have done here. As summarized by one court:

> The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. Although qualified immunity is called an affirmative defense, the defendant asserting qualified immunity does not have the burden to establish it. Rather, **it is the plaintiff whose burden it is to negate the assertion of qualified immunity, once it is raised**. An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. The plaintiff, bearing the burden of negating the defense, cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.[72]

"[T]he qualified-immunity defense 'shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[73] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" in situations in which "existing precedent . . . placed the statutory or constitutional question beyond debate."[74] It serves to shield an officer "from suit when [the officer] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [the officer] confronted."[75]  To

---

[72] *Tolan v. Cotton*, 854 F.Supp.2d 444, 463 (S.D. Tex. 2012) (emphasis added) (internal citations omitted), *affirmed* 713 F.3d 299 (5th Cir. 2013), *reversed on other grounds,* 134 S. Ct. 1861, 188 L.Ed.2d 895 (2014).

[73] *Dolan v. Parish of St. Tammany*, 2014 U.S. Dist. LEXIS 26200 *citing Behrens v. Pelletier*, 516 U.S. 299, 305 (1996).

[74] *Whitney v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citations omitted).

[75] *Kokesh v. Curlee,* 2021 U.S. App. LEXIS 28607 at *19 (5th Cir. Sep. 21, 2021) *citing Brosseau v. Haugen*, 543 U.S. 194, 205 (2004).

defeat the defense of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was *clearly established* at the time of the challenged conduct."[76] "The movant, on the other hand, can support its motion by relying solely on the pleadings."[77]

Qualified immunity exists to ensure that "fear of liability will not unduly inhibit officials in the discharge of their duties."[78] As noted by the United States Supreme Court, while qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."[79] This "clearly established law should not be defined 'at a high level of generality.'"[80] Instead, it must be "particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." [81] The "statutory or constitutional question" must be "beyond debate"[82] and so clearly established that a "reasonably official would have understood that what he is doing violates that right."[83] Importantly, the Supreme Court has recently ruled that "**[s]pecificity is especially important in the Fourth Amendment context**, where… it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts."[84]

---

[76] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added) (citation omitted).

[77] *Disraeli v. Rotunda*, 489 F.3d 628, 631 (5th Cir. 2007).

[78] *Camreta v. Greene*, 563 U.S. 692, 705 (2011) *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

[79] *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

[80] *Id*. at 552.

[81] *Id*.

[82] *Rivas-Villegas v. Cortesluna*, 2021 U.S. LEXIS 5311 at *6 (Oct. 18, 2021) *citing White v. Pauly*, 137 S. Ct. 548, 551 (2017).

[83] *Id citing Mullenix v. Luna* 577 U.S. 7, 11 (2015).

[84] *Id citing Mullenix*, 577 U.S. at 12 (emphasis added); *City of Tahlequah v. Bond*, 2021 U.S. LEXIS 5310 at *5 (Oct. 18, 2021) *citing Mullenix*, 577 U.S. at 12 (emphasis added).

This high burden requires Plaintiff to identify a "case where an officer acting under similar circumstances as [each of the defendants] was held to have violated [a person's constitutional rights]."[85] "If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages."[86] This notice is paramount, and the Supreme Court has in the past questioned a party for not submitting any Supreme Court cases that address the facts at bar and has even openly mused about the value of Circuit precedent in clearly establishing law.[87] It is for this reason that the Supreme Court has stated that "[m]any Courts of Appeals therefore decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity," as such decisions does not "settle constitutional standards or prevent repeated claims of qualified immunity."[88] This follows from the general practice of *stare decisis* whereby district court decisions are not binding authority "in either a different judicial district, the same judicial district, or even upon the same judge in a different case."[89] As will be shown below, Plaintiff fails to identify a violation of any clearly established, protected right, and therefore, Defendants are entitled to qualified immunity and summary judgment.

### b. Qualified Immunity Should be Determined on Summary Judgment

The issue of qualified immunity is uniquely ripe for disposition via summary judgment. This is why a district court denial of summary judgment to a defendant on the issue of qualified

---

[85] *Id.*
[86] *Camreta* 563 U.S. at 705.
[87] *Rivas-Villegas,* U.S. LEXIS 5211 at *7.
[88] *Camreta* 563 U.S. at 709; *see also Crane v. Utah Dep't of corr.* 2021 U.S. App. LEXIS 31681 at *7 (10th Cir. 10/21/21); *Matusick v. Erie Cty. Water Auth.,* 757 F.3d 31, 61 (2d Cir. 2014); *Booker v. S.C. Dep't of Corr.,* 855 F.3d 533, 545 (4th Cir. 2017).
[89] *Camreta* 563 U.S. at 709; *see also* 18 Moore's Federal Practice - Civil § 134.02[1][d] (2021).

immunity is immediately appealable when the "issue appealed concerned…whether or not certain given facts show a violation of a clearly established law."[90]

### c.  Defendants are Entitled to Qualified Immunity

Assuming *in arguendo* that any of the Plaintiffs' various § 1983 have merit, which Defendants deny, their claims must nevertheless be dismissed due to the fact that they are barred by Defendants' affirmative defense of qualified immunity.  As noted above, the "qualified-immunity defense 'shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[91]  Defendants respectfully submit that their actions in arresting Ms. Perkins, their use of force to effectuate the arrest, and the displaying of Deputy Moring's taser to the minor, D.J., do not violate any "clearly established" rights of the Plaintiffs and thus their claims must be dismissed.

### E.  This Court Should Decline to Exercise Jurisdiction Over Any Remaining State Law Claims

In addition to the numerous § 1983 claims filed by Plaintiff, Ms. Perkins, individually and on behalf of her minor son, D.J., Plaintiff has also asserted various claims under Louisiana State law, individually, and on behalf of her minor son, including claims of false arrest, battery, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligent infliction of emotional distress, and assault.[92] Defendants respectfully suggest that they are entitled to summary judgment to dismiss ***all*** of Plaintiff's claims, including Plaintiffs' § 1983 and state law claims. However, in the event that this Court dismisses Plaintiffs' § 1983 claims and

---

[90] *Johnson v. Jones,* 515 U.S. 304, 304 (1995) (citation omitted).
[91] *Dolan v. Parish of St. Tammany*, 2014 U.S. Dist. LEXIS 26200 *citing Behrens v. Pelletier*, 516 U.S. 299, 305 (1996).
[92] R. Doc. 1, ¶¶ 106-162.

none or some, but not all, of Plaintiff's state law claims, Defendants respectfully request that this Court decline to exercise supplemental jurisdiction over any of the remaining state law claims. Defendants' request is based on 28 U.S.C. § 1367(c), which permits a court, in its discretion, to decline to exercise supplemental jurisdiction over a claim when the court has dismissed all claims over which it has original jurisdiction.

### III.  CONCLUSION

For the foregoing reasons, Defendants respectfully suggest that the instant motion for summary judgment should be granted and that all claims advanced be Plaintiffs be dismissed with prejudice.

Respectfully submitted,

MILLING BENSON WOODWARD L.L.P.

*s/ Chadwick W. Collings*
_____
**CHADWICK W. COLLINGS, T.A.        # 25373**
**68031 Capital Trace Row**
**Mandeville, Louisiana 70471**
**Telephone:    (985) 292-2000**
**Facsimile:    (985) 292-2001**
ccollings@millinglaw.com
*Counsel for Defendants*

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana on February 6, 2022, by using the CM/ECF system, which system will send a notice of electronic filing to appearing parties in accordance with the procedures established.

*s/ Chadwick W. Collings*
_____
**Chadwick W. Collings**