## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TELIAH C. PERKINS**                                **CIVIL ACTION**

**VERSUS**                                           **NO. 21-879**

**KYLE HART AND RYAN MORING**                        **SECTION D (2)**

## ORDER AND REASONS

Before the Court is Defendants St. Tammany Parish Sheriff's Deputies Kyle Hart and Ryan Moring's Motion for Summary Judgment on the Issue of Qualified Immunity.[1] Plaintiff Teliah C. Perkins has filed an Opposition.[2] Defendants have filed a Reply.[3] After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **GRANTS IN PART AND DENIES IN PART** the Defendants' Motion for Summary Judgment on the Issue of Qualified Immunity.

## I.    FACTUAL BACKGROUND

This is an excessive force case. The case concerns the arrest of Plaintiff, Teliah C. Perkins, on May 5, 2020 by the Defendants.[4] Plaintiff is a resident of St. Tammany Parish and resides in Slidell, Louisiana.[5] Plaintiff alleges that she was on the porch of her home with her minor son, D.J., and nephew, J.P., when she observed Defendants, two St. Tammany Parish Sheriff's deputies, riding down the street on marked police motorcycles.[6] Plaintiff asserts that the Defendants turned their

---

[1] R. Doc. 34.
[2] R. Doc. 44.
[3] R. Doc. 56.
[4] R. Doc. 1 at ¶ 1.
[5] *Id.*
[6] *Id.* at ¶¶ 17-19. While the briefing does not state the time of the events leading up to and including arrest, the videos show the events took place in broad daylight. *See* R. Docs. 34-15 and 34-16.

1

motorcycles around, drove to Plaintiff's driveway, and shouted for Plaintiff to come to them.[7] Plaintiff contends that the Defendants advised Plaintiff that they were investigating a complaint that a person was riding a "dirt bike" without a helmet.[8] Plaintiff denied any knowledge of the incident.[9] Defendants demanded Plaintiff's driver's license, registration, and proof of insurance.[10]  Plaintiff asked whether the inquiry was racially motivated, to which Deputy Hart responded, "Shut the f—up! This call ain't f—ing about race!"[11] Plaintiff contends that she became frustrated and decided to call 911 to request a supervising officer.[12] Plaintiff then called for her son and nephew to come out from the house to the driveway and start recording video with their cell phones at which time Defendants immediately instructed Plaintiff's son and nephew to return to the porch.[13] Plaintiff advised her son and nephew that they did not need to go to the porch.[14] Plaintiff then alleges that Deputy Hart declared, "'that's it, right now you're being placed under arrest,' and stormed up the driveway" to handcuff Plaintiff.[15] Plaintiff contends that the Defendants violently seized her by her arms, forced her to the ground, muttering that she was "f—ing slippery," and then, together, "leaned on Ms. Perkins' back and neck with their knees and elbows, pulled her hair, and forced her face against the driveway pavement while

---

[7] *Id.* at ¶¶ 20-21.
[8] *Id.* at ¶ 21.
[9] *Id.*
[10] *Id.* at ¶ 25.
[11] *Id.* at ¶¶ 28 and 29.
[12] *Id.* at ¶ 31.
[13] *Id.* at ¶¶ 32 and 33.
[14] *Id.*
[15] *Id.* at ¶ 34.

wrenching her arms behind her back."[16] Plaintiff asserts that she justifiably tried to pull her arms away, but that she never struck either Defendant or tried to run from them.[17] During this time, D.J. and J.P. continued filming Defendants' arrest of Plaintiff.[18] Deputy Moring then stood up and moved directly between D.J. and his mother, blocking D.J.'s camera, and instructed D.J. and J.P. to stop filming, eventually drawing and pointing his service taser at D.J., who stopped filming.[19] Plaintiff contends that Deputy Hart continued to pin her face-first into the pavement, pressed his forearm against her throat, then wrapped his hand around her neck and leaned on it, causing her to gasp, "you're choking me."[20] Deputy Hart then lifted Plaintiff to her feet and she was placed in the patrol car.[21] Plaintiff's motorcycle was seized, towed away, and impounded by the St. Tammany Sheriff's Office, requiring Plaintiff to pay $204 for the eventual release of the motorcycle.[22]

Plaintiff was arrested for the following violations: La.R.S. 14:108.2 (Resisting a police officer with force or violence); La.R.S. 14:34.2 (Battery of a police officer); La.R.S. 32:863.1 (No proof of insurance); and La.R.S. 32:190 (No safety helmet).[23] On July 26, 2021, the District Attorney's Office for the 22nd Judicial District Court for the Parish of St. Tammany amended Plaintiff's bill of information to "R.S. 14:108

---

[16] *Id.* at ¶ 35.
[17] *Id.* at ¶ 37.
[18] *Id.* at ¶ 38
[19] *Id.* at ¶ 38.
[20] *Id.* at ¶ 39.
[21] *Id.* at ¶ 40.
[22] *Id.* at ¶ 42.
[23] *Id.* at ¶ 47.

Resisting an Officer."[24] Plaintiff was tried and found guilty of violating La. R.S. 14:108.[25]

Plaintiff has sued, individually and on behalf of D.J., her minor son, the arresting officers, St. Tammany Parish Sheriff's Deputies Kyle Hart and Ryan Moring.[26] Plaintiff asserts a number of claims, including false arrest in violation of the Fourth and Fourteenth Amendments, excessive force in violation of the Fourth and Fourteenth Amendments, unlawful seizure in violation of the Fourth Amendment as well as state law claims for false arrest, excessive force/ battery, false imprisonment, malicious prosecution, intentional infliction of emotional distress, and negligent infliction of emotional distress.[27] Plaintiff has also brought several claims on behalf of her minor son, D.J., including excessive force in violation of the Fourth and Fourteenth Amendments, retaliation in violation of the First Amendment, as well as state law claims for excessive force/battery, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress.[28] Plaintiff has since withdrawn several of her claims, including her §1983 claim of false arrest, and her state law claims for false arrest, false imprisonment, and malicious prosecution as well as D.J.'s state law false arrest claim.[29]

Defendants have filed a Motion for Summary Judgment, arguing that Plaintiff's remaining claims must be denied and that they are entitled to qualified

---

[24] R. Doc. 57, Summary of Material Facts, Defendants' Statement.
[25] *Id.*
[26] R. Doc. 1.
[27] *Id.*
[28] *Id.*
[29] R. Doc. 60.

immunity.[30] Initially, Defendants argue that Plaintiff's excessive force claims are barred by *Heck v. Humphrey*.[31] Defendants assert that Plaintiff's previous guilty adjudication to the crime of resisting an officer in state court contains an implicit legal conclusion, specifically that the deputies had probable cause to arrest her and thus their actions were reasonable.[32] Further, Defendants assert that Plaintiff's claim of excessive force must be denied because the deputies utilized only the level of lawful force necessary to overcome Plaintiff's resistance to their attempted arrest.[33] To bolster their argument, Defendants argue that the Internal Affairs Division of the St. Tammany Parish Sheriff's Office as well as Defendants' expert, John Ryan, determined that the level of force used by the Defendants was appropriate.[34] Defendants also argue that Deputy Moring's act of displaying his taser at D.J. as a show of force was justified as part of effectuating the lawful arrest of Plaintiff.[35] Finally, Defendants assert that they are entitled to qualified immunity regarding the arrest of Plaintiff, including their use of force when executing that arrest, and Deputy Moring's display of the taser to D.J. because they did not violate any clearly established rights of the Plaintiff and her minor child.[36]

Plaintiff has filed an opposition arguing that Plaintiff's excessive force claim is not barred by *Heck* for three reasons: (1) Plaintiff's excessive force claim does not require her to deny that she resisted a legal arrest; (2) Plaintiff's conviction for

---

[30] R. Doc. 34.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

resisting arrest is distinct from her § 1983 claim that the level of force used to overcome her resistance was excessive; and (3) the level of force used was excessive both before Plaintiff's resistance as well as after any resistance had ceased.[37] Further, Plaintiff argues that qualified immunity does not apply because the facts establish that Defendants violated Plaintiff's constitutional rights which were clearly established at the time.[38] Plaintiff further contends there are disputed issues of material fact regarding whether excessive force was used, thus requiring denial of summary judgment.[39] Plaintiff also contends that Defendants employed excessive force when interacting with her minor son, D.J., and that Deputy Moring violated D.J.'s First Amendment right by using his taser to interfere with D.J.'s recording of the arrest.[40] Plaintiff has also provided an expert report with the expert opining, among other things, that the force used to effect the arrest was unreasonable.[41]

Defendants have filed a reply and reiterate their argument that Plaintiff's excessive force claim is barred by *Heck* because the force used by Defendants to apprehend Plaintiff was proportionate and in direct response to her resistance to the deputies.[42] Defendants argue that a determination that Defendants' use of force was excessive would "necessarily imply" that Plaintiff was not aggressively resisting arrest which would further imply the invalidity of her state conviction for resisting arrest.[43] Defendants also argue that D.J.'s excessive force claim must be dismissed

---

[37] R. Doc. 44.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] R. Docs. 44-7 and 44-8.
[42] R. Doc. 56.
[43] *Id.*

because his Fourth Amendment rights were never violated, specifically, he was not seized when Deputy Moring pointed and threatened to use a non-lethal weapon at him.[44] Further, Defendants argue that D.J.'s First Amendment claim must be dismissed because, while D.J. has a constitutional protected right to record, his filming veered from documenting to interfering, and he did not have a constitutionally protected right to "blatant interference" with the deputies' arrest of Plaintiff.[45]

## II.   LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[46] When assessing whether a dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[47] While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of evidence."[48] Instead, summary

---

[44] *Id.*

[45] *Id.*

[46] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[47] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citations omitted).

[48] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[49]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[50] The nonmoving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[51] If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[52] The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[53]

---

[49] *Delta & Pine Land Co.*, 530 F.3d at 399 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[50] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991).
[51] *Id*. at 1265.
[52] *See Celotex*, 477 U.S. at 322-23.
[53] *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)).

**B.  42 U.S.C. § 1983 and the Qualified Immunity Claim.**

Title 42 U.S.C. § 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law. Specifically, it provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.[54]

Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability."[55] To establish § 1983 liability, the plaintiff must establish the following three elements: (1) deprivation of a right secured by the United States Constitution or federal law; (2) that occurred under color of state law; and (3) was caused by a state actor.[56] In this matter, Plaintiff has sued the two arresting officers in their individual capacities.[57] A state official can be sued in his individual capacity and held personally liable under § 1983 if a plaintiff can show that the official, acting under state law, caused the deprivation of a federal right.[58]  According to the Fifth

---

[54] 42 U.S.C. § 1983.

[55] *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted).

[56] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

[57] R. Doc. 1.

[58] *Terry v. City of New Orleans*, 523 F. Supp. 2d 486 (E.D. La. 2007) (citing *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)).

Circuit, "This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to a constitutional violation." [59]

As a defense to § 1983 claims, government officials may invoke qualified immunity, which "shields government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[60] Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.[61] The Supreme Court has made clear that qualified immunity functions as an immunity from suit, rather than a mere defense to liability.[62] "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"[63] "This means that even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity."[64] Once the government

---

[59] *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) (citing *Baker v. Putnal*, 75 F.3d 190, 194 (5th Cir. 1996); *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)) (internal citation omitted).

[60] *Mabry v. Lee County*, 100 F.Supp.3d 568, 572 (N.D. Miss. 2015) (quoting *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014), *cert. granted, decision rev'd on other grounds*, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015)).

[61] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[62] *Id.* at 237 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (internal quotation marks omitted).

[63] *Brumfield v. Hollins*, 551 F.3d 322, 326-27 (5th Cir. 2008) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

[64] *Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001) (internal quotation marks omitted).

official asserts the defense of qualified immunity, the burden shifts to the plaintiff to negate the defense.[65]

To overcome a claim of qualified immunity, a plaintiff must demonstrate: (1) that the official violated a statutory or constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct.[66] It is up to the district courts' sound discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.[67]

### III.   LAW AND ANALYSIS

#### A. Whether any Deficiency in Defendants' Statement of Material Facts Invalidates Their Motion for Summary Judgment.

The Court first addresses the alleged deficiency in Defendants' Statement of Material Facts and whether any such deficiency renders Defendants' Motion for Summary Judgment invalid. In its opposition to Defendants' Motion for Summary Judgment, Plaintiff argues that Defendants' Motion for Summary Judgment is materially deficient because Defendants failed to cite to the record in support of their recitation of the Statement of Material Facts in accordance with Local Rule 56.1.[68]

In their reply, Defendants argue that Local Rule 56.1 does not mandate each sentence contain a specific citation.[69] Nevertheless, Defendants provided a revised

---

[65] *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citation omitted).
[66] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).
[67] *Pearson*, 555 U.S. at 236.
[68] R. Doc. 44.
[69] R. Doc. 56.

Statement of Material Facts that contains additional citations to the record, without adding any new facts.[70]

Local Rule 56.1 of the Eastern District of Louisiana requires that a party moving for summary judgment submit a "separate, short and concise statement…of the material facts." In its Amended Scheduling Order, this Court imposed an additional requirement, specifically stating "[c]itations to record evidence shall indicate, whenever applicable, an exhibit reference, page reference, and record document number reference."[71] However, nowhere does this Court require that each sentence in the Statement of Material Facts contain a specific citation to the record. Further, this Court's Amended Scheduling Order and the local rules do not state that failure to provide specific citations to each statement in a moving party's statement of Material Facts renders a motion for summary judgment deficient. Defendants have subsequently amended their statement of facts and provided additional citations.[72] The Court determines that there is no merit to Plaintiff's argument that Defendants' Motion for Summary Judgment is deficient for failure to comply with the local rules.

### B. Whether Plaintiff's Claims are Barred by *Heck v. Humphrey.*

The Court next must determine whether Plaintiff's claim for excessive force is barred by *Heck v. Humphrey.* Defendants argue that Plaintiff's excessive force claims are barred by the application of *Heck.*[73] Defendants state that Plaintiff's previous guilty adjudication of the crime of resisting an officer in Louisiana state court

---

[70] R. Doc. 56-2.
[71] R. Doc. 30.
[72] *See* R. Doc. 56-2.
[73] *See* R. Doc. 34 and R. Doc. 56.

contains an implicit legal conclusion, specifically, that the Defendants had probable cause to arrest Plaintiff and that they used appropriate force when doing so because she was "aggressively resisting arrest."[74]

In response, Plaintiff contends that she is not required to deny that she resisted a legal arrest and thus her claim of excessive force is not barred.[75] Plaintiff instead asserts that Defendants used excessive force when arresting her.[76]

In *Heck*, the Supreme Court held that a plaintiff who has been convicted of a crime cannot bring a § 1983 claim challenging the constitutionality of his conviction unless that conviction has been reversed, expunged, declared invalid, or called into question by federal habeas corpus.[77] *Heck* bars claims for "unconstitutional conviction or imprisonment" as well as claims "for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid."[78] In *Heck*, the Supreme Court instructed that, "[W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence."[79]

The application of *Heck* to excessive force claims is not always straightforward. The United States Court of Appeals for the Fifth Circuit has noted that whether *Heck* bars an excessive force claim is a necessarily "fact-intensive" analysis, and turns on "whether success on the excessive force claim requires negation of an

---

[74] *Id.*
[75] R. Doc. 44.
[76] *Id.*
[77] 512 U.S. 477, 486-87 (1994).
[78] *Id.* at 486
[79] 512 U.S. at 487; 114 S.Ct. at 2372.

element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction."[80]  The Fifth Circuit has explained that "[a]n excessive-force claim is not *Heck* barred . . . if it is 'temporally and conceptually distinct' from the conviction."[81] This Court has previously explained that a plaintiff's conviction for resisting arrest is "distinct" from a § 1983 claim if the level of force used to overcome plaintiff's resistance was excessive.[82] Indeed, other courts have held,"[t]he fact that a suspect or arrestee is resisting does not give the arresting officers free [rein] to abuse the limits of the Fourth Amendment."[83]

Plaintiff was originally charged with "resisting a police officer with force/violence" in the 22nd Judicial District Court.[84] However, this charge was amended and Plaintiff was ultimately found guilty of "resisting a police officer" in violation of La. R. S. 14:108.[85] Defendants argue that the facts of this matter are analogous to both *Arnold v. Town of Slaughter* and *DeLeon v. City of Corpus Christi*.[86] In *Arnold*, the plaintiff claimed in his excessive force lawsuit that he had not utilized any force when resisting arrest.[87] Because this directly contradicted the state court's finding that he had used some force when he resisted arrest, the trial court granted the defendant

---

[80] *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008).

[81] *Lee v. Ard*, 785 F. App'x 247, 248 (5th Cir. 2019); *see also Thomas v. Pohlmann*, 681 F. App'x 401, 407 (5th Cir. 2017) (claim not barred by *Heck* where plaintiffs alleged excessive force that occurred after they were taken into custody).

[82] *Champagne v. Martin*, No. 18-1785, 2019 WL 3430457, at *5 (E.D. La. 2019) (guilty plea under L.R.S. 14:108 did not automatically bar excessive force claim based on officers throwing plaintiff to the floor and placing a knee into her back because success on that claim "does not necessarily negate plaintiff's conviction for resisting arrest").

[83] *Marquar v. Allen*, No. 1:11CV54-LG-RHW, 2013 WL 11522048, at *3 (S.D. Miss. Apr. 2, 2013).

[84] R. Doc. 34-8.

[85] *Id.* (citing La. R. S. 14:108).

[86] R. Doc. 43 (citing *Arnold v. Town of Slaughter*, 100 Fed. Appx. 321, 323 (5th Cir. 2004) and *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 657 (5th Cir. 2007)).

[87] 100 Fed. Appx. at 323.

officer's motion for summary judgment.[88] On review, the Fifth Circuit affirmed the trial court's application of *Heck* to bar the plaintiff's excessive force claim.[89] The Fifth Circuit explained that, "By proving an excessive force claim, a plaintiff will not invariably invalidate his conviction."[90] According to the Fifth Circuit, whether *Heck* bars a plaintiff from bringing a § 1983 claim "depends on the nature of the offense and of the claim."[91]

Defendants also rely on *DeLeon v. City of Corpus Christi*. In *DeLeon*, the plaintiff had previously confessed and pled guilty to a charge of aggravated assault of a police officer and then claimed in his excessive force lawsuit that he had not used any force at all.[92] The trial court granted the defendants' motion to dismiss on the grounds that plaintiff's claims were barred by *Heck* and plaintiff appealed[93]. Relying on its reasoning in *Arnold*, the Fifth Circuit affirmed the trial court's dismissal of plaintiff's claims as being barred by *Heck*.[94]

The case at hand is different from the facts in both *Arnold* and *DeLeon*. Plaintiff does not dispute that she was found guilty of "resisting a police officer," nor does she dispute that she used resistance.[95] Plaintiff does not deny that she resisted Defendants' attempts to arrest her, as her Complaint reflects that she "yelled that Defendants were hurting her and, justifiably, tried to pull her arms away."[96] Instead,

---

[88] *Id.*
[89] *Id.*
[90] *Heck,* (citing *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996).
[91] *Id.*
[92] 488 F.3d at 657.
[93] *Id.*
[94] *Id.*
[95] R. Doc. 34-8 and R. Doc. 1.
[96] R. Doc. 1 at ¶ 34.

Plaintiff alleges that Defendants use of force during the arrest was excessive.[97] Thus, the facts of the present case are distinguishable from the facts in *Arnold* and *DeLeon*, in which the plaintiffs in those cases alleged that they did not use any force at all when resisting arrest. Further, in *Bush v. Strain,* the Fifth Circuit held that "a claim that excessive force occurred after the arrestee has ceased his or her resistance would not necessarily imply the invalidity of a conviction for the earlier resistance."[98] Plaintiff has conceded she resisted; her argument is that the Defendants' use of force was excessive, and, further, such use of force continued after any resistance. "A claim that excessive force occurred after the arrestee submitted to the officer and stopped resisting 'would not necessarily imply the invalidity of a conviction for the earlier resistance.'"[99] Accordingly, based on the evidence before the Court, Plaintiff's claim of excessive force is not barred by *Heck.*

### C. Whether Defendants are Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim.

The Fourth Amendment provides citizens with the right to be free from excessive force. "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'"[100] The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

---

[97] R. Doc. 1; *see also* R. Doc. 34.
[98] 513 F.3d at 498 (5th Cir. 2008).
[99] *Lee v. Ard*, 785 F. App'x 247, 248 (5th Cir. 2019).
[100] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case.").

20/20 vision of hindsight.[101] "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.[102] "Reasonableness in these circumstances 'must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'"[103] In determining whether the amount of force used was objectively reasonable, the Fifth Circuit has instructed to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion.[104]

Defendants have raised the defense of qualified immunity and argue that their actions when arresting Plaintiff were justified due to her resistance.[105] Qualified immunity shields officers from liability unless their conduct violates a clearly established federal right of which a reasonable person would have known.[106] To overcome the claim of qualified immunity on her claim for excessive force, Plaintiff must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly

---

[101] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).
[102] *Graham*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-139 (1978); *Terry* 392 U.S. at 21).
[103] *Hathaway v. Bazany*, 507 F.3d 312, 320–21 (5th Cir. 2007) (quoting *Graham*, 490 U.S. at 397).
[104] *Timpa v. Dillard*, 20 F.4th 1021 (5th Cir. 2021).
[105] R. Doc. 56.
[106] *Kisela v. Hughes*, —— U.S. ——, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam).

unreasonable."[107] In determining whether the use of force was clearly excessive and clearly unreasonable, the Court evaluates each deputy's actions separately, to the extent possible.[108]

Regarding the first factor, Plaintiff alleges that she has suffered physical injuries including chronic pain in her legs, back and neck, as well as depression, anxiety, and insomnia that require her to treat with medication.[109] The Defendants do not contest that these injuries occurred. Accordingly, the first factor is satisfied. Turning to the next two factors, the Court notes that the parties addressed the combined actions of the Defendants during the Plaintiff's arrest. Accordingly, the Court does the same.

Defendants argue that the level of force employed by Deputy Moring and Deputy Hart when arresting Plaintiff was "neither clearly excessive nor was it clearly unreasonable."[110] Defendants further contend that the use of force by the deputies was reviewed by the Internal Affairs Division of the St. Tammany Parish Sheriff's Office as well as by its own expert, John Ryan, and both determined that the level of force was appropriate.[111]

Plaintiff argues that Defendants employed excessive force in comparison to the minor nature of what Plaintiff was arrested for, that Plaintiff did not pose a threat to

---

[107] *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).
[108] *Id.* (citing *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007) (holding that each officer's individual actions should be considered in determining whether qualified immunity applies).
[109] R. Doc. 1; *see also* R. Doc. 44.
[110] R. Doc. 34.
[111] *Id.*

the Defendants, and that her limited resistance did not justify the level of force employed by Defendants.[112]

The Fifth Circuit has determined that the second and third excessive force elements "collapse into a single objective-reasonableness inquiry,"[113] guided by the factors in *Graham v. Connor*: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[114] Courts have held that arresting officers employed excessive force after a subject is restrained or is not actively resisting.[115]

Turning to the first *Graham* factor, the Fifth Circuit has explained that the objective reasonableness of an officer's actions must be analyzed in light of the severity of the crime.[116] Defendants testified in their deposition that they were responding to a complaint of an individual recklessly operating a dirt bike in the street.[117] Plaintiff confirms that one of the Defendants advised that they had received a call from an undisclosed source about someone riding a "'dirt bike" without a helmet.[118] Upon arriving at Plaintiff's address, Defendants contend that they

---

[112] R. Doc. 44.
[113] *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018).
[114] *Pena*, 879 F.3d at 619 (quoting *Graham*, 490 U.S. at 396).
[115] *See Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir. 2008) (finding the use of certain force after an arrestee has been restrained and handcuffed is excessive and unreasonable); *Bagley v. Kolb*, 2021 WL 3376830, at *8–9 (W.D. La. Aug. 3, 2021) (finding it is excessive for an officer to strike a handcuffed person); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2018) (holding it was clearly established that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force).
[116] *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005).
[117] R. Doc. 44-2 at p. 67.
[118] R. Doc. 1.

observed Plaintiff backing her motorcycle into the driveway without a helmet and subsequently approached Plaintiff in her driveway; Plaintiff contends that she was on her porch with her nephew when she saw the officers' ride by her house.[119] The parties agree that the initial confrontation between the deputies and Plaintiff centered on whether the Plaintiff had been riding a motorcycle without a helmet. Plaintiff was ultimately arrested for four violations, including two misdemeanors, L.R.S. 14:108.2 (Resisting a police officer with force or violence); L.R.S. 14:34.2 (Battery of a police officer); L.R.S. 32:863.1 (No proof of insurance); and L.R.S. 32:190 (No safety helmet).[120]

The Fifth Circuit has held that when the severity of a crime is minor, such as a misdemeanor, the amount of force used by police during an arrest should be reduced accordingly.[121] More specifically, traffic violations generally will not support the use of a significant level of force.[122] Here, the Defendants initially approached Plaintiff because of a report that someone was driving a dirt bike without a helmet.[123] In their depositions, both Deputy Moring and Deputy Hart recognized that this crime, along with failing to produce motor vehicle insurance information, was a misdemeanor and

---

[119] *Id.*

[120] R. Doc. 34.

[121] *Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding that the "severity" factor militated against use of force where the crime at issue was a misdemeanor) (citing *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (holding that "the amount of force should [be] reduced accordingly" in proportion to the severity of the crime)).

[122] *See Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Deville was stopped for a minor traffic violation ... making the need for force substantially lower than if she had been suspected of a serious crime.")

[123] R. Doc. 44.

thus not serious.[124] In a video recording of Plaintiff's arrest, Defendants are seen twisting Plaintiff's arms, bringing her to the ground, placing her on her stomach, and then Deputy Hart appears to kneel on the back of Plaintiff's legs while attempting to handcuff her while Deputy Moring applies elbow pressure to the back to Plaintiff's upper back.[125] Plaintiff appears to initially resist the deputies' actions.[126] Plaintiff can be heard shouting that she is in pain several times, particularly when Deputy Hart appears to kneel on the back of her legs.[127] The video also appears to show Deputy Hart's hands on Plaintiff's neck on two separate instances.[128] Plaintiff is heard yelling "why you choking me?"[129] Defendants assert that Deputy Hart's "removal and then reapplication of his hand to Plaintiff's neck and chest areas was clearly his attempt to regain his balance and get onto his feet without stepping on Plaintiff or allowing her to roll herself back onto her stomach."[130] Plaintiff counters that the Defendants' explanation is "dubious, particularly considering that Deputy Hart removed and then reapplied force to Ms. Perkins' throat at least once."[131] Considering the minor nature of Plaintiff's crime and Defendants' own admittance of that fact, the Court determines that there is sufficient evidence that a jury could

---

[124] *See* R. Doc. 44-1 at 119: 21-120:05 (Deputy Moring deposition); *see also* R. Doc. 44-4 at 83: 19-84:03 (Deputy Hart deposition).

[125] R. Doc. 34-16. The Court notes that this video recording includes several portions that are fast forwarded. However, this video recording appears to accurately capture the arrest of Plaintiff as well as Defendants' actions. While the video in 34-16 lasts less than 3 minutes, it is unclear how long the encounter and arrest actually took since the video is fast forwarded.

[126] R. Doc. 34-16.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] R. Doc. 56.

[131] R. Doc. 44.

determine that the Defendants' actions during the arrest were disproportionate in comparison to the minor nature of her crimes. Accordingly, this factor weighs in favor of determining that the government had a minimal interest in the use of force against Plaintiff.

The Court next considers whether Plaintiff posed an immediate threat to the safety of the officers or others.[132] The Court is mindful that it "must adopt 'the perspective of a reasonable officer on the scene, rather than judge with the 20/20 vision of hindsight.'"[133] Defendants contend that Plaintiff posed an "objectively reasonable threat" to Defendants as she was shouting loudly, cursing, and refusing to follow the officers' instructions.[134] Defendants also argue that Plaintiff posed a threat when she started walking back towards to the house, where she could have obtained a weapon.[135] Plaintiff contends that she did not pose a threat at all to Defendants when she attempted to walk back into her house, especially since, "according to Defendants, Ms. Perkins approached and/or entered the home on one or two occasions during the interactions, without Defendants arresting her or fearing for their safety.[136] Plaintiff further argues that she did not display a weapon to the officers and instead called 911 herself because she feared for her own safety.[137]

---

[132] *Graham*, 490 U.S. at 397.
[133] *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (brackets omitted) (quoting *Graham*, 490 U.S. at 396).
[134] R. Doc. 56.
[135] *Id.*
[136] R. Doc. 44, referencing the Defendants' depositions at R. Doc. 44-2 at p. 201:2-202:7 (Deputy Moring); *see also* R. Doc. 44-5 at p. 136:16-137:13 (Deputy Hart).
[137] *Id.*

In a video recording of Plaintiff's arrest, all of which takes place in broad daylight, Plaintiff is seen walking in her driveway and shouting and cursing at the deputies.[138] At the start of the video, Plaintiff tells Defendants that she is waiting to receive the proof of insurance information for her motorcycle from her insurance agency.[139] The Defendant deputies are at the foot of the driveway.[140] Plaintiff is seen slowly pacing back and forth in her driveway, both towards and away from the deputies.[141] At one point, while walking with her back to the deputies, Plaintiff yells (apparently to either her nephew or son) that "y'all don't have to stand on no porch." It is at this point that one of the deputies declares that Plaintiff is under arrest, approaches her, and attempts to place her in handcuffs.[142] Plaintiff appears to twist her arms to avoid the deputies' initial attempts to place her in handcuffs and falls to the ground as the Defendants attempt to place her arms behind her back.[143] Defendants eventually handcuff the Plaintiff while she is on the ground.[144] The Court recognizes that an individual's shouting, cursing, and unwillingness to cooperate with the officers could have posed a threat to the Defendants or others.[145] However, while Plaintiff can be heard shouting and cursing, there is no evidence whatsoever that Plaintiff threatened the Defendants or made any reference to a weapon in her home. Additionally, and importantly, Deputy Moring testified in his deposition that Plaintiff

---

[138] R. Doc. 34-16.
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.*
[144] *Id.*
[145] *Id.*

"wasn't a danger to the public" and that he "d[idn't] believe she was" a danger to herself.[146] Deputy Moring further testified that neither of the minors posed a threat to the officers or the public.[147] Accordingly, this factor weighs in favor of determining that the government had a minimal interest in the use of force against Plaintiff.

Third, the Court analyzes whether the Plaintiff was actively resisting arrest or attempting to evade arrest by flight.[148] As described above, Plaintiff is seen slowly walking back and forth in her driveway on a video recording of her prior to the arrest but during the interaction with the deputies.[149] Defendants then declare that she is "under arrest" and attempt to place her in handcuffs as she had her back turned from the deputies and was walking towards her house.[150] The video shows that Plaintiff twisted her arms away from the Defendants and resisted the Defendants' initial attempts to place her in handcuffs.[151] Deputy Hart described Plaintiff in his deposition as "pulling away, turning away."[152] Plaintiff then fell to the ground as officers attempted to place her arms behind her back and handcuff her.[153] Plaintiff is again seen pulling her arms away from the Defendants and kicking her legs.[154] The Defendants then place Plaintiff prone on her stomach and Deputy Hart kneels on the

---

[146] R. Doc. 44-2 at p. 120: 10-18.
[147] R. Doc. 44-2 at 83.
[148] *Graham* 490 U.S. at 397. The Court notes that Plaintiff has already been convicted of resisting arrest. As previously described, Plaintiff recognizes this resistance but still contends that Defendants employed excessive force when arresting her. *See* R. Doc. 44.
[149] R. Doc. 34-16.
[150] *Id.*
[151] *Id.*
[152] R. Doc. 44-4 at 160: 9-15.
[153] *Id.*
[154] *Id.*

back of her legs as she is handcuffed.[155] At some point Plaintiff is turned and handcuffed with her back on the ground.[156] Deputy Hart continues struggling with Plaintiff and his hand appears to be on Plaintiff's neck on two occasions while Plaintiff is lying on her back.[157] Deputy Hart then helps Plaintiff stand up and walks her across the lawn where she remains handcuffed with her arms behind her back.[158]

Plaintiff was previous found guilty of resisting an officer in Louisiana state court and does not deny that she resisted arrest.[159] Indeed, Plaintiff acknowledges in her Complaint that she "tried to pull her arms away" and the videos support this.[160] That Plaintiff initially resisted arrest is supported by the evidence; the question remains whether Plaintiff continued to resist arrest to warrant Defendants' continued use of force. Accordingly, this factor is neutral in determining what interest the government had in the use of force against Plaintiff.

Upon extensive review of all available video recordings, depositions, and witness statements, expert reports, as well as an analysis of the *Graham* factors, the Court determines that the Defendants' actions were unreasonable at this stage. Further, a disputed issue of material fact exists regarding the amount of force used by Defendants while attempting to arrest Plaintiff and after she was handcuffed and subdued. Plaintiff insists that she was choked twice and can be heard on video saying

---

[155] *Id.*
[156] *Id.*
[157] R. Doc. 34-16 at 1:36-39. As noted previously, Defendants dispute that Deputy Hart choked Plaintiff.
[158] R. Doc. 34-16.
[159] R. Doc. 57, Summary of Material Facts, Defendants' Statement.
[160] R. Doc. 1.

"why you choking me?"[161] Defendants counter that Deputy Hart was attempting "to regain his balance and get onto his feet without stepping on Plaintiff or allowing her to roll herself back onto her stomach."[162] "Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable."[163] Just recently, the Fifth Circuit "catalogued" its jurisprudence on this point and "identified features of the cases that had 'reaffirmed' this principle 'again and again.'"[164] Some of those features included whare "the seized individual as 'suspected of only a minor offense,' 'initially resisted,' 'was . . . forced to line prone on [the] stomach with hands restrained and bodyweight force applied to [the] back,' and, 'most importantly . . . was subdued, unable to flee, and non-threatening during the continued use of force.'"[165] The Court would be remiss not to point out how many of those features apply to the matter before it. Plaintiff has properly rebutted Defendants' claim of qualified immunity. Defendants' Motion for Summary Judgment seeking qualified immunity for the Defendants in regard to Plaintiff's arrest is denied.

### D. Whether Defendants are Entitled to Qualified Immunity on D.J.'s Excessive Force Claim.

Plaintiff has also brought a claim on behalf of her minor son, D.J., and alleges that Defendant, Deputy Ryan Moring, used excessive force, in violation of D.J.'s

---

[161] R. Doc. 34-16.
[162] R. Doc. 56.
[163] *Timpa v. Dillard*, 20 F.4th 1021 (5th Cir. 2021).
[164] *Fairchild v Coryell County, Texas,* 2022 WL 2733704, -- F. 4th -- (5th Cir. 2022).
[165] *Id.*

rights under the Fourth and Fourteenth Amendments, by displaying and threatening to deploy his departmental taser.[166]

Defendant Moring argues that he is entitled to qualified immunity for several reasons. First, he contends that D.J.'s Fourth and Fourteenth Amendment rights were not violated because the officers merely threatened to use a non-lethal weapon at D.J.[167] Defendant also argues that Deputy Moring's actions were "objectively reasonable" because deputies have the right to secure the scene of an arrest, because D.J. was not complying with the deputies' commands to back away from the scene of the arrest, and because the display of the departmental taser was not a display of "deadly force," but rather a momentary display of non-lethal force.[168] Defendants state that Fourth Circuit jurisprudence as well as cases in the Second and Eleventh Circuit all hold that officers are allowed to display their weapons when necessary to effectuate an arrest and that it does not constitute excessive force.[169]

Plaintiffs contend that D.J.'s excessive force claim is supported by an assessment of the *Graham* factors, specifically because he was not accused of any crime, he posed no threat to Deputy Moring, and that he did not resist the officers in any way beyond continuing to lawfully film the arrest of his mother.[170]

---

[166] R. Doc. 1.
[167] R. Doc. 56.
[168] R. Doc. 34-3.
[169] R. Doc. 34-3; citing *Bellote v. Edwards*, 629 F.3d 415, 424 (4th Cir. 2011); *Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605 at *43 (S.D.N.Y. Sept. 30, 2015) (quoting *Cabral v. City of New York*, No. 12 Civ. 4659, 2014 WL 4636433 at *28 (S.D.N.Y. Sept. 17, 2014); *see also Courson v. McMillian*, 939 F.2d 1479, 1494-95 (11th Cir. 1991).
[170] R. Doc. 44.

The Court analyzes the Defendant's claims of Qualified Immunity under the same standard as stated earlier in this Order. To overcome the claim of qualified immunity on her claim for excessive force, a plaintiff must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[171]

Turning to the first factor, a plaintiff must have suffered an injury that is more than de minimis in order to overcome the defense of qualified immunity.[172] The evaluation of a plaintiff's alleged injury is context-dependent and is "directly related to the amount of force that is constitutionally permissible under the circumstances."[173] Consequently, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force."[174] Multiple district courts within the Fifth Circuit have held that "emotional distress"—as alleged here—satisfies the injury requirement of an excessive force claim when it results from a police officer's unreasonably excessive brandishing of his firearm.[175]

---

[171] *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

[172] *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001).

[173] *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996); *see Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) ("In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed.").

[174] *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2001) (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)).

[175] *Hodge v. Layrisson*, No. 97-cv-555, 1998 WL 564263, at *6 (E.D. La. Sept. 1, 1998) (stating that "emotional distress" satisfies the injury requirement of an excessive force claim when it results from a police officer's unreasonably excessive brandishing of his firearm); *Flores v. Rivas*, No. EP-18-CV-297-KC, 2020 WL 563799, at *7-9 (W.D. Tex. Jan. 31, 2020); *Mannis v. Cohen*, No. 3:00-cv-1955-P, 2001 WL 1524434, at *8 (N.D. Tex. Nov. 28, 2001).

Plaintiff alleges that D.J. suffered injuries resulting from Deputy Moring's direct verbal and physical threats, including "severe nervous breakdowns," diagnosed PTSD, panic attacks, and that he generally does not "feel comfortable being around people."[176] Defendants do not contest Plaintiff's recitation of D.J.'s injuries. Accordingly, the Court finds that an injury has been established.

The Court next evaluates whether the injuries were caused by Deputy Moring's use of excessive force that was clearly unreasonable.[177] The second and third excessive force elements "collapse into a single objective-reasonableness inquiry,"[178] guided by the factors in *Graham v. Connor*: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[179] However, the officer's actions must be "objectively reasonable" to satisfy the Fourth Amendment.[180]

Defendants do not allege that D.J. committed a crime while recording Plaintiff's arrest, although they do allege that he was close to interfering with the arrest of Plaintiff.[181] Second, D.J. was an unarmed minor who did not threaten Deputy Moring's physical safety or the safety of another police officer or the general public.[182] Deputy Moring stated in his deposition that he had no reason to believe

---

[176] R. Doc. 44-3.
[177] *Ontiveros*, 564 F.3d at 382.
[178] *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018)
[179] *Pena*, 879 F.3d at 619 (quoting *Graham*, 490 U.S. at 396).
[180] *Id.*
[181] *See Graham*, 490 U.S. at 396; *see also* R. Doc. 34 and R. Doc. 56.
[182] *Id.*

that D.J. had a weapon on him.[183] Further, in an interview conducted as part of the St. Tammany Parish Sheriff Department's internal investigation, Deputy Moring stated that D.J. slapped his hand away after Deputy Moring raised it and he told D.J. to stop walking towards Plaintiff.[184] D.J. is not seen slapping Deputy Moring's hand away on any video recording.[185] Lastly, there is no evidence in the record that D.J. did anything to resist, evade, or interfere with the arrest of Plaintiff beyond filming and standing relatively close to the arrest.[186] Finally, all of the events took place in broad daylight.[187] Accordingly, the analysis of the *Graham* factors indicate that that the government had a minimal interest in the use of force against D.J.

The Court next evaluates the level of force used by Defendants and whether it was reasonable. In *Flores v. Rivas*, an officer brandished his weapon at a group of compliant children, despite the absence "of any fact or circumstance which would lead a reasonable person to believe that Plaintiffs committed or were committing any offense, whatsoever."[188] The court, after conducting a brief analysis under *Graham*, held that it was "objectively unreasonable for a police officer to forcefully brandish a deadly weapon at citizens whom he could not reasonably have perceived to be dangerous," particularly when those citizens are "unarmed children who were not alleged to have done anything to threaten [the officer's] safety or the safety of another

---

[183] R. Doc. 44-1 at 110: 4-6.
[184] R. Doc. 34 at p. 16 (citing recorded Administrative Investigation by Capt. Michael Ripoll, Jr. June 25, 2020, 9:05 – 11:35).
[185] R. Doc. 34-15 and R. Doc. 34-16.
[186] *See* R. Doc. 34-16.
[187] *Id.*
[188] *Flores,* 2020 WL 563799, at *7-9.

police officer or the general public."[189] Similarly, the court in *Hodge v. Layrisson* held that it was objectively unreasonable for a police officer to forcefully brandish a deadly weapon at citizens whom he could not reasonably have perceived to be dangerous.[190] Further, courts have determined that "[u]sing force against someone who is not actively resisting arrest is in violation of clearly established law."[191]

D.J. was filming Plaintiff's (his mother's) arrest by Deputy Hart and Deputy Moring with his cell phone at her request.[192] D.J. was standing a few feet away from the scene of the arrest while filming.[193] After Plaintiff was handcuffed and while she was struggling with Deputy Hart on the ground, Deputy Moring approached D.J. and ordered him to back away and to not interfere with the scene of the arrest while he continued filming.[194] D.J. responded that he was not interfering with Plaintiff's arrest, but refused to back away, stating "no" and "I'm not moving" several times when told to step back.[195] Deputy Moring then stood in front of D.J., blocking his view of the arrest, and pushed D.J. in the chest, telling D.J. to back away.[196] Deputy Moring then pointed his taser at D.J. and took several steps towards him while

---

[189] *Id.*

[190] *Hodge*, 1998 WL 564263, at *6; *see also Checki v. Webb,* 785 F.2d 534 (5th Cir. 1986) (stating that "a police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him); *see also McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992) (recognizing excessive force claim based on threatening plaintiff at gunpoint).

[191] *Muslow v. City of Shreveport*, 491 F.Supp.3d 172, 189 (W.D. La. 2020); *Konrad v. Kolb*, 2019 WL 3812883, at *9 (W.D. La. Aug. 13, 2019) (same).

[192] R. Doc. 34-15 (video recorded by D.J.); *see also* R. Doc. 34-16 (video recorded by J.P. where D.J. can be seen interacting with Deputy Hart).

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] R. Doc. 34-16 at 1:44. Defendants contend that Deputy Moring only pushed D.J. away because D.J. pushed him first. This initial push by D.J. is not seen in any video recording of the arrest.

holding the taser out towards D.J.[197] Deputy Moring threatened to tase D.J., to which D.J. responded "you can't tase a child."[198] Plaintiff alleges that Deputy Moring then responded "watch me" and the video supports this interaction.[199] D.J. continued filming for several more seconds and then stopped.[200]

Under the *Graham* factors, Defendants had a minimal interest in the use of force against D.J. It is clearly established in the Fifth Circuit that even the use of relatively minor force, such as "pushing, kneeing, and slapping" is excessive when deployed against "a suspect who is neither fleeing nor resisting arrest."[201] Further, there is a robust consensus that pointing a gun at compliant children is objectively unreasonable.[202] Defendants attempt to differentiate the present case by pointing out that a taser is not a deadly weapon. However, all force, deadly and non-deadly, must be justified by the need for the specific level of force employed.[203] Because Defendants had a minimal interest in the use of force against D.J., Deputy Moring had no justification to display and threaten to use his taser against D.J. Accordingly, the Court finds that Deputy Moring's pointing a taser at D.J. and threatening to use it was unreasonable. Thus, Defendant Moring is not entitled to qualified immunity from D.J.'s excessive force claim against him.

---

[197] R. Doc. 34-15.
[198] R. Doc. 34-15; *see also* R. Doc. 34-16; *see also* R. Doc. 44-1 at 100: 13-25.
[199] R. Doc. 44. *See* R. Doc. 34-15; *see also* R. Doc. 34-16.
[200] R. Doc. 34-16.
[201] *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018) (collecting cases).
[202] *Flores*, 2020 WL 563799, at *7-9 (citing *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) ("[T]hese cases so often involve children because they are much less likely to present the police with a credible threat."); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192–93 (10th Cir. 2001) ("Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.")).
[203] *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 395).

### E. Whether Defendants are Entitled to Qualified Immunity on D.J.'s First Amendment Claim.

Plaintiff has also brought a First Amendment retaliation claim against Defendant Moring on behalf of her minor son, D.J., and argues that his First Amendment rights were violated when Deputy Moring ordered him to stop filming the arrest of Plaintiff and threatened him with a taser.[204] In their Motion for Summary Judgment, Defendants argue that D.J. has no First Amendment claim because the Defendants never ordered him to stop filming, because D.J. never stopped filming, and because D.J. was interfering with the arrest of Plaintiff.[205] Defendants also assert the defense of qualified immunity and argue that they are entitled to qualified immunity because they did not violate D.J.'s First Amendment rights.[206] In response, Plaintiff argues that Deputy Moring violated D.J.'s First Amendment right to record the arrest of Plaintiff by blocking D.J. from recording and by physically and verbally threatening D.J. with his taser, causing D.J. to suffer damages.[207] Plaintiff also argues that D.J. had a right to record Defendants' arrest of Plaintiff and thus Defendants are not entitled to qualified immunity.[208]

The Court evaluates Defendant's claim of qualified immunity under the same standard stated earlier. The Court must first determine whether D.J.'s rights under the First Amendment were violated. The elements of a First Amendment retaliation claim are (1) that the plaintiff was engaged in a constitutionally protected activity,

---

[204] R. Doc. 1.
[205] R. Doc. 34; *see also* R. Doc. 56.
[206] R. Doc. 56.
[207] R. Doc. 44.
[208] R. Doc. 44.

(2) the defendants' actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) the defendants' actions were substantially motivated against the plaintiff's exercise of that activity.[209]

First, the Court must determine if D.J. was engaged in a constitutionally protected activity. The Fifth Circuit has determined that "a First Amendment right to record the police does exist."[210] Defendants do not contest that D.J. was using his cellphone to record Plaintiff's arrest by the Defendants.[211] D.J. was filming while on private property, specifically on his family's driveway.[212] Defendants do not contest any of these facts. Accordingly, D.J. was engaged in a constitutionally protected activity.

Next, the Court must evaluate whether Deputy Moring's actions caused D.J. to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the activity.[213] A retaliation claim requires some showing that the plaintiff's exercise of free speech has been curtailed.[214] "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."[215] Courts have held that "[i]t would be unjust to allow a defendant to escape liability for

---

[209] *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).
[210] *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017).
[211] R. Doc. 1; *see also* R. Doc. 44.
[212] *Id.*
[213] *Keenan*, 290 F.3d at 258.
[214] *Id.*
[215] *Keenan*, 290 F.3d at 258 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity."[216]

Here, Deputy Moring pointed his taser at D.J. and verbally threatened him while he was filming the arrest of Plaintiff.[217] D.J. continues filming while Deputy Moring takes several steps closer to him while holding out his taser.[218] D.J. can be heard stating "you can't tase a child" several times before the camera drops and the video ends, presumably because he walked away and ceased recording.[219] Courts have held that even minimal effects on freedom of speech are sufficient to bring a First Amendment claim.[220] The fact that D.J. continued filming for several seconds while Deputy Moring displayed his taser is not sufficient to indicate that his speech was not chilled.[221] Accordingly, a jury could determine that D.J.'s speech was chilled because he ceased filming Plaintiff's arrest.

Third, the Court must assess whether Deputy Moring's actions were substantially motivated against the plaintiff's exercise of that activity.[222] Deputy Moring has admitted in his deposition that he intentionally stood in front of D.J. and blocked D.J. from recording Plaintiff's arrest by stepping in front of the camera.[223]

---

[216] *Keenan*, 290 F.3d 258 (citing *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001) ("The focus ... is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled.").
[217] R. Doc. 34-16.
[218] *Id.*
[219] *Id.*
[220] *Keenan*, 290 F.3d at 258 (quoting *Bart*, 677 F.2d at 625).
[221] *See Keenan*, 290 F.3d 258 (citing *Smith*, 258 F.3d at 1176 ("The focus ... is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled.").
[222] *Keenan*, 290 F.3d at 258.
[223] R. Doc. 44-2 at 95:1-10 ("Q: And as he moved to the side, you moved to the side in order to block his ability to record the incident, correct? A. Correct.")

Deputy Moring drew his taser, held it out front of him, and repeatedly ordered D.J. to back away, which after several seconds, caused D.J. to lower his camera and stop recording.[224] While Deputy Moring never directly ordered D.J. to stop filming, his attempts to block D.J. from filming Plaintiff's arrest coupled with his display of force indicate that his actions could be substantially motivated to prevent D.J. from filming the incident. Accordingly, there is sufficient evidence for a jury to determine Deputy Moring's actions were motivated against D.J.'s First Amendment-protected act of recording an arrest.

The Court must next determine whether D.J.'s First Amendment right was "clearly established" at the time of the challenged conduct.[225] "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."[226] "[G]overnment retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable."[227] Courts distinguish between retaliatory action that has an independent lawful basis—e.g., an officer's arrest of a speaker where the officer's motivation for the arrest is retaliation for the speaker's defamatory statements about the officer, but where probable cause exists justifying the arrest—and retaliatory action that has no independent lawful basis. Where "law enforcement officers might have a motive to retaliate but there was also a ground to charge criminal conduct against the citizen they disliked," then "the

---

[224] R. Doc. 34-16.
[225] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).
[226] *Hartman v. Moore*, 547 U.S. 250, 256 (2006).
[227] *Keenan*, 290 F.3d at 261 (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996)).

objectives of law enforcement take primacy over the citizen's right to avoid retaliation."[228] On the other hand, "[i]f no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [an officer] against the plaintiff[ ], then their retaliation violated clearly established law in this circuit."[229] In other words, D.J. has a clearly established right to be free from retaliatory action by government officials where "nonretaliatory grounds" are "insufficient" to justify the action.[230]

Here, D.J. was engaged in lawful activity, specifically the filming of Plaintiff's arrest by the Defendants from his family's driveway.[231] D.J. was not committing a crime and thus there was no retaliatory grounds, such as probable cause for arrest, to justify Deputy Moring's interference with his First Amendment rights. Thus, the Court concludes that Deputy Moring's conduct violated D.J.'s clearly established First Amendment right and was not "objectively reasonable in light of clearly established law."[232] Accordingly, the Court finds that Plaintiff has rebutted Deputy Moring's claim of qualified immunity. Thus, Deputy Moring is not entitled to the defense of qualified immunity from D.J.'s First Amendment claim.

### F. Plaintiff's Unlawful Seizure Claim

While Defendants seek summary judgment on Plaintiff's "unlawful seizure claims," Defendants only address Plaintiff's "seizure" in relation to her arrest in their

---

[228] *Keenan*, 290 F.3d at 261-62; *see also Mozzochi v. Borden*, 959 F.2d 1174, 1179 (5th Cir. 1992).
[229] *Keenan*, 290 F.3d at 262.
[230] *Hartman*, 547 U.S. at 256.
[231] R. Doc 34-16; *see also* R. Doc. 44.
[232] *Thompson*, 245 F.3d at 457.

motion. Plaintiff, in her opposition, asserts that her motorcycle was unlawfully seized and impounded by the Defendants after her arrest.[233] Further, Plaintiff states that the Louisiana Supreme Court has held that towing a vehicle incident to arrest when the vehicle is "not on a public highway and posed no danger of either obstructing traffic or causing accidents" is an unreasonable seizure.[234] In their reply brief, which addresses this claim for the first time, Defendants contend that Louisiana law requires all registered owners of motor vehicles to carry proof of liability insurance and that failure to do so can result in impoundment of the vehicle.[235]

Louisiana law requires police officers, when stopping an owner in connection with an alleged violation of law, to determine if the owner of a vehicle has proof of liability insurance.[236] If the owner does not have proof of liability insurance, Louisiana law states that "the motor vehicle shall be impounded."[237] Courts have upheld the impoundment of a vehicle following the owner's failure to produce proof of liability insurance.[238]

Plaintiff urges the Court to consider the Louisiana Supreme Court's finding in *State v. Hernandez*.[239] In *Hernandez*, the defendant's car was impounded after he was arrested for reckless operation of a vehicle.[240] Before the car was impounded, the

---

[233] R. Doc. 1.
[234] R. Doc. 44 (citing *State v. Hernandez*, 410 So.2d 1381, 1384 (La. 1982)).
[235] R. Doc. 56 (citing La. R.S. 32:863.1).
[236] La. R.S. 32:863.1.
[237] La. R.S. 32:863.1(c)(1)(a).
[238] *Spann o/b/o Spann v. Bogalusa City Police Dep't*, No. 20-2780, 2021 WL 4318133 (E.D. La. Sept. 23, 2021); *see also Jones v. Town of Woodworth,* No. 2:16-CV-00783, 2015-568, p. 11 (La. App. 3 Cir. 11/4/15), 178 So. 3d 243, 249 (finding that an officer had a legal obligation to impound a vehicle based on his issuing a ticket for no proof of insurance pursuant to La.R.S.32:863.1(C)(1)(a)).
[239] R. Doc. 44 (citing *Hernandez*, 410 So.2d at 1384).
[240] *Id.*

police re-entered the defendant's property, searched his car and found marijuana, leading to additional charges against the defendant for drug possession.[241] Defendant argued that his vehicle was unlawfully searched and impounded by the police.[242] The Louisiana Supreme Court held that impounding the vehicle was not proper incidental to the arrest and explained that "if a person is arrested in or at his place of residence and his car is parked in the garage or lot or other place where that person ordinarily leaves his car, then the police cannot justify seizure of the car on the ground that such action is needed for the protection of the vehicle and its contents."[243]

The facts in this matter are distinguishable from *Hernandez*. In *Hernandez*, the police re-entered defendant's property, searched his car, and then impounded it on the grounds that it was needed for the protection of the vehicle and its contents.[244] In this matter, however, Plaintiff's motorcycle was impounded for a different, statutorily approved reason, specifically because Plaintiff failed to provide proof of liability insurance.[245] Louisiana law states that "When a law enforcement officer stops a vehicle…in connection with an alleged violation of the law, or for any other reason…the law enforcement officer shall determine if the owner or lessee of each vehicle is in compliance with the provisions of this Section [La. R.S. 32:863] which require evidence of liability insurance or other security to be contained in the vehicle."[246] Plaintiff concedes in her Opposition that, "for purposes of this motion, Ms.

---

[241] *Id.*
[242] *Id.*
[243] *Id.*
[244] *Id.*
[245] *See* R. Doc. 56-5.
[246] La. R.S. 32:863.1(B)(1).

Perkins does not contest Defendants' claim that they saw her on the motorcycle in the road without a helmet."[247] Further, in his deposition, Deputy Moring stated that Plaintiff "said she had insurance but ultimately was unable to produce it."[248] Here, the officers followed La. R.S. 32:863 and impounded Plaintiff's motorcycle after she failed to provide proof of liability insurance. Accordingly, Plaintiff's motorcycle was lawfully impounded by the Defendants and Defendants are entitled to Qualified Immunity on that claim. Thus, Defendants' Motion for Summary Judgment as to unlawful seizure of her motorcycle is granted.

### G. Plaintiff's State Law Claims

Plaintiff has alleged a number of claims under Louisiana state law arising from her arrest, including excessive force, battery, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress.[249] Defendants move for summary judgment on these claims and make several arguments.[250] First, Defendants argue that Plaintiff's claims of excessive force, battery, and assault must be dismissed because the evidence indicates that the Defendants did not employ excessive force when arresting Plaintiff and because the Defendants are entitled to the defense of qualified immunity.[251] Plaintiffs contend that the evidence supports these state law claims.[252] As described above, the Court has determined that there is a material issue of fact in dispute regarding whether Defendants employed excessive

---

[247] R. Doc. 44 at fn. 4.
[248] *Id.*
[249] R. Doc. 1.
[250] R. Doc. 56.
[251] *Id.*
[252] R. Doc. 44.

force when arresting Plaintiff, or after she was restrained in handcuffs, and when interacting with her minor child D.J. and thus they are not entitled to qualified immunity. Accordingly, Defendants' Motion for Summary Judgment as to the state law claims of excessive force, battery, and assault must be denied.

Second, Defendants argue that Plaintiff's claims for intentional and negligent infliction of emotional distress must be dismissed because no "shocking or egregious" conduct occurred.[253] Plaintiffs counter that there is an issue of material fact in dispute regarding whether Defendants' conduct was "shocking or outrageous" as required under Louisiana state law to prove either claim.[254] Based on the above finding that there is a material issue of fact in dispute regarding whether Defendants employed excessive force when arresting Plaintiff and engaging with her minor child D.J., the Court finds that it is unable to determine at this stage whether Defendants' conduct was "outrageous" or "shocking or outrageous" as required under Louisiana law. Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff and her minor child's state law claims for intentional and negligent infliction of emotional distress must be denied.

---

[253] R. Doc. 56.
[254] R. Doc. 44.

IV.     CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment[255] is **GRANTED in part** and **DENIED in part**.

**IT IS GRANTED** as to Plaintiff's unlawful seizure claim solely as to the seizure of her vehicle.

**IT IS DENIED** as to all other claims.

New Orleans, Louisiana, July 26, 2022.

**WENDY B. VITTER**
**UNITED STATES DISTRICT JUDGE**

---

[255] R. Doc. 34.