UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
************************************************************
TELIAH C. PERKINS, ET AL

                              Docket No. 21-CV-879
                              Section "D"
v.                           New Orleans, Louisiana
                              Tuesday, April 30, 2024

KYLE HART, ET AL
************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE WENDY B. VITTER
UNITED STATES DISTRICT JUDGE
DAY 2 - MORNING SESSION


<u>APPEARANCES:</u>

FOR THE PLAINTIFF:           ACLU FOUNDATION OF LOUISIANA
                              BY:  ERIN B. WHEELER, ESQ.
                                   NORA AHMED, ESQ.
                              1340 Poydras St., Suite 2160
                              New Orleans, LA 70112

                              REID COLLINS & TSAI
                              BY:  EMMA CULOTTA, ESQ.
                                   KEITH COHAN, ESQ.
                                   RYAN M. GOLDSTEIN, ESQ.
                                   SEAN D. JOHNSON, ESQ.
                              1301 S. Capital of Texas Highway
                              Suite C-300
                              Austin, TX 78746

FOR THE DEFENDANT:          MILLING BENSON WOODWARD
                              BY:  ANDREW R. CAPITELLI, ESQ.
                                   SARAH A. FISHER, ESQ.
                              68031 Capital Trace Row
                              Mandeville, LA 70471

Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR, RMR
                              500 Poydras Street, B-275
                              New Orleans, Louisiana 70130
                              (504) 589-7776

   Proceedings recorded by mechanical stenography, transcript produced by computer.

I N D E X

WITNESSES FOR THE PLAINTIFF:                          PAGE/LINE:


JERON PERKINS

  Direct Examination by Mr. Goldstein              4/7

  Cross-Examination by Ms. Fisher                  9/9

  Redirect Examination by Mr. Goldstein            19/2


RYAN MORING

  Direct Examination by Mr. Goldstein              23/23

P R O C E E D I N G S

(TUESDAY, APRIL 30, 2024)

(MORNING SESSION)


(OPEN COURT.)

THE COURT:  Okay.  I understand the jury is here and ready.  Bring them in.

(WHEREUPON, THE JURY ENTERED THE COURTROOM.)

THE COURT:  Please be seated.  Good morning to our jurors.  Glad the weather's a little better.  Good to see you.  The jury is back in the courtroom.  The parties are present, counsel is present, and we're ready to proceed.  Mr. Goldstein.

MR. GOLDSTEIN:  Thank you, your Honor.  The plaintiff calls Jeron Perkins.

THE COURT:  All right.  Mr. Perkins.

MR. GOLDSTEIN:  He is right outside the door.

THE COURT:  And I am looking, we still have a sequestration of witnesses, correct?  I don't see any witnesses in court.

MR. GOLDSTEIN:  I would note for the record that our expert Roger Clark is in attendance in the courtroom as an expert witness.

THE COURT:  That is fine.  Mr. Perkins, right up here.  Stand here and raise your right hand.

(WHEREUPON, JERON PERKINS, WAS SWORN IN AND TESTIFIED AS

FOLLOWS:)

THE DEPUTY CLERK:  Thank you.  Please be seated and state your name in the microphone for the record, please.

THE WITNESS:  Jeron Perkins.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. GOLDSTEIN:

Q.  Good morning, Mr. Perkins.  Are you related to the plaintiff in this case, De'Shaun Johnson?

A.  Yes.

Q.  How are you related to De'Shaun?

A.  My cousin.

Q.  And how old are you?

A.  Nineteen.

Q.  Are you still in school or are you now working?

A.  I'm working but I'm going back to school May 28th.

Q.  You're going back to school on May 28th?

A.  Yeah.

Q.  Where do you currently live, which town?

A.  Terrytown.

Q.  And how often these days do you see your cousin De'Shaun?

A.  Like holidays.

Q.  Were you present at De'Shaun's house in Slidell in May of 2020 when there was an incident involving the St. Tammany Parish Sheriff's Office?

A.   Yes.

Q.   And how old were you then?

A.   I was like 15.

Q.   So you're about a year older than De'Shaun?

A.   Yeah.

Q.   Ms. Stone, if you could put up Exhibit 10, please.  Jeron, do you see in front of you a video or the beginning of a video?

A.   Yeah.

Q.   And Exhibit 10 was already admitted into evidence, but do you recognize this video?

A.   Yes.

Q.   And what is this video?

A.   A recording of what happened to my auntie.

         MR. GOLDSTEIN:  And, Ms. Stone, if you could go ahead and play the recording.

     (WHEREUPON, THE VIDEO WAS PLAYED.)

BY MR. GOLDSTEIN:

Q.   Jeron, in the video we just watched, who is the woman that's being handcuffed?

A.   My auntie.

Q.   I'm sorry, what did you call her?

A.   My auntie.

Q.   And what is her name?

A.   Teliah.

Q.   And who is the boy wearing orange?

A.   De'Shaun.

Q.   That's your cousin De'Shaun.  On what kind of device did you take this recording?

A.   My iPhone.

Q.   And after you took the recording, did you do anything with it?

A.   No.

Q.   Did you send it to anyone?

A.   I just sent it to my auntie, Teliah.

Q.   And how did you send it to her?

A.   Through iMessage.

Q.   Did you modify the video in any way before sending it to her?

A.   I just fast-forward it so I could, so I could make the size smaller because it wouldn't let me send the video that's, like -- the file was too big so I couldn't send it, so I just like cut out the part that was unnecessary and I just got to the point.

Q.   Other than fast-forwarding parts of it, did you modify the video in any way?

A.   No.

Q.   Do you still have a copy of the original video?

A.   Only the copy that y'all gave me.

Q.   The same version we just watched Exhibit 10?

A.   Yeah, that's the only one I got.

Q.   I want to turn to the events of May 5th, 2020, briefly.  At some point did the officers Officer Moring and Officer Hart pull up to your aunt's house?

A.    What you said?

Q.    Did the officers pull up to your aunt's house at some point that day?

A.    Yeah.

Q.    And where were you when the officers began communicating with your aunt?

A.    She told me to go inside so I went inside.

Q.    And so in Exhibit 10, Ms. Stone, if you could pull it up where it starts, I just want to ask you about the view.

       Do you recall the opening scene in Exhibit 10 looking out a window?

A.    Yeah.

Q.    So where were you standing at that point?

A.    In the kitchen.

Q.    And at some point did you come outside?

A.    Yeah.

Q.    Why did you go outside?

A.    Because De'Shaun went outside so I just followed behind him.

Q.    And once you went outside, where did you stand?

A.    Right behind De'Shaun on the porch.

Q.    Thank you, Ms. Stone.  Back up.  Here in Exhibit 10, the opening scene, that's the kitchen window that you testified about, Jeron?

A.    Yeah.

Q.    After you went outside I think you testified that you stood

behind your cousin De'Shaun; is that right?

A.   Yeah.

Q.   And at some point did the officers begin talking to you?

A.   I mean, they was telling us to go back inside, that's about it.

Q.   And did you and De'Shaun go back inside?

A.   I mean, no.  We was recording it.

Q.   Why did you record the interactions between the officers and your aunt?

A.   It just looked like it was getting messy so it was like, it was just something to record; it was just getting messy, so it was like...

Q.   And I want to turn to the part of the video when Officer Moring begins, stands up and begins talking to your cousin De'Shaun.  Do you recall that part of the video?

A.   Yeah.  Yeah.

Q.   And at this point your aunt is in handcuffs, right?

A.   Yeah.

Q.   And what did you observe Officer Moring do during his interactions with De'Shaun?

A.   He was holding the taser to his face and telling him to go back inside.

Q.   And how did you feel as you were witnessing these events that day on May 5th?

A.   It was weird.  It was like you see this stuff happen on social media, so it's like when you see it happen in front your eyes, it

was just weird.  But, yeah, it was weird.

MR. GOLDSTEIN:  Thank you, Jeron.  I pass the witness.

THE WITNESS:  All right.

THE COURT:  All right.  Another attorney is going to have some questions for you.

THE WITNESS:  All right.

THE COURT:  All right.  Ms. Fisher.

CROSS-EXAMINATION

BY MS. FISHER:

Q.  Good morning, Mr. Perkins.  My name is Sarah Fisher.

A.  Good morning.

Q.  Can you remind us when you started recording?

A.  When the cops, when the cops showed up when they was talking to my auntie.

Q.  As soon as the cops showed up you started recording?

A.  In the kitchen window.

Q.  So how much of that interaction is missing from this video?

A.  I don't know, not much.

Q.  Not much, so there is part of that interaction that's missing from this video?

A.  I never had it on video.

Q.  Okay.  So you did not start recording as soon as the cops pulled up; is that correct?

A.  Yeah.  I was in the kitchen window.

Q.  But you did not start recording as soon as the cops pulled up,

is that correct?  Yes or no?

A.  Yes.

THE COURT:  You can explain any answer as well.

BY MS. FISHER:

Q.  You may explain if you have an explanation.  But you just testified that you started recording as soon as they pulled up and you seemed to contradict that.

A.  I was in the kitchen window.

Q.  Okay.  So your explanation is because you were in the kitchen?

A.  Yeah.

Q.  When you first exited the home, were you recording?

A.  Yeah.

Q.  And did the cops tell you anything at that point?

A.  When I was outside?

Q.  When you first exited and you were, I guess it looks like you were towards the porch, did the cops tell you anything at that point?

A.  They told us to go back inside.

Q.  The cops told you to go back inside at that point?

A.  Yeah.

MS. FISHER:  Play Exhibit 10, please.

(WHEREUPON, THE VIDEO WAS PLAYED.)

BY MS. FISHER:

Q.  So, Mr. Perkins, that was the first half of the video you provided replayed.  Did you hear at any point the officers tell you

to go back inside?

A.   No.

Q.   Thank you.  But you did say in that recording that you recorded everything, right, you got everything?

A.   When he had the taser in his face, that's when he told De'Shaun go back inside.

Q.   All right.  So right there at the beginning of the video, the first half of the clip we just watched replayed, you stated that you had everything recorded, correct?

A.   Yeah.

Q.   Thank you.  So when your aunt decided to leave the traffic stop and the cops decided to arrest her, you and De'Shaun were recording at that point; is that correct?

A.   Yes.

Q.   And y'all were advised to stay back; is that correct?

A.   Yes.

Q.   And I believe it was Officer Hart, who is not a defendant in this case, who advised y'all too stay towards the porch; do you disagree with that?

A.   Yes.

        MR. GOLDSTEIN:  Object to the characterization of the case.

        MS. FISHER:  He answered the question.

        THE COURT:  I'm sorry, I want to hear the objection though.

MR. GOLDSTEIN:  Counsel referred to Officer Hart and described his role in this case.

THE COURT:  Overruled.  And what was the question again? The Officer Hart said what?

BY MS. FISHER:

Q.  I believe it is Officer Hart who advised you and De'Shaun to stay back towards the porch; is that correct?

A.  He said go inside.

THE COURT:  Are you going to play the video?

MS. FISHER:  The beginning, please.

(WHEREUPON, THE VIDEO WAS PLAYED.)

BY MS. FISHER:

Q.  Mr. Perkins, in that clip replayed for you, did you hear either officer tell you or De'Shaun to go back inside?

A.  No.

Q.  Could that portion maybe have been in the clip that you removed?

A.  No.

Q.  And I believe you testified a moment ago that you stayed behind De'Shaun; is that correct?

A.  Yeah.

Q.  Did an officer ever tell you to go back inside?  I believe your testimony has been yes; is that correct?

A.  Yes.

Q.  Even though we just watched the video you still state that an

officer told you at some point to go inside?

A.  Yeah.

Q.  Did an officer show his taser to you?

A.  To De'Shaun.

Q.  Did an officer show his taser to you?

A.  No.

Q.  Did an officer extend his hand out to you and ask you to step back?

A.  No.

Q.  And that's because you were standing behind De'Shaun; is that correct?

A.  Yeah.

Q.  I believe you also testified a moment ago that Officer Moring was holding a taser in De'Shaun's face and telling him to go back inside; is that correct?

A.  Yeah.

(WHEREUPON, THE VIDEO WAS PLAYED.)

MS. FISHER:  Pause it.

BY MS. FISHER:

Q.  So at that point Officer Moring displayed his service taser. Could you hear Officer Moring tell De'Shaun to go inside?

A.  No.

Q.  Do you think that could have maybe been in the section of the video that you altered?

A.  No.

Q.   So if you didn't hear it in the video and it wasn't in the section of the video that you altered, can you explain at what point Officer Moring told him to go inside?

A.   Yeah, when he was holding the taser in his face.

Q.   Okay.  Well, we just watched that video clip and you just testified that it is not in the video, that you recorded the whole thing, and you also testified that it could not be in the section of the video that you altered.  So can you explain that?  Or is it that Officer Moring never told De'Shaun or yourself to go inside?

A.   He probably never said it.

Q.   All right.  We'll move on to --

THE COURT:  What was that?  I'm sorry, I just didn't understand it.  Say it again.

THE WITNESS:  He didn't say that.

MS. FISHER:  Thank you.

BY MS. FISHER:

Q.   So going forward to the video itself.  I believe you testified a moment ago that you were videoing on an iPhone; is that right?

A.   Yeah.

Q.   Have you ever used the cloud feature of an iPhone?

A.   Yeah.

Q.   Are you familiar with what AirDrop is?

A.   Yeah.

Q.   But you cut out sections of this video; is that correct?

A.   No.

Q.   So you fast-forwarded through select portions of this video; is that correct?

A.   Yes.

Q.   And I believe you testified earlier that you did that based on parts that weren't relevant; is that right?

A.   Yes.

       MR. GOLDSTEIN:  Objection, mischaracterizes his testimony.

       MS. FISHER:  That's verbatim what he said, but we can go back and read it.

       THE COURT:  Overruled, overruled.  Address the objections and responses to me.  Overruled.  He may answer.

       You fast-forwarded through portions that you didn't think were relevant, is that your -- what you said?

       THE WITNESS:  Yes, yes.

BY MS. FISHER:

Q.   So can you explain for us what portions you may have viewed that you deemed irrelevant before you omitted them?

A.   Parts when I was in the kitchen.

Q.   Parts when you were in the kitchen.  Anything else?

A.   No.

Q.   Mr. Perkins, we just watched this video multiple times and there is a big chunk right in the middle that you tampered with.  Were you in the kitchen at that point?

       MR. GOLDSTEIN:  Objection, mischaracterizes the

testimony.

THE COURT:  Sustained.

BY MS. FISHER:

Q.  There is a large section of the video that is messed with right in the middle of the clip, fast-forwarded through.  Can you explain if you were in the kitchen at that point?

A.  Let me see the thing again, I fast-forwarded outside.  The part where I fast-forward outside.

(WHEREUPON, THE VIDEO WAS PLAYED.)

BY MS. FISHER:

Q.  Were you in the kitchen there, too?

A.  No.

Q.  So let's say that the video had to be cut from the front or from the back so that you could reduce the size to produce it to counsel or to whoever requested it.  Did you consider just breaking it into two whole videos?

A.  No.

MR. GOLDSTEIN:  Objection, mischaracterizes his prior testimony.

THE COURT:  Overruled.

BY MS. FISHER:

Q.  No, you did not consider that?

A.  No.

Q.  Do you believe you could have just broke it into two videos?

A.  I didn't feel like it.

Q. Okay. Can you explain to us what happened to the original of that video?

A. I don't have it. It was only one video.

Q. I understand. Can you explain to us what happened to the original version of that full video?

A. I don't have it.

Q. Do you have a reason why?

A. I don't have it.

Q. Okay. Do you remember hearing yourself state in that video, and I know I already covered this a moment ago, "I got everything. I got the whole thing every time," do you remember saying that in the video?

A. Yeah.

Q. So nobody stopped you from recording; is that correct?

A. No.

Q. Nobody told you to go inside; is that correct?

A. No.

Q. That's not correct?

A. I mean, yeah.

Q. And you were not interrupted from recording this incident; is that correct?

A. No.

Q. That's not correct, you were interrupted?

A. Yeah.

Q. If you were interrupted, then how did you get the whole thing

every time?

A.   Because the cop was in the way.

Q.   The cop was in the way of you?

A.   Yeah.

Q.   What is not shown in this video that you took that the cop was in the way of?

A.   When he was stepping in front, when the dude was assaulting her.

Q.   I'm sorry, can you say that again?

A.   When he was stepping in front and the dude was assaulting her.

Q.   When the dude was assaulting her?

A.   The cop.

Q.   You're aware that your aunt was convicted of resisting arrest, the cop did not assault your aunt?

A.   She wasn't resisting.

Q.   Are you aware that your aunt was convicted of resisting arrest?

A.   She wasn't resisting.

        MR. GOLDSTEIN:  Objection, I'd ask for a side bar if this line of questioning continues.

        THE COURT:  It's been asked and answered and we'll address it afterwards.  It's asked and answered.  He says she wasn't resisting.

        MS. FISHER:  Okay.  I have no further questions.  Thank you.

        MR. GOLDSTEIN:  Briefly.

REDIRECT EXAMINATION

BY MR. GOLDSTEIN:

Q.   Jeron, are you the plaintiff in this case in front of the jury?

A.   What that mean?

Q.   Have you filed a lawsuit related to this incident?

A.   No.

Q.   When you took the recording, did you ever think it would be used as evidence in a trial some day?

A.   No.

Q.   When you sent it to your aunt, did you ever think it would be used as evidence in a trial some day?

A.   No.

Q.   Did you fast-forward to eliminate parts that you thought were bad for your cousin and for your aunt?

        MR. CAPITELLI:  Objection, asked and answered.

        THE COURT:  I think it's proper redirect.  But don't lead your witness.

        MR. GOLDSTEIN:  Thank you, your Honor.

        THE COURT:  On that basis, rephrase the question.

BY MR. GOLDSTEIN:

Q.   Could you remind us which portions of the recording you fast-forwarded through?

A.   When I was in the kitchen.

Q.   Were there other portions that you fast-forwarded through?

A.   I mean, just now it looked like I fast-forward through

something, but I skipped to the part with us going outside.

Q.  Thank you.  Your aunt's house, does it have a porch in the front?

A.  Yeah.

Q.  And was there any discussion of the porch during the incident?

A.  No.

MR. GOLDSTEIN:  Thank you.  No further questions.

THE COURT:  Okay.  You may step down.  Thank you.

Counsel to the side bar, please.

(WHEREUPON, A SIDE BAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT:  How do you want this addressed as to her arrest, Mr. Goldstein?

MR. GOLDSTEIN:  I think it needs to be addressed by the Court, it's not an issue before the Court; that to the extent her arrest or her conviction are referred to, it needs to be an accurate description of what she was convicted of, which was misdemeanor resisting after having been charged with felony resisting and the felony traffic violations and with a penalty of a $50 fine.

MR. CAPITELLI:  That is completely unnecessary.  What she said was entirely accurate, she was convicted of resisting, no instruction is needed.

THE COURT:  You're saying not to instruct them at all?

MR. CAPITELLI:  No instruction is needed.

MS. FISHER:  There should also be an instruction that the

officer is not assaulting her.

MR. CAPITELLI:  If we're going to go over all of her defenses that we keep hearing related to choking and everything else are raised and dismissed at the criminal trial, otherwise we have an issue.

THE COURT:  Is there any objection, because I do think it would be helpful, is there any objection to me advising the jury right now that anything related to Ms. Perkins is not at issue in this case.  Is there any objection to that?

MR. CAPITELLI:  Not to that instruction, no.

THE COURT:  And secondly, that the parties have asked me to instruct you that Ms. Perkins, in fact, did plead guilty to resisting arrest.

MR. CAPITELLI:  No objection.

MR. GOLDSTEIN:  She didn't plead guilty.

THE COURT:  Well, convicted.

MR. GOLDSTEIN:  But I think it needs to be characterized if you're going to go that route, your Honor, I think misdemeanor conviction with resisting with a $50 fine.

MS. FISHER:  I really think we are undercutting the issue that this witness who was not a plaintiff made a comment about an actual defendant here accusing him of assault on the record, the jury cannot unhear that.  So we're about to go to lengths to protect Ms. Perkins and what happened to her?

MR. CAPITELLI:  After her conviction.

MS. FISHER:  More needs to be --

THE COURT:  For now I think it is important and this is the time now to give them a limiting instruction to remind them of the issue before the Court is only as to Mr. Johnson and not anything related to Ms. Perkins.  And then any issue related to her arrest y'all need to discuss further, for further instructions, but I think now I need to bring that up.

MR. CAPITELLI:  I think we should say related to Ms. Perkins or the force allegedly used on her, I think we need something outside of the force, Ms. Perkins --- I mean, need a more comprehensive --

MR. COHAN:  The language we proposed to defendants was it's not about whether the force used was reasonable or unreasonable or whether the arrest was lawful or unlawful, it's about De'Shaun --

MR. CAPITELLI:  I guess we'll do the one you suggested of just one the sentence about this case is not about Ms. Perkins, the instruction the case is not about Ms. Perkins, the case is only about De'Shaun.

THE COURT:  Okay.  Is there any objection to:  I am going to advise you now this case is not about Ms. Perkins or the force used on her.  This case is solely about Mr. Johnson's claims against Officer Moring.  Any objection?

MR. GOLDSTEIN:  None from the plaintiff.

MR. COHAN:  No objection.

MR. CAPITELLI:  No objection.

MS. FISHER:  That's fine.

THE COURT:  That's just for now.

(OPEN COURT.)

THE COURT:  Before you call your next witness.  Jury, it's appropriate to advise you, remind you that this case is not about Ms. Perkins or any force used on Ms. Perkins, and that is not to be considered or not a consideration for you in your deliberations.  This case is about the claims made by Mr. Johnson against Officer Moring.

With that, call your next witness.

MR. GOLDSTEIN:  Plaintiff calls Officer Ryan Moring to the stand.

THE COURT:  All right.  Officer Moring, come on up.

THE DEPUTY CLERK:  Please raise your right hand.

(WHEREUPON, RYAN MORING, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK:  Please be seated and state your name in the microphone for the record.

THE WITNESS:  My name is Deputy Ryan Moring.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. GOLDSTEIN:

Q.  Good morning, Deputy Moring.  You're a deputy in the St. Tammany Parish Sheriff's Office?

A.   Yes.

Q.   And you're currently assigned to the traffic division; is that right?

A.   Yes.

Q.   As of May of -- excuse me, March of 2020 -- May of 2020, you were also assigned to the traffic division; is that right?

A.   Yes.

Q.   You've been assigned to the traffic division from May of 2020 through today?

A.   Yes.

Q.   And you understand that as part of your job as a terrific deputy, there are constitutional limitations on what you can and cannot do, correct?

A.   Yes.

Q.   In fact, one of your primary responsibilities as a deputy is to protect citizens through the upholding of laws, including the U.S. Constitution, correct?

A.   Yes.

Q.   On May 5th, 2020, you were assigned to traffic duty, correct?

A.   Yes.

Q.   And you were riding with a partner that day, right?

A.   Yes.

Q.   That partner was someone named Deputy Hart?

A.   Yes, Deputy Kyle Hart.

Q.   And at some point that day you were called out to Jay Street,

right?

A.   Yes.

Q.   That's a street in Slidell, Louisiana.

A.   Yes.

Q.   And the reason that you and Deputy Hart were called out to Jay Street was there had been a report, an anonymous report of someone recklessly riding a dirt bike on Jay Street, correct?

A.   There was a report of a woman riding a blue dirt bike, yes.

Q.   And that report was made anonymously, right?

A.   Through our dispatch, yes.

Q.   And so the person who called dispatch didn't state their name when asked who they were?

A.   That information is not readily given to us as we're responding to it; but ultimately, yes, we did find that out that it was given anonymously.

Q.   And the person who reported it could have shared their name with dispatch, correct?

A.   Possibly.

Q.   They chose to report it anonymously?

A.   Yes.

Q.   And what time of day, generally, were you and Deputy Hart dispatched to Jay Street?

A.   The middle of the day.

Q.   The afternoon?

A.   It was the middle of the day.

Q. You don't recall what time generally?

A. No.

Q. When you arrived at Jay Street, did you observe anyone riding a dirt bike?

A. Initially, no.

Q. Did you observe anyone riding a dirt bike recklessly?

A. No, no dirt bike was observed.

Q. And no reckless rider was observed either, correct?

A. No.

Q. And as you rode down Jay Street you passed by 2018 Jay Street, correct?

A. Yes.

Q. And as you rode by you observed a woman out front, correct?

A. In the driveway standing next to a blue motorcycle, yes.

Q. And at the time that blue motorcycle was parked, right?

A. At that time, yes, it was.

Q. And the woman waved to you as you passed by?

A. I didn't see the wave.

Q. She acknowledged you as you passed by?

A. I did not see that.

Q. And then you continued down Jay Street, correct?

A. Yes.

Q. You didn't stop and talk to her?

A. At that point, no.

Q. As you got to the end of Jay Street you made a U-turn, correct?

A. Not the end of Jay Street but the first intersection.

Q. Thank you, that's a fair characterization. When you got to an intersection, the next interaction after 2018 Jay Street you did a U-turn?

A. Yes.

Q. And as you turned around, you again saw the woman out front of 2018 Jay Street, right?

A. And now we were in the street.

Q. You were on your motorcycle riding back towards 2018 Jay Street, correct?

A. Yes.

Q. And you at this time saw a woman walking her motorcycle backwards into the driveway, correct?

A. Out of the driveway.

Q. You observed a woman walking her motorcycle out of the driveway?

A. Yes.

Q. As in she was parked in the driveway facing towards the street and she was walking it into the street?

A. She backed it into the street.

Q. She backed it into the street from the driveway, so it was parked in the driveway facing the house?

A. I don't know the exact direction that the motorcycle was facing in the driveway.

Q. When you passed by her house the first time, which way was the

motorcycle facing?

A.    I don't remember, this was four years ago.

Q.    And as you came back after doing the U-turn, you observed the woman walking the motorcycle from the driveway into the street?

A.    Into the street, with the motorcycle on, engine revving.

Q.    You heard the engine revving?

A.    Yes.  It was very audible.

Q.    From down the block after doing the U-turn?

A.    Yes, between the end of the block and returning to the residence, yes.

Q.    And now, you have no jurisdiction over any motorcycle operations on someone's own driveway, right?

A.    As far as?

Q.    As far as someone riding without a helmet, for example?

A.    As far as riding without a helmet, no, but there are traffic laws that you do apply on private property.

Q.    But when it comes to riding without a helmet, if you observe a motorcycle rider on their private property without a helmet, that is not something you as a deputy of the St. Tammany Parish Sheriff's Office can cite them for, right?

A.    Correct.  But we were in the roadway.

Q.    You keep saying you were in the roadway.

A.    I was in the roadway, she was in the roadway as well.  I believe that's been abundantly clarified.

Q.    But your testimony today, sir, is that you saw her walking her

motorcycle from the driveway onto the roadway?

A.    She was in the roadway, yes.

Q.    I'm sorry, I don't think you're answering my question.  Did you observe her walking the motorcycle from the driveway into the roadway?

A.    Yes, at some point she had to leave the driveway to enter the roadway.

Q.    And you personally observed her do that?

A.    She was in the road, I observed her in the road.

Q.    Which way was her motorcycle facing when you observed her in the roadway?

A.    She was backing out of the driveway.

Q.    And which way was her motorcycle facing?

A.    It would have been toward the house at that point.

Q.    So her motorcycle when you rode by the first time was parked in the driveway facing the house, are you with me so far?

A.    I've already said I don't remember the direction.

Q.    Okay.  But at some point after you did the U-turn, you saw her walking the motorcycle from the driveway into the roadway, correct?

         MR. CAPITELLI:  Your Honor, I'm going to object at this point and ask for a side bar based on relevance, as well as counsel's well aware, but I don't want to say anything further in front of the jury.

         THE COURT:  Very briefly.  Approach the side.

      (WHEREUPON, THE SIDE BAR CONFERENCE WAS HELD AS FOLLOWS:)

MR. CAPITELLI:  Your Honor, the basis has been established, we have a criminal conviction of her, they are not allowed to challenge indirectly.  This has absolutely nothing to do with the First Amendment claim that's observed.  Details about whether she was properly in the roadway, did she have the helmet on, that's all irrelevant.

MR. GOLDSTEIN:  May I respond?

THE COURT:  Yes.

MR. GOLDSTEIN:  I was trying to establish the foundation for the day.  I did not expect Officer Moring to change his story and so that's why it's taking a little bit longer to get to the arrest.

MR. CAPITELLI:  It doesn't matter --

THE COURT:  Mr. Goldstein.

MR. GOLDSTEIN:  I did not expect the story to change, I'm trying to lay the foundation so I can determine whether I need to impeach him or not.  But I'll move on.

THE COURT:  No.  Let me rule.  It goes to credibility, I am overruling it.  Let's not waste time, you can make the objection without --

MR. CAPITELLI:  My next objection is that her conviction has been established and this is collaterally attacking the conviction he is trying to say whether or not she had a basis to be in the roadway, whether or not she had a helmet on.

MR. GOLDSTEIN:  She wasn't convicted for any traffic

violations.

THE COURT: But separate from that, if there's an issue with credibility, he has a right to question him about that. Overruled.

(OPEN COURT.)

THE COURT: Proceed, Mr. Goldstein.

BY MR. GOLDSTEIN:

Q. Ms. Stone, could you pull up Exhibit 10, please, at the 21 second mark. Deputy Moring, do you see Exhibit 10 in front of you?

A. Yes.

Q. And so at least at this point, and I realize we've jumped forward, at least at this point in the video the motorcycle is parked and facing the street, correct?

A. Yes.

Q. And so at some point it was moved from the street back onto the driveway?

A. Yes.

Q. When you observed the rider on Jay Street on a motorbike without a helmet -- I'm sorry, was she wearing a helmet?

A. At that point, no.

Q. So as you did your U-turn and came back down Jay Street, you saw a motorcycle, you saw a rider, and you saw that person without a helmet, correct?

A. Yes.

Q. And you saw that person moving from the driveway to the

roadway?

A.   Yes.

Q.   And she was just walking the motorcycle, correct?

A.   Yes.

Q.   She wasn't driving up and down Jay Street, right?

A.   Correct.

Q.   As you approached back towards the house, you did not turn on your siren, correct?

A.   No.

Q.   You did not turn on your emergency lights, right?

A.   No.

Q.   And you were riding yourself that day on a motorcycle, correct?

A.   Yes.

Q.   And your motorcycle has emergency lights, right?

A.   They do.

Q.   And it has some sort of siren?

A.   Yes.

Q.   You could have turned those on to initiate a traffic stop, right?

A.   I could.

Q.   But you didn't?

A.   I did not.

Q.   But you did, in fact, initiate a traffic stop, correct?

A.   Yes.

Q.   And that was a traffic stop for a person operating a motorcycle

without a helmet, correct?

A.   Yes.

Q.   Now in terms of the offenses you deal with as a deputy of the St. Tammany Parish Sheriff's Office, that's a relatively minor offense, correct?

A.   Yes.

Q.   It's, in fact, a misdemeanor offense?

A.   It is a misdemeanor traffic offense.

Q.   And the maximum fine for that offense is $50, right?

A.   That I can't attest to.

Q.   But you know generally that the fine for a misdemeanor traffic offense is relatively low in monetary payment?

A.   In the scheme of legal offenses that we deal with, yes, it is minor.

Q.   And even on the scale of a motorcycle rider operating without a helmet, walking a motorcycle to or from the street from a driveway is a less serious infraction than, say, recklessly riding down the road without a helmet, correct?

A.   It is less serious, but it is still probable cause for a traffic stop.

Q.   And it's less serious than riding down the street even in a normal non-reckless manner, correct?

A.   Wait, say it again.

Q.   I'll withdraw the question.

         When you pulled up to the scene at 2018 Jay Street, you

asked the individual to identify herself, right?

A. We asked for license, insurance, and registration.

Q. And she gave you her driver's license, correct?

A. She gave us her driver's license and a registration that belonged to another license plate for that motorcycle.

Q. The question was, she gave you her driver's license, correct?

A. Yes.

Q. And that driver's license showed that her name was Teliah Perkins, right?

A. Yes.

Q. And it showed her address as 2018 Jay Street?

A. That I don't remember.

Q. But you had no reason to doubt as you pulled up and initiated the traffic stop that you were talking to a resident of that house, right?

A. Possibly.

Q. In fact, you saw her moving at some point towards the house or in the house, correct?

A. Yes.

Q. She didn't refuse to give you her driver's license, did she?

A. No.

Q. She didn't refuse to give you the registration paperwork that you asked for, did she?

A. No.

Q. And with respect to the insurance papers, she told you that she

was trying to get them for you, right?

A. She -- she gave multiple reasons as to why she wasn't able to obtain them.

Q. But she told you one of those reasons was she was trying to get the paperwork, right?

A. Yes.

Q. Now, when you first began interacting with Ms. Perkins as you pulled up, she did not attempt to flee, right?

A. She did not.

Q. She did not threaten you in any way?

A. She did not threaten me.

Q. She did not physically touch you, correct?

A. No.

Q. And you did not immediately arrest her, right?

A. I did not arrest her.

Q. You and Deputy Hart, in fact, engaged in a back and forth discussion with Ms. Perkins, right?

A. Yes, as she was irate from the moment that we showed up.

Q. You, in fact, engaged in a heated discussion with Ms. Perkins, right?

A. Yes.

Q. But it went on for many minutes, correct?

A. Yes.

Q. And during that time you did not arrest her, right?

A. I did not arrest her.

Q. And you, neither you nor Deputy Hart arrested her during that time, right?

A. At the beginning of it, no.

Q. And she did not -- even after you say he was irate, she did not threaten you, correct?

A. No.

Q. And she did not physically touch you, right?

A. No.

Q. She did not display any weapons, correct?

A. No.

Q. And she did not flee the scene?

A. She ultimately attempted to.

Q. I want to focus on that portion before she was under arrest, okay. During that time when you had a lengthy discussion with her, she did not attempt a flee the scene, correct?

A. In the beginning, no.

Q. And you, in fact, knew that one of the calls Ms. Perkins made was to 911, right?

A. Yes.

Q. And that she was requesting a supervisor be sent out, right?

A. Yes.

Q. And she, in fact, spoke calmly to the 911 dispatcher, right?

A. I don't --  I couldn't tell you.  But they have that as a recorded phone call that's available through 911.

Q. Well, but I am asking you what you overheard at the time.  At

the time that Ms. Perkins called 911 to request a supervisor, she spoke calmly, right?

A.  I would say she continued her same demeanor throughout the phone call.

Q.  Throughout the phone call with 911 she had an irate demeanor, that's your testimony, Officer Moring?

A.  She was definitely loud.  Like I said, the phone call would be available if you requested it via public records.

Q.  Stand by, I am having some sort of binder issue here.

Now, at some point during your interaction two male teenagers exited the house, right?

A.  Yes.

Q.  They came out of the house?

A.  Yes, they came out of the front door of the house at 2018 Jay Street.

Q.  They didn't come from down the block or across the street?

A.  No.

Q.  And this was about five minutes or so into the interaction with Ms. Perkins; is that right?

A.  I don't remember the exact amount of time.

Q.  And when they came out, you did not ask the teenagers for their names, right?

A.  I did not.

Q.  You didn't say to them, "Hey, who are you guys?"

A.  I did not.

Q. You didn't ask them for their ID?

A. I did not.

Q. And you did not ask them to state their relationship to Ms. Perkins, did you?

A. No.

Q. In fact, you later learned that one of them was Ms. Perkins's son, right?

A. Yes, we know that now.

Q. Well, during the incident you learned that De'Shaun, the plaintiff sitting right here, was Ms. Perkins's son, right?

A. Yes, I believe she mentioned that.

Q. And he mentioned it too, right?

A. I won't dispute that.

Q. Right. I just want to make sure I understand the scene. Two individuals come out of the house, you understood at the time that they were teenagers, right?

A. They possibly could have been, yes.

Q. They possibly -- you thought maybe they were older than teenagers?

A. No, but they weren't babies.

Q. Right. Okay. And you didn't ask them for their names or to say their relationship to the person you were having a traffic stop with, right?

A. No. At that point they were bystanders.

Q. And then you later learned that one of them was Ms. Perkins's

son?

A.   Yes.

Q.   During the incident you learned that?

A.   Yes.

Q.   Now, when the teenagers came out of the house, when De'Shaun came out of the house, did they begin recording your interactions with Ms. Perkins?

A.   Yes, they recorded, or they appeared to be recording the entire time they were outside.

Q.   You could see the phones that they were using to record the interaction?

A.   Yes.

Q.   And you understood at the time that it is legal for a member of the public to record police officers?

A.   Yes.

Q.   In fact, a citizen recording the police can be an important piece of evidence in a case, right?

A.   Yes.

Q.   It can help prove the prosecution's case, correct?

A.   It can help prove whatever it proves.

Q.   It can help prove the defense's case?

A.   It could.

Q.   It can help expose issues within the police department?

A.   Yes.

Q.   When they came out and began recording, when De'Shaun came out

Q. to begin recording, you had no reason to believe that he was a threat, correct?

A. He did not present one, no.

Q. And you had no reason to believe that he was a threat?

A. He didn't present one whenever he first came out.

Q. Right, he wasn't a threat?

A. Correct.

Q. And he did not run towards you?

A. He did not.

Q. He did not make any sudden movements?

A. He did not.

Q. And the same for his -- the other individual, Jeron, he did not run towards you, did he?

A. No.

Q. He did not make any sudden movements?

A. At that point, no.

Q. De'Shaun did not use his words to threaten you, correct?

A. He did not threaten me.

Q. And Jeron did not threaten you at that point, correct?

A. No.

Q. De'Shaun did not display a weapon, did he?

A. No, he did not.

Q. Jeron did not display a weapon, did he?

A. No.

Q. And De'Shaun's hands were visible, correct?

A.   Mostly.

Q.   And, in fact, one hand was holding the phone that he was using to record you and Officer Hart, right?

A.   Yes.  I believe the other hand at a point in the video was actually inside of his left pocket as well.

Q.   At that particular point in the video, but I'm asking you about your recollection of the day.

A.   Sure.

Q.   As you were sitting there, standing there that day having interaction with Ms. Perkins, you could generally see De'Shaun's hands, correct?

A.   Generally, yes.

Q.   And you had no reason to believe that there was a weapon on him, right?

A.   Specifically, no, one was not presented.

Q.   You had no reason to believe that there was a weapon on him, right?

A.   I had no presentation of a weapon.  There is always the possibility that a weapon could be presented at a moment's notice inside of police work.

Q.   I am asking you with respect to this specific day on May 5th at 2018 Jay Street.  Based on what you observed at the time, you had no reason to believe that De'Shaun had a weapon on him, right?

        MR. CAPITELLI:  Objection, asked and answered several times now.

THE COURT: Sustained. He's answered.

BY MR. GOLDSTEIN:

Q.   No weapon was ever -- you never saw a weapon?

A.   No weapon was present during this interaction.

Q.   And you never saw one?

A.   I did not. That does not mean that there isn't one.

Q.   Now, as a result of this interaction, De'Shaun -- you never arrested De'Shaun, right?

A.   I didn't arrest anybody out of this incident.

Q.   Neither you nor Deputy Hart ever arrested De'Shaun, correct?

A.   No.

Q.   And De'Shaun was never charged with any crime, correct?

A.   No.

Q.   Now, you receive periodic training as part of your role at St. Tammany Parish Sheriff's Office, right?

A.   Yes.

Q.   And one of the areas that you're trained on is something called deescalation, right?

A.   Yes.

Q.   And deescalation means attempting to bring a situation down instead of up, right?

A.   Yes.

Q.   And it's an important skill for a deputy such as yourself assigned to the traffic division to have, right?

A.   Yes.

Q.   Deescalation is something that's taught to you as part of your continuing education at the sheriff's office, right?

A.   Yes.

Q.   And there's more room to deescalate when it's a traffic violation as compared to some of the other issues that law enforcement deals with like a life or death situation or an emergency, right?

A.   Yes.  But we were not involved in a minor traffic violation at the point in which deescalation became evident.

Q.   My question was -- okay, let's not talk about May 5th.  Just as a general matter, there's room to deescalate a minor traffic stop than with respect to some sort of life or death situation, right?

A.   For compliant individuals, yes.

Q.   And on May 5th, I think you may have just said this, but on May 5th, 2020, you did not deploy any specific deescalation techniques, right?

A.   Ultimately I feel like we did.

Q.   Okay.  I'm giving a copy of the deposition transcript -- let me --

         MR. GOLDSTEIN:  May I take a break?  My binder has fallen apart and I need the deposition in front of us.  I know it's perhaps not time for a mid-morning break, so I can take two minutes.

         THE COURT:  Of course.  You know what, let's take a five-minute recess right now.

MR. GOLDSTEIN:  Thank you, your Honor.

THE COURT:  Of course.  It is 10:06, let's recess till 10:15.

Jurors, please don't discuss the case, keep an open mind. You may either take your notebooks or leave them here, nobody will touch them if you leave them here, and we're in recess until 10:15.

THE DEPUTY CLERK:  All rise.

(WHEREUPON, THE JURY EXITS THE COURTROOM.)

THE COURT:  You may step down, don't discuss your testimony during this.  In recess until 10:15.

(WHEREUPON, A RECESS WAS TAKEN.)

* * * * *

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

___/s/ Karen A. Ibos_____
Karen A. Ibos, CCR, RPR, CRR, RMR
Official Court Reporter