UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


TELIAH C. PERKINS, et al.      *     Docket 21-CV-879
                                 *
versus                         *     Section D
                                 *
KYLE HART, et al.          *     April 29, 2024
                               *
* * * * * * * * * * * * * * * * *


DAY 1
JURY TRIAL BEFORE
THE HONORABLE WENDY B. VITTER
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiff:        ACLU Foundation of Louisiana
                        BY:  E. BRIDGET WHEELER, ESQ.
                              NORA S. AHMED, ESQ.
                        1340 Poydras Street, Suite 2160
                        New Orleans, Louisiana 70112

For the Plaintiff:        Reid Collins & Tsai, LLP
                        BY:  KEITH Y. COHAN, ESQ.
                              EMMA CULOTTA, ESQ.
                              RYAN M. GOLDSTEIN, ESQ.
                              SEAN D. JOHNSON, ESQ.
                        1301 S. Capital of Texas Highway
                        Suite C-300
                        Austin, Texas 78746

For the Defendant:        Milling Benson Woodward, LLP
                        BY:  ANDREW R. CAPITELLI, ESQ.
                              SARAH A. FISHER, ESQ.
                        68031 Capital Trace Road
                        Mandeville, Louisiana 70471

Official Court Reporter:          Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room HB-406
                                  New Orleans, Louisiana 70130
                                  (504) 589-7778


Proceedings recorded by mechanical stenography using computer-aided transcription software.

**I N D E X**

PAGE

Preliminary Matters                                          4

Jury Selection                                              12

Preliminary Instructions                                   113

Opening Statements

    Keith Y. Cohan, Esq.                                   124
    Andrew R. Capitelli, Esq.                              132

De'Shaun Johnson

    Direct Examination By Mr. Cohan                        137
    Cross-Examination By Mr. Capitelli                     173
    Redirect Examination By Mr. Cohan                      207

Teliah Perkins

    Direct Examination By Mr. Cohan                        213
    Cross-Examination By Ms. Fisher                        228
    Redirect Examination By Mr. Cohan                      252

**MORNING SESSION**

**(April 29, 2024)**

(Call to Order of the Court.)

**THE COURT:**  Good morning.  Please be seated.

*Perkins v. Hart*, case number 21-879.  Good morning.  It's been a long time coming, but here we are.

Counsel for Mr. Johnson, would you please -- good morning, Mr. Cohan.

**MR. COHAN:**  Good morning.

**THE COURT:**  Could you introduce everybody at your table, please.  Is this your IT specialist also?

**MR. COHAN:**  This is our senior paralegal, Tina Stone.

**THE COURT:**  Also known as "IT specialist"?

**MR. COHAN:**  She's a jack-of-all-trades.

**THE COURT:**  And is it Ms. Stone?

**MR. COHAN:**  Ms. Stone.

**MS. STONE:**  Yes.

**THE COURT:**  Okay.  And everyone else?

**MR. COHAN:**  This is the plaintiff, De'Shaun Johnson.

**THE COURT:**  Mr. Johnson, we have had a lot of discussions about this case but haven't met you in person.  Good morning.

**MR. JOHNSON:**  Good morning.

**MR. COHAN:**  Co-counsel from Reid Collins, Sean Johnson.

THE COURT:  Good morning.

MR. COHAN:  Ryan Goldstein.

MR. GOLDSTEIN:  Good morning.

MR. COHAN:  And Emma Culotta.

MS. CULOTTA:  Good morning.

MR. COHAN:  Co-counsel from the ACLU, Bridget Wheeler.

THE COURT:  I'm very familiar.  And Ms. Ahmed.

MR. COHAN:  Nora Ahmed.

THE COURT:  Okay.

MR. COHAN:  And Viktor Hermannsson from the ACLU.

THE COURT:  Good morning.

Ms. Culotta, did you want to be at this table? You can pull up another chair.  It's completely up to y'all how you handle that.

MS. CULOTTA:  No, Your Honor.  I'm comfortable right here but appreciate that.  Thank you.

THE COURT:  Mr. Capitelli, good morning.

MR. CAPITELLI:  Good morning, Your Honor.  I have Arielle McCullough, our paralegal from our office.

THE COURT:  Tell me your name again, the paralegal.

MR. CAPITELLI:  Arielle McCullough.

THE COURT:  McCullough.

MR. CAPITELLI:  Yes.

THE COURT:  Good morning.

08:21

**MS. MCCULLOUGH:** Good morning.

**MR. CAPITELLI:** Deputy Ryan Moring.

**THE COURT:** Deputy Moring, good morning.

**MR. CAPITELLI:** Sarah Fisher was here. She just stepped out to go to the bathroom and will be back momentarily. With us, as well, is Chief Bret Ibert from the St. Tammany Parish Sheriff's Office.

**THE COURT:** Is it Chief Ibert?

**CHIEF IBERT:** Chief.

**THE COURT:** Chief Ibert?

**CHIEF IBERT:** Yes, ma'am.

**THE COURT:** Good morning.

**MR. CAPITELLI:** And there's Sarah.

**THE COURT:** Good morning, Ms. Fisher.

**MS. FISHER:** Good morning, Judge.

**THE COURT:** Some preliminary matters to go over. This weekend I sent you the voir dire questions. Did everybody receive them?

**MR. CAPITELLI:** We did, Your Honor.

**MR. COHAN:** Yes, Your Honor.

**THE COURT:** Any objections to the Court's proposed voir dire, counsel for plaintiff?

**MR. COHAN:** No, Your Honor.

**THE COURT:** Counsel for defendant?

**MR. CAPITELLI:** No objections, Your Honor.

**THE COURT:** The one thing I will add, we had discussed before, is that I wanted to say up front, when I discuss the time frame, that the jury is not to take into consideration the time it has taken to get this to trial, that it is just court matters and other things that have delayed it. I'm going to add something along those lines. I had it written out. One moment. I will do that when they come in.

Let me put on the record the joint special voir dire questions that were emailed to the Court.

They are not filed in the record, are they, Tate? I don't see them.

**THE LAW CLERK:** They are not in the record.

**THE COURT:** They were emailed to the Court. Let me just point out 1, 2, 3, 4, 5, 6, 7 I have asked either as written or in some other way, but I have added those.

7 I am not asking. The question was, "Have you ever called" -- oh, no. I'm sorry. I did ask, "Have you ever called the police?"

8 I did not ask, "Have the police ever been called on you for any reason?" I think that is getting into a sensitive area. I do ask it in another way, if they have ever had any interaction with the police. I do remind the jury venire at all times that any sensitive information can be discussed at the bench, but I am not going to ask specifically have they ever been called on you.

I asked 9.  I asked 10.

I did not ask 11 for similar reasons.  That question was, "Have you ever been arrested?"  But, again, I ask about any interaction with law enforcement.

12 was, "Have you ever been the subject of a traffic stop or received a traffic citation?"  I declined to ask that because I dare say that every single juror will raise their hand.  I will too, and I would have to tell you about my traffic infractions.  I think it's overly broad, and I don't think in any way that helps us get a fair and impartial jury in this case.

14, 15 have been asked.

I did not ask 16, "In your opinion, do you believe the police have a responsibility to protect and serve?"  I didn't ask that question.  I don't think that helps get a fair and impartial jury.  I do ask about their impressions of law enforcement.

I did not ask 17, "How serious do you think crime is in your neighborhood?"  That has nothing to do with this case and will not help us get a jury.

18, "Have you ever moved or considered moving because you thought crime was a problem in your neighborhood?" for the similar reasons as 17, I declined to include that.

19, "Do you think the police are too hard on crime or too soft on crime?"  I did not think that helped us

get a jury.

I did add 20, 21, 22 as written.

I did not ask 23 or 24.  23 is, "Have you ever been in a situation where you could have filed a lawsuit but chose not to do so?"  24, "Do you think that people turn too readily to the courts to solve their problems?" I did not think that was relevant to this case.

I did ask 25, 26.

I did not ask 27, "Do you believe that all police encounters should be recorded?"  I did not ask 28, "Do you think officer safety is an important concern during an arrest?"  I did not ask 29, "Do you believe that minors should be held responsible for their actions?"  Many of these, I think, get into legal issues which the jury will be instructed on.

I did ask 30 and 31 and I asked 36.

I did not ask 32 through 35 or 37.  Again, many of these either ask for legal issues or I found that they did not help get a fair and impartial jury.

I also did not ask 38, 39, 41, and 42.  I did ask 40.  I did not ask 38, 39, 41, and 42.

With that, everybody has the voir dire, and you will also have the opportunity to ask me to ask additional questions once we complete this voir dire.

For those who have not tried a case with me,

when I say approach the bench, we go over here to the side.  As I indicated, we always meet in the morning and in the afternoon.  I want to keep those interruptions as few and far between as need be.  The time we will meet the most often on the side is probably right now, during jury selection, because we will be meeting fairly often over there.  Again, I don't have people stand in front here.

What I will say to the jury and add to the voir dire is what is in the jury instruction, which is:

"You may wonder why this matter is proceeding to trial now in 2024.  You are instructed that you are not to hold that delay against either the plaintiff or the defendant.  Suffice it to say, COVID and other court issues kept it from being brought to trial any earlier."

Any objection to that, Mr. Cohan?

**MR. COHAN:**  No, Your Honor.

**THE COURT:**  Mr. Capitelli?

**MR. CAPITELLI:**  No objection, Your Honor.

**THE COURT:**  Anything else we need to go over before the jury comes in?  Mr. Cohan.

**MR. COHAN:**  I didn't know if the Court would be open to us moving for the admission of exhibits that haven't been objected to before trial starts or what the Court's procedure is to preadmitting exhibits into evidence.

**THE COURT:**  At the beginning of trial, but not before

trial starts.  We will do it at the beginning of trial.

**MR. COHAN:**  Thank you.

**THE COURT:**  Mr. Capitelli, anything else?

**MR. CAPITELLI:**  I don't see that there are any witnesses here.  I was going to ask that if they do arrive that they be sequestered.

**THE COURT:**  Okay.  I will not sequester them during voir dire.

**MR. CAPITELLI:**  I meant during trial.

**MR. COHAN:**  During trial?

**MR. CAPITELLI:**  Yes.

**THE COURT:**  So I would ask that each of you look and tell me because I will not know, if anyone else walks in, whether they are a witness or somebody else, so you just let me know for each side.

If there's nothing else, I will get off the bench and come back.  As soon as we have a jury -- I don't have the jury list.  I get it when you get it, when they bring them up here.

Also, I don't think I said this.  The selection of a jury should be based on the questions posed and the answers that are introduced.  There shouldn't be any outside research on the jurors once you get the list, so no looking into social media or searching them.  We choose a jury based on their questions and answers and anything that occurs in court.

With that, Court is in recess until we have the jury come up.  Thank you.

**THE DEPUTY CLERK:**  All rise.

(Recess.)

**THE COURT:**  Please be seated.

Back on the record.  Counsel and the parties are present.  The jury is not yet in here.

Mr. Cohan, you have something you want to bring to my attention?

**MR. COHAN:**  Yes.  We would object to not being able to do any online research about the jurors.  We think it's important to be able to do the research about public social media presence to make sure and ensure we have a fair jury.  We would just assert that objection.

**THE COURT:**  Thank you.

I understand the jury is being lined up outside. Do you have the jury list, Counsel?  Yes?

**MR. COHAN:**  Yes.

**MR. CAPITELLI:**  Yes.

(Off the record.)

**THE COURT:**  Good morning everybody.  Thank you for being here.  On behalf of everybody, thank you for appearing for jury service this morning.

I'm Wendy Vitter, and you are in Division D of federal court for the Eastern District of Louisiana.  The case

before you today is Mr. De'Shaun Johnson versus Deputy Ryan Moring, which I will tell you a little bit more about in a few minutes.

The right to a jury trial in certain matters is a cornerstone of our constitutional government, and your service in that regard here today is essential.  Truly, you are as important as the attorneys, and each of you who will be chosen will essentially be a judge of issues in this case.

Before we begin, let me advise you that we take everyone's health and safety very seriously.  I hope you can see that we have instituted safety and distancing protocols so that you, as jurors, the attorneys, the parties, everyone here can feel comfortable throughout the trial.  We have air purifiers here in court.  We have air purifiers in the jury room.  If you are selected to be a juror in this case, we will take every opportunity to accommodate any reasonable requests.

First, to the entire venire, can everybody hear and see well right now?  I see everybody nodding.

If at any time I speak too low or anyone else speaks too low, just get my attention.  Raise your hand and let me know.

Secondly, can everyone here read, write, speak, and understand the English language?  Can anyone not understand English?  I suppose if you can't understand English, you wouldn't understand the question either, would you, but we will

get to that.

As I indicated, this morning we have a civil proceeding. In this court, in the Eastern District of Louisiana, we hear both civil and criminal matters. Today is a civil matter. It is expected to last three days, so the rest of today, Tuesday, and Wednesday. I want you to be thinking about that because that is going to impact you if you are selected, only three days. The jury will not be sequestered. You will go home every evening. We will work until about 5:00, 5:30 p.m. You will go home in the evening. You will come back in the morning.

As a very broad overview of the case, I will tell you that the plaintiff, Mr. De'Shaun Johnson, claims that the defendant, Deputy Ryan Moring, of the St. Tammany Parish Sheriff's Office, violated the plaintiff's First Amendment right and committed a state law tort while the plaintiff, Mr. Johnson, was filming his mother's arrest. The defendant denies liability as to all of plaintiff's claims and asserts that he did not prohibit the filming of the arrest and only took actions to ensure that there was no interference with the arrest.

That statement I just gave you is just a very broad overview of the case that will be presented. It is not evidence, and it should not be considered by you as evidence. It is for you, the jury that will be selected, to determine the

facts in this case from the evidence that will be presented to you.

I will explain much more in the jury instructions to the jury that is selected, but I will caution you and advise you right now that the evidence comes only from testimony from a witness on the witness stand, stipulations that the parties may have entered into or agreed to, and exhibits introduced during the trial.

With that, I'm now going to ask counsel to introduce themselves, everybody at the table, and the parties to this case.

Mr. Cohan.

**MR. COHAN:** Hi.  My name is Keith Cohan, and I'm the lawyer for the plaintiff, De'Shaun Johnson.  With me today is my co-counsel Sean Johnson, Ryan Goldstein, Bridget Wheeler, Emma Culotta, Nora Ahmed, and our senior paralegal, Tina Stone. Thank you.

**THE COURT:**  Would you also introduce Mr. Johnson.

**MR. COHAN:**  Yes.  My plaintiff here, my client, is De'Shaun Johnson.

**THE COURT:**  Thank you, Mr. Cohan.

Mr. Capitelli, please do the same.

**MR. CAPITELLI:**  Good morning.  I'm Andrew Capitelli. I am here as counsel for Deputy Ryan Moring along with my co-counsel, Sarah Fisher, and our paralegal, Arielle

McCullough.

THE COURT:  Thank you.

I would like to introduce you to my staff and the people who work in the courtroom.

My law clerk right in front of me is Tate Currington.  I also have a law clerk Frannie Ledson.  My law clerks are experienced attorneys who have offered to work in the court for a year and offer their experience.

My judicial assistant is Marie Firmin, who is not in court at this time, but you may see her walking in and out and handing me documents or books.

The case managers are, to the left, Cherie Stouder and Melissa Verdun.  What they are both doing is making sure the exhibits get into the official court record, taking an accurate minute entry for the court proceedings, and making sure everything runs on time.

To your left is our court reporter, Ms. Toni Tusa.  She is taking down an accurate transcript of the case.

The purpose of the voir dire examination, as you probably heard downstairs in the jury room, the parties, the plaintiff and the defendant in this case, have a right to have the case tried by a qualified, fair, and impartial jury.  A qualified, fair, and impartial jury is one which is responsible and capable and which will without fear, favor, bias, prejudice, sympathy, or passion objectively hear and decide the

issues to be tried and render its verdict based solely on the evidence presented at the trial and the law applicable to the case as will be given to you by myself.

A juror's qualifications and impartiality may not be assumed without inquiry, and the inquiry or questioning we are about to make is known as a voir dire examination.  It's a time-honored process by which the qualifications and impartiality of jurors may be determined.  Its purpose is to determine the truth about a juror's competency for the case before us and his or her frame of mind today and ability to do his or her sworn duty in accordance with the juror's oath.

Your answers to the questions which I will ask will enable me to determine whether a juror should be excused for cause, either on my motion or upon a motion of the party, and your answers will also allow counsel to make intelligent use of their peremptory challenges.  Peremptory challenges are challenges which the law gives each party to exercise without assigning any reason.

You should understand, then, your answers to the questions asked must be complete and truthful.  Each of you is under a compulsion to disclose upon a general question to the entire venire any matters which might tend to disqualify you for any reason from sitting on the case.

While the scope of the questions may be very broad, it's your affirmative duty to honestly and

conscientiously answer the questions asked and to make your answers as full and complete as possible under the circumstances.  False or misleading answers may result in the seating of a juror who might have been discharged by the Court for cause or stricken through the exercise of a peremptory challenge and could result in a miscarriage of justice.

I would ask that you consider each question carefully, and don't wait until you are selected as a juror and sworn in as a juror to disclose something that perhaps ought to have been disclosed beforehand when the question was asked or when one question suggests another.  If you believe you should offer some answer for consideration, please do so.

Further, please know that our purpose here in asking questions is not in any way to embarrass anybody.  If appropriate, you are welcome to provide an answer to a question which you believe may be sensitive at the bench with myself and counsel.  All you have to do is say, "May I approach?" or "May I come up to the bench to answer that question?"

My clerk will now administer an oath, so I would ask if our jury will please stand and raise your right hand.

(Venire duly sworn.)

**THE COURT:**  Ladies and gentlemen, what I'm about to say should not be construed as an invitation for any of you capriciously or without good cause to seek to be excused merely to avoid discharging the legal and civil duty which you have to

serve as jurors, and I'm sure none of you would do that because you all appeared with your summons and are here bright and early this morning.

With that said, if any of you honestly and conscientiously believe that you would be subjected to serious hardship or would be otherwise seriously inconvenienced or affected if you were selected as a juror in this trial -- and again I'm going to point out this trial will last three days this week -- I request that you one by one raise your hand, we will hand you a microphone, and give the basis for your request to be excused.

Let me give you some parameters here.  What I would consider an example of a serious inconvenience would be if your son or daughter were getting married this weekend. Your mind might be on that, and you might have functions to go to.  Or if you have a surgical or a medical procedure that either could not or should not be put off, that may certainly be an inconvenience or a hardship.

Interestingly, another example is one that is before me.  I have jury duty on Thursday.  I am being called to another court for jury duty.  So if any of you were lucky enough to get two jury summons for a different court, that would be another serious inconvenience or hardship because I don't think you can be in two places at once.

I'm going to start here on this side.  Raise

your hand if you believe you would be seriously inconvenienced or it would be a hardship to sit as a juror in this trial. Anybody?

Here we go.  Juror 1, we are going to bring you a microphone.  Ms. Bell.  Yes, ma'am.  I will just remind you if it is a medical issue and you don't feel comfortable discussing it or any other sensitive issue, just ask to come up here.  Yes, ma'am.  Ms. Bell.

**JUROR 1:**  Okay.  It's a little embarrassing, but I just went back to work off of a suspension, nonpaid, and for me to miss another three days would really seriously hurt me because I'm already getting half a check.

**THE COURT:**  So you just returned to work.  Am I hearing it would be a financial hardship, ma'am?

**JUROR 1:**  Yes, ma'am.

**THE COURT:**  May I ask what you do.

**JUROR 1:**  I'm a customer service associate at the electric company.

**THE COURT:**  I couldn't hear the first part.

**JUROR 1:**  Customer service at the electric company.

**THE COURT:**  At the electric company.

Ms. Bell, you do know you will be paid for jury service -- I'm certain not what you normally get paid -- but you will be paid after the fact, right?

**JUROR 1:**  Yeah, and it's only a third of what I would

make if I was to be able to go to work every day.

THE COURT:  So what I said to everybody, what we are trying to find is whether you will be able to give your full attention or whether there will be other issues on your mind if you are selected as a juror.  Ms. Bell, you know yourself more than anyone else.  If you were selected, would you be able to give this case your full, undivided attention?

JUROR 1:  I would, yes.

THE COURT:  Yes?

JUROR 1:  Yes.

THE COURT:  Even knowing that you will be missing work?

JUROR 1:  It will be in the back of my mind, but, I mean, that doesn't affect my decisions.

THE COURT:  Thank you.

Mr. Mitchell, did you raise your hand?

JUROR 2:  Yeah.

THE COURT:  Yes, sir.

JUROR 2:  Sometimes when I get in a setting like this, I get nervous and I go to the restroom a lot.  So, you know, if I have to sit, I probably will be going to the restroom a lot.  I might; might not.  Sometimes it happens; sometimes it don't.

THE COURT:  Fair enough.  If you are selected, Mr. Mitchell, I will let you know jurors will be right here.

Usually I'm watching the jurors and Cherie and Melissa.  If you make eye contact or just raise your hand, we usually know, "Oh, I think it's time for the jurors to stretch their legs and take a break," and we send the jurors to their jury room.  I do that several times during the trial.

I know you just gave that microphone away.  You might need to take that microphone back.  Knowing that we will have breaks in the trial, do you think you would be able to sit as a fair and impartial juror?

**JUROR 2:**  I will do my best, you know what I'm saying, but like sometimes I go often.  Like last night I was nervous.  I went to the bathroom about seven times, ain't even slept so, you know.

**THE COURT:**  Since you're sharing that, I do the same during the night.  All right, Mr. Mitchell.

Let's go on with the questions.  Mr. Landry, did you also raise your hand, sir?

**JUROR 3:**  Yes, ma'am.

**THE COURT:**  What's the issue, sir?

**JUROR 3:**  This week I have my $40 million project wrapping up, and me missing three days would be detrimental. I'm also very exhausted because I have 2 1/2-month-old at home that likes to scream all night.  This would be pretty tough for me to be here late, not being able to help with the baby, and then really hurt me at work.

THE COURT:  One moment, sir.

What do you do for a living?  You have a project wrapping up, is that what you said?

JUROR 3:  Yes, ma'am.  I'm an assistant superintendent for a commercial construction company.  I'm building an apartment/hotel in the Warehouse District.

THE COURT:  What company do you work for?

JUROR 3:  It's now RNGD.  We just changed our name a few months ago.

THE COURT:  When you are not at work, do you have somebody else who can assist with wrapping up that project?

JUROR 3:  There's a couple of people there, but we have different areas of the project.  So, like, I have a certain area of the building that I'm supposed to get through with this week.  I know all about it, what needs to be done in every apartment, this, that, and the other, that these other people don't know about.

THE COURT:  The same question I asked Ms. Bell: If you were selected as a juror, would you be able to give this case your full attention and render a fair and impartial verdict?

JUROR 3:  I think that I would try to, but like I said, I am very tired with my daughter at home.

THE COURT:  Congratulations on the --
2 1/2-month-old?

**JUROR 3:** Yes, ma'am. Thank you.

**THE COURT:** First child?

**JUROR 3:** Yes, ma'am. Yeah.

**THE COURT:** You do understand that you will be home every evening? You live in what parish?

**JUROR 3:** I live now Uptown in Orleans Parish.

**THE COURT:** You live nearby?

**JUROR 3:** On Claiborne, yeah.

**THE COURT:** You will be home every evening and have a full evening at home and come back the next morning.

**JUROR 3:** I understand.

**THE COURT:** I'm going to ask you again about your job. If you were selected, would you be able to call into work and say, "I'm going to be serving on a jury. Somebody else needs to handle this project for the next couple of days. I will be back on Thursday"?

**JUROR 3:** That would happen, yes, ma'am. I could call.

**THE COURT:** Thank you, Mr. Landry.

Anybody else over on this side? I see a few hands raised.

Yes, ma'am. Tell me your juror number, please, ma'am.

**JUROR 6:** Number 6.

**THE COURT:** Number 6. That's Ms. Favaloro?

**JUROR 6:**  Yes, it is.

**THE COURT:**  All right.  Ma'am, what's the issue?

**JUROR 6:**  Well, I don't have a wedding this weekend, but my son is getting married on the 18th.  We have a lot going on.  We also have a lot of out-of-town guests coming to my house.  We are making some renovations, at least the bathroom, to accommodate them.  I mean, it's not this weekend, but -- I get stressed a lot.

**THE COURT:**  So your son is getting married in --

**JUROR 6:**  On the 18th.

**THE COURT:**  Right.  A little over three weeks?

**JUROR 6:**  Three weeks.

**THE COURT:**  Three weeks.

**JUROR 6:**  Well, three weekends.

**THE COURT:**  Ms. Favaloro, the same questions I asked the other potential jurors: It's going to be a three-day trial. You are home every evening.  If you are selected, would you be able to sit and give it your full attention and --

**JUROR 6:**  Yes.

**THE COURT:**  -- render a fair and impartial verdict?

**JUROR 6:**  I think so.

**THE COURT:**  Thank you.

Tell us your juror number, please.

**JUROR 13:**  Number 13.

**THE COURT:**  Lucky Juror 13.  That's Ms. Caron?

**JUROR 13:** Caron.

**THE COURT:** Caron. Yes, ma'am.

**JUROR 13:** I'm a traveling speech therapist. I'm supposed to move to Florida today and start work on Wednesday. They have been waiting on me for a few weeks. I was there a couple months ago. So they don't have a full-time speech therapist and they need one. I think they would like me back, if they can, but I did tell them I was summoned.

**THE COURT:** Where were you supposed to be?

**JUROR 13:** Jacksonville.

**THE COURT:** Florida?

**JUROR 13:** Uh-huh.

**THE COURT:** Would you be going to a school when you go to Jacksonville?

**JUROR 13:** It's at a skilled nursing facility and like a short-term rehab.

**THE COURT:** So they haven't had anybody?

**JUROR 13:** Just prn, so only like two days a week.

**THE COURT:** "prn," you are speaking medical terms.

**JUROR 13:** I'm sorry.

**THE COURT:** Like as needed?

**JUROR 13:** Yeah. So a speech therapist just to fill in like two hours a day, two days a week as opposed to a full-time therapist. It's lots of stroke victims and things like that.

THE COURT:  Could that person fill in for this week?

JUROR 13:  I mean, they would continue it, yeah. It's just that the contract technically starts Wednesday.  It was signed, you know, a month ago.

THE COURT:  But you do think they would be able to accommodate and continue --

JUROR 13:  If they have to, yeah.

THE COURT:  -- and get that speech therapy to those residents?

JUROR 13:  Yeah.

THE COURT:  And you could go next week?

JUROR 13:  I could, yeah.  I'm just already paying rent and don't have income.

THE COURT:  Do you think, if selected as a juror, you could be a fair juror?

JUROR 13:  Yeah.  If I was selected, I would, yeah.

THE COURT:  Thank you, Ms. Caron.

Anybody else on this side?  Thank you.

Now, serious inconvenience or hardship, you have heard from several people.  Anybody else on this side?  I see several people.  In the red shirt, ma'am?  Yes, ma'am.

UNIDENTIFIED JUROR:  No.

THE COURT:  Oh, okay.

JUROR 17:  I don't know how serious it is, but I'm a pastor --

THE COURT:  Tell me your juror number, sir, please.

JUROR 17:  I'm sorry.  17.  Excuse me.

THE COURT:  That's all right.  That is Mr. Washington, sir?  Yes, sir.

JUROR 17:  Yeah.  I'm a pastor of a church.

THE COURT:  Yes, sir.

JUROR 17:  To be away for three days is a bit much for me, preparing for Sundays and Saturdays.  That's pretty much it.

THE COURT:  What's the name of your church, sir?

JUROR 17:  Say it again, ma'am.

THE COURT:  What's the name of the church?

JUROR 17:  Oh, Lord, they got me so nervous I can't even remember it.  Isn't that something?  If my people hear that, I would be in trouble.  You know, I just come out of a district association and I'm kind of tired.  It's beautiful Zion Baptist Church in Napoleonville, Louisiana.  I'm from Assumption Parish.

THE COURT:  I'm guessing, like any good pastor, your main work is on the weekend?

JUROR 17:  I preach, but you teach through the week, you know.  Ministry is 24/7.

THE COURT:  Mr. Washington, with that, with you being a pastor, I'm certain that you especially understand your civic obligations and how important this is, to serve as a juror,

right?

JUROR 17:  I understand.

THE COURT:  I'm going to ask you the same questions I asked the other jurors.  If you were selected and you're seated as a juror, would you be preoccupied and concerned by I should be doing this, or somebody needs my counseling, or there are other things on your mind and not giving this case the full attention it deserves?

JUROR 17:  I'm not going to say I'm not going to be able to give it full attention, but it would be on my mind.  It's always going to be on your mind if you are pastoring people.  They are on your mind, but I will do my best.

THE COURT:  That's all we can ask, isn't it?  We are going to go on and ask some more questions.  You will have more opportunity.

Next to you?  No.  Behind you?

Yes, ma'am.  What's your juror number, please?

JUROR 23:  Number 23.

THE COURT:  Juror 23.  Ms. Barnes-Barrington?

JUROR 23:  Yes, ma'am.  Yes.  I'm an accountant for a school, and this is the end of the month for us.  It wouldn't be a hardship for me, but it would be for the school.  It's a Catholic school.  I've been working there for 19 years, and I'm the only one who does the accounting, invoices, payments.  It wouldn't be any problem for me to serve, be impartial one way

or the other, but I know it would be a detriment to the school, especially right now at the end of the school year.

THE COURT:  Like most small schools, you are the only financial person, right?

JUROR 23:  Yes, ma'am.  I've been there for 19 years, St. Mary's Academy.

THE COURT:  On the West Bank?

JUROR 23:  No, it's on Chef Menteur Highway.

THE COURT:  Oh, okay.

JUROR 23:  Yes.

THE COURT:  So who takes over when you are out on vacation or anything?

JUROR 23:  I'm hardly ever out.  I work year-round. Even though I get like a month vacation during the summer, I don't use it because I know during that time we are doing, you know, registration and stuff like that.  You can ask my boss. She will tell you how many days on one hand that I missed.  I mean, it wouldn't be a detriment to me.  I mean, I want to give, of course, to my civic duty, but I know it will be a hardship where the school is concerned.

THE COURT:  I know I asked the same question to the pastor and everyone else.  If you were selected, do you think you could give your full attention?

JUROR 23:  Yes, ma'am.

THE COURT:  Let me be clear to everyone I've asked

that question to.  If you honestly believe that you can't at this point in time -- it doesn't mean you would not be a good juror and a fair and impartial juror for another case down the road, and I do appreciate that.  I don't want everyone to think I sort of have to say yes.  That's why I'm asking.  You know what your mind is right now for this week.  It doesn't mean next month it might be different.

So you said, yes, you could give your full attention?

**JUROR 23:**  Yes.  As a matter of fact, I knew that I would probably be called in today, so I did all my checks that I had invoices for last week for this week.  But, you know, things come up where they may need a check the same day and of course I won't be there.

**THE COURT:**  All right.  I understand that.  Thank you, Ms. Barnes-Barrington.

**JUROR 23:**  You're welcome.

**THE COURT:**  Was there anyone else?  Right next to you to your right.  Other side.

Is this Juror 25?

**JUROR 22:**  Number 22.

**THE COURT:**  Number 22.  Sorry, I can't see. Mr. Michalski?

**JUROR 22:**  Yeah.

**THE COURT:**  Yes, sir.

JUROR 22: I have a doctor's appointment scheduled tomorrow morning that I've been trying to get scheduled for about a month. I can reschedule it, but it is somewhat time sensitive.

THE COURT: I'm not going to ask you to disclose what it's for, but that's one of those medical issues. Is it time sensitive that you feel that you need to get in there tomorrow or soon?

JUROR 22: I probably should. I can try to reschedule it if needed for this. That's a noncommittal answer. I'm not really sure what to say.

THE COURT: You know, you are not going to know if you are able to reschedule it by the time we select a jury. We are going to have a jury this morning.

JUROR 22: Yeah.

THE COURT: So if you are selected and you are still in that unknown -- like you can make a call later this afternoon, but you won't know when it can be rescheduled by the time if you are selected. Would that weigh on your mind if you found out that it couldn't be rescheduled until three weeks or a month?

JUROR 22: Yes, but I do think I could be an impartial juror too.

THE COURT: Okay.

JUROR 22: It would weigh on my mind.

THE COURT:  Could you give the case your full attention?

JUROR 22:  Yes, ma'am.

THE COURT:  Thank you, Mr. Michalski.  For that, any verification you need from the Court that you were on jury service to ask for a quicker appointment, we could certainly help provide it.

Anybody else, any serious inconvenience or hardship?

Yes, sir.  What's your juror number, please?

JUROR 25:  Number 25.

THE COURT:  Number 25.  Mr. Brunet?

JUROR 25:  Yes, ma'am.

THE COURT:  Yes, sir.

JUROR 25:  I'm working a turnaround in a plant on nights.  For all three days, I would be very exhausted due to working seven days a week, 12-hour days.

THE COURT:  Put the microphone a little closer.  So you work at night?

JUROR 25:  Yes, ma'am.

THE COURT:  What hours do you work till?

JUROR 25:  6:00 to 6:00.

THE COURT:  6:00 p.m. to 6:00 a.m.?

JUROR 25:  Yes, ma'am.

THE COURT:  Where is that, sir?

JUROR 25: In Plaquemine.

THE COURT: So for those people who work during the day, when you have jury service, you would be off work. Could you take off work for these three days?

JUROR 25: I would need some kind of excuse due to it being, you know, a turnaround.

THE COURT: You would have an excuse because an employer has to accommodate and recognize jury service. So would you be able to do that, sir? Because I can tell you that I don't think any of the parties want you to be leaving here and working 6:00 p.m. to 6:00 a.m. and coming in because you will be exhausted.

JUROR 25: Right.

THE COURT: So would you be able to take off work?

JUROR 25: I could.

THE COURT: Did you tell your employer already that you got called for jury service today?

JUROR 25: Yes, ma'am. I had to leave work early today to make it in time.

THE COURT: Did you work last night?

JUROR 25: Yes, ma'am.

THE COURT: How tired are you today?

JUROR 25: I'm quite exhausted. I left work at about 5:30.

THE COURT: You worked all through the night?

JUROR 25:  Yes, ma'am.

THE COURT:  This is the time you are normally asleep?

JUROR 25:  Yes, ma'am.  I wake up for about 4:30-ish in the evening.

THE COURT:  All right.  Thank you, Mr. Brunet.

Anybody else that I missed?  I apologize if I did.  Nobody else is raising their hand.

I'm going to ask some additional questions. Please raise your hand if you have any answer you would like to disclose to any of my questions.  Again, I will remind you that you may request to approach the bench and discuss any answers with myself and with the attorneys, if need be.

From the very brief overview I gave you of the case, it involves a claim by Mr. De'Shaun Johnson against Deputy Ryan Moring for an event that occurred in Slidell at Mr. Johnson's home on May 5, 2020.  From that very broad and brief overview, does anyone think they know anything about this case?  I don't see any hands up.

Again, the plaintiff in this case is Mr. De'Shaun Johnson.  You met him earlier.  The defendant is Deputy Ryan Moring.  You met him.  Does anyone know either of these individuals or any members of their family?

Oh, yes.  There's a hand up?

JUROR 14:  Yes.

THE COURT:  Why don't you take that.  Tell me your

juror number, sir.

JUROR 14:  Number 14.

THE COURT:  Number 14.  Yes, sir.  Okay.  That is Mr. Fuselier?

JUROR 14:  Yes, ma'am.

THE COURT:  Yes, sir.

JUROR 14:  Yes, yes.

THE COURT:  Do you think you know somebody?

JUROR 14:  I know Deputy Ryan.

THE COURT:  You know Deputy Ryan.  Can I ask in what capacity you know him?

JUROR 14:  I worked several years at Walmart.  He occasionally worked the detail.  I have encountered him out and about from time to time.

THE COURT:  Mr. Fuselier, the fact that you know Deputy Ryan Moring, would that affect your ability to be fair and impartial in this case?

JUROR 14:  No, ma'am.

THE COURT:  If I instruct you -- which I will instruct everybody -- that you are to decide the credibility of the witnesses, nobody else can determine that, and just because somebody may be an officer or let's say somebody is a doctor or anything else, their credibility is to be determined just like anyone else's, can you do that?

JUROR 14:  Yes, ma'am.

THE COURT: Would you give Deputy Moring more credibility without him even testifying yet because you know him?

JUROR 14: No, ma'am.

THE COURT: Thank you, Mr. Fuselier.

Anyone else?

The attorneys introduced themselves earlier. I'm going to provide their names and their law firms again.

Representing Mr. Johnson, the plaintiff, is Keith Cohan, Ryan Goldstein, Emma Culotta, Sean Johnson of the Reid Collins & Tsai law firm in Austin, Texas, and Bridget Wheeler and Nora Ahmed of the ACLU, American Civil Liberties Union.

Representing the defendant, Deputy Moring, is Andrew Capitelli and Sarah Fisher of the Milling Benson Woodward law firm.

Does anyone know any of the attorneys or have any interaction with any of the law firms?

Yes. I'm going to get the microphone to you. This is juror number --

JUROR 7: Number 7.

THE COURT: Number 7, Ms. Gerrity.

JUROR 7: Yes. Mr. Capitelli was my opposing counsel in a pretty contentious case about 3 1/2 years ago.

THE COURT: Ms. Gerrity, are you an attorney?

**JUROR 7:** I am, yes.

**THE COURT:** What is your practice?

**JUROR 7:** I do civil litigation, but currently I just went in-house. I'm working for an insurance company.

**THE COURT:** When you did civil litigation, was it your own firm?

**JUROR 7:** No. At the time that I opposed Mr. Capitelli, I worked for Lowe Stein.

**THE COURT:** What was the focus of your practice?

**JUROR 7:** Just general civil litigation.

**THE COURT:** In that case where you and Mr. Capitelli were on opposing sides, the same question I asked Mr. Fuselier: Would that impact your ability to be fair and impartial in this case?

**JUROR 7:** No, Your Honor.

**THE COURT:** You know everybody wants to know who won the case.

**JUROR 7:** It resolved.

**THE COURT:** It amicably resolved?

**JUROR 7:** Correct.

**THE COURT:** Thank you.

**JUROR 7:** Thank you.

**THE COURT:** Anybody else?

Does anyone know any of the court staff that I introduced earlier or me? Anybody? I don't see any hands up.

09:34

I'm going to read you a list of witnesses who may testify in this matter.  Please listen carefully or ask me to repeat, and raise your hand if you know any of the names I have read:

Mr. De'Shaun Johnson.  Ms. Teliah Perkins.  Mr. Jeron, J-E-R-O-N, Perkins.  Lieutenant Roger Clark.  Deputy Ryan Moring.  Deputy Kyle Hart.  Ms. Erin Wright.  Mr. John or Jack Ryan.  Benjamin Rushing.  Ms. Trinity Graves.

Did I miss anyone?

**MR. CAPITELLI:**  Your Honor, Mr. Trinity Graves.

**THE COURT:**  Oh, "Mr."  Thank you.  Thank you, Mr. Capitelli.

Does anybody recognize any of these names?

Yes, sir.  This is Juror 4?

**JUROR 3:**  Juror 3, ma'am.  I know a Benjamin Rushing.  I don't know if it's the same person.

**THE COURT:**  Benjamin Rushing is whose possible witness?

**MR. CAPITELLI:**  Mine.

**THE COURT:**  How do you know Benjamin Rushing?

**JUROR 3:**  My fraternity brother and friend.

**THE COURT:**  Do you keep in touch with him?

**JUROR 3:**  I see him about every six months or so, not too often.

**THE COURT:**  If he were to testify in this case, would

you give him more credibility than any other witness?

**JUROR 3:**  I wouldn't say so, no, ma'am.

**THE COURT:**  Would you give him less?  I know these fraternity --

**JUROR 3:**  No.  We had good times together, but no.

**THE COURT:**  Would that affect your ability to be a fair and impartial juror, sir?

**JUROR 3:**  No, ma'am.

**THE COURT:**  Thank you.

Has anyone here other than Ms. Gerrity, which I just heard from, ever worked in the legal field?  A lawyer, a paralegal, or in any capacity whatsoever in a law firm or law office?

A few hands are raised.  Okay.  Let's start right here right next to Ms. Gerrity.  Tell me your juror number, please.

**JUROR 8:**  Number 8.

**THE COURT:**  Number 8, Ms. Levy.

**JUROR 8:**  Yes, ma'am.

**THE COURT:**  Yes, ma'am.

**JUROR 8:**  My father was an attorney, and going through college I worked at his law firm.

**THE COURT:**  What law firm was that?

**JUROR 8:**  Bernard Levy, Attorney-at-Law.  It was in Terrebonne Parish.

THE COURT:  You worked there while you were in -- did you say college?

JUROR 8:  Yes, ma'am.

THE COURT:  What was the focus of that law firm or that practice?

JUROR 8:  He was a public defender and he did a lot of family law.

THE COURT:  Thank you, Ms. Levy.  I saw somebody else raise their hand right behind you on the other side.

Juror number?

JUROR 11:  Number 11.

THE COURT:  Number 11.  Ms. Rodrigue?

JUROR 11:  Yes, ma'am.

THE COURT:  Yes, ma'am.

JUROR 11:  I am not in the legal system.  However, I'm a certified court reporter with the 17th JDC, Judge Larose. I'm pretty much in court every day.

THE COURT:  You are currently a certified court reporter?

JUROR 11:  Yes, ma'am, I am.

THE COURT:  In Jefferson Parish, 24th JDC?

JUROR 11:  Lafourche.

THE COURT:  Lafourche.

JUROR 11:  17th.

THE COURT:  Lafourche Parish.

JUROR 11:  Yes, ma'am.

THE COURT:  Are y'all as shorthanded as we are?

JUROR 11:  Yes, we are extremely, extremely shorthanded.  I was holding my breath, but anyway . . .

THE COURT:  We are so appreciative of the great services of our court reporters.  That's another reason why I can tell you jurors that you will be leaving by 5:30 because the one person who never stops working is the court reporter.  Everyone else can take a break.  Thank you for that, Ms. Rodrigue.

Ms. Rodrigue, you have sat through many trials, right?

JUROR 11:  Yes, ma'am.

THE COURT:  You have heard lots of attorneys speak?

JUROR 11:  Yes, ma'am.

THE COURT:  Is there any reason why you think you couldn't be fair and impartial in this case?

JUROR 11:  Oh, no, ma'am.

THE COURT:  Thank you, ma'am.

Anyone else ever worked in the legal field?  A couple of hands over here.  Oh, somebody else here?

Yes.  I'm sorry.  I'm sorry I missed you.

JUROR 4:  Number 4.

THE COURT:  It's Ms. Brierley?

JUROR 4:  Yes, ma'am.

**THE COURT:** Yes, ma'am. Where did you work?

**JUROR 4:** Danna Schwab Law Firm in Terrebonne Parish.

**THE COURT:** In Terrebonne?

**JUROR 4:** Yes.

**THE COURT:** When was that, or do you still work there?

**JUROR 4:** No, ma'am. This was a few years back. I was in college.

**THE COURT:** Do you remember the focus of the practice of that law firm?

**JUROR 4:** Criminal, they did divorces, and community property.

**THE COURT:** Criminal law, divorces, and what else?

**JUROR 4:** Community property.

**THE COURT:** Community property. All tough areas. How long did you work there?

**JUROR 4:** About two years.

**THE COURT:** In what capacity?

**JUROR 4:** I was a receptionist. I helped with some paralegal work and bringing court documents back and forth.

**THE COURT:** Thank you, Ms. Brierley.

Over on the other side, I saw a couple of hands up. Please tell me --

**JUROR 21:** Number 21.

**THE COURT:** Yes. Juror 21, Ms. Wells.

**JUROR 21:**  Yes, ma'am.  I was a legal secretary for a law firm that did family law, community property.  That's what I can remember.  I worked there for about a year many moons ago because I hated it.  I only worked there for a year, and it was the law firm of Eddie J. Lambert in Ascension Parish.

**THE COURT:**  Did you say you only worked there one year?

**JUROR 21:**  Yes, ma'am.

**THE COURT:**  How long ago did you say that was, or did you?

**JUROR 21:**  Twenty-six years ago.

**THE COURT:**  Thank you, Ms. Wells.

I saw somebody else with their hand up.  Juror number?

**JUROR 26:**  Number 26.

**THE COURT:**  Number 26, Ms. Winker.

**JUROR 26:**  Yes.  It wasn't private.  It was federal government.  I didn't know if you wanted that also.

**THE COURT:**  I'm sorry.  Say it again.

**JUROR 26:**  I worked for the federal government, the Office of Hearings and Operations, Social Security Administration, but I'm retired.  I did handle all the dockets, assigning to the judges and the support staff and the attorneys, and supervised everybody.

**THE COURT:**  How long ago was that that you retired,

that you happily retired?

JUROR 26:  Twelve years ago.

THE COURT:  Twelve?

JUROR 26:  Yes.

THE COURT:  After working there many years, right?

JUROR 26:  Thirty-eight.

THE COURT:  So they hired you when you were a child?

JUROR 26:  Yes.

THE COURT:  You have had a lot of experience with attorneys and with judges.

JUROR 26:  Yes.

THE COURT:  Does that affect your ability to be a fair and impartial juror in any way?

JUROR 26:  I don't think so.

THE COURT:  Thank you, Ms. Winker.

Anybody else?  If I missed your hand, I apologize.

Is anyone married to or in a committed relationship with an attorney?

Get the microphone ready.  Has anyone ever served on a jury before, civil or criminal?

Ms. Bell, Juror 1.  You have served on a jury before, ma'am?

JUROR 1:  Yes.

THE COURT:  Do you remember if it was civil or

criminal?

JUROR 1:  I don't remember.  I remember the case, but I don't know how to describe what it would have been.

THE COURT:  Where was it?  Was it in St. Tammany?

JUROR 1:  No, ma'am.  This was in California.

THE COURT:  In California?

JUROR 1:  Yes.

THE COURT:  How long ago?

JUROR 1:  About seven years ago.

THE COURT:  Did the trial go to a verdict, where the jury reached a verdict, or did they resolve it beforehand?

JUROR 1:  We reached a verdict.

THE COURT:  You reached a verdict.  Without telling us your vote, do you remember what the jury's verdict was?

JUROR 1:  Not guilty.

THE COURT:  Not guilty.  So that would mean it was a criminal case probably.

JUROR 1:  Yes.  Now that you say it, yes.

THE COURT:  How was the experience serving on a jury, Ms. Bell?

JUROR 1:  It was interesting to, you know, see both sides, to hear what was going on and try to figure out, you know, who's right and who's not.

THE COURT:  Were you treated respectfully and fairly by the court and by the attorneys?

**JUROR 1:**  Yes, ma'am.

**THE COURT:**  Who else?  Right behind you first.

This is Ms. Favaloro?

**JUROR 6:**  Yes, it is.

**THE COURT:**  Juror 6.  Go ahead.

**JUROR 6:**  It was in Jefferson Parish.  I'm guessing it was about 10 years ago.

**THE COURT:**  Do you remember if it was civil or criminal?

**JUROR 6:**  It was criminal.

**THE COURT:**  Criminal?

**JUROR 6:**  It was criminal.  It also involved a police officer.

**THE COURT:**  Do you remember what the charge was?

**JUROR 6:**  No, I honestly don't.  I honestly don't.

**THE COURT:**  Did the jury reach a verdict?

**JUROR 6:**  Yes, we did.

**THE COURT:**  What was the verdict?

**JUROR 6:**  It was guilty.

**THE COURT:**  Was it an officer that was on trial?

**JUROR 6:**  No.  No, ma'am.

**THE COURT:**  Were you treated respectfully and fairly by the attorneys and by the court?

**JUROR 6:**  Yes, I was.

**THE COURT:**  How was the experience?

JUROR 6:  It was interesting.  It was interesting.

THE COURT:  I think somebody else -- yes, right here.

Juror 2, Mr. Mitchell?

JUROR 2:  Yeah.

THE COURT:  Yes, sir.

JUROR 2:  About 20 years ago, I was called for jury duty, and we heard a couple little cases.  Then they let us go home because the people, you know, I guess they -- we didn't need no jurors.

THE COURT:  They resolved it without the jury having to make a decision?

JUROR 2:  Yeah.

THE COURT:  So when you were called for jury duty, were you actually selected as a juror, or was it just like this and then they let y'all all go home?

JUROR 2:  They let everybody go home.

THE COURT:  They let everyone go home.  All right. That's the only time, Mr. Mitchell?

JUROR 2:  Yeah, that's the only time.

THE COURT:  Thank you, sir.

Right behind you, and that's Ms. Gerrity?

JUROR 7:  Yes.  Juror 7.  About four or five years ago, I was selected as an alternate in a criminal case at the Criminal District Court in Orleans Parish.  It was a serial rape case.  After I want to say day one, the defendant pled

out.

THE COURT: So none of the jury had to reach a verdict in that case?

JUROR 7: Correct.

THE COURT: That's the only time, Ms. Gerrity?

JUROR 7: Yes, Your Honor.

THE COURT: Anybody else on this side ever served on a jury?

Yes. Mr. Fuselier, and that's --

JUROR 14: Number 14.

THE COURT: Number 14, Mr. Fuselier. About how long ago, did you serve on a jury, sir?

JUROR 14: Probably about 10 years.

THE COURT: Do you remember whether it was civil or criminal? Civil cases usually involve monetary damages, money damages. Criminal cases usually result in a guilty or not guilty and involve the potential of somebody losing their freedom. Those are the two different kinds. Do you remember the type of case it was?

JUROR 14: Yes, Your Honor. Both were criminal, both here. One was drug possession. He copped for a lesser plea about two days into it. The last one was a mistrial because they caught jurors talking about the case. He was paying employees to find friends to marry his friends so they could stay in the country.

**THE COURT:** Was that a criminal case, the second one you are talking about, that he was paying employees to keep them in the country? Is that what you said?

**JUROR 14:** I'm pretty sure, yes, ma'am.

**THE COURT:** Well, that's interesting, Mr. Fuselier.

If you are selected as a juror, I will advise the jury several times after every break please don't discuss the case, please don't discuss it at this time, and that's a good example because the case that he served on -- you said it resulted in a mistrial because some of the jurors were discussing the case?

**JUROR 14:** Yes, ma'am. He was retried six months later, made the front page, and he was convicted.

**THE COURT:** Two criminal cases: one pled guilty in the middle of a trial, and one ended up in a mistrial.

I don't know if you said this. Was this St. Tammany Parish?

**JUROR 14:** No, ma'am. Right here.

**THE COURT:** Oh, right here, you said. Thank you, Mr. Fuselier.

Anyone else over on this side served on a jury, civil or criminal jury? Nobody else.

Has anyone here ever testified in a lawsuit, maybe in a deposition or in any lawsuit in any way or in any criminal matter? Anyone ever testified?

09:49                        Yes, sir.  Juror 2, Mr. Mitchell.

**JUROR 2:**  Yeah, I testified in a deposition.  A young lady had slipped and hurt herself and kind of like -- she was suing the parish, and I worked for the parish.  That happened at home, and then they called me to do a deposition and asked me what happened.  I just went and told them what happened.

**THE COURT:**  How long ago was that, sir?

**JUROR 2:**  That was about 20 years ago.

**THE COURT:**  So when you went to that deposition, did you go into a law office to do the deposition?

**JUROR 2:**  Yeah, it was in a law office.

**THE COURT:**  Were you treated respectfully by the attorneys during that?

**JUROR 2:**  Yes.

**THE COURT:**  Do you know what happened with the case?

**JUROR 2:**  She won the case.

**THE COURT:**  Did she go to trial?

**JUROR 2:**  I don't know.  I don't know.  I know she -- well, she won the case.

**THE COURT:**  Do you know if you testified for her, if she called you as a witness, or for your employer?

**JUROR 2:**  Like where she got hurt at, it was like for the state.  It was government housing.  They were trying to decide if it was for the state or it was for the parish, the part where she got hurt at.  That's what they were trying to

decide.

THE COURT:  Who was responsible for it, the state or the parish?

JUROR 2:  Yeah.

THE COURT:  Anybody else ever testified in any matter?

Yes, ma'am.  Oh, somebody else over here I didn't see.

This is Ms. Levy, Juror 8?

JUROR 8:  Yes.

THE COURT:  Yes, ma'am.

JUROR 8:  I had a suit against my employer for harassment that I testified in deposition, and it was settled.

THE COURT:  I'm sorry.  I missed the first.  Did you bring a suit against your employer?

JUROR 8:  Yes.

THE COURT:  Yes, ma'am?

JUROR 8:  Yes.

THE COURT:  How long ago was that?

JUROR 8:  It settled last year, in 2023.

THE COURT:  Is this your current employer or a --

JUROR 8:  Yes.

THE COURT:  Still your current employer?

JUROR 8:  Yes.

THE COURT:  Did it get to the point where y'all had

done depositions?

JUROR 8:  Yes, ma'am.

THE COURT:  Throughout that process -- so you filed a lawsuit, and there was some process before the parties agreed to amicably settle it.  Were you treated fairly and respectfully?

JUROR 8:  Yes, ma'am.  Absolutely.

THE COURT:  Were you happy with the settlement?

JUROR 8:  Yes.  Thank you.

THE COURT:  Thank you.

Yes, yes.  This is Juror 13?

JUROR 23:  Number 23.

THE COURT:  Number 23.  Sorry.  I'm trying to see. Number 23, Ms. Barnes-Barrington.  Yes, ma'am.

JUROR 23:  It was a civil case with the school and the contractor after Katrina for work that wasn't done.  I was deposed because I was the accountant.  It went to trial, and they settled.  The school, you know, won.  It was because of the materials that they were using on the school.

THE COURT:  Post-Katrina, which everyone just understands immediately, a contractor was doing work at the school?

JUROR 23:  Yes.

THE COURT:  Did the contractor sue the school or the school the contractor?

**JUROR 23:** We stopped paying them because the work was not up to par, and they sued us for over $2 million. We won, but the money that we won was really not what we were really asking, but they sided with the school.

**THE COURT:** You testified as an employee of St. Mary's?

**JUROR 23:** As the accountant, correct.

**THE COURT:** Thank you, Ms. Barnes-Barrington.

**JUROR 23:** You're welcome.

**THE COURT:** Anybody else ever testified?

Has anyone here, you or a family member or a very close friend, ever worked for the St. Tammany Parish Sheriff's Office or applied for a job with the St. Tammany Parish Sheriff's Office?

Ms. Bell, Juror 1. Yes, ma'am.

**JUROR 1:** Both my sister and best friend work for the clerk of courts in St. Tammany Parish.

**THE COURT:** For the clerk of court?

**JUROR 1:** Yes, ma'am.

**THE COURT:** In that capacity, do they have the opportunity to speak with members of the sheriff's office?

**JUROR 1:** Yes, ma'am.

**THE COURT:** Do they come home and tell you about their dealings with people?

**JUROR 1:** Sometimes. It's not too often. But, yeah,

depending upon what's going on.

THE COURT:  Of course.  Just like any family member and sisters, we share.

JUROR 1:  Yes, ma'am.

THE COURT:  Have you ever applied to the clerk's office there at St. Tammany?

JUROR 1:  No, ma'am.

THE COURT:  Anyone else applied for a job with St. Tammany, worked for St. Tammany, or have a family member, such as Ms. Bell, that works in the St. Tammany Parish clerk's office or law enforcement?  Nobody else?

Has anyone ever worked in law enforcement, not just St. Tammany Parish, any parish, you or close family member worked in law enforcement?  Just to be clear, that could be a sheriff's office, police department, Department of Justice, U.S. attorney's office, district attorney's office.  I see a few hands up.

Juror 7, Ms. Gerrity.

JUROR 7:  My stepfather is a retired Baltimore city police officer, and my mother was a state attorney for Maryland, a prosecutor.

THE COURT:  Did you say where your stepfather was a police officer?

JUROR 7:  Baltimore city.

THE COURT:  Ms. Gerrity, the fact that your

stepfather was in law enforcement -- did you say your mother was a state attorney?

JUROR 7:  Yeah, a prosecutor in Maryland as well, correct.

THE COURT:  A prosecutor, prosecuted on behalf of the state.  Would that affect your ability to be fair and impartial?

JUROR 7:  I would like to think not, but I do tend to, I mean, favor police officers in cases that I find when I see them on TV or that kind of thing.

THE COURT:  Seeing it on TV and watching *NCIS* or whatever case is on TV is, as you know --

JUROR 7:  Correct.

THE COURT:  -- very different than being in court and being faced with real people who have claims.

JUROR 7:  Correct.  Yes.

THE COURT:  I will instruct you that everyone starts on an even playing field, and you are to be fair and impartial to everybody.  Can you do that in this case?

JUROR 7:  Yes.  Yes, Your Honor.

THE COURT:  Does Deputy Moring start ahead of the plaintiff in this case for any reason?

JUROR 7:  No, I would say not.

THE COURT:  Right next to you, Ms. Gerrity.

This is Juror 6, Ms. Favaloro.  Yes, ma'am.

**JUROR 6:**  I hate to be standing up so many times.

**THE COURT:**  That's all right.

**JUROR 6:**  I have a brother who is no longer a police officer and a nephew who is presently a police officer with Jefferson Parish.

**THE COURT:**  Was your brother also Jefferson Parish?

**JUROR 6:**  Yes.

**THE COURT:**  Without meaning to embarrass you, why did he leave the Jefferson Parish Sheriff's Office?

**JUROR 6:**  I'm not sure.  He was also with Orleans at one time.  I think he is maybe a little hotheaded.  I don't know.

**THE COURT:**  Your nephew is currently with JPSO?

**JUROR 6:**  Yes, he is.  I would not be partial.

**THE COURT:**  I didn't even ask the question yet, Ms. Favaloro.  All right.  Thank you.

You wouldn't give law enforcement, a deputy who testifies, whether it's Deputy Moring or anyone else, a head start or give him more credibility solely for the reason that he is a law enforcement officer?

**JUROR 6:**  No, ma'am, I wouldn't.

**THE COURT:**  Right behind you, yes.

**JUROR 11:**  Number 11.

**THE COURT:**  Yes.  Juror 11, Ms. Rodrigue.

**JUROR 11:**  I was a juvenile probation and parole

officer for the Office of Juvenile Justice for 15 years, and I resigned that and became a court reporter.

THE COURT: What did you just say after that?

JUROR 11: I resigned from there after 15 years and became a certified court reporter.

THE COURT: With probation and parole, you have interactions with courts, with attorneys, and I would think with law enforcement. Did you?

JUROR 11: I was POST certified, yes, ma'am. Yes, ma'am. We did it all. I mean, we had a caseload. If they were on parole or probation or if they were in a group home, you handled all those things. We were at Bridge City, went to all the prisons, and things like that.

THE COURT: You said 15 years doing that, Ms. Rodrigue?

JUROR 11: Yes, 15 years.

THE COURT: The same questions I asked the other jurors: Would you give a law enforcement officer -- would you think just solely for the fact that he is a law enforcement officer he gets more credibility than anyone else who testifies?

JUROR 11: No, ma'am. No, ma'am.

THE COURT: Thank you.

Anyone else? Yes. This is Juror 23, Ms. Barnes-Barrington.

JUROR 23: Yes. My brother was a deputy for the Orleans Parish criminal sheriff's office for years. He resigned and went into the private sector. My sister was also a nurse at the prison.

THE COURT: Is your sister still a nurse at the --

JUROR 23: No. She is working for Ochsner now. She works at home.

THE COURT: At Orleans Parish Prison, she was a nurse?

JUROR 23: Yes.

THE COURT: Your brother was an Orleans Parish sheriff's office employee?

JUROR 23: Yes.

THE COURT: And now went to a private firm?

JUROR 23: Yes.

THE COURT: Ms. Barnes-Barrington, the same questions I asked the others: Would you believe a law enforcement officer when he testifies over anyone else?

JUROR 23: No, ma'am.

THE COURT: Anybody else that I missed?

Has anyone here had any specialized training in law enforcement or in criminal justice? That could be in a school setting or some other kind of training. Anyone?

Has anyone here ever been the victim of a crime?

Juror 23, Ms. Barnes-Barrington.

JUROR 23:  Yes.  I was robbed in front of my house, 2011, in New Orleans East.

THE COURT:  Do you know if the person was caught?

JUROR 23:  No, ma'am.

THE COURT:  He was not caught, he or she?

JUROR 23:  Correct, he was not.

THE COURT:  Were police called?

JUROR 23:  Yes.  Yes.  I was bringing my son to camp. We came outside, and my son gets in the car.  The guy was onside the house with a mask on and a gun and robbed me.  Thank God he didn't shoot us.  This was like at 8:00 in the morning.

THE COURT:  You said police were called?

JUROR 23:  Yes, ma'am, they were called.

THE COURT:  Did they respond immediately?

JUROR 23:  Yes, they did.  Yes, they did.

THE COURT:  How did the police handle it with you, in your view?

JUROR 23:  The good thing was one of the cops that came was a friend of the family.  Then my cousin is also a lieutenant with the New Orleans Police Department, and he came over too.  He lived, like, not too far from where I am.

THE COURT:  Is your cousin still with NOPD?

JUROR 23:  Yes, he is.

THE COURT:  Thank you, Ms. Barnes-Barrington.

Anyone else been the victim of a crime?  Yes.

Over here.

JUROR 6:  Number 6, Favaloro.

THE COURT:  Number 6, Ms. Favaloro.

JUROR 6:  We have a business in Kenner.  It's a garden center.  We recently had one of our trucks stolen.  We have been in business 40 years, so we have had a few break-ins through those 40 years.

THE COURT:  Have you had the opportunity to call -- was it Jefferson Parish or Kenner Police Department?

JUROR 6:  Kenner police?

THE COURT:  Kenner police.  They have come out and responded?

JUROR 6:  Yes, they have.

THE COURT:  How have your interactions been with the Kenner police?

JUROR 6:  They have been good.

THE COURT:  What's your garden center?

JUROR 6:  Garden Specialities.

THE COURT:  Anyone else?

I do have more questions, and I want to just take a moment and say I know it gets old.  I know you are thinking, "I know what she is going to ask," and sometimes you are very correct about that.  I appreciate your patience, and I know the parties do as well because it's important for them to give you every opportunity -- all the attorneys have submitted

the questions to me and said, "Please let the jurors speak and encourage them to speak," so it's very helpful.  Thank you.

Has anyone else ever had to call police or law enforcement for any reason that I haven't discussed?

Yes.  This is juror number --

**JUROR 16:**  Number 16.

**THE COURT:**  Juror 16, Ms. Leger.  Yes, ma'am.

**JUROR 16:**  I have had to call a few times.  I think the first time I was in college and there was somebody passed out drunk on campus.  They needed help with that.

**THE COURT:**  You were in college, and there was somebody passed out drunk where?

**JUROR 16:**  On campus outside my dorm.

**THE COURT:**  Then we would be calling the police a lot, I think.

**JUROR 16:**  Yeah, we tried to help her get inside, but then she passed out, and we couldn't help anymore.

**THE COURT:**  That's good that you called the police.  So did the police respond?

**JUROR 16:**  Yes, they did.

**THE COURT:**  Was it campus police or was it --

**JUROR 16:**  It was campus police, yes.

**THE COURT:**  They helped get her up?

**JUROR 16:**  Yeah.  They took her -- I think they tried to take her on an ambulance, but she had woken up and refused.

So they just let her in the -- whatever, the office on campus, and I don't know what happened after that. I saw her around campus after, so they didn't kick her out.

THE COURT: Well, that's good because that can be scary.

JUROR 16: The other times have been -- I work at the St. Tammany Parish Library, and there have been some disruptive patrons or yelling or screaming or threatening or whatever, and they have had to have police called on them.

THE COURT: So you work at the St. Tammany Parish Library?

JUROR 16: Uh-huh.

THE COURT: When you have to call for assistance, is it the St. Tammany Parish Sheriff's Office?

JUROR 16: Yes. The Mandeville specifically.

THE COURT: Mandeville police?

JUROR 16: Uh-huh.

THE COURT: Have they responded?

JUROR 16: Yes.

THE COURT: Are you the head librarian?

JUROR 16: No.

THE COURT: Have you had the opportunity to interact with law enforcement when they have responded?

JUROR 16: I have interacted with them a few times. Usually the manager is the one who actually calls, but

sometimes they will ask us, like, what's going on, those at the desk.

THE COURT:  Are those the only times you have had interactions with law enforcement?

JUROR 16:  Yes.

THE COURT:  Thank you, ma'am.

Anybody else any interactions with law enforcement?

JUROR 8:  I'm Juror 8.

THE COURT:  Yes.

JUROR 8:  Can I approach the bench?  It's more of a sensitive --

THE COURT:  Yes.

(The following proceedings were held at the bench.)

THE COURT:  Juror 8, Ms. Levy.  Yes, ma'am.

JUROR 8:  Yes, ma'am.  Twenty years ago, I guess, I was in an abusive relationship with one man, and I had to call the police.  Also, I was sexually assaulted during that time.

THE COURT:  By him --

JUROR 8:  Yes.

THE COURT:  -- or by somebody else?

JUROR 8:  By somebody else.

THE COURT:  What parish was this in?

JUROR 8:  It was in Lafayette.

THE COURT:  Did the police respond?

**JUROR 8:**  Yes, ma'am.

**THE COURT:**  How was your interaction with law enforcement?

**JUROR 8:**  Always a good experience.

**THE COURT:**  When you were sexually assaulted, was somebody ever arrested for that?

**JUROR 8:**  Yes.

**THE COURT:**  What happened with the case?

**JUROR 8:**  Well, I think they settled outside of -- someone was arrested.  I was paid restitution because I was robbed also at the same time.

**THE COURT:**  You never had to go to trial in that case?

**JUROR 8:**  No.

**THE COURT:**  Anybody have any questions for Ms. Levy about that?

**MR. COHAN:**  No, ma'am.

**MS. WHEELER:**  No, Your Honor.

(End of bench conference.)

**THE COURT:**  Thank you.  We are back on the record. I'm glad that juror did that because if anyone else is thinking, "I don't want to be the first one to ask to approach the bench," that was appropriate.

Has anyone here ever witnessed a crime?

I know, Ms. Leger, you said you had witnessed --

**JUROR 16:**  I don't think it was really a crime.

**THE COURT:**  Yes, it wasn't a crime.  You are right. You didn't know what it was.  Somebody passed out just drunk. College.

Has anybody witnessed a crime?  Anybody here?

Has anyone here ever had the occasion to film the police for any reason?  In any situation?  Nobody is raising their hand.

I will advise you at the end of this trial what I have said before, that you will be the judges of the facts. I will further advise you that you are the judges to determine any questions regarding the credibility of truthfulness of witnesses.  You can determine, after you hear a witness' testimony, whether to believe someone, partially believe someone, or not believe someone.  Does anyone have any hesitation in making these determinations or these judgments about witness credibility?  Anyone have any issues with that?

I have mentioned it before in the law enforcement context, but I will further instruct you that even if a witness has specialized training or experience in a particular field, it's up to you as the jurors to decide whether to accept that witness' testimony and whether to rely on it.  That goes for an expert witness or fact witness.

Does anyone here believe that someone should be believed solely because of their title or their job, whether

their title is judge or professor or doctor or deputy?  Anybody believe that, just because of their title, they should be believed?  I see heads shaking no.

We have asked this several times.  I'm going to ask it again.  Would anyone automatically believe a police officer's testimony solely because the person is an officer?  Nobody is raising their hand.

Has anyone ever had such a bad experience with law enforcement or for whatever reason that you would automatically not believe an officer's testimony?  Anyone had a negative experience with law enforcement?  Nobody is raising their hand.

Has anyone had any interactions, good or bad, with the St. Tammany Parish Sheriff's Office?  I do think I asked that before, and I apologize if I did.  Anybody?  Yes.  Raising her hand is Juror 16, Ms. Leger.

Yes, ma'am.  You told us about interaction with the St. Tammany Parish Sheriff's Office as an employee of the St. Tammany Parish Library.

**JUROR 16:**  Yeah.  Same answer.  It's we have had to call for rowdy patrons.

**THE COURT:**  Do you know either of the officers I mentioned, Ryan Moring or Kyle Hart?

**JUROR 16:**  No.

**THE COURT:**  Thank you, ma'am.

Anyone else?

JUROR 23:  Yes.  I lived in St. Tammany Parish in 2007.  I was home alone with my kids.  The alarm had gone off on our house and they came out.  You know, we called and they came out and stuff, but we had a really good experience with them.  But that was the only other time that I have ever had to call, you know, them for anything.

THE COURT:  That's Juror 23?

JUROR 23:  Yes.  Barnes-Barrington.

THE COURT:  How long ago did you say that was, ma'am?

JUROR 23:  This was in 2007, right before I moved back to the city.

THE COURT:  Thank you.

JUROR 23:  You're welcome.

THE COURT:  Does anyone here ride a motorcycle?

We have somebody who rides a motorcycle.  This is juror number --

JUROR 9:  Number 9.

THE COURT:  Number 9, Mr. Champagne.

JUROR 9:  That's correct.

THE COURT:  You ride a motorcycle primarily?

JUROR 9:  Repeat, please.

THE COURT:  Is that your primary mode of transportation?

JUROR 9:  Oh, no, ma'am.  No.  I've been driving this

particular motorcycle for 40 years.

THE COURT:  What kind of motorcycle?

JUROR 9:  It's a Harley Davidson, ma'am.

THE COURT:  Have you ever been cited for not wearing a helmet while riding a motorcycle?

JUROR 9:  I have just before -- '78, '79.

THE COURT:  1978 or 1979?

JUROR 9:  Yes, ma'am.

THE COURT:  I'm going to be very impressed if you remember the circumstances, but I will ask it anyway.  Do you remember what happened?

JUROR 9:  I was riding down the road without my helmet.

THE COURT:  And got pulled over?

JUROR 9:  I was pulled over, yes, ma'am.

THE COURT:  Do you remember what parish you were in?

JUROR 9:  St. Charles Parish, Paul Mallard Road, yes.

THE COURT:  Were you cited?  Were you given a citation it.

JUROR 9:  Yes, I was.  No helmet and loud exhaust.

THE COURT:  Is that the only time, Mr. Champagne?

JUROR 9:  I've had a couple of speeding tickets on it, but other than that, that's it.

THE COURT:  During those interactions, traffic infractions, have they ever escalated to any issue?

**JUROR 9:**  No, ma'am, not at all.

**THE COURT:**  How were your interactions with the law enforcement during those traffic infractions?

**JUROR 9:**  Reasonable.

**THE COURT:**  Thank you, Mr. Champagne.

Anybody else ever ride a motorcycle?

If you are selected as a juror in this case, you will be required to put aside any personal feelings or feelings of passion or prejudice and decide the case solely on the evidence introduced during the trial and the instructions that I will give you concerning the law.  Can you do that?  Everyone is nodding their head.

Does anyone here know of any reason why you think you could not sit in this case, from the information that you have so far, and render a just, fair, honest, and impartial verdict?  Anything else anyone wants to bring up?

I'm going to ask you to give the microphone to Juror 1, Ms. Bell.

You are going to be our leader.  I'm going to ask you to stand up.

Melissa, are you going to put that on the screen?  One moment.

Ms. Bell, if you will just answer those questions.  Give us: your name; the city where you live, not your address; your marital status; your present occupation or

business; the name of your employer; if you have a spouse, the business that that spouse is in; and anyone else residing with you such as children.  That's what we would like to know.

**JUROR 1:**  Adrienne Bell.  Covington.  Single.  Customer service, Cleco.  No spouse and no kids.

**THE COURT:**  Juror 2, Mr. Mitchell, sir.

**JUROR 2:**  Kenneth Mitchell.  I live in Reserve, Louisiana.  Divorced.  I work for St. John Parish Council.  I got one son, he is about 36, like you said, that live with me.

**THE COURT:**  He does live with you?

**JUROR 2:**  Yeah.

**THE COURT:**  Juror 3, Mr. Landry.

**JUROR 3:**  Dane Landry.

**THE COURT:**  We know about the baby.

**JUROR 3:**  Yeah.  Dane Landry.  New Orleans.  Not married.  I am an assistant superintendent for a construction company.  I work for RNGD.  My spouse is not back at -- or my girlfriend is not back at work yet.  I live with my girlfriend and my baby.

**THE COURT:**  What does she do?  Did you say?

**JUROR 3:**  She was a manager for Walk-On's, but we are moving in a few weeks to Nashville.  She is probably not going to work until we get there.

**THE COURT:**  A manager at Walgreens?

**JUROR 3:**  No.  Walk-On's.

THE COURT:  Walk-On's.  Oh, right over here.

JUROR 3:  Down the road, yes, ma'am.

THE COURT:  Thank you.

Juror 4, Ms. Brierley.

JUROR 4:  Chelsi Brierley.  Houma, Louisiana.  Single.  Nidec Motor Corporation, accounting.  Gulf Island for my spouse.  Three stepdaughters.

THE COURT:  Are your stepdaughters young, old?

JUROR 4:  They're older.

THE COURT:  Do they live with y'all?

JUROR 4:  On and off, yes.

THE COURT:  Teenagers or "older" older?

JUROR 4:  Teenagers.

THE COURT:  Teenagers.  I'm sorry.  What did you say your spouse does?

JUROR 4:  He works for Gulf island.

THE COURT:  I'm not familiar with Gulf Island.

JUROR 4:  It's in Houma.  They have a fabrication yard.  He is like the QC manager there.

THE COURT:  Got it.  Thank you.

Juror 5.

JUROR 5:  My name is Reina Victor.  I live in Westwego, Louisiana.  Single.  I'm a credit union examiner.  I work for the National Credit Union Administration.  I have a two-year-old daughter.

THE COURT:  Ms. Victor, how long have you been with the credit union?  Oh, you thought you were getting rid of that microphone, didn't you?

JUROR 5:  I will make one year in June.

THE COURT:  You have someone help care for the child or is your baby is day care?

JUROR 5:  She is in day care.

THE COURT:  Thank you.

Juror 6, Ms. Favaloro.

JUROR 6:  Darnell Favaloro.  I live in Metairie, Louisiana.  I am married.  I own a business, Garden Specialities, with my husband.  There's no one else residing with us.  I have a first-time grandchild, though.

THE COURT:  Nice.

Juror 7, Ms. Gerrity.

JUROR 7:  Abigail Gerrity.  New Orleans, Louisiana.  I'm married.  I am an assistant vice president of property claims litigation for Arch Insurance.  My husband is an entrepreneur.  We have a 3-year-old son and a 1-year-old daughter living with us.

THE COURT:  Let's go back, Ms. Gerrity.  Your husband is an entrepreneur.  Is there a focus of this --

JUROR 7:  He has like 25 businesses, something like that.  I don't think you want me to read them all.

THE COURT:  Juror 8, Ms. Levy.

**JUROR 8:**  Yes, ma'am.  Anna Levy.  I live in Lockport, Louisiana.  I'm currently separated.  I'm a registered nurse.  I work for Physicians Medical Center in Houma.  I have three children, a 13-year-old and two 6-year-olds, that live with me.

**THE COURT:**  Juror 9, Mr. Champagne.

**JUROR 9:**  Mark Champagne.  Hahnville, Louisiana. Divorced.  Retired.  I live alone.

**THE COURT:**  What are you retired from, sir?

**JUROR 9:**  I was an instrument control technician.  I used to work the nuclear facilities, so I worked a number of different contractors.

**THE COURT:**  You did that for a long time?

**JUROR 9:**  About 25 years.

**THE COURT:**  That's a long time.  Thank you, sir.

Juror 10, Ms. Morgan.

**JUROR 10:**  Annastasia Morgan.  Bayou Blue.  Married. Xfinity sales rep.

**THE COURT:**  I'm sorry.  Where do you work, ma'am?

**JUROR 10:**  Xfinity.

**THE COURT:**  Xfinity?

**JUROR 10:**  Cable.

**THE COURT:**  Cable.  Xfinity Cable, what do you do there?

**JUROR 10:**  I'm a sales rep.

THE COURT:  A sales rep.  You said you were married?

JUROR 10:  Yes, ma'am.

THE COURT:  What does your spouse do?

JUROR 10:  He works at M&L Engine.  He's a sales rep too.

THE COURT:  How long have you been with Xfinity?

JUROR 10:  Ten years.

THE COURT:  Anyone else live in the home with you?

JUROR 10:  Just our fur babies.

THE COURT:  A fur baby?

JUROR 10:  Our fur babies.

THE COURT:  Are fur babies cats or dogs or something else?

JUROR 10:  Both.

THE COURT:  Both.  Thank you.

Juror 11, Ms. Rodrigue.  You are a certified court reporter with Lafourche.

JUROR 11:  Lafourche, yes, ma'am.  I am Sandra Rodrigue.  I'm from Thibodaux, Louisiana.  I'm married.  My occupation is court reporter.  My husband is currently unemployed because he has a medical issue.  I have my brother and his two young children live with me at this time.

THE COURT:  How old are your nephews or nieces that are living with you?

JUROR 11:  My nephew is nine.  My niece is seven.

THE COURT:  Your spouse who's currently on medical leave, what did he do previously?

JUROR 11:  He is an AutoCAD designer, drafter.

THE COURT:  Thank you, ma'am.

Juror 12, Ms. Athas.

JUROR 12:  Holly Athas.  I live in Ponchatoula.  I am married.  I've been a homemaker for the last 14 years but just started working about four months ago part-time for my dentist, actually.  My husband, he during the week actually lives in Alabama.  He is the director of operations for a construction company out there.  My two boys, 24 and 17, they live at home with me.

THE COURT:  24 and 17 and they live at home with you?

JUROR 12:  Yes, ma'am.

THE COURT:  Did you say you have been raising them, but now you are working part-time --

JUROR 12:  For my dentist.

THE COURT:  For your dentist?

JUROR 12:  Uh-huh.  Yep.  I know.

THE COURT:  Nice.  Thank you.

Juror 13, Ms. Caron.

JUROR 13:  Yes.  Kaycee Caron.  River Ridge is my permanent residence, but I've been in Jacksonville since December until this month.  Single.  I'm a speech therapist.  The name of the company is Core Medical Group.  It's a travel

health care company.  I don't have anyone living with me.  I just travel.

THE COURT:  How long have you been doing that?

JUROR 13:  December is when I started.

THE COURT:  Are the contracts usually six months, a year, longer?

JUROR 13:  Three months and then I have just been extending.  I just came back to visit and because I had deferred my summons from February.

THE COURT:  Thank you, Ms. Caron.

Juror 14, Mr. Fuselier.

JUROR 14:  Keith Fuselier.  I live in Abita Springs.  Married.  I retired from Walmart about two years ago.  Recently I worked part-time for a postal contractor.  Wife is a retired schoolteacher.  It's just the two of us at home now.

THE COURT:  I'm sorry.  I didn't hear.  Your wife retired also?

JUROR 14:  Retired schoolteacher.

THE COURT:  Schoolteacher.  Was she primarily in one school or more than one?

JUROR 14:  She worked about six schools till she landed at Fountainebleau, and she stayed there 18 years.

THE COURT:  Fontainebleau is high school?

JUROR 14:  Yes, ma'am.

THE COURT:  You say nobody is at home with y'all?

10:28

JUROR 14:  (Shakes head.)

THE COURT:  No.  Okay.  Thank you, Mr. Fuselier.

Go ahead.  Juror 15.

JUROR 15:  My name is Carlos Tinoco.  I live in New Orleans.  I'm single.  I'm an associate accountant with CAPTRUST Financial, LLC.  I currently reside with my older brother, who is the chef at the Hilton Hotel.

THE COURT:  So how long have you had that position as an associate accountant, sir?

JUROR 15:  Going to make a year in May.

THE COURT:  What did you do before that?

JUROR 15:  Before then I was a full-time student.

THE COURT:  Thank you, sir.

Juror 16, Ms. Leger.

JUROR 16:  Hi.  I'm Catherine Leger.  I live in Hammond.  I'm not married yet, recently engaged.  I'm the library associate at the Mandeville branch of the St. Tammany Parish Library.  My fiancé is a web developer at Anntoine Marketing and Design.  Me and my fiancé live just us.

THE COURT:  You said your fiancé is a web designer?  Is that what you said?

JUROR 16:  Yes.

THE COURT:  Did you say how long you have been at the library?

JUROR 16:  I didn't.  Five years in December, I

think.

THE COURT:  Do you have a date selected for your wedding?

JUROR 16:  October 4.

THE COURT:  Nice.  Congratulations.

JUROR 16:  Thank you.

THE COURT:  Pastor.  Juror 17, sir.

JUROR 17:  Daniel Washington.  I live in Napoleonville, Louisiana.  I'm married for 28 years.  My present occupation is I work for Conrad Industries in Morgan City, I'm a school board member, and I'm a pastor.  My wife does not work.  She's retired.  No one is living at home but me and her and my grandkid every now and then.

THE COURT:  What did your wife retire from?

JUROR 17:  She was working in catering.  She worked in Donaldsonville.  She retired -- next month will be one year.

THE COURT:  Just retired.  How's it working with y'all home together?

JUROR 17:  Not good.

THE COURT:  And that's from a man of religion, a man of faith.

JUROR 17:  It's all right.  It's all right.  But I should be the one retired.  That's what I'm saying.

THE COURT:  Everyone needs a hobby.  You said you also sit as a school board member?

**JUROR 17:**  Yeah.

**THE COURT:**  Is that elected, sir?

**JUROR 17:**  I've been on the school board for -- this is my fourth term.  I'm terming out after this.  That's it.

**THE COURT:**  Thank you, sir.

Juror 18.

**JUROR 18:**  My name is Rhodesia Brumfield.  I live in LaPlace, Louisiana.  I'm divorced.  I'm a line supervisor at Baumer's Foods.  I live with my parents.

**THE COURT:**  How long have you been with Baumer's?

**JUROR 18:**  Seven years.

**THE COURT:**  A very Louisiana company.  A line supervisor there?

**JUROR 18:**  Yes, ma'am.

**THE COURT:**  Thank you.

Number 19.

**JUROR 19:**  Bruce Robert.  I live in Kenner.  I'm single and retired.

**THE COURT:**  Where did you work before you retired, sir?

**JUROR 19:**  Pizza Hut.

**THE COURT:**  For many years or --

**JUROR 19:**  No, just a couple of years.  I had several different jobs.

**THE COURT:**  Thank you, sir.

Juror 20.

**JUROR 20:**  Ian Vansuffelen.  I live in Montz, Louisiana.  I'm married.  I work for Cooper Consolidated.  My wife works as an assistant manager at Kenner Seafood, and I have four kids.

**THE COURT:**  We are going to take that a little slower.  You work for Cooper Consolidated.  Is that what I heard?

**JUROR 20:**  Yes, ma'am.

**THE COURT:**  What do you do with them?

**JUROR 20:**  I'm a fleet mate.  I drive a crew boat.

**THE COURT:**  How long have you been doing that?

**JUROR 20:**  About a year.

**THE COURT:**  We get a lot of cases here involving crew boats and vessels.

I'm sorry.  I missed what you said your wife does.

**JUROR 20:**  Assistant manager at Kenner Seafood.

**THE COURT:**  You said you have some young ones at home with you?

**JUROR 20:**  A little bit of both.

**THE COURT:**  What are the age ranges?

**JUROR 20:**  They are 21, 17, 16, and 5.

**THE COURT:**  A full house.

**JUROR 20:**  Yes.

THE COURT: Thank you, sir.

We are going all the way to Juror 21, Ms. Wells.

JUROR 21: Yes, ma'am. My name is Michelle Wells. I live in Gramercy, Louisiana. I am currently transitioning from operations coordinator to branch manager of Intertek, which is a barge inspection company. My husband also works for Intertek. He was the branch manager and is transitioning to business development. We have our 11-year-old daughter who lives with us, and I take care of my 3-year-old grandson every other week.

THE COURT: Help me understand. You're transitioning from one position at a company to another position at the same company?

JUROR 21: Yes, ma'am.

THE COURT: From what to what?

JUROR 21: From operations coordinator -- well, manager, operations manager to branch manager.

THE COURT: Branch manager. Did you say it's a barge company?

JUROR 21: We do petroleum inspections, so we inspect barges, vessels, shore tanks, and terminals.

THE COURT: So I may have the opportunity to see you in here sometime too.

JUROR 21: I hope not.

THE COURT: Thank you, Ms. Wells.

**JUROR 21:**  You're welcome.

**THE COURT:**  Juror 22.

**JUROR 22:**  Jack Michalski.  I live in New Orleans.  I am unmarried.  I am a supervisor at Empanola.  It's an empanada shop in New Orleans.  I live with my partner, who writes grant applications for Louisiana Environmental Action Network.

**THE COURT:**  Mr. Michalski, what did you say you did?

**JUROR 22:**  I'm a supervisor at a counter service restaurant, Empanola.

**THE COURT:**  Did you say whether you have any children at home?

**JUROR 22:**  No children.

**THE COURT:**  None.  Just the two of you.

**JUROR 22:**  Yeah, that's right.

**THE COURT:**  Thank you, sir.

Juror 23, Ms. Barnes-Barrington.

**JUROR 23:**  Yes, ma'am.  I'm Tanya Barnes-Barrington. I live in New Orleans.  I am married.  I am the financial accountant for St. Mary's Academy.  My husband is self-employed.  He's a disaster management consultant.

**THE COURT:**  Can you put the microphone a little closer.  I'm having a little trouble hearing.

**JUROR 23:**  Yes.  My husband is a disaster management consultant.  He owns his own company.  As of two weeks ago, it was just my husband and I until my son came home from Las Vegas

with the surgery he had -- he is a professional wrestler.  He had to have shoulder surgery two weeks ago, so he will be with us for the next six weeks.

THE COURT:  Your son is a professional wrestler?

JUROR 23:  In Vegas, yes, ma'am.

THE COURT:  I just have to ask.  How did he get into that?

JUROR 23:  Since a kid.  He wrestled when he was at Brother Martin, had two knee surgeries, went to LSU, graduated from there.  He wrestled out in Baton Rouge.  Then my oldest son moved out to Vegas.  He is a personal chef.  So then he convinced my youngest one to move there once he graduated from college.

He has been doing bouts with FSW, WWE.  He did a bout with Brian Cage a couple of months ago -- well, a month ago before he came home for the surgery.  So he will be out up until like six months before he can get back in the ring.

THE COURT:  Do you just worry all the time?

JUROR 23:  Yes, I do.  Yes, I do.  Yes.

THE COURT:  Goodness.  Thank you.

Juror 24.

JUROR 24:  Yes.  My name is Jean-Paul Boudreaux.  I live in Marrero.  I am currently single.  I am a machine operator at Froggiemoe Manufacturing, LLC.  I currently live with my parents and my grandma.

THE COURT:  One moment because you spoke fast.  You are a machine operator?

JUROR 24:  Yes, ma'am.

THE COURT:  How long have you been doing that?

JUROR 24:  About four years.

THE COURT:  Did you do that right out of school?  You look pretty young.

JUROR 24:  Yeah.  COVID kind of messed everything up and once I graduated from high school.

THE COURT:  You live with your -- did you say your parents and your grandparents?

JUROR 24:  Just one of my grandmothers.  But, yes, with my parents.

THE COURT:  Your parents and your grandmother.

JUROR 24:  Yes.

THE COURT:  Did you say what city you live in?

JUROR 24:  Marrero.

THE COURT:  In Marrero.  Where did you go to high school?

JUROR 24:  Shaw.

THE COURT:  Thank you, Mr. Boudreaux.

JUROR 24:  Thank you.

THE COURT:  Juror 25, Mr. Brunet.

JUROR 25:  Yes, ma'am.  My name is Austin Brunet.  I live in Hammond, Louisiana.  Single.  Scaffold builder.  I'm

employed with Brock Industries.  I live with my mother.

THE COURT:  What is the name of the company, Brock Industries?

JUROR 25:  Yes, ma'am.

THE COURT:  How long have you been with them?

JUROR 25:  I just started with them about six months ago.

THE COURT:  How is the job going?

JUROR 25:  It's not easy.

THE COURT:  Thank you, sir.

Juror 26, Ms. Winker.

JUROR 26:  Nancy Winker.  I live in Metairie.  I'm married.  I'm retired.  My husband is also retired.  He sold his business, New Horizons Computer Learning Center.  No one else lives with us right now.  Thank goodness all of them are out.  There were a lot.

THE COURT:  Your husband's business, New Horizons, did he do that almost his entire career?

JUROR 26:  No.  He was an executive vice president with Hibernia Bank, and then you know how that goes.  Then he went to IBM, and then he opened his own.

THE COURT:  Thank you, ladies and gentlemen.  I'm going to meet with the attorneys at the side.  We are getting to the end.  I just want to meet with them and see what I missed here, and we will get back to you.  One moment, please.

10:41

(The following proceedings were held at the bench.)

THE COURT:  Out of the presence of the jury, number one, any follow-up questions, Mr. Cohan?

MR. COHAN:  I had a couple.  One is just to follow up if the Benjamin Rushing is the same Benjamin Rushing.

THE COURT:  Whose witness is Benjamin Rushing?

MR. CAPITELLI:  That's ours.

THE COURT:  Tell me what he does.

MR. CAPITELLI:  He is not in law enforcement anymore.

MS. FISHER:  He used to be with the sheriff's office. Now I think he does contract work.

MR. CAPITELLI:  I think he is at least five if not 10 years older.

MR. COHAN:  He is certainly over 30, I believe.  I don't know if they were fraternity brothers together or not.

THE COURT:  I will call him up and we will get back to that.  Is he testifying, Mr. Rushing?

MR. CAPITELLI:  Yes.

THE COURT:  We will call him up here for that.

What else, Mr. Cohan?

MR. CAPITELLI:  I'm sorry.  He is not.  Sarah had him.

MS. FISHER:  He was on our list, but we are not going to call him.

MR. CAPITELLI:  I don't know if y'all are.

**MR. COHAN:** We don't plan to.

**THE COURT:** Let me ask him the questions just in case, but I appreciate that.

**MR. COHAN:** One on Juror 11. She mentioned she was a juvenile probation and parole officer, just if she received any special training or certifications for that.

**MS. FISHER:** She said she had to be POST certified.

**THE COURT:** We can get her right now. Juror 11, Ms. Rodrigue.

(Juror 11 approached the bench.)

**THE COURT:** When you were a probation and parole officer, what kind of training did you get or have for that?

**JUROR 11:** I went through POST. POST Academy.

**THE COURT:** What does that mean?

**JUROR 11:** That is POST certification. Police officer. I was a police officer. That was, I think, 10 weeks in Baton Rouge. This has been a while back. I had a four-year degree to be able to go with the state. We had periodic training like ethics. That was about it. We had our yearly CPR and things like that, but basically I was a probation and parole officer for seven parishes.

**THE COURT:** Anybody have any questions? Mr. Cohan? Ms. Wheeler?

**MR. COHAN:** That answers my questions.

**THE COURT:** Mr. Capitelli?

**MR. CAPITELLI:**  No questions.

**THE COURT:**  Thank you.

(Juror 11 returned to her seat.)

**THE COURT:**  Anything else, Mr. Cohan?

**MR. COHAN:**  Maybe some more on the nature of Juror 14's relationship with Deputy Moring, how often they came together.  I guess he answered --

**THE COURT:**  He was at Walmart.

**MS. WHEELER:**  I think it would be helpful if we asked if he had any specific impression of Deputy Moring during his time working.  He said that he worked with him on several different occasions, but I think it would be relevant if he had developed a positive --

**THE COURT:**  He is not here right now, but Juror 3, Mr. Landry, who knows a Benjamin Rushing, is here, so let's get him.

(Juror 3 approached the bench.)

**THE COURT:**  We just have some follow-up questions. It's easier to do it this way.

Where did you go to school that you think you know Benjamin Rushing?

**JUROR 3:**  I went to LSU.  That sounds like a really common name.

**THE COURT:**  We agree.  That's what we are trying to get to.  When did you graduate?

JUROR 3:  I graduated in 2020, and I think he graduated in 2021.

THE COURT:  Do you think he is about your age?

JUROR 3:  He is 24, maybe 25.

THE COURT:  We don't think it's him.  Any idea what he does now?

JUROR 3:  He moved to New Orleans, but I'm not sure what he does.

THE COURT:  As far as you know, was he ever in law enforcement?

JUROR 3:  No.

(Off the record.)

THE COURT:  Counsel, any follow-up questions for Mr. Landry?

MR. COHAN:  Is he bald with glasses?

JUROR 3:  No.

MR. COHAN:  That's all.

THE COURT:  I have a couple of questions.  Right at the beginning you said you have a new baby, and there was another reason why you said it might be a hardship.

JUROR 3:  I'm building a big building right down the road, and I have to finish in a few days.  If I'm not there, I don't know that we will finish.

THE COURT:  Now we are getting to the end of selecting the jury, and these attorneys need to make a

decision.  Can you give them your assurance and me your assurance that you can give this your full attention and not be worried about what's going to happen?

**JUROR 3:**  I'll be honest with you.  I'm very, very stressed right now.  It doesn't help that I don't sleep at night.  On top of that, I'm currently packing my things to move to Nashville.  I'm at the most stressed I've been in my life in a long time, to be completely honest with you.  I'm a strong-minded person, but I am very stressed out.  I'm very concerned about work and moving.  I have a lot on my plate.

**THE COURT:**  Mr. Cohan, Ms. Wheeler, any questions?

**MS. WHEELER:**  No follow-ups.

**THE COURT:**  Mr. Capitelli?  Ms. Fisher?

**MR. CAPITELLI:**  You're an assistant superintendent?

**JUROR 3:**  Yes, sir.

**MR. CAPITELLI:**  Are there other assistant superintendents?

**JUROR 3:**  I have a senior superintendent who likes to sit at the desk, and I have one other superintendent who is in charge of the exterior of the building.  I'm in charge of the interior, all five floors, roof, pool deck.  It's 120-something apartments.  It's a lot.

**MR. CAPITELLI:**  Do you own the company?

**JUROR 3:**  I'm sorry?

**MR. CAPITELLI:**  Do you own the company?

JUROR 3:  No, no.

THE COURT:  How long have you been with the company?

JUROR 3:  Three and a half years.

THE COURT:  Do you have any concerns about your job security?

JUROR 3:  No.  No.  That's why I'm moving in a few weeks is because I'm actually getting a promotion to go build a building.

THE COURT:  Anything further?

MR. CAPITELLI:  That's all the questions I have.

THE COURT:  Thank you, sir.

(Juror 3 returned to his seat, and Juror 14 approached the bench.)

THE COURT:  It's easier to do a few follow-up questions like this.

JUROR 14:  That's good.  I thought I was in trouble. I may still be.

THE COURT:  You indicated that you know Deputy Moring from your time at Walmart.

JUROR 14:  Yes.

THE COURT:  Did you have a lot of interactions with him?

JUROR 14:  A pretty good bit.

THE COURT:  What's your impression of him?

JUROR 14:  I like him.  I respect him.

THE COURT:  Did you ever see him lose his temper?

JUROR 14:  I haven't, and I saw times when I would have.

THE COURT:  Mr. Cohan, Ms. Wheeler, do you want to ask any questions?

MS. WHEELER:  Would you say that your impression of Officer Moring is positive?

JUROR 14:  Yes.

MS. WHEELER:  No other questions.

THE COURT:  Mr. Capitelli.

MR. CAPITELLI:  I may have missed it.  What did you do at Walmart?

JUROR 14:  I spent nine years doing floor maintenance, when we had floors, and the last six part-time daytime maintenance.

THE COURT:  You were inside for that?

JUROR 14:  In and out.

THE COURT:  Is it the Covington Walmart?

JUROR 14:  Yes.

THE COURT:  That detail with the officer is usually outside with Walmart?

JUROR 14:  That's depending on the deputy.  Some did a better job than others.

MR. CAPITELLI:  I've seen that car kind of parked out there.

10:51

**JUROR 14:**  Some park at Home Depot.

**MR. COHAN:**  How long was your shift when you were working there?

**JUROR 14:**  Usually eight hours.

**MR. CAPITELLI:**  Was he always there when you were working?

**JUROR 14:**  No.  They usually got someone different every day.

**MR. CAPITELLI:**  You occasionally saw him?

**JUROR 14:**  A couple times a year.  Every once in a while I would see him someplace else.

**MR. CAPITELLI:**  You say a couple times a year?

**JUROR 14:**  At Walmart.

**MR. CAPITELLI:**  Pretty infrequently.  Thanks.

**THE COURT:**  I asked this before.  Will you judge his credibility just as you would any other witness?

**JUROR 14:**  Sure.

**MR. COHAN:**  One follow-up question.  You said a couple times a year at Walmart.  Did you ever see him outside of Walmart?

**JUROR 14:**  Occasionally, but still when he was on duty.  If we both stopped at the gas station to get coffee, I might run into him.  We never actually shared a cup of coffee or had lunch, just to give you some perspective.

**THE COURT:**  Thank you, Mr. Fuselier.  Thank you.

You're not in trouble yet.

(Juror 14 returned to his seat.)

THE COURT:  Any other questions for anybody?

MS. WHEELER:  No, Your Honor.

MR. COHAN:  None from me.

MR. CAPITELLI:  We don't have any.

THE COURT:  Challenges for cause.  Mr. Cohan?

MR. COHAN:  I would start with number 14.  He just testified that he knew Deputy Moring, he saw him on multiple occasions, has a positive impression of him.  He likes him.  He respects him.  I think he comes in with a biased view on that.

THE COURT:  Mr. Capitelli.

MR. CAPITELLI:  I disagree.  He noted that he worked at a store that employs a number of individuals, that he saw him a couple times a year.  If you live in St. Tammany Parish, it's expected you may see an individual as you are driving around.  He said that he could be fair and impartial.  He said he wouldn't have any bias.  He stated that he would judge everyone fairly.  We have no reason to believe that's not the case.

THE COURT:  I'm glad we called Mr. Fuselier up here because that is what I heard as well, that he sees this deputy a couple of times a year at Walmart, or did when he was working at Walmart, but he very clearly said here and there that he could be fair and impartial and would not give him any more

credibility than anyone else.  There is no reason he can't be a fair and impartial juror.

As you will see, Mr. Cohan, New Orleans generally is a small community, and people run into each other or know somebody they went to school with.  I deny the challenge for cause.

Next.

MR. COHAN:  Number 7.  She spoke up that she knows Mr. Capitelli and had a case against him that went forward that ultimately settled.  She also mentioned that she favors police officers.  I think when you asked the question whether or not she could judge things impartially, she ultimately answered that she could, but there was a bit of a pause before that answer, which gives me some pause in her as a potential juror.

THE COURT:  Mr. Capitelli, give us your impression from this case.

MR. CAPITELLI:  I'll be honest with you, Judge.  I didn't even remember her until she spoke up.

MS. WHEELER:  Goodness.

MR. CAPITELLI:  We had a case together.  She was not the primary attorney on the other side.  She was assisting with that case.  Once she said Lowe Stein, I was able to remember what case it was.  It was a really one-off case with a community property settlement where we came in after the fact and helped facilitate between counsel.  It ultimately resolved.

There was no negative or positive things either way between she and I.  I think maybe we had a conversation together in the course of that case.  I was primarily speaking with Jeff Hoffman, who represented Lowe Stein.

Again, I think she is an attorney.  Sarah and I are attorneys here.  You are as well.  We have a number of cases where we could run across people.

THE COURT:  I agree with what Mr. Capitelli said. The fact that she is an attorney and was on the opposite side of counsel here has no bearing, and she said it has no bearing. I find it interesting that she was on the opposite side.  It wasn't even that she was working with him at the time.

I pressed her on whether she would give officers any more credibility that anyone else, and she did say no. Whether she paused or not, she said no, and I think I followed up.  I think that's the basis for a peremptory challenge, if appropriate, but not for a challenge for cause.  She said she could be fair and impartial.  I take her at her word.  I deny that challenge for cause.

MR. COHAN:  Okay.  I don't know if we will get there, but number 25, the man who works nights, I just noticed he was sleeping a lot during the session.  I worry that he would be able to stay awake for the trial.

THE COURT:  Let me just put on the record exactly what Mr. Cohan said.  I have been watching him as well.  I

noticed the exact same, that he was either dozing or looking like he was sleeping during this.

Mr. Capitelli and Ms. Fisher, anything about Juror 25?

**MR. CAPITELLI:**  No, just to note that he would be excused from work just like anybody else.  Presumably he would be able to sleep at night.

**THE COURT:**  But the issue is today.  He got up at 4:30 yesterday and is dozing and not paying attention right now and comes in, as he says, exhausted.

**MR. CAPITELLI:**  I saw him closing his eyes as well, for fairness sake.

**THE COURT:**  I'm granting that challenge for cause. Juror 25, Mr. Austin Brunet, is excused for cause.

Is that it, Mr. Cohan?

**MR. COHAN:**  One more.  Sorry I keep jumping around.

Number 3, which we just spoke with, not about Benjamin Rushing, but about the 2 1/2-month-old baby and his situation at work.  You asked him the question straight up about whether he would be able to serve on the jury, and not once but twice he said, "To be honest, I'm very, very stressed and very concerned about doing that."  Having a 2 1/2-month-old while you are about to move and dealing with the end of this construction project that he was talking about, it sounds like he would have difficulty serving on the jury.

**MR. CAPITELLI:**  I disagree.  A number of people in here have kids.  I have an 8-year-old and twin 7-year-olds that wake me up all the time.  That's not a young baby exclusive problem.  I think he says he lives with his girlfriend, who is home with the baby as well.  He is about to move.  He is getting a promotion.  His job is not at risk.  I understand they are building a building, but I don't believe he is so instrumental to building that building --

**MS. WHEELER:**  He said point-blank, Your Honor, whenever you asked him the question if he could pay attention and be fair and impartial and not have his mind somewhere else, it was very clear his mind was somewhere else.  I think he stated very clearly his mind would be somewhere else during the course of the trial.

**THE COURT:**  Well, I thought he said the opposite, Ms. Wheeler.  I know I asked that.  I thought he said, yes, he could pay attention.

**MS. WHEELER:**  So the difference is that I believe -- correct me if I'm wrong.  I believe that you said from the bench -- when we called him up here and you pressed him a little bit, he had not just hesitation, he said "most stressful time of my life."  He didn't answer your question.  He didn't say yes.

**THE COURT:**  Let me get him back.  I do have a question about him.

(Juror 3 approached the bench.)

**THE COURT:**  Sorry, Mr. Landry.  We have another question because I misunderstood an answer, and I want to make sure.

I know you said you are stressed with everything on your plate right now.  That's very clear.  If you were selected as a juror, could you give this case your full attention, or would your mind be on the other stressors in your life?

**JUROR 3:**  I mean, I can't say that I will not think about work, but I don't think I would not do a just job -- like my mind is racing about work --

**THE COURT:**  Did you say you don't think you would do --

**JUROR 3:**  I think I would pay attention and do a decent job, but my mind is absolutely racing about work right now.  I'm just being honest, but I think that it would be okay.

**THE COURT:**  You think you would be okay?

**JUROR 3:**  I think I could handle it.

**THE COURT:**  Can you call your work, if you are selected as a juror, immediately and say --

**JUROR 3:**  I'm not going to be there for the next three days?

**THE COURT:**  Yes.

**JUROR 3:**  They already know that I'm here today.

**THE COURT:** Would that give you any relief once you do that?

**JUROR 3:** I think it would give me a little relief. I think the big thing that I'm nervous about is also, like, I'm supposed to get my Nashville package from, like, my big bosses today. I'm kind of nervous on what they are offering.

**THE COURT:** Is that just something you are finding out -- it's already done, it's being sent to you or emailed to you?

**JUROR 3:** I don't know. He texted me to call him when I was out of here, so I don't know. I don't know. I think I would be okay, I guess.

**THE COURT:** Ms. Wheeler, anything further?

**MS. WHEELER:** No.

**THE COURT:** Mr. Capitelli or Ms. Fisher?

**MR. CAPITELLI:** You mentioned the first time around that you were strong-willed or you had a strong mind and that you would be able to dedicate yourself to this.

**JUROR 3:** Yeah. I mean, I build big buildings. I've got to be.

**MR. CAPITELLI:** I know there are distractions in life, but I thought you said -- did you use the words "strong-minded" or "strong-willed"?

**JUROR 3:** Yeah. I believe that I am. I'm a tough person. I can handle a lot of things at once, but this is a

11:02   lot of things going on right now.

MR. CAPITELLI:  Thank you.  That's all the questions I have.

THE COURT:  Thank you, sir.

(Juror 3 returned to his seat.)

THE COURT:  I'm going to deny the challenge.  I've tried to give him every opportunity to say that, but he keeps coming back that he can sit and give it his attention and be impartial.  I do think he is stressed, and he said that.  He is very stressed, but most of those things have nothing to do with anything he can do.  He is waiting on what his future is going to hold.  He will get that information.  I deny that.

Anything else, Mr. Cohan?

MR. COHAN:  No more cause challenges here.

THE COURT:  Did I ask y'all?

MR. CAPITELLI:  You didn't, but we do not have any cause challenges.

THE COURT:  Speak to each other and to your clients about peremptories, just 5 minutes at the most.  We are coming right back here with back and forth.

(End of bench conference.)

THE COURT:  The good news is no more questions, ladies and gentlemen.  Just give us a few more minutes, and we will select our jury.

(The following proceedings were held at the bench.)

THE COURT:  Mr. Cohan, Juror 1, Ms. Bell. Acceptable?

MR. COHAN:  Yes.

MR. CAPITELLI:  Strike.

THE COURT:  Struck by the defendant, Juror 1.

MS. WHEELER:  May I ask for the reason, please, under *Batson*?

THE COURT:  Yes, but that's --

MS. WHEELER:  We are allowed under the law to challenge the very first strike that's made.

THE COURT:  Without a pattern?

MS. WHEELER:  Under *Snyder v. Louisiana*, the Constitution forbids striking even one single prospective juror for discriminatory purposes.  That's why we are asking what the purpose of the strike is.

THE COURT:  I'm going to allow it.  What is the reason for striking Ms. Bell?

MR. CAPITELLI:  From California, not local, not going to know the area, seven years ago involved in a jury trial where the verdict was not guilty, has a connection with the clerk of court, noted her hardship for financial reasons, not based on her race.

THE COURT:  Okay.

MS. WHEELER:  That's fine.

THE COURT:  I've heard the reasons given by counsel

for defendant, and I believe he is sincere in those reasons. They are justified from what I heard from Ms. Bell about the financial hardship, about previous service on a jury, about not being from Louisiana.  I find those are not pretextual and are valid nonrace-dominant or race-centered issues.

Juror 2, Mr. Mitchell.

**MR. CAPITELLI:**  Strike.

**MS. WHEELER:**  Your Honor, we are also going to, under *Batson*, ask for what the purpose of the strike is.

**MR. CAPITELLI:**  Nervous.  He has a medical issue that may cause him not to focus, frequent urination.  He testified in a deposition where someone had a civil recovery.  That was actually my main reason for it.  That's it.  That's not based on race.

**MR. COHAN:**  He testified as to what happened in the deposition.  It wasn't what allowed --

**MR. CAPITELLI:**  You asked for the basis of my peremptory challenge.

**THE COURT:**  I do think he said he testified for the co-worker, but either way there are nonrace bases for the striking of that juror.  I don't see any race-based strike of that juror for the reasons that Mr. Capitelli has mentioned.  I believe Mr. Mitchell -- and I'm looking at my notes -- did say he is very stressed to even be here, has the bathroom issue, and what else he testified to, so he is struck.

Juror 3, Mr. Landry.

**MR. COHAN:**  Acceptable.

**MR. CAPITELLI:**  Juror 3 is acceptable.

**THE COURT:**  Juror 4, Ms. Brierley.

**MR. CAPITELLI:**  Acceptable.

**MR. COHAN:**  Acceptable.

**THE COURT:**  Our second juror is Ms. Brierley.

Juror 5 to plaintiff, Ms. Victor.

**MR. COHAN:**  Acceptable.

**MR. CAPITELLI:**  Strike.

**MS. WHEELER:**  Your Honor, I'm going to *Batson* challenge this one.  All three of the strikes have been against black jurors.  This means our jury will have no black jurors on the jury and can have a discriminatory impact.  Whenever one alleges a discriminatory impact, the burden shifts to the defendant in this.

**MR. COHAN:**  Can I just add that Juror 5 said about 10 words during this whole thing, which was that she is a credit union examiner.  She said she has childcare for her child.  I don't see any reason for this other than race.

**THE COURT:**  You just make the challenge.  Now it's up to them.

Mr. Capitelli.

**MR. CAPITELLI:**  The credit examiner was a concern for me.  I would also note that Officer Moring told me that he

believed she has been mean-mugging him the entire time. He was actually the primary reason for that. I had asked him to sit here and to tell me his impressions of the jurors. He certainly had interaction with the community. That was actually based on him as well as our plan for what jurors we believe should be picked. It is not based on race. That one actually wasn't from me. It was conversations with him as well as her credit union examiner status. I believe unless there is a race-based motivation established --

MS. WHEELER: It has a disparate impact. It would mean our entire jury would have no black jurors.

THE COURT: I don't know why you say that. There are other black jurors. I don't know why you are saying that now.

MS. WHEELER: Because we know what our peremptory strikes are going to be.

THE COURT: Well, you say that, but I just want to say for the record there are other African Americans in the venire.

MS. WHEELER: They are in the venire, yes, but they won't be seated as part of the jury.

THE COURT: I don't know that you know that right now. They are there.

MR. CAPITELLI: This is not a racial case anyway.

THE COURT: Just for the record, body language, eye contact, those types of matters are appropriate race-neutral

matters.  However, I think I want to hear from Deputy Moring on this and what the basis is.  Call him over here.

MR. COHAN:  Should the plaintiff be present?

THE COURT:  You may if you would like.

MR. COHAN:  I will ask him.

MR. CAPITELLI:  The judge is going to want to ask you some questions.

THE COURT:  Everyone is present.  We are talking about the selection of jurors, and specifically we are talking about Juror 5, Ms. Victor.  I'm speaking with Deputy Moring.

Your counsel has advised that they want to peremptorily strike her, and they base it on something that you said.  Is there any reason why you have any information about --

MR. CAPITELLI:  Number 5 is on the end of the first row.  Would you like to get your notes?

THE DEFENDANT:  Yes.

THE COURT:  Did you tell your counsel anything about her to help them with their peremptories?

THE DEFENDANT:  Due to her profession.  She is a credit union examiner.

THE COURT:  What is it about that?  Anything else?

THE DEFENDANT:  No.

MR. CAPITELLI:  Did you tell her about how she was --

THE DEFENDANT:  That was No. 1.

**MR. CAPITELLI:** Oh, I'm sorry. I misunderstood you. I thought he said Juror 5. My apologies.

**THE COURT:** Okay. Please be seated.

I find that it is not an appropriate strike. I will not allow her to be struck. Juror 5 is our third juror.

Juror 6, Ms. Favaloro.

**MR. CAPITELLI:** Acceptable.

**MR. COHAN:** Acceptable.

**THE COURT:** Juror 6, Ms. Favaloro, is our fourth juror.

Juror 7, Ms. Gerrity.

**MR. COHAN:** Strike.

**THE COURT:** Plaintiff's first peremptory, struck.

Juror 8, Ms. Levy.

**MR. CAPITELLI:** Acceptable.

**MR. COHAN:** Acceptable.

**THE COURT:** Juror 8, Ms. Levy, is our fifth juror.

Juror 9, Mr. Champagne.

**MR. COHAN:** Acceptable.

**MR. CAPITELLI:** Acceptable.

**THE COURT:** Juror 9, Mr. Champagne, is our sixth juror.

Juror 10, Ms. Morgan.

**MR. CAPITELLI:** Strike.

**THE COURT:** That will be your third strike, and the

defendants have no other strikes.  The rest is to plaintiff.

            MS. WHEELER:  Could we ask for the reason for the strike, Your Honor?

            THE COURT:  Is she African American?

            MS. WHEELER:  She is not, but she is not white.  She is an American Indian/Alaska native.  That's what it says here, American Indian/Alaska native.  She was very, very quiet.  She didn't say very much.

            MR. CAPITELLI:  I don't think they are entitled to know unless it's a disparate impact, but your client is black.  Is he an American Indian/Alaska native?

            MS. WHEELER:  It doesn't have to be black.  *Batson* doesn't say -- you can actually challenge white jurors under *Batson*.  It doesn't necessarily have to be black.

            MR. CAPITELLI:  Again, it's observing her.  It's the quietness.  It's the fact that she has no children.  It's a multitude of factors we decided to strike her.  It's not based on race.  I didn't even realize she was an American Indian/Alaska native.  Again, it has nothing to do with her race.

            MS. WHEELER:  I would only note that under *Foster*, Your Honor, shifting reasons have been declared to be inherently suspect.  These reasons don't seem to have a lot of basis.

            THE COURT:  Well, they have a valid nonrace basis.

One I didn't think so and I agreed with you on that, but this one, until you said that, I did not see that she was of any other race or background.  You are correct it is in the records, but I hadn't seen that.  I believe that he is sincere in what he has said about that juror.

I will note for the record she is not African American.  I understand what the law is, Ms. Wheeler, but I will say that I do find that is a race-neutral reason.

The rest is up to the plaintiff.  We have six jurors.  You have struck one.  We are on Juror 11.

**MR. COHAN:**  Strike.

**THE COURT:**  That is your second strike.

Juror 12, Ms. Athas.

**MR. COHAN:**  Acceptable.

**THE COURT:**  That will be our seventh juror, Juror 12, Ms. Athas.

Juror 13, Ms. Caron.

**MR. COHAN:**  Acceptable.

**THE COURT:**  That will be our final juror.  Juror 13, Ms. Caron, will be our final juror.

Please confirm with me our jurors are:

Mr. Dane Landry will be Juror 1.  Ms. Chelsi Brierley will be Juror 2.  Ms. Reina Victor will be Juror 3. Ms. Darnell Favaloro will be Juror 4.  Ms. Anna Levy will be Juror 5.  Mr. Barton Champagne will be Juror 6.  Ms. Holly

Athas will be Juror 7.  Ms. Kaycee Caron will be Juror 8.

Is that correct, plaintiff?

MR. COHAN:  Yes, Your Honor.

THE COURT:  Correct, defendant?

MR. CAPITELLI:  Yes, Your Honor.

THE COURT:  Further, the defendant struck: Juror 1, Ms. Bell; Juror 2, Mr. Mitchell; and Juror 10, Ms. Morgan. Correct?

MR. CAPITELLI:  Correct.

THE COURT:  Plaintiff struck Juror 7, Ms. Gerrity, and Juror 11, Ms. Rodrigue.  Correct?

MR. COHAN:  Yes.

MS. WHEELER:  Correct.

THE COURT:  We have our jurors.  I will excuse the rest of the jurors, we will swear in this jury, and then we will do an early break for lunch -- depending what time we stop, maybe a little over an hour -- come back, and y'all be ready for opening statements.

Have you said who your first witness is going to be?

MR. COHAN:  Yes.  De'Shaun Johnson.

THE COURT:  Do you have any follow-up witness you --

MR. COHAN:  We have a follow-up witness.

MR. CAPITELLI:  I don't know if she is going to come back, but you may want to tell her she will be sequestered.  I

know you wanted to know if and when our witnesses arrive.  She was here for this.

**MS. WHEELER:**  Thanks, Judge.

**MR. CAPITELLI:**  Thank you.

**MR. COHAN:**  Thank you.

(End of bench conference.)

**THE COURT:**  I'm going to call eight jurors' numbers and names.  I would ask that those eight jurors remain in the courtroom.  The other jurors, I thank you very much for your service.  We all do.  I would ask that you go back down to the jury room and check in, and do not leave here without doing that.  They will officially discharge you.  Again, thank you for your service here.

Juror 3, Mr. Dane Landry, please stay in the courtroom.  Juror 4, Ms. Chelsi Brierley, please stay in the courtroom.  Juror 5, Ms. Victor, please stay in the courtroom.  Juror 6, Ms. Favaloro, please stay in the courtroom.  Juror 8, Ms. Levy, please remain.  Juror 9, Mr. Champagne, please stay.  Juror 12, Ms. Athas, please remain.  Juror 13, Ms. Caron, please remain.  You will be our eight jurors.

Everyone else, again, thank you for your service.  Please return downstairs.  The eight jurors remain where you are, and we will seat you where you will be seated during the trial.  Thank you everybody.

(Venire excused.)

THE COURT:  Juror 1, Mr. Landry, come on up.  Melissa is going to show you where you will be seated.  Juror 2, Ms. Brierley, come on up.  Go right over here.  Juror 3, Ms. Victor.  Juror 4, Ms. Favaloro.  Y'all will be in the front row.  Thank you ma'am.  Juror 5, Ms. Levy.  Juror 6, Mr. Champagne.  Juror 7, Ms. Athas.  Juror 8, Ms. Caron.

Everyone else be seated.  Now, our eight jurors, these will be your seats during the trial.  Please stand and we are going to get you sworn in.  I'm going to give you some preliminary instructions until we break for lunch.  Stand and raise your right hand, please.

(Jury duly sworn.)

THE COURT:  Please be seated.

Ladies and gentlemen, you have now been sworn as the jury to try this case.  As the judge, I will decide all questions of law and procedure.  As the jury, you are the judges of the facts.  At the end of the trial, I will instruct you on the rules of law that you must apply to the facts as you find them.

If you have a cell phone, smart phone, or anything similar to that, please make sure that it is off during the trial.

There are certain rules you must follow while participating in this trial.  First, you may not communicate with anyone about the case, including your fellow jurors, until

it is time to deliberate.

I understand you may want to tell your family, close friends, office that you have been called for jury service.  You should advise them solely that you have been called for jury service, that the judge has instructed you that you cannot tell them anything else about the service until after the trial is over.

Please do not give any information to anyone by any means.  Do not talk face-to-face or use any electronic device or media, telephone, cell phone, smart phone, computer, any social media to communicate to anyone any information about the case until I accept your verdict or until you have been excused as a juror.  This includes any information about the parties, witnesses, judge, evidence, or anything else related to the case.

Secondly, do not speak with anyone in and around the courthouse other than your fellow jurors and court personnel.  Some of the people you may encounter may have a connection with the case that you won't know anything about, so please don't speak to anybody.

These are very friendly attorneys here, but I have advised them that if they see you in the hallway or in an elevator that they are not to have any communication with you.  Please don't think that they are being unfriendly if they step out of an elevator or look down or walk away.  They don't want

anyone to even see you saying "good morning" and think that you have had some other conversation with them, the same as with the parties in this case.

Third, do not do any research on the internet, in libraries, in books, newspapers, magazines, or any other source.  Do not visit or view any place discussed in this case. Do not in any way research any information about this case, the law, or the people involved, including the parties, the witnesses, the lawyers, myself until after you have been excused as jurors.

These rules protect the parties' right to have this case decided solely on the evidence that they know about that has been presented here in court.

If you gain any information through any investigation that we do not know about or gain any information through improper communication, then your verdict may be influenced by this inaccurate, incomplete, or misleading information that has not been tested by the trial process, which includes of course the oath to tell the truth and cross-examination by an attorney.  It could also be unfair to a party's right to know what information the jurors are relying on to decide the case.

Each of the parties is entitled to a fair trial by an impartial jury, and you must conduct yourselves so as to maintain the integrity of the trial process.  If you decide the

case based on information not presented in court, you will have denied the parties a fair trial in accordance with the rules of this country, and you will have done an injustice.

You may take notes during this trial.  Either Melissa or Cherie are going to provide you with a notebook and with pens.  The notebooks will remain in the court during the trial.  The courtroom is secured every night and nobody will have access to those notes.

Since you are allowed to take notes, do not allow your note-taking to distract you from listening to the testimony.  Your notes are simply an aid to your memory.  If your memory should later be different than your notes, you should rely on your memory.  Do not be unduly influenced by the notes of other jurors.  A juror's notes are not entitled to any greater weight than each juror's recollection of the testimony.

Again, until this trial is over, do not discuss the case with anyone, and do not permit anyone to discuss the case in your presence.  This includes your spouse, relatives, friends, coworkers.

Again, do not communicate in any way any information about this case until I accept your verdict or excuse you as a juror.  Do not even discuss the case with your fellow jurors until the end of the case when you retire to deliberate.  It's unfair to discuss the case before all the evidence is in because you may become an advocate for one side

or the other without hearing all the evidence.  The parties, the witnesses, the attorneys, and persons associated with the case are not allowed to communicate with you, and you may not speak with anyone else in or around the courthouse.

There are some issues of law or procedure that I must decide that the attorneys and I must discuss.  These issues are not part of what you must decide, and they are not properly discussed in your presence.  To avoid having you leave the courtroom and go to the jury room and to save time, I may discuss these issues with the attorneys at the sidebar, as you saw this morning.  When I confer with the attorneys at the bench, please do not listen to what we are discussing.  In the event the discussions take more time, I may have you leave the courtroom until the lawyers and I resolve those issues.

The lawyers and I have discussed this, and they are coming in early in the morning and staying late so that we can attempt to resolve those issues outside of your presence and not waste your valuable jury time.  We will keep those disruptions as few and as brief as possible.

The trial will begin immediately after lunch.  We are going to take a lunch break in just a minute.  When the trial begins, lawyers for each side will make an opening statement.  Opening statements are intended to assist you in understanding the significance of the evidence that will be presented during the trial, but the opening statements are not

evidence.

After the opening statements, the plaintiff, Mr. Johnson's side, will present its case through witness testimony or documentary or other evidence. Next, the defendant will have an opportunity to present his case. The plaintiff then may present rebuttal evidence. After all the evidence is introduced, I will instruct you on the law that applies to the case, the lawyers will make closing arguments, and then the case will go to the jury.

I will advise you just as I advised you that opening statements are not evidence, closing arguments are not evidence, but rather closing arguments are the attorneys' interpretations of what they believe the evidence has shown or not shown. It is only after all of that evidence and the closing arguments that you will go into the jury room to deliberate to reach a verdict.

Again, keep an open mind during the entire trial. Do not decide the case until you have heard all the evidence, the closing arguments, my instructions, and then make your determinations.

We are now going to take our first break. It is almost 11:45 and we are going to take a lunch break. You may make whatever calls. Just as I said, you may advise your family, your work that you have been selected for jury service. You may make any arrangements you need to make.

If you would like to get any information about lunch places around here, either Cherie or Melissa can give you some lunch places easily within walking distance, all within a block of here.

We are going to show you to the jury room in a moment.  We always have snacks in the jury room and drinks and coffee.  You may get lunch and bring it back to the jury room.  We are on the third floor.  When you come back in, just come straight up to the third floor and say, "Judge Vitter's courtroom, I'm a juror," and they will show you right into the jury room, or you may eat out wherever you find a place and come back.

We are going to come back at 12:45 to start the trial.  We will have opening statements at that time.

When you go in the back, one of the other things Cherie or Melissa are going to ask you is about what time you want to start every day of the trial.  I always leave it to the jurors together and offer you 8:00, 8:30, or 9:00 because I don't know where everyone will be coming from.  That will be one of the first things that they discuss with you, and then I will get with the attorneys on that.

If you need to put money in your parking meter, please also do that during lunch.  I don't want anyone to have any parking issues.

I fully expect and the attorneys have indicated

that they are all going to work to getting you out today as close to 5:00 as possible because we know you need to make arrangements.  After today, I would like to go to 5:00 or 5:30 at the latest.  We are all looking to be 5:00 at the latest today for you to leave.

Anything else, counsel for plaintiff?

MR. COHAN:  No, Your Honor.

THE COURT:  Counsel for defendant?

MR. CAPITELLI:  No, Your Honor.

THE COURT:  The jury is excused for lunch break until 12:45.

THE DEPUTY CLERK:  All rise.

(Jury out.)

THE COURT:  Hope y'all have umbrellas.  Apparently it's raining outside.

Anything we need to go over before we break for lunch?  Counsel for Mr. Johnson?

MR. COHAN:  Just to follow up with the exhibits that we were talking about.

THE COURT:  Please be seated.

MR. COHAN:  The process for that, we will give opening statements, and then after that we should move for admission of evidence?

THE COURT:  Correct.

MR. COHAN:  Thank you.

THE COURT:  Anything else?

MR. CAPITELLI:  Just procedurally for tomorrow, I think you were going to tell us by noon who you are calling and what order it is tomorrow so we are able to prepare.

MR. COHAN:  Yes.  Let us discuss on our end, and we will tell you before noon.

MR. CAPITELLI:  Okay.  Thank you.

MR. COHAN:  Thank you.

THE COURT:  All good.  I think that's it.  12:45 back with opening statements.  Thank you.  Court is in recess.

(Lunch recess.)

* * *

**AFTERNOON SESSION**

**(April 29, 2024)**

**THE COURT:** Back on the record. The parties are present. Counsel is present. The jury is not in the courtroom.

We are providing to counsel on both sides the Court's proposed verdict form for discussion later tonight. We are just providing it.

With that, are we ready to proceed with opening statements?

**MR. COHAN:** Yes, Your Honor. Sorry. There was a little seat change.

**THE COURT:** Ready for opening statements?

**MR. CAPITELLI:** Yes, Your Honor.

**THE COURT:** When the jury comes in, they usually walk that way. Is that now cleared by you, Ms. Ahmed?

**MS. AHMED:** Yes.

**THE COURT:** I just wanted to make sure. We are good?

**MS. AHMED:** Yes, we are good.

**THE COURT:** Everybody is ready?

The jury has said 8:30 start tomorrow, which means I want everyone in here by 8:00.

Mr. Cohan, you have asked several times about exhibits. You may move to introduce whatever exhibits when the jury comes back.

**MR. COHAN:** One more thing while we have time right now. Would it be possible for the Court to provide a note for De'Shaun's teachers for school? He is missing the three days, and it would be much appreciated.

**THE COURT:** Sure. Any objection?

**MR. CAPITELLI:** No, no objection.

**THE COURT:** Yes. Should I make a call? Just tell me what you want to say and tell me what school to direct it to, and I will give you something. Tell me, Mr. Johnson.

**THE PLAINTIFF:** Just that I'm going to be missing the next three days. It's Booker T. Washington High School.

**THE COURT:** Booker T. Washington.

**MR. COHAN:** Thank you.

**THE COURT:** One more thing. Addressed to anyone in particular? The principal?

**THE PLAINTIFF:** Yeah, the principal.

**THE COURT:** Please rise.

(Jury in.)

**THE COURT:** Please be seated.

The jurors are back in the courtroom. I hope you were able to get something to eat. We will always keep some kind of snacks or food, and I see a couple of people have bottles of water. If you would like to bring a bottle of water or a cup with a cover on it into the court, you may.

If you will recall, during voir dire I mentioned

to someone else if you would like a break for whatever reason -- to stretch your legs, do whatever -- just make eye contact with me or with Cherie or Melissa and we will know to take a break.  The plan is right now probably to take a break in about a couple of hours and then go the rest of the day.

With that, the parties are ready.  The attorneys said they are ready for opening statements.

Mr. Cohan, please proceed.

MR. COHAN:  Thank you, Your Honor.

Before I proceed with opening statement, I would just like to move for the admission of some exhibits that there have been no objections to.  It's Exhibits 1 through 10 on the parties' joint trial exhibit list.  It's docket number 109.

THE COURT:  Exhibits 1 through 10, Mr. Capitelli?

MR. CAPITELLI:  No objection, Your Honor.

THE COURT:  Exhibits 1 through 10 are admitted without objection.

MR. COHAN:  Thank you, Your Honor.

THE COURT:  Please proceed.

MR. COHAN:  Good afternoon.  This is a case about a 14-year-old boy's brave attempt to record the violent arrest of his mother in his own driveway, a right guaranteed by the First Amendment to the U.S. Constitution, and the suffering he experienced as a result of it -- the pain, the anguish, and the fear -- from an officer who went too far and stepped out of

bounds.

The evidence in this case will show that the defendant, Deputy Moring, not only attempted to block that recording, but did so while pushing the boy, shoving him back, and sticking a taser at point-blank range in his face and threatening to use it. Ladies and gentlemen, my name is Keith Cohan, and together with my co-counsel we represent that 14-year-old boy, De'Shaun Johnson.

The incident at issue in this case took place on May 5, 2020, back when COVID had just begun, so that 14-year-old boy looks a little bit different now. He is now the 18-year-old young man sitting at counsel's table. During this trial you will learn more about De'Shaun and about how defendant Moring's actions on May 5 dramatically changed his life and how despite all of it he has grown into a fine, intelligent, and hardworking young man.

At the time of the incident, De'Shaun was an eighth grader at Slidell Junior High, and he is now a senior at Booker T. Washington High School, where he will graduate in just a couple of weeks with flying colors.

At the time of the incident, in many ways De'Shaun is just a normal kid who does normal kid stuff. He loves video games. He loves to play basketball. He loves the Saints and Pelicans. De'Shaun is also a very special kid. He has excelled academically, which has earned him a full academic

scholarship to Alabama State University, where he will matriculate in the fall.  He is a smart and hardworking young man and is loved by his teachers, and he ultimately hopes to pursue his dream of becoming a pilot.

De'Shaun has done all of this while being raised by a single parent, his mom, Teliah Perkins, and while suffering from PTSD and intense anxiety that he suffered in the years following the May 5 incident.  Now, I could go on and on about De'Shaun, but let's get into what happened on May 5, 2020, which is why we are all here.

The truth in this case should not be complicated.  The truth is straightforward.  Not only will you hear testimony from eyewitnesses and see documents, but you will see three videos of the incident: one from De'Shaun, one from his cousin Jeron, and one from a neighbor down the street who is a family friend, Auntie Z.

The events at issue in this case took place in front of De'Shaun's home in Slidell on 2018 Jay Street.  As the evidence will show, the deputies were dispatched to Jay Street based on an anonymous complaint that a female was recklessly driving a dirt bike.  At the time De'Shaun was inside his house playing video games while his mom and cousin were on the porch having a snack.

While on the porch, De'Shaun's mom, Ms. Perkins, saw defendant Moring and Deputy Hart riding their police marked

motorcycles down her street, and she got up and got near the street to see what was going on.  She saw the officers turn back around towards her house and start approaching.  Her motorcycle was parked in her driveway at the time.

Ms. Perkins and the officers strongly dispute what happened over the next several minutes while De'Shaun was still inside the house playing video games and had not yet started recording.  Ms. Perkins will explain that the officers were only there due to a baseless complaint by a neighbor.  She will explain that even though she complied with the officers and gave them her driver's license and proof of ownership, the officers became aggressive with her, so much so that she called 911 to request a supervisor for her own safety before ultimately getting agitated with how the officers were treating her.

The defense will tell a different story.  You will likely hear the officers come up and testify that they stopped Ms. Perkins because they saw her back-pedaling her motorcycle from the street into her driveway without a helmet on.  They will likely try to smear her and vilify, but even the officers will likely admit that the reason for the stop was a minor traffic violation punishable by a citation and a $50 fine.

Now, I wish we had a recording of what happened during that part of the interaction so we would know what

happened then for sure, but we don't.  Fortunately, it doesn't really matter.  This case is not about whether Ms. Perkins acted reasonably or whether the officers should have arrested her.  You will see video of Ms. Perkins talking back to the officers and pulling away, but this case isn't about whether Ms. Perkins' conduct was improper or disrespectful.  This case is about what happened to De'Shaun after he came outside, and fortunately we have videos of that.

While all this was happening, De'Shaun will tell you that he was sitting in his garage that had been converted into a playroom playing Fortnite on his Xbox, normal stuff that normal kids do.  He will tell you that his cousin came inside to tell him what was going on and that they peeked out the window and watched things escalate between his mom and the officers.

De'Shaun will tell you that he then heard his mom cry out to him to come out and start recording to document what was happening.  He will tell you that he immediately put down his controller, grabbed his phone, and got outside as fast as he could without even taking the time to put on his socks and shoes.  He was barefoot.  He was in his driveway.  That's when he saw the police come up the driveway and take his mom down to the ground.

He will tell you that he was scared, that he was worried about his mom, but that he knew better than to try to

stop the police.  He didn't try to hinder the arrest, he didn't threaten the officers, he didn't try to pull them off his mother, and he didn't charge toward the scene.  He will tell you how he did the only thing that he could do to protect his mom, which was to document what was happening.  He got his phone out and he kept recording.

He hoped that maybe, just maybe if the police had the camera on them, then they wouldn't hurt his mom.  Even after the deputies pinned Ms. Perkins' face to the ground and she began screaming while the deputies dig their knees and elbows into her back and legs, De'Shaun maintains a reasonable distance, remained calm, and simply keeps recording.

You will see that after the officers handcuffed Ms. Perkins, defendant Moring got up to approach De'Shaun.  You will see defendant Moring push De'Shaun back not once but twice and draw his taser.

(Video played.)

**MR. COHAN:**  Even after getting pushed and hearing his mom screaming that she is getting choked, De'Shaun doesn't push back, he doesn't threaten the officer, and he maintains his ground on his own property, in his own driveway.  He is not going to stop recording what's happening to his mom.  He is going to try to protect his mom by recording the scene.

The evidence will show that defendant Moring not only pushed De'Shaun back, but also actively tried to block his

recording, especially as the confrontation between Ms. Perkins and Officer Hart reached its boiling point.  As De'Shaun tried to move to the side to record what was happening, Officer Moring moved with him.  When he moved to the other side, Officer Moring moved with him then again too.  All this is happening while his mom is pleading that she is being choked in the background, and defendant Moring in fact successfully blocks De'Shaun from recording what's going on.

The video that De'Shaun's cousin took highlights exactly what it was that defendant Moring was blocking.  In the picture on the left, you can see the cousin's video, which has a clear view of what's happening between Deputy Hart and De'Shaun's mom.  In the picture on the right, you can see what De'Shaun was able to view with his video.  And the same here.

You will see from the video evidence that even after Ms. Perkins had been handcuffed and moved further way, defendant Moring pointed his taser directly into De'Shaun's face at point-blank range until De'Shaun stopped recording. You will see defendant Moring hold his taser right in De'Shaun's face and how despite this clear danger to a child, De'Shaun doesn't threaten the officers or try to hinder the arrest.  He stays calm.  He keeps recording.

You will hear De'Shaun simply stand his ground and tell defendant Moring, "You can't tase a child," and you will hear defendant Moring coldly respond, "Watch me."  You

will see video of this part of the incident from not only De'Shaun's and his cousin's point of view, but also from a video taken by a neighbor and friend, Auntie Z or Ms. Zina.

Now, you have seen screenshots and you have heard me talk about the videos, but I'm going to play the whole video for you that De'Shaun took without interruption so you can see what's happening for your own eyes. Again, as you watch this, remember what's important in this lawsuit; not Deputy Hart's use of force against Ms. Perkins and not Ms. Perkins' mouthing off to the officers, but De'Shaun's exercise of his First Amendment right.

(Video played.)

**MR. COHAN:** Now, although De'Shaun kept a brave face and stood his ground and kept recording during the arrest, this incident has had a dramatic impact on his life. After the incident, De'Shaun was no longer the cheery boy you see in this picture. He had trouble sleeping and he had repeated nightmares about the police. His mom would keep the door open to hear him scream so she could go in and comfort him.

You will hear how he was jumpy and on edge and plagued with panic attacks and nervous breakdowns where he felt his heart beating out of his chest. He became anxious in social settings and feared being anywhere around law enforcement. He missed days of school, and he had days where he would go to school and then call his mom to pick him up

because he couldn't take it.

He missed the one thing he truly loved that would get his mind off anything, basketball, because he was scared to see officers at the games. He quit going out with his friends and would spend hours in his room with the door closed just crying.

The evidence will show that within weeks of the incident, De'Shaun went to his primary care doctor to get help. The evidence will show that his primary care doctor referred him to a psychiatrist and that the psychiatrist diagnosed De'Shaun with post-traumatic stress disorder and anxiety as a result of the incident. The psychiatrist prescribed De'Shaun medication, which he took for over three years following the incident.

De'Shaun has been constantly working to better his mental well-being and has made progress, but his life will never be the same. Why? Why did a young 14-year-old boy go through this? He went through it because defendant Moring stepped out of bounds. He went too far. He shoved him, he stuck a taser in his face, and he threatened to use it for doing nothing more than recording the police. That's it. That's what this case is about. Thank you.

THE COURT: Thank you, Mr. Cohan.

Mr. Capitelli.

MR. CAPITELLI: Good afternoon.

Safety.  This case is about safety, the ability to control a scene and to ensure safety.  I don't plan to show you select screenshots or animations.  I'm not going to place arrows on the screen, and I'm not going to pull images out of context.  The reason for this is simple.  I am not here to try to tell you what to think.  I want you to hear from those involved, to watch the videos, and to evaluate whether Mr. Johnson was told to stop recording or if he was simply asked to move back for officer safety.

There are three videos in this matter.  I ask that you evaluate the videos and the testimony on your own.  While I expect you will see them many times during this trial, I plan to show you all three in a moment.  When viewing, I ask you to consider the full scene and not an isolated moment in time.

The evidence in this matter will include setting the scene.  You will hear testimony regarding the reason officers were at Ms. Perkins' house and the basis for her lawful arrest.  You will hear from Mr. Johnson, from Ms. Perkins, and from his cousin Jeron Perkins.  You will hear from Deputy Ryan Moring, Sergeant Kyle Hart, and an independent witness to this matter, Erin Wright.

I ask that you place yourself in the shoes of those involved, including Officer Moring.  I ask that you note that three people recorded this incident while only one is the

subject of Officer Moring's requests to simply move back.

Let's go ahead and play Mr. Johnson's video.

(Video played.)

MR. CAPITELLI:  Now we are going to play his cousin Jeron Perkins' video.

(Video played.)

MR. CAPITELLI:  Before we play the neighbor's video, the third video of the event, I will note that the evidence will show that that video was not sped up or altered in any manner by defense, that actually it was done by Jeron Perkins.

Now, let's go ahead and play at least the relevant part of Ms. Zina Fernandez' video, which does not have sound.

(Video played.)

MR. CAPITELLI:  Plaintiff and plaintiff's counsel will attempt to make this matter about any issue other than the one we were here for today.  I encourage you to stay focused on the only issue before you.  This is not about Ms. Perkins.  Her arrest has been determined to be lawful, along with the use of force on her during her arrest and her active resistance.

Your decision is much narrower.  This matter only involves De'Shaun Johnson.  The evidence will show that Mr. Johnson was asked to move back six times when he was within at most 1 to 3 feet of an actively resisting individual that was being arrested and after he had touched her hand during the

arrest.

Testimony will also explain why an individual who was physically at least as large if not larger than the officers involved cannot be that close to an arrest, to the arresting officers' weapons, and to being immediately behind them.  The videos in evidence will also note his voiced refusal to simply move back six times.

You will be asked whether it was a violation to ask Mr. Johnson to move back; and when he refused to do so, to take further action, including extending a hand; and when that was knocked away and proved ineffective, drawing and displaying -- but not using -- a taser.  When you do, I am confident that you will reach the same conclusion I reach. This matter involves safety, not a violation of anyone's right to record.  Thank you.

THE COURT:  Mr. Cohan, call your first witness, sir.

MR. COHAN:  Could I just request a brief sidebar?

THE COURT:  Yes.

(The following proceedings were held at the bench.)

MR. COHAN:  There was just one statement in defendant's opening that I think may warrant a limiting instruction.  He said that Ms. Perkins' arrest was lawful, and that's not what's been ruled.  It was ruled that the deputies are entitled to qualified immunity on the arrest, not that it was a lawful arrest.

**MR. CAPITELLI:**  She was convicted.

**MR. COHAN:**  On the use of force used in the arrest.

**MR. CAPITELLI:**  She was convicted.  She raised those defenses in her trial.  She was convicted.

**THE COURT:**  Let's proceed.  I'm not saying no to a limiting instruction.  Let's see if we can agree on it.  There's been discussions prior to trial about an arrest being lawful, and so let's see if there's a limiting instruction we can agree to, and then I will present it.

**MR. CAPITELLI:**  I will note briefly, Your Honor, that it appears Ms. Perkins is still in the courtroom.

**MR. COHAN:**  I will ask her to step out.

**THE COURT:**  She hasn't heard any testimony.  I thought that was her.  I saw her walk in during opening statements.  Nobody has testified --

**MR. COHAN:**  Would that apply to the chief also since the corporate representative of the --

**MR. CAPITELLI:**  He is not testifying.

**MR. COHAN:**  The corporate representative is.  Isn't he here as a corporate representative?

**MR. CAPITELLI:**  No, he is not here as a corporate representative.

**THE COURT:**  Unless you can tell me any reason why he shouldn't be in here, I think he can stay.  If you come up with anything, let me know.

**MR. COHAN:**  Thank you, Your Honor.

**THE COURT:**  I will announce sequestering of witnesses so you don't have to go to her right now.

(End of bench conference.)

**THE COURT:**  Any person who is going to be witness in the case must be sequestered.  Counsel has asked that they be sequestered, which means you have to step out of the court and not listen to the testimony.

With that, Mr. Cohan, are we ready to proceed?

**MR. COHAN:**  Yes.  Your Honor, I would like to call the plaintiff, De'Shaun Johnson, to the stand.

**THE COURT:**  Mr. Johnson, come right up here.

**DE'SHAUN JOHNSON,**

having been duly sworn, testified as follows:

**THE DEPUTY CLERK:**  Please be seated and then state your name in the microphone for the record.

**THE WITNESS:**  De'Shaun Johnson.

**THE COURT:**  Mr. Cohan.

**DIRECT EXAMINATION**

BY MR. COHAN:

**Q.**   Good afternoon, De'Shaun.

**A.**   Good afternoon.

**Q.**   Could you tell us how old you are.

**A.**   I'm 18.

**Q.**   Do you go to school?

DE'SHAUN JOHNSON - DIRECT

**A.** Yes, sir.

**Q.** Where do you go to school?

**A.** Booker T. Washington High School.

**Q.** What grade are you in?

**A.** Twelfth.

**Q.** How is that going?

**A.** It's going good, I mean, as good as things can go.

**Q.** What classes are you taking this semester?

**A.** Physics, art, trigonometry, college readiness, African American studies, and English IV.

**Q.** How have you been doing academically?

**A.** Great.  All A's and B's mostly.

**Q.** Any C's?

**A.** Yeah, I had one.

**Q.** Any academic achievements that you have had?

**A.** Yes, sir.

**Q.** Tell us about that.

**A.** The Lexile reading assessment, I got the highest score in the school.

**Q.** How many people are at your high school?

**A.** A lot.  Several hundred.

**Q.** What did you get for getting the top score on that?

**A.** They gave me an award, like a little certificate and an award, and they gave me AirPods.

**Q.** Are there any sports or extracurricular activities you do

DE'SHAUN JOHNSON - DIRECT

outside of school?

**A.**   Yes, sir.  I played basketball and baseball.

**Q.**   What else do you like to do outside of school?

**A.**   Work out, play the game.

**Q.**   What games do you play?

**A.**   Fortnite, Call of Duty, GTA, and regular games.

**Q.**   Do you have plans for next year after you graduate?

**A.**   Yes, sir.

**Q.**   What are those?

**A.**   I'll be attending Alabama State University.

**Q.**   What do you want to be when you grow up?

**A.**   A pilot.

**Q.**   Where do you live, De'Shaun.

**A.**   Slidell, Louisiana.

**Q.**   Who do you live with?

**A.**   My mama and my grandma.

**Q.**   Do you have any brothers or sisters?

**A.**   No, sir.

**Q.**   Who raised you?

**A.**   My mom.

**Q.**   Just your mom?

**A.**   Well, my grandma too.

**Q.**   Who provides for your family?

**A.**   My mama.

**Q.**   What type of relationship do you have with your mom?

DE'SHAUN JOHNSON - DIRECT

A.   We got a close relationship, you know.  We tell each other everything.  We have our debates and stuff from time to time, but it's good.

Q.   What do you debate about?

A.   Sports, anything we just disagree on in general.

Q.   What do y'all like to do together?

A.   Work out.  You know, we usually get most of our talks in car rides because, you know, she be doing stuff and I will be doing stuff.  So that's where we mostly get our talks at, in car rides.

Q.   I want to switch gears and talk about the events that happened on May 5, 2020, that gave rise to this lawsuit.  Do you remember that day?

A.   Yes, sir.

Q.   You testified that you are 18 now.  How old were you then?

A.   Fourteen.

Q.   What grade were you in at the time?

A.   Eighth grade.

Q.   So it that junior high?

A.   Yes, sir.

Q.   Where did you go to junior high school?

A.   Slidell Junior High.

Q.   Where were you on May 5 in the hours leading up to the incident?

A.   I was in the garage.

DE'SHAUN JOHNSON - DIRECT

Q.   What were you doing in the garage?

A.   Playing the game.

Q.   What game were you playing?

A.   I was playing Fortnite.

Q.   Is that the same house you live in now?

A.   No, sir.

Q.   What was the address of that house?

A.   2018 Jay Street.

Q.   Who lived with you in that house?

A.   Me, my mom, my grandma, and my disabled cousin.

Q.   How was your cousin disabled?

A.   He was on hospice.  He had had multiple strokes and seizures, which left him bedridden.  He wasn't able to move and he was blind.

Q.   What was his name?

A.   Grant Perkins.

Q.   Who would take care of Grant?

A.   My mom.

Q.   So what would she have to do for him?

A.   She would have to clean him because he wasn't physically able to move, and she would have to feed him.

Q.   So before the deputies arrived on that day, who was actually at the house?

A.   Me, my cousin, and my mom, and my disabled cousin.

Q.   Tell me what you remember about that day and the hours

**DE'SHAUN JOHNSON - DIRECT**

leading up to the deputies' arrival.

A.   It was a normal day.  I had woke up, you know, ate some snacks, and got on the game.  It was just smooth.

Q.   Was your mom at home for that time?

A.   She had just came back from running errands.

Q.   How did you first learn something was happening, that the deputies were there?

A.   My cousin was sitting outside with her, and they had both saw the deputies drive past.  He had came inside when he saw them and he was like, "The police are outside," but we didn't think too much of it.

Q.   So what did you do at that point when you heard that they were outside?

A.   Me and him just wanted to go be nosey, so we was looking out the window in the kitchen.

Q.   At this point did you have any ill will towards the St. Tammany Parish Sheriff's Office at that time?

A.   No, sir.

Q.   Had you met the sheriff before, Randy Smith?

A.   Yes, sir.

Q.   What were the circumstances of your relationship with Randy Smith?

A.   My barber, he used to have me advertise for Randy Smith, so I would hold up signs and get paid for it.  One day he came to the barbershop and I met him, took a picture with him.

DE'SHAUN JOHNSON - DIRECT

**Q.**   Did you meet the sheriff?

**A.**   Yes, sir.

**Q.**   Did you meet any of his other family members?

**A.**   No, sir.

**Q.**   When you met him, how was that?

**A.**   We just shook hands.  We talked for a little bit.

**Q.**   Was this the first time that St. Tammany Parish sheriff's officers had been at your house?

**A.**   No, sir.

**Q.**   What else had they been there for?

**A.**   They had been called multiple times for the same reason, the bike.

**Q.**   How did those visits end?

**A.**   Every time they came they was, like, nothing is wrong, and they left.

**Q.**   You mentioned that you and your cousin looked out the window to be nosey and see what was going on.  What could you see from looking out the window?

**A.**   We saw my mama at the end of the driveway talking to the two officers.

        **MR. COHAN:**  Ms. Stone, if you could pull up Exhibit 10, which has been admitted into evidence, and just the first image of the scene.

**BY MR. COHAN:**

**Q.**   Is this what you and your cousin were able to view when

DE'SHAUN JOHNSON - DIRECT

you were looking outside?

A.   Yes, sir, that's the exact angle.

Q.   I just wanted to clarify two things.  We have heard talk about two cousins.  There's one cousin who is with you looking out and there's a disabled cousin.  Could you just explain the difference between the two.

A.   Yeah.  My cousin Jeron, he was staying with us at the time.  That's like, you know, we work out together, play sports together.  Then my disabled cousin, you know, he wasn't able to move and my mama took care of him, so he would just stay in the room.

Q.   How old was Jeron at the time?

A.   Fifteen.

Q.   He's a year older than you?

A.   Yes, sir.

Q.   After you were looking out the window, what could you tell about the interaction between your mom and the officers while you were inside?

A.   At first it looked like they were just having a regular conversation, but then it looks like things had started to tense up because I could tell by body language that they were becoming more and more hostile or aggressive towards my mother.

Q.   Did you see your mom on her motorcycle at all?

A.   No, sir.

Q.   If you are inside and not looking out the window, can you

DE'SHAUN JOHNSON - DIRECT

tell when your mom is on her motorcycle in the driveway?

A.    No, sir.

Q.    Did you ever see her on her motorcycle without her helmet on?

A.    No, sir.

Q.    Have you ever seen your mother ride a motorcycle without a helmet on?

A.    No, sir.

Q.    At a certain point did you decide to go outside?

A.    Yes, sir, when my mother called me out.

Q.    So tell me about that.  What did you hear?

A.    I heard my mama screaming for us to come outside because she had felt threatened.

Q.    So what did you do then?

A.    We immediately ran outside.

Q.    When did you start recording?

A.    When my mother told me to start recording, so as soon as we stepped out.

Q.    Did your cousin go outside too?

A.    Yes, sir.  He was right behind me.

Q.    Was he also recording?

A.    Yes, sir.

Q.    When you went outside, had your mother been handcuffed yet?

A.    No, sir.

**DE'SHAUN JOHNSON - DIRECT**

Q.   So what was happening between your mother and the officers?

A.   From what I had heard, she was waiting on her insurance. That's what I thought was going on.  That's all I knew.

          MR. COHAN:  Ms. Stone, could you put up the demonstrative from opening of 2018 Jay Street.

BY MR. COHAN:

Q.   De'Shaun, can you tell us what we are looking at here.

A.   That's my old house and the driveway.

Q.   So is this where the incident took place?

A.   Yes, sir.

Q.   When you came outside -- I think you should have some sort of telastrator -- could you point out where the officers were standing.

          THE COURT:  Just use your finger and it marks on the computer.

          THE WITNESS:  Wait.  What you asked?

BY MR. COHAN:

Q.   Could you point out where the officers were standing when you came outside.

A.   Right here.

Q.   Where was Jeron?

A.   Right here.

Q.   Where were you?

A.   (Indicating.)

DE'SHAUN JOHNSON - DIRECT

Q. Where was your mom?

A. She was pacing back and forth like right here.

MR. COHAN: We can take that one down.

BY MR. COHAN:

Q. So after you came outside, your mom is talking to the officers. Did you ever threaten the officers?

A. No, sir.

Q. Did you make any sudden movements towards the officers?

A. No, sir.

Q. Did you charge at the officers?

A. No, sir.

Q. Did you run towards the scene?

A. No, sir.

Q. Were you generally standing in the same place or moving around?

A. I was generally staying in the same spot.

Q. Did you have any weapons on you?

A. No, sir.

Q. Were your hands generally visible?

A. Yes, sir.

Q. What were you wearing?

A. A bright orange shirt and some shorts and no shoes.

Q. Did you try to stop the officers from arresting your mom?

A. No, sir.

Q. Did you try to get in the officers' way?

DE'SHAUN JOHNSON - DIRECT

A.   No, sir.

Q.   Did you try to pull the officers away from your mom?

A.   No, sir.

Q.   Did you curse at the officers?

A.   No, sir.

Q.   Did you try to act respectful?

A.   Yes, sir.

Q.   Remind us, how old were you at this time?

A.   Fourteen.

       MR. COHAN:   Ms. Stone, if we could go to Exhibit 1.

BY MR. COHAN:

Q.   This is a video that we watched during opening statements.
Do you recognize this video?

A.   Yes, sir.

Q.   Do you know who took this video?

A.   Yes, sir.

Q.   Who was that?

A.   Me.

       MR. COHAN:   Could we start playing the video up to
the 25-second mark.

       (Video played.)

BY MR. COHAN:

Q.   What's going through your head at this point?

A.   I'm scared.  I don't know what's going on.

Q.   Did you know why the officers were arresting your mom?

DE'SHAUN JOHNSON - DIRECT

**A.**    No, sir.

**Q.**    Do you know who your mom handed her phone to?

**A.**    Yes, sir.

**Q.**    Who was that?

**A.**    Me.

**Q.**    You took the phone, but did you ever try to break up the arrest?

**A.**    No, sir.

**Q.**    Did you hinder the arrest in any other way?

**A.**    No, sir.

**Q.**    When you got the phone, did you move a little bit after you got it?

**A.**    Yes, sir.

**Q.**    How did you move?

**A.**    I stepped back.

**Q.**    Other than grabbing the phone, did you move toward the arrest or did you stay still?

**A.**    I stayed still.

        **MR. COHAN:**    Now if we could go to Exhibit 10, Ms. Stone.

**BY MR. COHAN:**

**Q.**    Do you recognize this video as played during defendant's opening statement?

**A.**    Yes, sir.

**Q.**    Do you know who took this video?

DE'SHAUN JOHNSON - DIRECT

**A.**   Yes, sir.  My cousin Jeron.

        **MR. COHAN:**  Could you start the video.

        (Video played.)

BY MR. COHAN:

**Q.**   Did you hear what your mother told you there during this part of the clip?

**A.**   Yes, sir.

**Q.**   What did she say?

**A.**   "This is their driveway.  They don't have to stand on the porch."

**Q.**   How far away were you from the officers at that point?

**A.**   Pretty far.  I was a good 12 feet.

**Q.**   So if you are on your driveway, are you closer to your house or are you closer to the street at that point?

**A.**   I was closer to my house.

**Q.**   Did you move any closer to the street?

**A.**   No, sir.

**Q.**   Did you do what your mom said and stay right there?

**A.**   Yes, sir.

**Q.**   Again, whose driveway is this?

**A.**   That was my driveway.

        **MR. COHAN:**  If you could continue the video.

        (Video played.)

BY MR. COHAN:

**Q.**   So we see someone in the orange shirt there.  Who is that?

DE'SHAUN JOHNSON - DIRECT

**A.**    That's me.

**Q.**    Again, why are you barefoot at the time?

**A.**    Because I ran outside as soon as my mom called me.

**Q.**    Are you moving towards the officers at all here?

**A.**    No, sir.

**Q.**    Could you tell what made the officers decide to arrest your mom at that point?

**A.**    Her telling us that we didn't have to go on the porch because it was our driveway.

         **MR. COHAN:**  If you could keep playing a little bit more.

         (Video played.)

**BY MR. COHAN:**

**Q.**    So, again, what do you do after you take the phone?

**A.**    I stepped back.

**Q.**    Were there other people on the scene besides you and Jeron and your mom and the officers?

**A.**    Yes, sir.

**Q.**    Who else was there?

**A.**    My close family friend, Auntie Z, she was on the street. My neighbor, she was standing by her house, Ms. Daphne.

**Q.**    Let's take those two.  Was there anybody else there besides the people we just mentioned?

**A.**    No.

**Q.**    Auntie Z, about how old was she?

DE'SHAUN JOHNSON - DIRECT

**A.**   In her 50s, about 54, 55.

**Q.**   Is she an imposing lady?

**A.**   No, sir.

**Q.**   Did she threaten the officers?

**A.**   No, sir.

**Q.**   Did she run at the officers?

**A.**   No, sir.

**Q.**   You said she was on the street.  Was she on the street in front of your house or on the street somewhere else?

**A.**   On the street like further away from my house.  She was by the neighbor's house.

**Q.**   Did she try to get in the way of the arrest?

**A.**   No, sir.

**Q.**   You mentioned one other person, Daphne.  Who is Ms. Daphne?

**A.**   That was our neighbor at the time.

**Q.**   So if we are facing your house, is her house to the right or to the left?

**A.**   Facing my house?

**Q.**   Uh-huh.

**A.**   To the right.

**Q.**   Where was Ms. Daphne standing?

**A.**   Standing like right in front of her house.

**Q.**   So was she on your property?

**A.**   No, sir.

DE'SHAUN JOHNSON - DIRECT

**Q.**   About how old is Ms. Daphne?

**A.**   Late '30s.

**Q.**   What about her, is she an imposing figure?

**A.**   No, sir.

**Q.**   Was she threatening the officers?

**A.**   No, sir.

**Q.**   Did she do anything to try to get in the way of the arrest?

**A.**   No, sir.

**Q.**   Ms. Zina, Auntie Z, or Ms. Daphne, did they do anything to pose a threat to the officers or to the general public?

**A.**   No, sir.

          **MR. COHAN:**   If we could go back to Exhibit 1, please, Ms. Stone, and just keep playing.

          (Video played.)

**BY MR. COHAN:**

**Q.**   So can you just explain what's happening, what's going on in this part of the video.

**A.**   They were arresting my mother.

**Q.**   What's going through your head at this point?

**A.**   You know, I'm fearful that something bad was going to happen, so all I could do was record.

**Q.**   Was it you who said, "What are they taking her to jail for?"

**A.**   No, sir.

DE'SHAUN JOHNSON - DIRECT

Q.    Who was that?

A.    My cousin Jeron.

Q.    How did they respond?

A.    I didn't hear them say anything.

Q.    Did you know why they were arresting her to start with?

A.    No, sir.

Q.    Why did you keep recording at this point?

A.    Because that was the only thing I could do.  I couldn't do anything else.

Q.    At one point we hear defendant Moring telling you to get back.  Why didn't you do what he told you to do?

A.    Because I was on my property.  I had the right to record it.  I wasn't interfering with anything.

Q.    This whole time were you doing anything to interfere with the arrest?

A.    No, sir.

Q.    Were you moving closer to the scene or just standing still?

A.    I was standing still.

Q.    Did you try to push the officers off your mom when they got her on the ground?

A.    No, sir.

Q.    Did you try to push them off when you heard her screaming?

A.    No, sir.

Q.    Did you try to hinder the arrest in any other way?

DE'SHAUN JOHNSON - DIRECT

**A.**   No, sir.

        **MR. COHAN:**  If we could go back to Exhibit 10, Ms. Stone, and keep playing.

        (Video played.)

**BY MR. COHAN:**

**Q.**   Does this video from a different angle change your mind at all about your testimony that you weren't trying to hinder the arrest?

**A.**   No, sir.

**Q.**   It looks like at one point towards the end of the clip we looked at, we can see you moving from around the arrest scene. Do you know why you would have moved then?

**A.**   Yes, sir.  So I could record, get a better angle on what they were doing to my mother.

**Q.**   We will get to the video in a second, but could you tell the jury what defendant Moring did after your mom was in handcuffs.

**A.**   Yeah.  He got up and proceeded to push me back.

**Q.**   When he pushed you, did you push him?

**A.**   No, sir.

**Q.**   Did he block you from recording what was happening between your mom and the other officer?

**A.**   Yes, sir.

**Q.**   Were you able to keep filming your mom and the other officer after defendant Moring approached you?

DE'SHAUN JOHNSON - DIRECT

A.   No, sir.

MR. COHAN:  If we could go back to Exhibit 1.

(Video played.)

BY MR. COHAN:

Q.   At the beginning of the clip, we see the camera shake a bit on two occasions.  What's happening there?

A.   He pushed me twice.

Q.   At this point where are you standing on your property?

A.   In the walkway leading to my front door.

Q.   It sounds like you say, "You can't touch me.  I'm a child," and how did he respond?

A.   (No response.)

Q.   It's okay if you don't remember.

Were you interfering with the arrest at this point?

A.   No, sir.

Q.   Later you say, "I'm not moving."  Why are you refusing to move?

A.   Because I'm just trying to record what's going on with my mama.  I don't know what's going on at this point.  I'm scared something is going to happen to her, and the only thing I can do in that situation is record.  Plus, I'm on my property.

MR. COHAN:  Ms. Stone, if you could continue the video for a little bit.

(Video played.)

DE'SHAUN JOHNSON - DIRECT

BY MR. COHAN:

Q.   During this point of the incident, could you tell what was happening between Deputy Hart and your mom?

A.   No, sir.

Q.   Could you hear her yelling?

A.   Yes, sir.

Q.   Could you tell what she was yelling?

A.   Yes, sir.

Q.   What was that?

A.   He is choking her.

Q.   Were you able to record what was happening then?

A.   No, sir.

Q.   Why not?

A.   Because every time I tried to sidestep to record, he would step in front of me.

Q.   Was that you who said, "That's my mom"?

A.   Yes, sir.

Q.   What were you trying to communicate with that statement?

A.   Like, that's my mama, like, what you want me to do.

Q.   What were you feeling?

A.   I was scared.

        MR. COHAN:  If we could go back to Exhibit 10.

BY MR. COHAN:

Q.   Can you tell us what's happening in that part of the video.

**DE'SHAUN JOHNSON - DIRECT**

A.    He is pushing me back.

Q.    Did you ever push Deputy Moring back?

A.    No, sir.

          MR. COHAN:  Let's resume the video again.

          (Video played.)

BY MR. COHAN:

Q.    At this point were you able to record what was happening between Deputy Hart and your mom?

A.    No, sir.

Q.    Why not?

A.    When he noticed that I noticed what was going on, he started stepping in front of me so I couldn't record.

          MR. COHAN:  Let's play the video a little bit more.

          (Video played.)

BY MR. COHAN:

Q.    So, again, over that last period of time, could you explain what's going on.

A.    Not really.  The only thing I can say is my mom is being arrested.

          MR. COHAN:  Let's play the end of De'Shaun's video.

          (Video played.)

BY MR. COHAN:

Q.    At the beginning of that clip, we hear you and Deputy Moring talking about who is pushing who.  Who was pushing who then?

DE'SHAUN JOHNSON - DIRECT

**A.**    He was pushing me.

**Q.**    He told you to stop touching him, though, right?

**A.**    Yes, sir.

**Q.**    Were you touching him?

**A.**    No, sir.

**Q.**    When Deputy Moring pulled out his taser, how far away was he standing from you?

**A.**    He was right in front of me.

**Q.**    What's going through your mind at this point?

**A.**    I'm about to get tased.

**Q.**    Were you scared?

**A.**    Yes, sir.

**Q.**    What is it that you said to Deputy Moring when he is holding the taser at you?

**A.**    "You can't tase me.  I'm a child."

**Q.**    How did he respond?

**A.**    "Watch me."

**Q.**    How did that make you feel?

**A.**    Like he didn't care.

**Q.**    Were you prepared to get shot with a taser --

**A.**    Yes, sir.

**Q.**    -- to keep recording?

**A.**    Yes, sir.

**Q.**    Why?

**A.**    I just didn't want to leave my mom's side.  Anybody else

DE'SHAUN JOHNSON - DIRECT

in that situation -- I don't know what anybody else would have did.  My mama was getting arrested for no reason, so I just didn't want her to feel alone in that situation.  I didn't want nothing to happen, so I stayed by her.

Q.    Now, it's your mom.  Were you going to just fight the police?

A.    No, sir.

Q.    Why not?

A.    I can't do nothing.  I'm not trying to interfere.  I just wanted to record it just to make sure that they didn't do anything to her.

Q.    At the end of the video, when the video ends, is that when you stopped recording?

A.    Yes, sir.

Q.    Why did you decide to stop?

A.    Because he was holding the taser in my face, and they had also told me to -- my mom had told me to go back to the house because she feared that I was going to get tased.

Q.    And then what happened after that?

A.    We looked on from the door.

        MR. COHAN:  Ms. Stone, if we could go to Exhibit 6 and play the first 23 seconds or so.

        (Video played.)

BY MR. COHAN:

Q.    Do you know who took this video?

DE'SHAUN JOHNSON - DIRECT

A.   Yes, sir.

Q.   Who is that?

A.   My close family friend, Auntie Zina.

Q.   Remind us who she is.

A.   She is like a close family friend, but I call her my auntie.

Q.   She is not actually your aunt?

A.   Yeah, she is not actually related.

Q.   Can you explain to us what angle she is recording this from.

A.   She was recording this from the neighbor's driveway.

Q.   There's no sound here, but was she acting hostile towards the officers while she is taking this video?

A.   No, sir.  This is at the time when she told me to go inside.

Q.   When you had the camera, your phone off at that point, why are you still recording at that point?

A.   Because I was worried something was going to happen to me at this point.

Q.   After you move away from defendant Moring, did you have any more interactions with him that day?

A.   No, sir.

Q.   Were you able to go talk with your mom after that all happened?

A.   No, sir.

DE'SHAUN JOHNSON - DIRECT

Q.    Were you able to give her a hug?

A.    No, sir.  They didn't let us get close, nowhere near her or the bike.

Q.    Tell us about the rest of your day after that happened.

A.    I mean, the day was horrible after that.  I was worried about my mama being in jail.  I cried a little bit.  I had to help my grandma change my disabled cousin.  I had to feed him.  It was just a gloomy day after that.

Q.    When did you next see your mom?

A.    Two days later.

Q.    That night, who stayed with you at the house?

A.    My grandma.

Q.    You said you had to change your cousin?

A.    Yes, sir.

Q.    He couldn't change himself?

A.    No, sir.

Q.    I want to switch gears a little bit from that day to talk about what happened after May 5.  Did the incident affect your well-being at all in the days, months, or years after the incident?

A.    Yes, sir.

Q.    Did you suffer any physical injuries during the event?

A.    No.  No, sir.

Q.    How did it affect you?

A.    Mentally.

DE'SHAUN JOHNSON - DIRECT

**Q.** Could you explain that a little bit more.

**A.** I started having nightmares. I started having panic attacks when I was around officers and also when I was in public in a lot of places. I was diagnosed with PTSD.

**Q.** So let's take you to the nightmares. Was there a certain theme to those nightmares?

**A.** Yes, sir.

**Q.** Could you tell us what those were like.

**A.** Police officers chasing me. One was a police officer pulling me out of a car and me getting shot. Every time I just wake up from my sleep and I wouldn't be able to go back to sleep.

**Q.** Were these nightmares that you had had before May 5?

**A.** No, sir.

**Q.** How did they affect you? When you had it, would you wake up after the nightmare? Tell us about it.

**A.** Yes, sir. I would jump up out of my sleep. I wouldn't be able to go back to sleep. I would just sit in my bed and cry sometimes, and sometimes I just sit there and wait for the day to start.

**Q.** The next day, would you just go to school after having those or what would happen?

**A.** Some days I would try to go to school, and some days I really couldn't go to school. Like I would try to go to school and I would have a panic attack because of the SRO on campus.

DE'SHAUN JOHNSON - DIRECT

I just didn't feel comfortable being around police at that point.

Q.    What is a panic attack?  What is that like?

A.    My heart will start beating fast, and I would start breathing like I just got finished running a mile or something. I would just have to go out -- like I would have to find the nearest open space.

Q.    These nightmares and panic attacks, how long did they last after the incident?

A.    Two years.

Q.    You mentioned the nightmares, the panic attacks.  You said your diagnosis.  Were there any other things that you were feeling at the time, or was it limited to that?

A.    I wasn't able to go to a lot of things.  I missed a lot of things at school because of that.  I also missed almost the entire basketball season.

Q.    So why did you miss school because of this incident?

A.    I didn't like being around the SRO on campus.  It would make me uncomfortable, and every day I would tell my mom to come check me out.

Q.    Do you know how many days of school you missed because of this?

A.    About a quarter out of the school year.

Q.    Was that consistent with your attendance before this incident on May 5?

165

DE'SHAUN JOHNSON - DIRECT

A.   No, sir.

Q.   Why couldn't you go to basketball practice or basketball games?

A.   With the basketball games, it was always a high number of police at every school sports event because they would always have fights between students.  So every time we would have a game or something, it would be a high number of police in attendance, and I just didn't feel comfortable.

Q.   Did you have this fear of law enforcement before May 5?

A.   No, sir.

Q.   What about your social life?  How was that after the incident?

A.   A lot of things that my friends were doing at the time, there were always police at the places they were going, so I wouldn't go out with my friends a lot anymore.  I would usually just sit in my room.

Q.   Did it affect your schoolwork at all, besides missing school?

A.   Yes, sir.

Q.   How so?

A.   Well, my grades dropped a little.

Q.   Did it affect your relationship with your friends?

A.   Yes, sir.

Q.   How so?

A.   I stopped hanging out with them, so like we kind of got

DE'SHAUN JOHNSON - DIRECT

separated.

Q.   At some point did you seek medical treatment?

A.   Yes, sir.

Q.   What did you do?

A.   Like three, four weeks after, when my mama had realized something was wrong, she took me to my primary care doctor, and he referred me to a psychiatrist.

Q.   Did a lawyer tell you to go seek medical treatment?

A.   No, sir.

Q.   Did a lawyer tell you to go to a psychiatrist?

A.   No, sir.

Q.   So what made you decide to do that?

A.   I mean, the nightmares partially because I really couldn't sleep at night.  It was happening like four or five times a week, and I wouldn't be able to go back to sleep.  I really started having panic attacks.  I had never experienced that before, so I didn't know how to deal with it.

Q.   Did you actually see the psychiatrist?

A.   Yes, sir.

Q.   Was it in person or telemedicine?

A.   It was Zoom calls.

Q.   A Zoom call.

     Did you receive a diagnosis?

A.   Yes, sir.

Q.   What was the diagnosis?

DE'SHAUN JOHNSON - DIRECT

**A.**    Post-traumatic stress disorder.

**Q.**    Were you prescribed medication?

**A.**    Yes, sir.

**Q.**    Did you take the medication?

**A.**    Yes, sir.

**Q.**    How long did you take it?

**A.**    Almost three years.

**Q.**    Is it a daily medication or something you just take when you're feeling bad?

**A.**    It was daily.  Every night.

**Q.**    Did you take it every night?

**A.**    Yes, sir.

        **MR. COHAN:**  I would like to, without publishing it to the jury, bring up Exhibit 11.

        **THE COURT:**  Do you want the witness to see it?

        **MR. COHAN:**  Yes.

        **THE COURT:**  Is it on your monitor?

        **THE WITNESS:**  Yes, ma'am.

        **THE COURT:**  Okay.  The witness sees the exhibit.

        **MR. COHAN:**  Your Honor, this is a medical record.  I would like to move for the admission of Exhibit 11.  It has a business records affidavit at the front of it from the psychiatrist, Patrick Dowling.

        **THE COURT:**  Are you moving to admit it into evidence?

        **MR. COHAN:**  Yes.

DE'SHAUN JOHNSON - DIRECT

THE COURT:  Counsel.

MR. CAPITELLI:  Are you only moving to admit the handwritten one or the one y'all had transcribed?

MR. COHAN:  The transcription and the handwritten one, the full exhibit.

MR. CAPITELLI:  We object, as noted before, to the transcribed copy of the record.  I also don't believe he has established a foundation for even the handwritten one at this point.

THE COURT:  This has previously been provided to defendant, correct?

MR. COHAN:  Previously been provided to defendant and meets the standard under Federal Rule of Evidence 902(11).

MR. CAPITELLI:  The transcribed version does not, Your Honor.

THE COURT:  I have already ruled on the transcription.  This has been provided to both parties, the original record, for at least two years now, and so I will allow it into evidence --

MR. COHAN:  Thank you, Your Honor.

THE COURT:  -- over the objection.  It's allowed into evidence.

BY MR. COHAN:

Q.  De'Shaun, could you please tell us what this document is.

A.  Yes, sir.

DE'SHAUN JOHNSON - DIRECT

**MR. COHAN:** If you could turn to the third page of it, Ms. Stone, and if we could publish it to the jury at this point as well.

**THE COURT:** You may. It's in evidence.

BY MR. COHAN:

**Q.** Could you tell us what the document is.

**A.** It's a diagnosis note.

**Q.** The service date --

**MR. COHAN:** Could you bring that up, Ms. Stone.

BY MR. COHAN:

**Q.** What's the service date here?

**A.** 06/17/2020.

**Q.** Does that sound about the time that you spoke with the psychiatrist for your initial diagnosis?

**A.** Yes, sir.

**Q.** The psychiatrist listed as Dr. Patrick Dowling, does that ring a bell?

**A.** Yes, sir.

**MR. COHAN:** If we could go to the next page, and zoom in where it says "Chief Complaint."

BY MR. COHAN:

**Q.** What is the chief complaint listed here?

**A.** "Was threatened with tasing by police."

**Q.** Is that consistent with what you told the psychiatrist at the time?

DE'SHAUN JOHNSON - DIRECT

**A.**   Yes, sir.

**Q.**   Why did you go to a psychiatrist and have a chief complaint about being threatened with a taser?

**A.**   Because I felt like everything that was going on in my head was more of like a psychic thing.

        **MR. COHAN:**   In the next section, if we could drop down, highlight that part.   That's good.

**BY MR. COHAN:**

**Q.**   It talks more about the May 5 incident there.   Is this what you told the psychiatrist at the time?

**A.**   Yes, sir.

**Q.**   It says: "Since then frightened to go out.   Jumping in his sleep.   Jumpy."

        Is that consistent with what you told the psychiatrist at the time?

**A.**   Yes, sir.

**Q.**   Was it true?

**A.**   Yes, sir.

**Q.**   Had you been dealing with these same issues before May 5, 2020?

**A.**   No, sir.

**Q.**   Had you had trouble sleeping?

**A.**   No, sir.

**Q.**   Had you been jumpy?

**A.**   No, sir.

DE'SHAUN JOHNSON - DIRECT

Q.   Had you been frightened to go out?

A.   No, sir.

Q.   Again, was it a lawyer who told you to go do this?

A.   No, sir.

     MR. COHAN:  If we could go to the next page and go to No. 10, "Thought Content."

BY MR. COHAN:

Q.   What does it say there?

A.   "Had bad dreams about the police incident."

Q.   Is that consistent with what you told your psychiatrist?

A.   Yes, sir.

     MR. COHAN:  The next page once again and highlight the diagnosis.

BY MR. COHAN:

Q.   What's the diagnosis listed here?

A.   "PTSD."

Q.   Do you know what that stands for?

A.   Yes, sir.  Post-traumatic stress disorder.

Q.   Under "Plan," what's listed there?

A.   Lexapro.

Q.   Do you know what that is?

A.   Yes, sir.

Q.   What's that?

A.   That was the medicine I took at the time.

Q.   The indication is "anxiety, dreams."  Do you know why it

DE'SHAUN JOHNSON - DIRECT

Q.   says that there?

A.   Yes, sir.

Q.   Why is that?

A.   It would help with the panic attacks and also help with my dreams, suppressing.

Q.   After you took the medication, did the symptoms go away?

A.   It didn't fully go away.

Q.   How long did the symptoms go on?

A.   The symptoms went on for another two years after that.

Q.   Where did you go to ninth grade and tenth grade?

A.   I went to Slidell High School.

Q.   You told us you go to Booker T. Washington now.  How's the transition been from Slidell to Booker T?

A.   It's been way better.

Q.   Why is that?

A.   There's no police at the school.  It's really just security.  I kind of developed a relationship with one of the security guards.  He is helping me, mentoring me.

Q.   Do you think you are fully recovered at this point?

A.   No, sir.

Q.   How so?

A.   I mean, I still have it in the back of my head that I can't trust officers.  I mean, I still don't like to go places. It's still hard for me to be around a large amount of people.

Q.   Do you think you will ever be the same?

DE'SHAUN JOHNSON - CROSS

A.    No, sir.

Q.    One last question: Why did you choose to bring this lawsuit and continue to relive what you lived on May 5, 2020?

A.    I just feel as nobody should have to go through anything like that.  I mean, it's damaged me for the worse.  I'm trying to move past it and I'm trying to see progression from it, and I just feel like things could have been different.

          MR. COHAN:  I pass the witness.

                    CROSS-EXAMINATION

BY MR. CAPITELLI:

Q.    Good afternoon, Mr. Johnson.

A.    Good afternoon.

Q.    You were inside the home when the officers first arrived on May 5, 2020, correct?

A.    Yes, sir.

Q.    You were called out of the house by Ms. Perkins?

A.    Yes, sir.

Q.    You started recording once you walked out?

A.    Yes, sir.

Q.    Right when you walked out, did the officers instruct you to stop recording?

A.    No, sir.

Q.    Could they see that you were recording?

A.    I don't know.

Q.    They could see you holding up a phone, correct?

DE'SHAUN JOHNSON - CROSS

A.   I don't know what they saw.  They were focused on my mother.

Q.   You didn't speak to the officers before you started recording, right?

A.   No, sir.

Q.   Had you ever met them before that day?

A.   No, sir.

Q.   Did they have any idea who you were?

A.   No.

Q.   Whether you posed a threat to them or not?

A.   No, sir.

Q.   Now, you mentioned that several individuals were at the scene, correct?

A.   Yes, sir.

Q.   In fact, your mom, Ms. Perkins, was calling people to come to the scene; is that correct?

A.   I have no idea.

Q.   But you do know that at least yourself, your cousin, your mom, and two neighbors were at the scene?

A.   Yes, sir.

Q.   So five individuals?

A.   Yes, sir.

Q.   How many officers were at the scene at that point?

A.   Two.

Q.   Two.

DE'SHAUN JOHNSON - CROSS

Let's go ahead and watch Exhibit 1.  This is, as I understand it, your video, correct?

A.   Yes, sir.

(Video played.)

BY MR. CAPITELLI:

Q.   At the beginning of the recording, you would agree with me that you were further away from your mother, correct?

A.   Yes, sir.

Q.   Then she starts walking towards you, correct?

A.   Yes, sir.

Q.   At that point the officers initiated an arrest of your mother?

A.   Yes, sir.

Q.   Would you agree with me that at the beginning of the arrest, you were within 1 to 3 feet of your mother?

A.   I don't know how many feet I was in.

MR. CAPITELLI:  Let's go to 10 seconds, if we could.

(Video played.)

BY MR. CAPITELLI:

Q.   You wouldn't say you were 1 to 3 feet away at that point?

A.   Yes, sir.

Q.   You would?

A.   Yeah.

Q.   Both officers were attempting to handcuff Ms. Perkins, correct?

DE'SHAUN JOHNSON - CROSS

A.   Yes, sir.

Q.   She was actively resisting their efforts?

A.   Yes, sir.

Q.   Correct?

A.   Yes, sir.

        **MR. COHAN:**  Objection.  Calls for a legal conclusion.

        **THE COURT:**  Overruled.  He answered.

BY MR. CAPITELLI:

Q.   While the officers were attempting to handcuff Ms. Perkins, that's when Deputy Moring instructed up to step back, correct?

A.   Yes, sir.

Q.   He actually instructed you twice, right?

A.   Yes, sir.

        **MR. CAPITELLI:**  Let's go to 29 seconds, if we could, and play it to 32.

        (Video played.)

BY MR. CAPITELLI:

Q.   Who was Officer Moring speaking to at that point?

A.   I don't know.

Q.   To you?

A.   Yeah, I guess.

Q.   You refused to step back, correct?

A.   Yes, sir.  I was on my property.

Q.   But you refused his two commands to step back?

DE'SHAUN JOHNSON - CROSS

A.    I was on my property.

Q.    Is that a yes?  You did refuse?

A.    I didn't refuse.

Q.    You didn't say you wouldn't step back?

A.    I didn't refuse.

          MR. CAPITELLI:  Let's play 31 to 33 seconds, if we could.

          (Video played.)

BY MR. CAPITELLI:

Q.    You didn't say, "No, I'm not moving"?

A.    Yes, sir.  I did say that.  I did say that.

Q.    You did say that?  Okay.  You were refusing his request to step back, right?

A.    Yes, sir.

Q.    Both officers then, due to your mother's active resistance, had to get her flat on the ground to handcuff her, correct?

          MR. COHAN:  Objection.  Calls for speculation.

          THE COURT:  Sustained.

BY MR. CAPITELLI:

Q.    Did you see the officers lay your mother flat on the ground?

A.    Yes, sir.

Q.    That was in an attempt to handcuff her?

A.    Yes, sir.

DE'SHAUN JOHNSON - CROSS

MR. CAPITELLI:  Let's go forward to 59 seconds, if we could, and pause it.

BY MR. CAPITELLI:

Q.    How close would you say you are to the officer at this point?

A.    I don't know.

Q.    Maybe a step away, if that, correct?

A.    No, sir.

Q.    You are not that close?

A.    No, sir.

Q.    You couldn't reach his gun by taking one simple step?

A.    No, sir.

Q.    You are not at his back at this point?

A.    No, sir.

Q.    Behind him?

A.    No, sir.

Q.    That's not you behind him filming?

A.    No, sir.

Q.    Who was filming this?

A.    The phone is close, not me.

Q.    Where was the phone being held?

A.    The phone was being held like this.  I'm not that close to the officer.

Q.    So you held your phone out far enough that it was several feet from your body?

DE'SHAUN JOHNSON - CROSS

**A.** Yes, sir.

**Q.** You could reach several feet, then, with your arms. You would agree with me, correct?

**A.** Yes, sir.

**Q.** Your testimony is you were not standing behind this officer?

**A.** I didn't say I wasn't standing behind him. I said I wasn't as close as what you said.

**Q.** Were you standing behind this officer?

**A.** Yes, sir.

**Q.** Were you within 1 to 3 feet of this officer?

**A.** No, sir.

**Q.** The officers then handcuffed Ms. Perkins, correct?

**A.** Yes, sir.

**Q.** Is that a yes?

**A.** Yes, sir.

**Q.** Once she was handcuffed, Officer Moring stood up?

**A.** Yes, sir.

**Q.** I'm sorry. I'm having trouble hearing. Is that a yes?

**A.** Yes, sir.

**Q.** He then instructed you yet again to move back, correct?

**A.** Yes, sir.

**Q.** You refused again, correct?

**A.** No, sir.

**Q.** You didn't?

DE'SHAUN JOHNSON - CROSS

MR. CAPITELLI:  Let's play 108 to 111 so we can hear.

(Video played.)

BY MR. CAPITELLI:

Q.   He said, "Get back."  You said, "No.  He said, "Get back."  Correct?

A.   Yes, sir.

Q.   So you did refuse again?

A.   No, sir.

Q.   That's not a refusal?

A.   No, sir.

Q.   Oh, okay.  Well, what does "no" mean, then, if it's not a refusal?

A.   I'm on my property.  I don't consider it a refusal.

Q.   I didn't ask for the reason why you said no.  I asked if you refused to comply with his directive to move back.  Did you refuse to comply?

A.   No, sir.

Q.   No?  So you did move back?

A.   No, sir.

Q.   So you didn't move back.  Okay.

It was at this point that Officer Moring extends his hand toward you, correct?

A.   No, he pushed me.

Q.   He extended his hand out?

A.   He pushed me.

DE'SHAUN JOHNSON - CROSS

Q.    Did he extend his hand out?

A.    You know what a push is.  He pushed me.

Q.    He then told you to get back two more times, correct?

A.    He forced me to get back.  He didn't even have to tell me nothing.

Q.    He didn't tell you two more times, then, either?

A.    He didn't.

        MR. CAPITELLI:  Let's play 114 to 117.

        (Video played.)

BY MR. CAPITELLI:

Q.    "Get back," right?  Is that what he said?

A.    Yes, sir.

Q.    He did instruct you yet again to move back?

A.    Yes, sir.

Q.    You knocked his hand away, right?

A.    No.  I didn't touch him.

Q.    Officer Moring then tells you, if we are keeping count, a sixth time to move back, correct?

A.    Yes, sir.

Q.    "Yes, sir?"

A.    Yes, sir.

Q.    I just couldn't hear you.

        In response, you state five times in a row that you are not moving, correct?

A.    Yes, sir.

DE'SHAUN JOHNSON - CROSS

MR. CAPITELLI: Let's play that so we can hear it, 122 to 130.

(Video played.)

BY MR. CAPITELLI:

Q.    At this point you have received six instructions to simply move back from an actively resisting individual being arrested, correct?

A.    No, sir.

Q.    You haven't received instructions to move back?

A.    Oh, I received instructions to move back.

Q.    It was in the context of your mother, who is actively resisting on the ground, correct?

A.    No, sir.

Q.    She wasn't resisting?

A.    No, sir.

Q.    She wasn't kicking officers?

A.    No, sir.

Q.    She wasn't fighting being handcuffed?

A.    No, sir.

Q.    At this point, as we move through six instructions to move back, the officer extends his hand toward you because clearly his verbal instructions aren't working, right?

A.    He pushed me.

Q.    He pushed his hand out toward you. You would say pushed, I said extended, but that action was taken after the warnings

DE'SHAUN JOHNSON - CROSS

to move back, right?

A.    It was in between.

Q.    In the context of being told to move back, you were then pushed according to you, extended arm according to me, right?

A.    Yes, sir.

Q.    Did you continue to step forward?

A.    No, sir.

Q.    You didn't?

A.    No, sir.

Q.    We will come back to that in just a moment.

At this point, after six warnings and extending his hand twice, that's when Officer Moring drew his taser, correct?

A.    No, he had already drew it when he first stood up.

Q.    He was pointing it at you this whole time while he was pushing you?

A.    No, he drew it when he first got up.  He put it back, then he started pushing me, then he drew it again.

Q.    Right.  He didn't point the taser at you --

A.    When he first drew it, he pointed it at me.

Q.    That's on your video?

A.    Yeah, that's on the video.  You can go back to when he first got up.  You will see him pull it out.

Q.    He pulls his taser out, reholsters it, instructs you to move back, extends his arm twice, and then points his taser at you again?

DE'SHAUN JOHNSON - CROSS

A.    Yes, sir.

Q.    During this whole interaction, your mom is yelling instructions at you, right?

A.    Yes, sir.

Q.    She is telling you not to move back?

A.    Did she tell me to go forward?

Q.    Did she tell you not to move back?

A.    She told me not to move back, not to go forward.

Q.    What type of phone were you using?

A.    An iPhone.

Q.    An iPhone, can it be zoomed?

A.    Yes, sir.

Q.    You just zoom by just pinching, right?

A.    Any phone can be zoomed.

Q.    You would agree with me you could take a step back to where the officer had asked and just zoom on your phone, right?

A.    I was already in that area before the arrest had taken place.

Q.    No, you were actively refusing to move back.

A.    I was already in that area before the arrest had taken place.

Q.    And the arrest, your mother came towards you, and that's where the arrest occurred, right?

A.    Okay.

Q.    Now, your cousin, you said, Jeron Perkins, was also at the

DE'SHAUN JOHNSON - CROSS

Q.   house?

A.   Jeron.

Q.   Jeron?  I'm sorry.  Jeron.

MR. CAPITELLI:  Let's go to Jeron's video, Exhibit 10.

BY MR. CAPITELLI:

Q.   While she's getting there, you said Jeron was -- I might have missed it -- older?

A.   Yes, sir.

Q.   Older than you?

A.   Yes, sir.

Q.   Heightwise, about the same height at 14?

A.   I don't know.  I don't remember.

Q.   Now, we covered that Jeron conveniently fast-forwards right over the beginning of this video, right?

A.   Huh?

Q.   He fast-forwards the beginning of this video, correct?

A.   Oh, I don't know.

Q.   Do you know why he edited the video?

A.   The video is not edited.

Q.   It's not?  It doesn't skip or jump?

A.   You can see the scene skip.  It's the same thing as my video.  It's the exact same time and then it was skipped.

Q.   You don't know why it skips, though?

A.   No.  I don't know.

DE'SHAUN JOHNSON - CROSS

**MR. CAPITELLI:**  Let's go to the 20- to 25-second mark and play that.

(Video played.)

**BY MR. CAPITELLI:**

**Q.**  De'Shaun, I thought you told me your hands were mostly out of your pockets and visible during the arrest, right?

**A.**  When did I say that?

**Q.**  During your testimony.  You stated that your hands were visible to the officers during the arrest.

**A.**  Yes, sir.

**Q.**  Isn't your left hand in your pocket here?

**A.**  I can't tell.

**Q.**  You can't tell if your left hand is in your pocket?  Let's play a little more.

**A.**  I really can't.

(Video played.)

**BY MR. CAPITELLI:**

**Q.**  Can you tell me now that your hand is in your pocket?

**A.**  Yeah, I can tell.

**Q.**  So your hand was in your pocket for at least part of the arrest?

**A.**  For a second.

**Q.**  Any reason why that might be a concern to officers that you know of?

**A.**  They weren't even worried about me at that point.

DE'SHAUN JOHNSON - CROSS

**MR. CAPITELLI:** Now, let's go forward to 31 seconds. Play 31 to 33.

(Video played.)

BY MR. CAPITELLI:

Q. You are so close to this arrest that you can reach out and actually do touch your mother?

A. They allowed me to grab my mother's phone.

Q. Who allowed you?

A. The officers.

Q. They told you to do it?

A. No, they allowed me to.

Q. How did they allow you to do it?

A. If they were trying to secure a scene for arrest, they wouldn't have allowed me to grab her phone.

Q. Don't you think they were kind of occupied trying to take someone down at that time?

A. No. They would have immediately told me to get back, don't touch the phone.

Q. So the officers allowed you to, but would you agree with me that you actually touched your mother's hand --

A. No.

Q. -- during an arrest?

A. I grabbed the phone.

Q. From her hand?

A. I grabbed the phone.

DE'SHAUN JOHNSON - CROSS

         **MR. CAPITELLI:**  Let's go forward to 35 seconds and let's play to 44.

         (Video played.)

**BY MR. CAPITELLI:**

**Q.**   Now, this is Jeron's video.  Where are you in relation to Jeron?

**A.**   I'm in front of the officers.

**Q.**   When he looks up, he is looking at you in that scene, in other words?  You are kind of, I guess, to Officer Moring's right?

**A.**   Yes, sir.

**Q.**   His right side?

**A.**   Yes, sir.

**Q.**   His gun side, correct?

**A.**   I don't know which side a police gun is on.

**Q.**   Do you see his gun sticking out right there out of his right side?

**A.**   Yeah, I see it.

**Q.**   You see it?  So you were within 1 to 3 feet of his gun while he was trying to arrest somebody who was resisting, right?

**A.**   Jeron was on his blind side.  He was on both of their blind sides.

**Q.**   You were closer and you were on the gun side, right?

**A.**   But they could see me.  They couldn't see Jeron.

DE'SHAUN JOHNSON - CROSS

Q.   That point, when he looks up, if we watch the other video, that's actually when he warns you to move back, right?

A.   Yes, sir.

Q.   Yes?

A.   Yes, sir.

          THE COURT:  Pull that microphone down a little.  I think it's blocking your face.

          MR. CAPITELLI:  Let's go to 111 and watch to 116 of Jeron's video.

          (Video played.)

BY MR. CAPITELLI:

Q.   In this scene, as I understand it, two officers are attempting to handcuff someone who is resisting, right?

A.   No, sir.

Q.   You would agree with me that both officers, at least, were engaged with your mother at this point, right?

A.   No, sir.

Q.   They weren't both actively trying to do something?

A.   They were both actively trying to carry out an arrest.

Q.   You're moving around them within 1 to 3 feet at that time?

A.   I was backing up from them.  If you notice from the spot where I was at the beginning of the arrest to the spot I'm at now, I've gotten further away from the officers.

Q.   Let's play it again.  It actually moves like you move around the side.  Let's see.

DE'SHAUN JOHNSON - CROSS

A.    And I stay in their sight.  I went from being on his right side to directly in front of him.

(Video played.)

BY MR. CAPITELLI:

Q.    You are pretty close there, aren't you?

A.    I could have stayed in his blind spot or I could get where he could see me at.

Q.    You couldn't get much closer without just touching them, could you?

A.    No, I wasn't going to touch them.

Q.    There was not enough space between you and them to even really take maybe one step, right?

A.    No, no.

Q.    You could take multiple steps in that space?

A.    Yes, sir.

Q.    Okay.  Now, in this scene, you can see it's frozen there. It looks like Officer Hart is kind of sitting on the back of your mother trying to handcuff.  Is that accurate?

A.    That's what the picture shows.

Q.    Do you see that weapon on Officer Hart's left side?

A.    I thought the gun was on the right side.

Q.    Do you see the weapon on Officer Hart's left side?

A.    I thought you said the gun was on the right side.

Q.    I didn't say "gun."  I said did you see the weapon on Officer Hart's left side?

DE'SHAUN JOHNSON - CROSS

**A.**   What weapon?

**Q.**   The taser that he has right there.

**A.**   Oh.  Yeah, I see it.

**Q.**   When Officer Moring extends his hand or as you say pushes, who did he push?

**A.**   He pushed me.

**Q.**   You stated that he moved side to side in an attempt to block you from recording?

**A.**   Yes, sir.

**Q.**   You would also agree that he moved side to side to match your movements and attempt [sic] you from getting to your mother, right?

**A.**   I didn't move forward.  I moved side to side.

**Q.**   Let's watch and see what you did.

            **MR. CAPITELLI:**  Let's go to 138 and watch to 148.

            (Video played.)

            **THE WITNESS:**  Looks like side to side to me.

BY MR. CAPITELLI:

**Q.**   Do you see those steps forward that you are taking towards the officer?

**A.**   I physically literally looked side to side.

**Q.**   Let's watch again, and let's just see if either of your feet take a step forward towards the officer.

            (Video played.)

DE'SHAUN JOHNSON - CROSS

**BY MR. CAPITELLI:**

**Q.** Left foot forward, steps forward, right?

**A.** No, you are trying to make it seem like I was stepping forward. I was trying to move around the officer to record, like I had been doing the entire arrest.

**Q.** In your opinion, you were trying to move around the officer to record?

**A.** No, I was trying to move on side of the officer to record because my mother told me to record.

**Q.** But you did step forward at least partially, right, in trying to get around him?

**A.** No, sir.

**Q.** Now, throughout this whole time your cousin is recording?

**A.** Yes, sir.

**Q.** Officer Moring didn't instruct him to move back, did he?

**A.** This isn't about my cousin.

**Q.** No, it is about your cousin. Your cousin was recording as well, right?

**A.** Yes, sir.

**Q.** Did Officer Moring instruct your cousin to move back?

**A.** I don't know.

**Q.** He instructed it to you, right?

**A.** I don't know.

**Q.** You would agree with me that Officer Moring extended his hand towards you, right?

DE'SHAUN JOHNSON - CROSS

**A.** He pushed me, yeah.

**Q.** Did he extend his hand or push your cousin?

**A.** Was my cousin near him?  Did he walk up on my cousin?

**Q.** That's exactly my point, Mr. Johnson.  You were closer, right?

**A.** At this point my mother is nowhere near me.

**Q.** Let me just see if I understand this.  You are both recording, right?

**A.** Yeah.

**Q.** You are closer to the arrest than your cousin, right?

**A.** Yes, sir.

**Q.** We would agree that the directions to move back, the extension of the arm, and the pointing of the taser were only done to you, right?

**A.** I don't know.  I don't know.

**Q.** Did he point the taser at your cousin?

**A.** I don't know.

**Q.** You don't know?  You don't recall?

**A.** I mean, my cousin was behind me.

**Q.** We will solve that another way in just a moment.  Let's watch, if we could for a moment, your neighbor's video.

Who did you say your neighbor was again that recorded this video?

**A.** Ms. Zina.

**Q.** Ms. Zina.

DE'SHAUN JOHNSON - CROSS

14:34

            (Video played.)

BY MR. CAPITELLI:

Q.   Was Ms. Zina asked to step back?

A.   Yes.

Q.   She was told to move back by the officer on the video?

A.   Yeah.  No, not on this video, no.

Q.   When?

A.   When she was walking up, she was told to move back.

Q.   Now, you start videoing when you walked outside, right?

A.   Uh-huh.

Q.   How would you know that if you were inside the home?  How would you know what the officer told Ms. Zina if you were inside the home?

A.   Ms. Zina had walked up while we were walking outside.

Q.   No, no, no.  You told me the officer instructed her to move back.  It's nowhere on any video, but you are telling me you walked out of the home, you started recording, but now you are also telling me you were out there before to see her instructed to move back?

A.   No, it was right before I started recording.  That's not what I'm saying.  I mean, Ms. Zina is in the back of my video if you want to get technical.  You can see her in the background.

Q.   Was an arm extended towards Ms. Zina?

A.   She didn't get close enough.  They didn't allow her to.

DE'SHAUN JOHNSON - CROSS

Q.    Did they point a taser at her?

A.    They didn't let her get close enough.

Q.    Exactly.  It's the closeness that matters, isn't it, Mr. Johnson?

A.    I was already right there on my property before they arrested my mother.

Q.    Let me ask you something.  Is officer safety not a concern when they are on someone's property?

A.    Oh, officer safety is a concern, but they walked up on me. I'm on my property.

Q.    They didn't know you, right?

A.    No, I didn't know them.

Q.    Your hand was in your pocket at the start of the arrest, right?

A.    For 5 seconds.

Q.    You touched Ms. Perkins, right?

A.    I grabbed the phone.

Q.    You were within 1 to 3 feet of the arrest, right?

A.    No.

Q.    I'm just a little confused, Mr. Johnson.  You were never told not to record, correct?

A.    I don't know.

Q.    Were the words "stop recording" said to you?

A.    I don't know.  I wasn't paying attention.

Q.    You had the video, right?  Do we hear it anywhere on the

DE'SHAUN JOHNSON - CROSS

video?

A.   I wasn't paying attention.

Q.   Let's play it back.  We'll play your video back, and we will see if we hear any instruction not to record.  Okay?

(Video played.)

BY MR. CAPITELLI:

Q.   Were you instructed not to record?

A.   No.  No, sir.

Q.   You were never told to put your phone away or turn it off, correct?

A.   No, sir.

Q.   The instruction you were given consistently was move back, right?

A.   Yes, sir.

Q.   Now, we talked a little bit or you talked a little bit, I should say, about your treatment in this matter, right?

A.   Yes, sir.

Q.   You said that you did not have any physical injuries, right?

A.   Yes, sir.

Q.   But you are asserting that you had PTSD from this incident?

A.   What you mean?

Q.   You said you were diagnosed with PTSD, right?

A.   Yes, sir.

DE'SHAUN JOHNSON - CROSS

14:40

Q.   You believe that it's a result of this incident, right?

A.   Yes, sir.

Q.   It was the result of seeing your mother arrested?

A.   No, sir.

Q.   It was the result of --

A.   It was being physically pushed and abused by a cop and then getting a taser pulled on you for doing nothing.

Q.   It was the hand pushing?

A.   You stated that it was about space and officer safety.  If it was about space and officer safety, when the officer picked my mother up and moved her to the middle of the grass, why did the officer keep threatening me with his taser?  I was well away from my mother at that point.  It couldn't have been still about securing the area for arrest because the arrest moved multiple places.

Q.   Mr. Johnson, had you already approached your mother, as I noted, trying to step to the side, trying to take a step towards her, ignored six commands, and actively refused his hand extension at that point?

          MR. COHAN:  Objection.  Compound and argumentative.

          THE COURT:  Overruled.  You may answer it, if you can.

          THE WITNESS:  State the question again.

BY MR. CAPITELLI:

Q.   Absolutely.  After Officer Hart moved your mother away to

DE'SHAUN JOHNSON - CROSS

try to diffuse the situation further, at that point you had already refused six commands to move back.  You had already fended off two arm extensions and had to have a taser pointed at you to keep you from continuing to advance towards your mother.  Correct?

A.   If I was trying to have advanced towards my mother -- Officer Moring was standing in front of me.  My mama was right there.  All I had to do was run this way.  If I was trying to advance towards her, I would have gotten to her.  Even if I would have gotten tased, I would have got to her.  So don't say I was trying to advance.  I wasn't.  Then you said I fended off his attacks.  I never, not once, touched Officer Moring.  He pushed me.  I did nothing.  That's not fending off anything.  That's receiving and just taking it.

Q.   I appreciate you saying that if you wanted to get to her, you could, and that you could run to her, and my point is that's exactly --

A.   I wasn't a threat.  The entire arrest I was not a threat.  You brought up multiple points why I could have reached for the officer's gun, I could have done something, but I didn't because I wasn't trying to.  I just wanted to use my right to record because I was scared that they were going to physically hurt my mother.

Q.   Mr. Johnson, I'm not going to continue to go back and forth with you.  I understand your testimony and your point of

DE'SHAUN JOHNSON - CROSS

view.  My point of view is this, as I pointed out.  The officers did not know you before that day, correct?

A.   Yes, sir.

Q.   They had no idea what was going on inside of your mind, correct?

A.   Yes, sir.

Q.   So they didn't know whether or not you were a threat, correct?

A.   I don't know what they were thinking.  I can't read minds. I didn't know they were a threat until it happened.  I can't read minds.

Q.   So let's move back to your treatment.  What I was trying to understand is you were diagnosed with post -- tell me again.

A.   Post-traumatic stress disorder.

Q.   PTSD, right?

A.   Yes, sir.

Q.   Exhibit 11 was admitted.  We saw that was, as I understand it, one Zoom session with a psychiatrist, correct?

A.   No, sir.

Q.   It wasn't one Zoom session?

A.   I have no idea what you are talking about.

Q.   Let's go to Exhibit 11, if we could.  Do you remember looking over this note during your direct examination?

A.   Yes, sir.

Q.   You can see the date right there, 6/17/2020, right?  At

DE'SHAUN JOHNSON - CROSS

the bottom of the page.  We can zoom in if you need to see it.

A.    I see it.  I see it.

Q.    This visit you said was by Zoom, right?

A.    Yes, sir.

Q.    Any idea how long it lasted?

A.    It says 33 minutes.

Q.    33 minutes.

      These four pages are the sum total, your entire medical treatment, that has been provided to us in this case related to your PTSD, correct?

A.    I have no idea.

      MR. COHAN:  Objection.  Mischaracterizes the evidence.

      THE COURT:  I'm going to overrule it.  He has already answered he has no idea.

BY MR. CAPITELLI:

Q.    Did you ever go to any other Zoom sessions of therapy?

A.    Yes, sir.

Q.    You did?

A.    Yes, sir.

Q.    This incident occurred in 2020, right?

A.    Yes, sir.

Q.    It's been pending for four years; is that right?

A.    Yes, sir.

Q.    But you are contending that you had other medical records

DE'SHAUN JOHNSON - CROSS

and treatment visits other than your attorneys have provided to us in this case?

A.    I don't know.  I'm not a lawyer.  I don't know.

Q.    Your testimony is you attended more than one single visit for 33 minutes?

A.    Yes, sir.

Q.    How many appointments do you think you attended?

A.    I don't know.  I don't remember.  It's been four years.

Q.    When did you attend them?

A.    Through the span of 2020 to, like, 2021?

Q.    How many appointments?  You don't know how many appointments you attended?

A.    I don't know.

Q.    Who did you attend them with?

A.    Dr. Dowling.

Q.    Over and over with Dr. Dowling?

A.    Yes, on a Zoom call.  It was during COVID.  I couldn't physically see him.

Q.    I'm going to let you know that despite four years -- would it surprise you to learn that we haven't been provided with one other medical record on your behalf?

A.    I'm not a lawyer.  I don't know.

Q.    You have lawyers, right, in this matter?

A.    Yeah.

Q.    Six of them, I think, that are here.

DE'SHAUN JOHNSON - CROSS

**MR. COHAN:**  Objection.  Argumentative.

**THE COURT:**  Sustained.

**BY MR. CAPITELLI:**

**Q.**   So you can't tell me when they occurred or how many they were; you just believe you went to some other appointments. Right?

**A.**   I went to multiple Zoom sessions with Dr. Dowling.  They don't just randomly make up -- you don't just randomly make up a spreadsheet.

**Q.**   What spreadsheet are you talking about?

**A.**   A spreadsheet of somebody's medical records.

**Q.**   What spreadsheet are you talking about?

**A.**   This right here that you are showing me.

**Q.**   This is a medical record for one health visit.

**A.**   Okay.

**Q.**   Right?

**A.**   Okay.

**Q.**   So what spreadsheet of visits are you talking about?  I'm not clear.

**A.**   I'm trying to figure out what point you're trying to get across.

**Q.**   I'm trying to get across the point that you claim to have been diagnosed with PTSD by one 33-minute Zoom session, and that's the sum total of your medical treatment in the last four years.

DE'SHAUN JOHNSON - CROSS

A.    That is not true at all.

Q.    If you have another medical record, I would be happy to hear about it.

A.    Just because that's the only medical record you're seeing, that doesn't mean that's the only Zoom call I have done with Dr. Dowling.

Q.    Let me clarify, Mr. Johnson.  That's not the only one I'm seeing.  That's the only one in this case.

        MR. COHAN:  Objection.  Mischaracterizes the evidence.

        MR. CAPITELLI:  How does it mischaracterize it?

        THE COURT:  I'm sustaining it.  He doesn't know what exhibits are in the case.

BY MR. CAPITELLI:

Q.    Did you ever go see a school counselor to talk about your mental health?

A.    Yes, sir.

Q.    You did?

A.    Yes, sir.

Q.    What school counselor did you go see?

A.    I don't remember her name.  It was in my tenth grade year. I don't remember her name, though.  It's been so long.

Q.    How many times did you go?

A.    I don't remember.

Q.    Let's look at this medical record, if we could.  Let me

DE'SHAUN JOHNSON - CROSS

find the single medical record.  I note that in the "Youth Interview Section" --

MR. CAPITELLI:  This is on page 2, if we could scroll to it.

BY MR. CAPITELLI:

Q.   It says: "Youth Interview.  Police were called on mother. Wants to be a lawyer.  Very poor picture and sound quality."

Was there very poor picture and sound quality during the Zoom session?

A.   I don't remember.

Q.   How were you doing it?  Were you doing it on your phone?

A.   I don't remember.

Q.   Now, let's back up and just talk about your PTSD more generally.  I want to understand it because I have usually heard that in the context of, I don't know, a veteran, war, right?  A bomb, something of that nature.  I understand your PTSD was related to this video that we have watched.  Correct?

MR. COHAN:  I just object to the --

THE COURT:  The commentary?

MR. COHAN:  -- beginning of the question.

THE COURT:  Unless it's related to a question, I sustain it.

MR. CAPITELLI:  I was just asking him.

THE COURT:  Ask the question.

THE WITNESS:  Are you saying that post-traumatic

DE'SHAUN JOHNSON - CROSS

stress disorder is only related to veterans?

BY MR. CAPITELLI:

Q.   No, I'm just trying to understand is it only related to this -- what we saw on the video, right?

A.   I'm just saying you said it generally is related to veterans and bombs.  What does that mean?

Q.   I just want to understand what you attribute it to specifically.

A.   I'm confused on what you mean.

Q.   Sure.  Several things happened in the course of this video.  You would agree with me, right?

A.   Uh-huh.

Q.   Yes?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes, sir.

THE COURT:  The court reporter needs to take it down.

THE WITNESS:  I'm sorry.

BY MR. CAPITELLI:

Q.   Your mom was arrested in front of you, right?

A.   Yes, sir.

Q.   Was that upsetting for you?

A.   Very.

Q.   That was very upsetting for you?

A.   What child wants to see their mother get arrested?

DE'SHAUN JOHNSON - CROSS

Q.   Were you angry because of that?

A.   I was scared.

Q.   So you were scared and upset at your mother being arrested, right?

A.   What does that mean?  Are you saying I was scared and upset at the fact that my mother was being arrested?

Q.   At witnessing it?

A.   No.

Q.   You weren't upset about that?

A.   No, that's not what I was scared and upset about.

Q.   Were you scared or upset because a hand was extended towards you?

A.   I was scared and upset -- I was scared and upset because of the force that the officers used.

Q.   The force, right?  The force itself?

A.   No, the force that was used on me.

Q.   Right, that's what I mean.  The force that was used on you, right?

A.   Yes, sir.

Q.   The extension of the hand being one of those types of force?

A.   The taser being pulled, all that.

Q.   Sure.  I was going to get to it.

A.   It all comes into play.

Q.   So it was the use of the force itself that caused your

DE'SHAUN JOHNSON - REDIRECT

PTSD?

A.   I can't really explain what caused the PTSD.  I still don't know to this day what really caused it.  I just know after that it was very hard for me to sleep peacefully.  I didn't like being around officers or being in their vicinity in general.  I would freak out and have a panic attack.  That's all I know.  That's what I got from the situation.  It wasn't like that before the situation.  It was like that after the situation.  That's the only way I can explain it.

Q.   Understood.

        MR. CAPITELLI:  Mr. Johnson, that's all the questions that I have for you.  I appreciate your time today.

        THE COURT:  Let's see if your attorney has any other questions, and then you can get off the stand.

        MR. COHAN:  I do have a short redirect.

        THE COURT:  Let's do it now and then take a break.

        MR. COHAN:  Ms. Stone, can you pull up Exhibit 11 again that we were just looking at.  Could you go to the third page, please.  Could you zoom in on the diagnosis one more time.

                    REDIRECT EXAMINATION

BY MR. COHAN:

Q.   So, again, who provided this diagnosis to you in 2020?

A.   Dr. Dowling.

        MR. COHAN:  Then could we go to the next page, and go

**DE'SHAUN JOHNSON - REDIRECT**

back to the chief complaint.

BY MR. COHAN:

Q.   What is the chief complaint that led to that diagnosis as told on this medical report?

A.   "Was threatened with tasing by police."

MR. COHAN:  Thank you.  We can put that down.

BY MR. COHAN:

Q.   De'Shaun, you're a pretty big guy right now, right?

A.   Yes, sir.

Q.   Is this what you looked like in May of 2020?

A.   No, sir.

Q.   How did you look different?

A.   I was shorter than my mother, so I was like 5'5", 5'6".

Q.   How old were you when all this was happening?

A.   Fourteen.

Q.   Again, there were questions from defense counsel about you being in the vicinity of a weapon.  Did you ever make any sudden movements to those weapons?

A.   No, sir.

Q.   Did you ever threaten the officers?

A.   No, sir.

Q.   Did you ever charge toward the officers?

A.   No, sir.

Q.   Did you ever give them a reason to think that you were going to pull their gun?

DE'SHAUN JOHNSON - REDIRECT

A.    No, sir.

         MR. COHAN:  Ms. Stone, could we go back to Exhibit 10 and play from the 45-second mark to the minute 17 mark.

         (Video played.)

BY MR. COHAN:

Q.    I believe there is a screenshot that defense counsel showed you where he was asking if you were 1 to 3 feet away from the officers.  Were you in a position to pull the officer's weapon at this point?

A.    No, sir.

Q.    You did grab your mother's phone; is that correct?

A.    Yes, sir.

Q.    What did you do after you grabbed your mother's phone?

A.    I put the phone in my pocket.

Q.    What did you do physically?  Where did you move at that point?

A.    Oh, I backed up.

         MR. COHAN:  Let me see if we can find that part of the video one more time.  If we could go on this exhibit at the 34-second mark, I believe, or back further to maybe the 20-second mark.

         (Video played.)

BY MR. COHAN:

Q.    So what do you do when you grab the phone?

A.    I backed up.

DE'SHAUN JOHNSON - REDIRECT

Q.   Were you trying to impede the arrest at all when you took your mother's phone?

A.   No, sir.

Q.   Why did you take her phone?

A.   She told me to grab her phone.

Q.   What was happening to your mom at that point?

A.   She was getting arrested.  And she knew she was getting arrested, so she told me to grab the phone.

        MR. COHAN:  Could we go to the very beginning of this video now.

        (Video played.)

BY MR. COHAN:

Q.   So at this point where are the officers standing?

A.   In the street.

Q.   Where are you standing?

A.   Next to the car all the way by the house.

Q.   Closer to the house or closer to the street?

A.   Closer to the house.

Q.   When your mom says, "It's their driveway.  They don't have to stand on the porch," what's she responding to at this point? Are you being told to stand on the porch?

        MR. CAPITELLI:  Objection.  Calls for hearsay.

        THE COURT:  Sustained.

BY MR. COHAN:

Q.   Is Officer Moring at that point calling for you to stand

DE'SHAUN JOHNSON - REDIRECT

on the porch?

MR. CAPITELLI:  Objection.  Calls for hearsay.

MR. COHAN:  Statement by a party opponent, Your Honor.

MR. CAPITELLI:  He is asking him what he said.

MR. COHAN:  Then the exception under 803.

THE COURT:  Overruled.  Overruled.  Overruled.

Did Officer Moring tell you to stay on the porch?

THE WITNESS:  Yes, sir.

BY MR. COHAN:

Q.   Even though you weren't close to him at this point?

A.   Yes, sir.

MR. COHAN:  Just one second.

Nothing further, Your Honor.

Thank you for your testimony, De'Shaun.

THE COURT:  Before you step down, let me let the jury go.  One moment.

THE WITNESS:  Yes, ma'am.

THE COURT:  We are going to take a break.  We will come back at 3:15.  I will remind you please keep an open mind.  You have only heard one witness, so keep an open mind.  Do not start discussing the case with each other because you might find yourself being an advocate for one side or the other without having all the evidence.  We will take a break until

212

DE'SHAUN JOHNSON - REDIRECT

3:15.

THE DEPUTY CLERK:  All rise.

(Jury out.)

THE COURT:  Counsel to the sidebar.  Court is in recess.

(Recess.)

THE COURT:  Everybody ready?  Let's bring in the jury.

(Jury in.)

THE COURT:  Everyone be seated.

The jury is back in the court.  The parties are in the court.  The attorneys are in the court.  We are ready to proceed.

Mr. Cohan, call your next witness.

MR. COHAN:  The plaintiff calls Teliah Perkins to the stand.

THE COURT:  Ms. Perkins.

TELIAH PERKINS,

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please be seated and then state your name in the microphone for the record, please.

THE WITNESS:  Hi.  My name is Teliah Perkins.

THE DEPUTY CLERK:  Thank you.

MR. COHAN:  May I proceed, Your Honor?

THE COURT:  Please.

TELIAH PERKINS - DIRECT

DIRECT EXAMINATION

BY MR. COHAN:

Q.   Good afternoon, Ms. Perkins.  What's your relation to the plaintiff, De'Shaun Johnson?

A.   Son.  That's my son.

Q.   Do you have any other children?

A.   No, sir.

Q.   Your last name is what again?  Can you remind us.

A.   Perkins.

Q.   His is Johnson.  Are you his birth mother?

A.   No, sir.

Q.   Could you explain when you started raising De'Shaun.

A.   Since birth.

Q.   How did that come to be?

A.   His mother and I were college friends.  She wasn't fit to raise him, using drugs and alcohol abuse.  She wanted to have an abortion, and I talked her out of it.  I promised her that I would take care of him.

Q.   So how old was he when you started raising him?

A.   I was there when she had the pregnancy, so immediately.

Q.   Did you live through on that promise you made to her to raise him?

A.   Yes, sir.

Q.   Could you tell us what your relationship is like with De'Shaun.

TELIAH PERKINS - DIRECT

A.    Awesome.

Q.    What do you guys like to do together?

A.    Debate about sports.

Q.    About sports teams or about you playing sports?

A.    Both, about teams and who is better.

Q.    What sports do you play with De'Shaun?

A.    Mainly all sports: basketball, football, track, anything.

Q.    Who is better?

A.    Of course I am.

Q.    This lawsuit involves an incident that occurred on May 5, 2020.  Are you familiar with that?

A.    Yes, sir.

Q.    Will you know what I'm talking about when I refer to May 5 or the incident?

A.    Yes, sir.

Q.    Could you tell us a little bit about how De'Shaun was doing mentally and emotionally before the incident.

A.    He was doing great.

Q.    What was his personality like?

A.    Talkative.  Outgoing.  Happy.

Q.    Did he have anxiety?

A.    No, sir.

Q.    How did he do in social settings?

A.    He did wonderful.

Q.    Did he go out with friends?

TELIAH PERKINS - DIRECT

A.   Yes.

Q.   Did he have lots of friends?

A.   Yes.

Q.   Did he have nightmares then?

A.   No, sir.

Q.   Let's talk about that day itself, May 5.  Could you tell us what you were doing in the hours leading up to the incident.

A.   Sitting on the porch.

Q.   How long had you been sitting on the porch before the officers came?

A.   About an hour.

Q.   Where had you been before that?

A.   I had left the house and went to speak to a guy that I was told about.  He puts lights on cars, motorcycles, and he also does audio.  I had a conversation with someone stating that I wanted lights on the motorcycle because of, you know, safety reasons, and that's why I went, and back home.

Q.   You were back home.  You were on the porch.  Were you with anybody on the porch?

A.   My nephew Jeron.

Q.   Who all was at your house at that point?

A.   Me, Jeron, my, son, and my now deceased cousin.

Q.   Who is that?

A.   Grant Perkins.

Q.   What was Grant's situation at the time?

TELIAH PERKINS - DIRECT

**A.**  He was blind and contracted due to sickle cell.

**Q.**  Who took care of Grant?

**A.**  My mother, De'Shaun, and I, like we would take turns.

**Q.**  Did you have any training to take care of him, or was it just a family thing?

**A.**  Yes, sir.  I was actually his caregiver at the time.

**Q.**  So what did taking care of him involve?

**A.**  Bathing him, feeding him, you know, basically he was like a child.  He couldn't do anything for himself.

**Q.**  Was he there when the officers arrived?

**A.**  Yes, sir.

**Q.**  So tell me about that part.  How did the interaction between you and the officers start?

**A.**  Calm, like friendly.

**Q.**  Were you on your motorcycle and on your street at all?

**A.**  No, sir.

**Q.**  When did you first see them?

**A.**  While Jeron and I were sitting on the porch chatting.

**Q.**  When did they approach your house?

**A.**  Once they passed my house and had gone to the stop sign and they made a U-turn coming in my direction.

**Q.**  Did they eventually stop at your house?

**A.**  Yes, sir.

**Q.**  Did you know why they stopped at your house?

**A.**  No, sir.

TELIAH PERKINS - DIRECT

Q.   Did they ask you for any information when they arrived?

A.   Yes, sir.

Q.   What did they ask for?

A.   Driver's license, registration, and my insurance.

Q.   Did you comply with their request for information?

A.   Yes, sir.

Q.   So did you provide your driver's license?

A.   Yes, sir.

Q.   Did you provide proof of ownership of your motorcycle?

A.   Yes, sir.

Q.   Did you provide your insurance?

A.   No, sir.

Q.   Why didn't you provide that?

A.   I had told the officers that I had recently purchased the bike.  I had not yet got my insurance through the mail, so I didn't have it when he asked me for it.

Q.   While all this is happening at the beginning part of the interaction, where were you and where were the officers?

A.   We were at the end of the driveway.

Q.   What was the temperament like?  What was the mood like at that point of the interaction?

A.   Still the same like, you know, just speaking, they asking questions, and I'm answering the questions the best that I could.

Q.   Did the situation escalate at some point?

TELIAH PERKINS - DIRECT

A.   Yes, sir.

Q.   How did that happen?

A.   I had asked them a question, and I guess they didn't like my answer.

Q.   What was the question and answer?

A.   I had asked them was it a racist caller that called them, and they was, like, "Shut the F up.  No, this isn't about race."

Q.   While that happened, did you start to make phone calls?

A.   No, sir, not at the time.

Q.   Are you sure?

        MR. COHAN:  If you could pull up Exhibit 9.

BY MR. COHAN:

Q.   To clarify the question, during this interaction before De'Shaun comes outside and that part of the interaction, do you start making phone calls on your cell phone?

A.   Yes, sir.

Q.   I pulled up Exhibit 9, which has already been entered into evidence.  Do you recognize this screenshot?

A.   Yes, I do.

Q.   It looks like the screenshot is from May 7, but the date on the side is Tuesday, which I will represent to you was May 5.

        What phone calls were you making at this point?

A.   My mom.  I had called 911.  I had called my mom's best

TELIAH PERKINS - DIRECT

friend, who we acknowledged by our auntie.  I called the person that was responsible for -- like my agent, my insurance agent.

Q.   Did you make these calls while the officers were at your property?

A.   Yes, sir.

Q.   Why did you call your mom?

A.   I was afraid.

Q.   Why did you call 911?

A.   Same.  Afraid.

Q.   What did you say when you called 911?

A.   I don't remember it word by word, but I remember probably me saying something like can y'all get like a -- can y'all send like a supervisor out because I'm dealing with some disrespectful and irate officers.

Q.   At this point who was present at the scene besides you and the officers?

A.   My neighbor Daphne, Ms. Zina, De'Shaun, and Jeron.

Q.   Let's talk about each of those.  Ms. Daphne, who is she?

A.   My neighbor.

Q.   Where was she standing?

A.   Like in her doorway.

Q.   Did you say she is your neighbor?

A.   Yes, sir.

Q.   Was she on her property or your property?

A.   She was on her property.

TELIAH PERKINS - DIRECT

Q.    What about Ms. Zina?  Where was she?  Was she on your property?

A.    No, sir.

Q.    How old are Ms. Zina and Ms. Daphne?

A.    Ms. Zina is about 58 years old.  Ms. Daphne is, I would say, like 41.

Q.    Did they threaten the officers?

A.    No, sir.

Q.    Did they try to hinder anything that was happening between you and the officers?

A.    No, sir.

Q.    At some point did you ask De'Shaun to come outside?

A.    Yes, sir.

Q.    Did you ask your nephew Jeron to come outside?

A.    Yes, sir.

Q.    At what point was that in this whole situation?

A.    After Ms. Zina had came.

Q.    Why did you ask them to come out?

A.    Because I just felt like something was going to happen bad.

Q.    Did you ask them to record what was happening?

A.    Yes, sir.

Q.    Why did you want them to record what was happening?

A.    I felt that I was going to get hurt.

Q.    Did they come out?

TELIAH PERKINS - DIRECT

A.   Yes, sir.

Q.   So what was happening between you and the officers when the boys came out?

A.   I remember him saying -- one of the officers telling me -- he said, "That's it," or something.  After that I just noticed like he was trying to restrain me, and I didn't know why.

Q.   We all see De'Shaun sitting here today.  Is this what he looked like in May of 2020?

A.   Of course not.

Q.   When did De'Shaun have his growth spurt?

A.   I would say about tenth grade, middle of tenth grade.

Q.   From the videos that the jury has seen at this point -- have you seen the videos of the arrest on May 5?

A.   Yes, sir.

Q.   The video taken by De'Shaun?

A.   Yes, sir.

Q.   And the video taken by Jeron?

A.   Yes, sir.

Q.   From those videos it looks like you're walking up the driveway when the officers arrested you.  Where were you going?

A.   I was just pacing.

Q.   Were you trying to flee the scene?

A.   No, sir.

Q.   Did you tell them, "F y'all.  I'm going inside"?

A.   No, sir.

TELIAH PERKINS - DIRECT

**Q.** At what point did Officer Hart tried to arrest you?

**A.** Once I called De'Shaun and Jeron out.

**Q.** Did you know why he was arresting you?

**A.** Probably because I called them out, outside, and I asked them to record.

**Q.** Did De'Shaun try to stop the deputies from arresting you?

**A.** No, sir.

**Q.** Did he try to get in the way?

**A.** No, sir.

**Q.** Where was he standing?

**A.** By the door.

**Q.** What about Jeron?

**A.** Same.

**Q.** Were there any weapons on the scene?

**A.** No, sir.

**Q.** Did you have any weapons?

**A.** No, sir.

**Q.** Did you threaten the officers with any weapons?

**A.** No, sir.

**Q.** Were you eventually handcuffed?

**A.** Yes, sir.

**Q.** After you were handcuffed, could you see what was happening with De'Shaun?

**A.** No, sir.

**Q.** Could you see Deputy Moring draw his taser?

TELIAH PERKINS - DIRECT

**A.** No, sir.

**Q.** Well, it sounds like, the video, that you say something about, you know, "I wish he would." What are you saying to Officer Moring at that point?

**A.** I didn't see him draw it, but I heard him and De'Shaun like going back and forth, and I heard De'Shaun say, "You can't tase a child."

**Q.** How did that make you feel?

**A.** Very angry.

**Q.** What happened next? Where did you go after you were handcuffed?

**A.** I was still on the ground.

**Q.** Where did you spend that night?

**A.** Repeat the question.

**Q.** Where did you spend that night?

**A.** In jail.

**Q.** How long were you in jail?

**A.** One day.

**Q.** When did you see De'Shaun next?

**A.** When him and my mother came to bond me out.

**Q.** What was that interaction like between you and De'Shaun when they came to bond you out?

**A.** I was happy, but I was sad.

**Q.** What were you sad about?

**A.** Because my son had to see me get handcuffed.

TELIAH PERKINS - DIRECT

**Q.** Did you notice any changes in De'Shaun?

**A.** Yes, sir.

**Q.** What did you observe?

**A.** That he was afraid to go outside after that.  He lost a lot of his friends.  He was having nightmares.

**Q.** How did you observe the nightmares?

**A.** He would get up out of his sleep and be crying.

**Q.** Did you go to him then?

**A.** Yes, sir.

**Q.** How did you comfort De'Shaun?

**A.** Sometimes he would come lay with me or either I will go and lay with him until he fell back to sleep, or sometimes he didn't.

**Q.** You said he lost his friends or he didn't go out with his friends.  Could you explain that, what happened there.

**A.** Because sometimes like -- all of his friends didn't live right there where we were, so the friends that couldn't come to our neighborhood, I would allow him to go to their neighborhood.  Their parents wouldn't let them come over because we live, I guess they would say, too far for their kids to, you know, travel by themselves.

**Q.** Why do you think that was related to the incident on May 5?

**A.** Can you rephrase the question.

**Q.** Sure.  This was May 2020.  Was this something that could

TELIAH PERKINS - DIRECT

have just happened because of COVID, or how do you know it was because of what happened on May 5, 2020?

A.   Because with COVID, that was one of the best times of my son's life.  That's when he enjoyed life the most, to me.

Q.   Then was it a distinct change between before May 5 and after May 5?

A.   Yes, sir.

Q.   Did you witness any panic attacks?

A.   Yes.

Q.   What were those like?

A.   He would like break out in sweats and kind of shaky, like nervous all the time, and even if I was sitting next to him and like -- he would like jump.

Q.   Did he miss any school?

A.   Yes, sir.

Q.   Before this happened, what was his school attendance like?

A.   Perfect attendance.

Q.   About how many days of school did he miss?  Did he miss full days or half days?  Could you tell us about it.

A.   Full days.

Q.   Did you ever have to pick him up from school?

A.   A lot.

Q.   Would he call you from his cell phone or from the nurse's office or what?

A.   Depending on what classroom he was in because certain

**TELIAH PERKINS - DIRECT**

teachers would allow him to call, and he would call from the office, from the nurse, from his phone, and sometimes even his peers' phones.

Q.   Why do you think this was a result of what happened on May 5 and not just a teenage boy going through something?

A.   Because it was something tragic that he experienced that he had never experienced in his life.

Q.   Did he get medical attention for what he was going through?

A.   Yes, sir.

Q.   What type of medical attention did he get?

A.   When I took him to urgent care, they referred me to a psychiatrist.

Q.   Did he meet with a psychiatrist?

A.   Yes, sir.

Q.   Was he prescribed medication?

A.   Yes, sir.

Q.   Who would pick up the medication for him?

A.   I would.

Q.   Where would you pick up the medication from?

A.   Walgreens.

Q.   Do you know if he took it?

A.   Yes, sir.

Q.   How often would he take it?

A.   Every day.  He would take one during the day and one right

TELIAH PERKINS - DIRECT

before he went to bed.

**Q.**    Did the medications make his problems go away?

**A.**    No, sir.

**Q.**    Were there any other changes in his life that you observed after the event?

**A.**    Yes.  He no longer played basketball and that was one thing, you know, that he loved to do.  It made him very happy when, you know, he could play basketball.  He turned into a game freak.  As I said earlier, he wouldn't go outside anymore, so he stayed inside a lot.  He became jumpy.  We just like did a lot of things together that would be indoors a lot or either like with close, close family.

**Q.**    Are you proud of De'Shaun for going through with this trial?

**A.**    Of course.

**Q.**    Why is that?

**A.**    I'm proud of him because he is a very brave child.  He is very intelligent.  He has shown me that no matter what that he will always stand up for what's right, and I feel like he was braver than I was.

            **MR. COHAN:**  Thank you, Ms. Perkins.

                    I pass the witness.

            **THE COURT:**  Ms. Fisher.

TELIAH PERKINS - CROSS

CROSS-EXAMINATION

BY MS. FISHER:

Q.   Hi, Ms. Perkins.  My name is Sarah Fisher.

I believe you testified at the beginning of your direct that when you first saw the officers, you were sitting on the porch of your residence.  Is that correct?

A.   Yes, ma'am.

THE COURT:  Ms. Fisher, push that other microphone to you as well.  Perfect.  Great.  Thank you.

BY MS. FISHER:

Q.   That's still your testimony?  That is still your testimony, you were on the porch?

A.   Yes, ma'am.

Q.   You were not standing in the driveway next to your motorcycle when you first saw the officers?

A.   No, ma'am.

Q.   It is not your belief that you waved at them from the driveway as they passed by?

A.   Not that I believe.

Q.   Not that you believe?

A.   No, ma'am.

Q.   Do you think you may have been standing in the driveway and waved at them as they passed by?

A.   No, ma'am.

Q.   You ultimately walked away from the officers at some point

TELIAH PERKINS - CROSS

during the encounter; is that correct?

A.   Yes, ma'am.

Q.   Did you say anything to the officers when you turned and walked away?

A.   No, ma'am.

Q.   When you turned your back on the officers to head back towards the home, you did not state, "Fuck y'all.  I'm leaving"?

A.   No, ma'am.

Q.   Did you curse at them at any point?

A.   No, ma'am.

Q.   Would it surprise you to hear that we have watched the videos almost a dozen times today and you cursed a good many times at the officers throughout the videos?

A.   I disagree that I cursed at them, but I probably said vulgar language while they were harassing me.

Q.   Fair enough.  Before the officers ultimately arrested you or at least handcuffed you, would you agree that they gave you multiple chances to provide proof of insurance?

A.   Yes, ma'am.

Q.   How many attempts did you make to obtain proof of insurance before they arrested you?

A.   Only one.  I made the call.

Q.   But multiple times throughout the videos you are seen on your phone seemingly attempting various maneuvers, making

TELIAH PERKINS - CROSS

calls, I guess maybe sending texts to obtain that insurance. Do you disagree that that's what you were doing?

MR. COHAN: Objection. Mischaracterizes the evidence.

THE COURT: Overruled. You may answer that, if you can, Ms. Perkins.

THE WITNESS: No, ma'am.

BY MS. FISHER:

Q.   So while you were walking around on your phone in the videos portraying to the officers that you were attempting to obtain proof of insurance, it's your testimony that you actually only made one phone call, correct?

A.   I made one phone call to the insurance adjuster, yes, ma'am.

Q.   Right.  So you lied to the officers' faces all of the other times when you led them to believe that you were trying to get proof of insurance so that this call could go smoothly, right?

A.   I said earlier that I called my mom, I called Ms. Zina, and I called 911.

Q.   Right, but none of those were going to provide you with proof of insurance; is that correct?

A.   No, I had already called Bianca.  She was the first call that I made.

Q.   And the only call, right?

TELIAH PERKINS - CROSS

A.   I didn't say she was the only call.

Q.   The only call intended to provide proof of insurance?

A.   Oh, yes, ma'am.

Q.   I believe you testified briefly about Ms. Zina's presence at the scene.  Is that correct?

A.   Yes, ma'am.

Q.   Is she one of the people that you called to summon to the scene?

A.   Yes, ma'am.

Q.   When she approached, did you hear the officers ask her to stand back?

A.   Yes, ma'am.

Q.   Did she?

A.   Yes, ma'am.

Q.   At the time she approached the scene and was asked to stand back, was she recording?

A.   I'm not sure.

Q.   That's fair.  When the officers asked Ms. Zina to stand back, she ultimately did, correct?

A.   Yes, ma'am.

Q.   She came no closer to the scene at any point during the arrest; is that right?

A.   Not that I know of.

Q.   The officers never put a hand up to Ms. Zina and drew a taser on her, did they?

TELIAH PERKINS - CROSS

**A.** No, ma'am.

**Q.** They never used any other tactics to keep her back other than their request, which she obeyed, right?

**A.** Their vulgar language request.

**Q.** But they asked her to stand back and she did; is that right?

**A.** Yes, ma'am.

**Q.** So while you were being arrested for resisting, is it correct that at some point Officer Moring turned his attention over to De'Shaun?

**A.** Yes, ma'am.

**Q.** That you witnessed, did Officer Moring do anything to De'Shaun to keep him back other than ask him to stay back and to eventually display his service taser?

**A.** Repeat your question.

**Q.** At any point that you witnessed, did Officer Moring do anything to keep De'Shaun back other than request that he stand back and ultimately display his service taser?

**A.** I'm not sure.  My head was turned.

        **MR. COHAN:**  Objection.  Calls for speculation.

        **THE WITNESS:**  My head was turned.

        **THE COURT:**  She asked if she saw anything.

        **THE WITNESS:**  My head was turned.

        **THE COURT:**  I overrule it.

        **THE WITNESS:**  I'm not sure.

TELIAH PERKINS - CROSS

THE COURT:  She's not sure.

BY MS. FISHER:

Q.   Did you hear Officer Moring ask De'Shaun to stand back?

A.   Yes, ma'am.

Q.   Would you agree that Officer Moring asked De'Shaun to stand back multiple times?

A.   Yes, ma'am.

Q.   You would agree that after multiple requests for De'Shaun to stand back, Officer Moring did ultimately draw his service taser and point it at De'Shaun to display a show of force?

A.   I'm not sure.

Q.   What was De'Shaun doing to draw Officer Moring's attention?

A.   Videoing.

Q.   The recording, correct?

A.   Yes, the recording.

Q.   Weren't you the one in the videos commanding De'Shaun to record?

A.   Yes, ma'am.

Q.   In fact, you can be seen on the videos multiple times instructing De'Shaun to ignore police orders, right?

A.   I disagree.

Q.   You told De'Shaun to continue recording multiple times?

A.   Yes, ma'am.

Q.   You heard the officers instruct De'Shaun multiple times to

TELIAH PERKINS - CROSS

stand back?

A.   Yes, ma'am.

Q.   When De'Shaun came closer and the officers told him not to get any closer, you encouraged him to come closer and continue recording, correct?

A.   No, ma'am.

Q.   Would it surprise you to learn that the videos that we have seen today show something different?

MR. COHAN:   Objection.   Mischaracterizes the evidence.

THE COURT:   The videos speak for themselves. Sustained.

BY MS. FISHER:

Q.   Is it your belief, Ms. Perkins, that individuals can ignore police officers as they see fit?

A.   No, ma'am.

Q.   That's not your belief?

A.   Not at all.

Q.   Do you remember giving a deposition in this matter?

A.   Yes, ma'am.

THE COURT:   Wait.   Before you put this up -- take this down.   Take it down.

MS. FISHER:   Oh, I didn't know it was --

THE COURT:   Is this an exhibit?

MS. FISHER:   Not yet.

TELIAH PERKINS - CROSS

THE COURT:  What would you like to do with what you were about to show?

MS. FISHER:  I wasn't going to show it yet.  I didn't know the monitor was visible.

MR. COHAN:  May we have a copy?

THE COURT:  Yes.  If you are going to try to impeach her with it, you need to tell us what you are doing, or opposing counsel.

BY MS. FISHER:

Q.   So you remember giving the deposition; is that correct?

A.   Yes, ma'am.

Q.   Do you remember testifying in your deposition that at one point you ignored the officers' commands to you because you didn't feel they were talking to you in a way that you felt was appropriate?

MR. COHAN:  Objection.  Hearsay.

THE COURT:  I believe it was her testimony she is asking her about.

MS. FISHER:  Correct.

MR. COHAN:  It's just not a prior inconsistent statement based on the question and answer.

MS. FISHER:  Well, she just testified that she doesn't believe that it's correct that she can just defy police.

THE WITNESS:  I disagree.

TELIAH PERKINS - CROSS

THE COURT:  Do you remember testifying in your deposition that you ignored the officers' commands because you didn't feel they were talking to you in a way that you felt appropriate?  Do you remember testifying to that.

THE WITNESS:  No, ma'am.

THE COURT:  Would you like to refresh her memory?

MS. FISHER:  I would.  May I approach?

THE COURT:  You may.

Would it help you to review that deposition and look at it?

THE WITNESS:  Yes.

THE COURT:  Just read it to yourself, Ms. Perkins.

THE WITNESS:  (Complies.)

THE COURT:  Did you have an opportunity to read it?

THE WITNESS:  Yes, ma'am.

THE COURT:  Did that refresh your memory of what you testified to?

THE WITNESS:  No, ma'am.  I didn't testify to that. It's different.  It's not the same thing.

THE COURT:  Would you like to explain that?

THE WITNESS:  Yes.  I said the reason why I ignored them because how they addressed me when they first pulled up, which was, "Hey, you."  So, of course, I'm not a "hey, you," so I continued to walk.  Then they fixed it and they said, "Ma'am," and that's when I turned around and I said, "Yes,

TELIAH PERKINS - CROSS

sir," and I proceeded to walk towards them.

**BY MS. FISHER:**

**Q.**   Well, first, what you just recited is slightly inconsistent from what is here on your deposition.  Even that aside, based on what you just testified in the court today, when the officers first came up to your residence and addressed you, you just testified that you ignored them because you did not agree with the way that they were speaking to you, and you waited until they addressed you in a way that you felt was appropriate, correct?

**A.**   Yes, ma'am.

**Q.**   Ms. Perkins, throughout the entire encounter, did Officer Moring ever instruct De'Shaun to stop recording?

**A.**   I don't remember.

**Q.**   Did he ever tell De'Shaun to put his phone away?

**A.**   I don't remember.

**Q.**   Did he ever tell him to go in the house?

**A.**   Yes, ma'am.

**Q.**   He told him to go in the house?

**A.**   Yes, ma'am.

**Q.**   Do you remember when?

**A.**   No, ma'am.

**Q.**   Ms. Perkins, we are going to watch what is marked as Trial Exhibit 1, which is De'Shaun's recording of the incident.

**A.**   Yes, ma'am.

TELIAH PERKINS - CROSS

(Video played.)

BY MS. FISHER:

Q.   Ms. Perkins, did that video refresh your recollection from that day?

A.   Yes, ma'am.

Q.   Did you ever hear Officer Moring tell De'Shaun that he could not record?

A.   No, ma'am.

Q.   Did you ever hear Officer Moring tell De'Shaun to go into the house?

A.   No, ma'am.

Q.   But he did tell him to get back six times in that video, correct?

A.   I disagree.

Q.   Which part do you disagree with?

A.   Some of those times that was not De'Shaun.  That was Jeron that he was speaking with.

Q.   Okay.  We will just say multiple times Officer Moring instructed De'Shaun specifically to get back.  Would you agree with that?

A.   I agree.

Q.   Would you agree that at one point in that video De'Shaun was within 1 to 3 feet of the arrest, 1 to 3 feet of you?

A.   Yes, ma'am.

Q.   At one point he leaned in close enough to touch you,

TELIAH PERKINS - CROSS

right, when he reached over to grab your cell phone?

A.   Yes, ma'am.

Q.   You weren't worried about your son getting hurt at that point?

A.   Of course I was.

Q.   You were on the ground being actively arrested, and you kept summoning your son closer to you, closer to the scene of the arrest, and you weren't worried about his safety at that point?

A.   Yes, I was.

Q.   But more important to you was him recording and getting close to you?

A.   I disagree.

Q.   Which part of that do you disagree with?

A.   With him getting close to me.

Q.   But you did ask him to get close to you.  You have just testified to that, right, to grab the cell phone out of your hand?

A.   Yes, but I wasn't telling him to get close like that.  I was just asking him to grab the phone, and immediately he stepped back.

Q.   So you summoned your child within inches of your active arrest, but his safety was more important to you?

A.   Yes, ma'am.

Q.   Did your son sustain any bodily injuries on May 5, 2020?

TELIAH PERKINS - CROSS

**A.**   No, ma'am.

**Q.**   Did anyone shoot your son with a taser?

**A.**   No, ma'am.

**Q.**   Did anyone take out a baton or pepper-spray him?

**A.**   No, ma'am.

**Q.**   Did anyone put him in some sort of takedown position?

**A.**   No, ma'am.

**Q.**   Was he handcuffed or arrested?

**A.**   No, ma'am.

**Q.**   Now let's go to your nephew Jeron.  You testified a moment ago, I believe, that Officer Moring did at one point tell Jeron to back up; is that correct?

**A.**   Yes, ma'am.

**Q.**   Did he ever pull a taser on Jeron?

**A.**   No, ma'am.

**Q.**   Did he ever ask Jeron to stop recording or to go inside?

**A.**   I don't remember.

**Q.**   From what we just watched in the video here, did you hear him tell Jeron to stop recording or to go inside at any point?

**A.**   No, ma'am.

**Q.**   Jeron was standing at all times further back than De'Shaun, correct?

**A.**   I disagree.

**Q.**   Which part do you disagree with?  At what point did Jeron ever get closer to the scene than De'Shaun did?

TELIAH PERKINS - CROSS

A.   When I asked De'Shaun to get the phone, you could hear Jeron right there.

Q.   So if De'Shaun was up touching you, grabbing the phone from your hand, how was Jeron closer to the scene than that?

A.   Jeron was right by him.

Q.   But was he closer than the person grabbing the phone from your hand?

A.   Yes, ma'am.

            THE COURT:  What video are you showing?

            MS. FISHER:  Jeron's video.

            THE COURT:  Exhibit?

            MS. FISHER:  Exhibit 6, Jeron's video.

            THE COURT:  Exhibit 6?  Thank you.

            MS. FISHER:  Exhibit 10.

            THE COURT:  Exhibit 10.  Thank you.

            (Video played.)

BY MS. FISHER:

Q.   Does that clip of the video or the encounter refresh your recollection?

A.   Yes.

Q.   Is it still your testimony that at that point Jeron was closer to the arrest than De'Shaun was?

A.   What I'm saying is --

Q.   I'm sorry.  Is your testimony that in this portion of the video -- and we can watch it again if you want -- that Jeron

TELIAH PERKINS - CROSS

was at any point closer to the scene of your arrest than your son was?

A.   I disagree with that because -- just because it's a video, that's not when they started --

Q.   I'm sorry.  I just asked you --

        THE COURT:  Excuse me.  Allow her to --

        THE WITNESS:  They wasn't recording the entire thing. So, yes, they were at the arrest the whole time together -- not the whole time, but when they first started, they were together.  Then De'Shaun just stepped up and started recording, but they both were recording right there at one point together.

BY MS. FISHER:

Q.   I appreciate that, but that does not answer my question. So, one, we are going to limit this question to the clip that we just watched.  In this clip that we just watched, are you telling the Court that at any point Jeron is closer than De'Shaun?

        MR. COHAN:  Objection.  Asked and answered.

        MS. FISHER:  She has not answered the question.

        THE COURT:  Overruled.  She may answer.

        THE WITNESS:  I'm not sure.

        THE COURT:  She is not sure.

        MS. FISHER:  Okay.  Then we will move on.

BY MS. FISHER:

Q.   Ms. Perkins, would you agree that if a police officer does

TELIAH PERKINS - CROSS

something to cause an individual severe mental trauma that a complaint should be filed on that officer?

A.   Of course.

Q.   You filed an internal affairs complaint with St. Tammany Parish Sheriff's Office in this matter, correct?

A.   Yes, ma'am.

Q.   That complaint was about the May 5 incident?

A.   Yes, ma'am.

Q.   You were asked about that IA complaint that you filed in your deposition.  Do you remember that?

A.   No, ma'am, I don't remember.

Q.   Do you remember what prompted you to file that internal affairs complaint?

A.   The way I was treated by the officers and because of my injuries.

Q.   Did someone encourage you to make that complaint?

A.   No, ma'am.

Q.   Did you have any help making that complaint?

A.   No, ma'am.

Q.   Do you remember who you spoke to when you made that complaint?

A.   I don't remember the name or anything.  I believe it was a captain or lieutenant or someone.  I don't remember.

Q.   But it was a police officer with the St. Tammany Parish Sheriff's Office?

TELIAH PERKINS - CROSS

**A.**   Yes, ma'am.

**Q.**   Do you remember what you told him?

          **MR. COHAN:**  I'm going to object on relevance grounds here.

          **THE COURT:**  Overruled.  I'll let her ask the questions.

                 Do you recall what you told him about what your complaint was?

          **THE WITNESS:**  I told him about the incident.

**BY MS. FISHER:**

**Q.**   Have you seen a copy of that IA report that you filed with the sheriff's office?

**A.**   Can you tell me, what is an IA report?

**Q.**   I believe you went over to the sheriff's office.  You made a statement, if not multiple.  There was some writing done.  I believe you and the officer -- correct me if I'm wrong -- reviewed at least one if not two of the videos when you went over to the sheriff's office.  Does this sound familiar?

**A.**   I don't remember.

          Yes, ma'am.  Yes, ma'am.  I remember now.  Yes, ma'am.

**Q.**   Did you ever file a complaint on behalf of your son?

**A.**   No, ma'am.

**Q.**   Never?

**A.**   With this situation?

TELIAH PERKINS - CROSS

Q.   Your son has claims in this matter for emotional distress, and at the time of this incident he was 14 years old.  You're his guardian, correct, his mother?

A.   Yes, ma'am.

Q.   Never once did you tell the sheriff's office anything about your son's alleged injuries or complaints or any emotional distress or anything.  Do you disagree with that?

A.   No, ma'am.

Q.   Do you remember at any point at any time, other than this investigative report that you filed with the sheriff's office, making a complaint to anyone about your son's alleged mental distress, or was it only about your claims and your arrest?

A.   I spoke with the doctor about it.

Q.   You didn't go to the sheriff's office or anyone else of authority or any other --

A.   No, ma'am.

Q.   You never brought up your son's alleged injuries?

A.   Yes, ma'am.

Q.   Until this lawsuit and other than the doctor, did you tell anyone else or make a complaint?

A.   I went to the ACLU.

Q.   Well, that pertains to this lawsuit.  I meant outside of this.

A.   No.  No, ma'am.

Q.   So I just mentioned for you, Ms. Perkins -- and I know you

TELIAH PERKINS - CROSS

know this, but your son has emotional distress claims in this matter; is that correct?

A.   Yes, ma'am.

Q.   Did you do anything to get your son professional help regarding his alleged emotional distress?

A.   I did.

Q.   Did you take him to the doctor?

A.   Yes, ma'am.

Q.   What doctor did you take him to?

A.   Abundant.

Q.   Did you take him to any doctor before you took him to Abundant Health?

A.   The primary care doctor.

Q.   Who is his primary care doctor?

A.   He has two.  He has a female and a male.

Q.   Do you know their names?

A.   I can't remember right now.

Q.   So then you took him to Abundant Health, and who did he see at Abundant Health?

A.   Dr. Dowling.

Q.   What did Dr. Dowling do?

A.   Diagnosed him with a disorder.

Q.   So Dr. Dowling was his psychiatrist?

A.   Yes, ma'am.

Q.   What disorder did he diagnose him with?

TELIAH PERKINS - CROSS

A.    PTSD.

Q.    Did you make sure that De'Shaun got any treatment for his alleged PTSD?

A.    Yes, ma'am.

Q.    What did that include?

A.    Regular visits with a psychiatrist, counseling, and medication.

Q.    Did you attend any of those medical visits with your son?

A.    Every time.

Q.    You say every time.  There were multiple sessions?

A.    Yes, ma'am.  He couldn't even speak with the psychiatrist without me there.

Q.    You mentioned medication; is that correct?

A.    Yes, ma'am.

Q.    Were you asked to provide documents to your attorneys or to assist in this litigation regarding De'Shaun's claims?

A.    Repeat that question, please.

Q.    Were you asked throughout this litigation to provide your son's attorneys with documents or information to assist in this lawsuit?

A.    No, ma'am.

Q.    You were never asked to give them any information or documents or details about your son for this lawsuit?

A.    The attorneys?  Yes, ma'am.

Q.    Did you tell the attorneys anything about the health care

TELIAH PERKINS - CROSS

16:14

treatment he received?

MR. COHAN:  Objection.  Privileged.

THE COURT:  Sustained.

BY MS. FISHER:

Q.   Did you assist the attorneys in any way in gathering information about your son's treatment?

MR. COHAN:  Same objection.  We would like to have a sidebar, Your Honor.

MR. CAPITELLI:  It's not privileged whether she --

MS. FISHER:  It's a yes/no.  I'm not going to get into any details.

THE COURT:  Quick sidebar.  One moment, please.  Stay right there.

(The following proceedings were held at the bench.)

THE COURT:  Mr. Cohan.

MR. COHAN:  If it's okay, I will defer to Mr. Goldstein on this issue.

THE COURT:  Mr. Goldstein.

MR. GOLDSTEIN:  Yes.  Discovery in this matter took place in 2022.  Ms. Perkins at the time was a claimant in the action, a plaintiff, along with her son, for whom she was the guardian.  Plaintiffs produced voluminous medical records from both Ms. Perkins and Mr. Johnson.

Defendant first requested documents 10 days before the close of fact discovery, a time after which we had

TELIAH PERKINS - CROSS

already produced voluminous materials.  We then gathered additional materials, produced those materials.

Defendant then took the depositions of Ms. Perkins and Mr. Johnson, asked questions about their medical treatment.  Defendant never followed up, never sought additional documents from plaintiffs, and never sought the materials from any of the providers.

Defendant also never raised any objection about the medical records in the lead-up to trial, in fact, tried to exclude the only medical record that we listed on the exhibits.

MR. CAPITELLI:  I don't understand your objection to privilege.  What's the objection?

MR. GOLDSTEIN:  First of all, the questions unfairly led the jury to believe that plaintiff did not produce medical records, and that's just not the case.

MR. CAPITELLI:  She can answer the question on whether she did or she didn't.

THE COURT:  What's the question?

MS. FISHER:  Did she have any hand in assisting the attorneys in preparing documents for this litigation.

MR. CAPITELLI:  Providing the documents.

MS. FISHER:  Documents or information.

THE COURT:  And the objection is?

MR. GOLDSTEIN:  Well, it's a privilege objection.  If the question calls for a yes or no response, which the question

TELIAH PERKINS - CROSS

didn't, then perhaps it won't elicit privileged information. Asking a plaintiff about her involvement in gathering materials for the case can be privileged depending on how the question is asked and how the witness answers.

MS. FISHER:  She is not a plaintiff.

MR. GOLDSTEIN:  She still has a privilege.

THE COURT:  I'm going to allow her to answer that question.

We have an issue here with records.  You have an obligation, a continuing obligation, to provide them, and I'm hearing all this morning that there are more records.

MR. GOLDSTEIN:  There are no additional records that I'm aware of.

MS. FISHER:  You just said thousands.

MR. GOLDSTEIN:  We produced --

THE COURT:  Wait.  We are going to do this afterwards.  We don't need to do this right now.  Let Ms. Fisher get back to her cross-examination, and then let's talk later about the records issue.

(End of bench conference.)

THE COURT:  Ms. Perkins, did you gather documents for this litigation regarding your son's treatment?  Did you get medical records?

THE WITNESS:  Yes, ma'am.

THE COURT:  Go ahead, Ms. Fisher.

TELIAH PERKINS - CROSS

**BY MS. FISHER:**

**Q.** Did you provide those to your attorneys?

**A.** Yes, ma'am.

**Q.** Did you give your attorneys everything?

**A.** I'm not sure.

**Q.** You are not sure?  Is there anything you remember withholding from your attorneys for some reason?

**A.** No, ma'am.

**Q.** So do you think you gave them everything that you had?

**A.** Yes.

**Q.** Ms. Perkins, would it surprise you to know that the medical record in this case for your son consists of three pages that shows one Zoom appointment lasting 33 minutes?

**A.** Repeat the question.

**Q.** Would it surprise you to know that the entire medical record in this case for your son consists of three pages noting one Zoom session lasting 30 minutes?

**A.** Yes.

**Q.** That would surprise you?

**A.** Yes.

**Q.** So you believe that there are documents that are not present in this?

**A.** Yes.

**Q.** Would it also surprise you to know that the only three pages of medical records in this case indicate that

TELIAH PERKINS - REDIRECT

follow-up appointments were requested for your son and that he didn't show up for them?

A.    I disagree.

Q.    So that would surprise you to know that that's what the record shows?

A.    Yes.

MS. FISHER:  One moment, Your Honor.

No further questions.

MR. COHAN:  Just a few follow-up questions, Your Honor.

THE COURT:  Sure.  Mr. Cohan.

REDIRECT EXAMINATION

BY MR. COHAN:

Q.    Hello again, Ms. Perkins.  There were some questions about whether or not defendant Moring asked De'Shaun to stop recording.  Do you remember that line of questioning?

A.    Yes.

Q.    The video was played a couple of times over again to see if that command was made?

A.    Yes.

Q.    There wasn't any sound in that video of him telling either De'Shaun or Jeron to stop recording, is there?  We didn't hear it in the video?

A.    I did.

Q.    Okay.  Well, whether or not he asked them to stop

TELIAH PERKINS - REDIRECT

recording, did Deputy Moring actively block De'Shaun's filming of the incident?

**A.**   Yes, he did.

**Q.**   Did he try to send De'Shaun and Jeron back to the porch?

**A.**   Yes, he did.

   **MR. CAPITELLI:**  Object to the form.  Leading.

   **THE COURT:**  Sustained.

   **MR. CAPITELLI:**  He is leading her several times in a row now.

   **THE COURT:**  Sustained.  You have to object.

   It's your witness.

**BY MR. COHAN:**

**Q.**   At the beginning of the video, you can be heard saying, "It's their driveway.  They don't have to go back to the porch."  Do you remember that?

   **MR. CAPITELLI:**  Object to the form.  Leading.

   **MR. COHAN:**  I'm just setting a foundation for the next question.

   **MR. CAPITELLI:**  He is leading the witness.  He can ask her what was said.

   **THE COURT:**  It's just a foundational question.

   Do you remember?

   **THE WITNESS:**  Yes.

   **THE COURT:**  What's the question?

TELIAH PERKINS - REDIRECT

**BY MR. COHAN:**

**Q.** What was that in response to?

**A.** Repeat the question. Y'all made me forget.

**Q.** So the foundational question I was asking was we heard in the beginning of the video you say, "It's their driveway. They don't have to go back to no porch," or something along those lines.

**A.** Yes.

**Q.** Do you remember that?

**A.** Yes.

**Q.** Why did you say that?

**A.** Because I felt like we were on our property and that we have all the right to record and, you know, get the situation on video.

**Q.** There were some questions about an IA report. Do you remember that?

**A.** Yes.

**Q.** And whether or not you made a complaint for De'Shaun when you were making a complaint to the sheriff's office, do you recall that?

**A.** Right. Yes.

**Q.** Is there anything you did for De'Shaun while he was a minor to try to seek justice for De'Shaun?

**A.** Yes.

**Q.** What did you do?

255

TELIAH PERKINS - REDIRECT

A.    De'Shaun participated in a lot of rallies, spoke with other people that may have encountered the same thing as we were going through similar, and just trying to keep him around positive people and have him speak with several counselors about the situation.

Q.    When De'Shaun brought his claims in this lawsuit, were you his natural guardian?

MR. CAPITELLI:  Objection.  Leading.

THE COURT:  Overruled.

Were you his natural guardian?  Are you De'Shaun's guardian?

THE WITNESS:  Yes.

THE COURT:  Well, when he was a minor?

THE WITNESS:  Yes.  Yes, sir.

MR. COHAN:  There's a document I would like to show the witness but not publish to the jury, if it's okay.

MR. CAPITELLI:  Your Honor, we object.  He is attempting to show her an exhibit that was excluded.

MR. COHAN:  It goes to the medical records that were provided in this case, Your Honor, that defendants opened the door to.

MR. CAPITELLI:  That was argument.  This was excluded.

(The following proceedings were held at the bench.)

THE COURT:  What is it?

TELIAH PERKINS - REDIRECT

MR. COHAN:  This is when he went to the primary care doctor and he referred him to a psychiatrist.  It's a medical record that was produced in this case that we had on our exhibit list.  The defendants moved to exclude it, and now they are saying we don't have any evidence --

THE COURT:  Why are you showing that?  Tell me what you are trying to get.

MR. COHAN:  To show that she provided more medical records.  They say there's only one medical record.

THE COURT:  Well, she has testified that she went to the primary care.  She has been testifying they went to primary care.  This is the primary care person, right?

MR. COHAN:  Right.  They are questioning the truth of that.

THE COURT:  You can ask her, "You went to the primary care?"  That's not an issue, but she doesn't need to see that record.

MR. COHAN:  Can I ask her if they were records that she provided?

THE COURT:  You can ask her that.  What is it, one page, two pages?

MR. COHAN:  A couple of pages.

THE COURT:  You can ask that.  Go ahead.  You don't need to show her that, but you can ask her that.

(End of bench conference.)

TELIAH PERKINS - REDIRECT

16:27

THE COURT:  Go ahead, Mr. Cohan.

BY MR. COHAN:

Q.   Ms. Perkins you testified about De'Shaun going to the primary care doctor.  Do you remember that?

A.   Yes, sir.

Q.   Were you with him for that visit?

A.   Yes, sir.

Q.   If you had records of that visit, would you have provided it in the course of this lawsuit?

A.   Yes, sir.

Q.   Are you aware if De'Shaun saw anybody else at his high school, like a high school counselor, for his issues?

A.   Yes, sir.

Q.   Did he?

A.   Yes, sir.

Q.   Do you have any records of De'Shaun's visits with the high school counselor?

A.   I'm sure the high school does.  I don't.

MR. COHAN:  Thank you.  No further questions.

THE COURT:  You may step down, Ms. Perkins.

Ladies and gentlemen of the jury, I've spoken with the attorneys, and we think this is a good stopping point since it's day one.  We know you need to make arrangements for this evening, and the next witness is likely to be a long witness.  We all said you were going to be out for 5:00.

We are about to recess for an overnight recess. Remember the same thing I said before: Until the trial is over, you are not to discuss the case with anyone, including your fellow jurors. If anyone approaches you or attempts to talk to you about the case or anything having to do with the case, you are to advise me immediately. Do not use any technology tools to do any independent research about any issue related to this case. Most importantly, remember to keep an open mind until all the evidence has been received.

A couple of housekeeping issues:

You may bring your lunch. We have that small refrigerator in there, but we have a larger one. So if you need lunch refrigerated, we can keep it there. I don't know what the weather is like tomorrow. I don't know if it was raining when you went out today. So you might want to think about that or check the weather as to whether you want to bring lunch tomorrow.

You may have noticed sometimes this courtroom gets really cold and sometimes it gets warm, so if you want to bring a sweater and have that.

Leave your notebooks in here. They will be guarded and nobody will have access to them or will touch them at all.

If you have any allergies where we shouldn't have certain things in snacks, please advise Cherie or Melissa

or the CSO so they can let me know.  If there's anything else we can do to make it more comfortable during your service, let us know.  I believe that's it.

Anything else, counsel for Mr. Johnson?

MR. COHAN:  No, Your Honor.

THE COURT:  For the defendant?

MR. CAPITELLI:  Nothing, Your Honor.

THE COURT:  We are going to start again at 8:30.

Oh, one other thing I always tell the jurors, hopefully it won't be bad weather or traffic, but you never know downtown.  Please don't panic if you are running late because until the eight of you are here, we are not going to start.  We will make sure that you are in place, but I would like you to make every effort to be here on time.  I know the attorneys will be here early.  We can start at 8:30, and that way we can keep on schedule and know that we can complete the trial on Wednesday.

Court is in recess.

THE DEPUTY CLERK:  All rise.

(Jury out.)

THE COURT:  Please be seated.

Is there anything else we need to put on the record right now?  I know we are all meeting in a bit.  Anything else?

MR. GOLDSTEIN:  Your Honor, there is the limiting

instruction we discussed at sidebar.  I think it would make sense for us to first confer with the defendant's counsel before we propose language.

**THE COURT:**  I plan on discussing that, I agree, the limiting instruction as to Ms. Perkins' arrest.  We will discuss that between us and confer.  Anything else, Counsel?

**MR. CAPITELLI:**  No, Your Honor.

**MR. COHAN:**  No, Your Honor.

**THE COURT:**  Good.  Court is in recess.  It's 4:30.  I will meet with counsel.  I'm going to go see if we have enough chairs in the conference room.  I will let you know.  We will either meet in the conference room or here to discuss jury instructions, limiting instruction, and possibly the records issue as well.

**MR. COHAN:**  When would you like to reconvene, Your Honor?

**THE COURT:**  Ten to 5:00.  Thank you.  Court is in recess.

**THE DEPUTY CLERK:**  All rise.

(Proceedings adjourned.)

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled matter.

*s/ Toni Doyle Tusa*
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter