UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
TELIAH C. PERKINS, et al.      *      Docket 21-CV-879
                               *
versus                         *      Section D
                               *
KYLE HART, et al.              *      April 30, 2024
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

DAY 2 – PART 2
JURY TRIAL BEFORE
THE HONORABLE WENDY B. VITTER
UNITED STATES DISTRICT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Plaintiff: | ACLU Foundation of Louisiana<br>BY:  E. BRIDGET WHEELER, ESQ.<br>      NORA S. AHMED, ESQ.<br>1340 Poydras Street, Suite 2160<br>New Orleans, Louisiana 70112 |
| For the Plaintiff: | Reid Collins & Tsai, LLP<br>BY:  KEITH Y. COHAN, ESQ.<br>      EMMA CULOTTA, ESQ.<br>      RYAN M. GOLDSTEIN, ESQ.<br>      SEAN D. JOHNSON, ESQ.<br>1301 S. Capital of Texas Highway<br>Suite C-300<br>Austin, Texas 78746 |
| For the Defendant: | Milling Benson Woodward, LLP<br>BY:  ANDREW R. CAPITELLI, ESQ.<br>      SARAH A. FISHER, ESQ.<br>68031 Capital Trace Road<br>Mandeville, Louisiana 70471 |

Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room HB-406
                                New Orleans, Louisiana 70130
                                (504) 589-7778

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

# I N D E X

                                                    PAGE

Ryan Moring

        Cross-Examination By Mr. Goldstein          4


Roger Clark

        Voir Dire By Ms. Culotta                    29
        Traverse By Mr. Capitelli                   36
        Direct Examination By Ms. Culotta           40
        Cross-Examination By Mr. Capitelli          53
        Redirect Examination By Ms. Culotta         77


Ryan Moring

        Direct Examination By Mr. Capitelli         82
        Cross-Examination By Mr. Goldstein          115
        Redirect Examination By Mr. Capitelli       146


Kyle Hart

        Direct Examination By Ms. Fisher            154
        Cross-Examination By Mr. Goldstein          175
        Redirect Examination By Ms. Fisher          206


Erin Wright

        Direct Examination By Mr. Capitelli         210
        Cross-Examination By Mr. Cohan              220
        Redirect Examination By Mr. Capitelli       233


Defense Proffer                                     236


Rule 50 Motion                                      238

<div align="center"><u>MORNING SESSION</u></div>

<div align="center">**(April 30, 2024)**</div>

(The following proceedings were held after the morning break.)

THE COURT:  Before we get the jury, everybody ready?

We are ready for the jury.

(Jury in.)

THE COURT:  Be seated.  The jury is back in court. Deputy Moring remains on the stand under examination by plaintiff.

Proceed, Mr. Goldstein.

MR. GOLDSTEIN:  Thank you, Your Honor.

<div align="center">RYAN MORING,</div>

having been duly sworn, testified as follows:

<div align="center">CROSS-EXAMINATION</div>

BY MR. GOLDSTEIN:

Q.   Deputy Moring, I want to clarify something that happened before the break just to make sure I understand your testimony today.

You testified today that Ms. Perkins was walking the motorcycle from her driveway to the street when you observed her after the U-turn; is that right?

A.   She was observed in the street on the motorcycle while it was operating in a public road, yes.

Q.   Did you personally observe her walking the motorcycle from

RYAN MORING - CROSS

the driveway to the street?

A.   I believe she was walking it backwards, yes.

Q.   From the driveway to the street?

A.   Yes.  There was nowhere else to go.  There are ditches on either side of this driveway.

Q.   I understand.  You were deposed in this case.  Correct, Officer Moring?

A.   I believe so.

Q.   That deposition took place on January 21, 2022, right?

A.   That's the one that was approximately seven hours?

Q.   I'm not sure if that's right, but do you recall generally in January of 2022 appearing for a deposition at your counsel's office?

A.   Yes.

Q.   I took that deposition, correct?

A.   Yes.

Q.   You were under oath?

A.   Yes.

Q.   You truthfully answered questions during the deposition?

A.   I did my best.

        MR. GOLDSTEIN:  Your Honor, I would like to provide a copy of that transcript of the deposition to the witness for purposes of impeachment.  I have provided a copy to opposing counsel as well.

        THE COURT:  Okay.

RYAN MORING - CROSS

MR. GOLDSTEIN:  May I approach?

THE COURT:  You may.

BY MR. GOLDSTEIN:

Q.    Officer Moring, do you have in front of you a copy of your January 21, 2022, deposition in this case?

A.    It says it is.

Q.    If you could turn to page 44, line 20 through 25.  Are you there?

A.    I'm working on it.  All right.  44.

Q.    Page 44, line 20 through 25, at your deposition you were asked:

"QUESTION:  But she was not moving forward; is that right?

"ANSWER:  Yes.

"QUESTION:  And she was walking the motorcycle backwards from the street onto the driveway?

"ANSWER:  Back to the driveway, yes."

Those were your answers at your deposition in January of 2022, correct?

A.    At that point, yes.

Q.    Those were the answers you gave under oath at your deposition?

A.    At that point.

Q.    I'm sorry --

A.    I believe I also testified onside of this and stated that

RYAN MORING - CROSS

she completed a K-turn, which would have allowed that motorcycle to then flip around and face the other direction in which it has been pictured.

Q.   It's your testimony here today that she performed some sort of K-turn?

A.   She walked the motorcycle in the direction of a K-turn.

Q.   You did not observe that?

A.   But we are also asking minute details in reference to an incident that occurred four years ago, so I apologize if my memory is slightly fuzzy in reference to what direction something was facing.

Q.   Now, before the break you testified that during the interaction you deployed de-escalation techniques.  Do you recall that testimony from a bit ago?

A.   Yes.

Q.   Your testimony here today is that you, in fact, deployed de-escalation techniques during the incident with Ms. Perkins?

A.   I didn't say in reference to Ms. Perkins.  I said I deployed de-escalation techniques.

Q.   So you deployed de-escalation techniques with respect to someone other than Ms. Perkins?

A.   I believe so, yes.

Q.   But with respect to Ms. Perkins, you did not use any de-escalation techniques.  Is that fair?

A.   It's kind of hard to when somebody is physically resisting

RYAN MORING - CROSS

arrest.

Q.    It's your testimony today that you did, in fact, use de-escalation techniques with the minors?

A.    Yes.

Q.    I would ask you to go to page 184 of the January 2022 deposition, line 10 through line 14.  Are you there on page 184?

A.    Yes.

Q.    You were asked at your deposition:

        "QUESTION:  And so as with respect to the incident on
    May 5 with Ms. Perkins and the minors, were there specific
    de-escalation techniques that you attempted to deploy?
        "ANSWER:  Not specific ones, no."
        That was your answer at your January 2022 deposition, correct?

A.    Again, at that point, yes, sir.

Q.    Now, at some point during the interaction with Ms. Perkins, Deputy Hart made the decision to formally place her under arrest; is that right?

A.    Yes.

Q.    That was a decision that Deputy Hart made and not you?

A.    Yes.  I believe he verbalizes it in the video.

Q.    You at that point when Deputy Hart verbalized it, as you say, hadn't yet determined whether to place Ms. Perkins under arrest?

RYAN MORING - CROSS

A.   I did not verbalize it nor did I place her under arrest.

Q.   At some point prior to the decision to put her under arrest, I think you testified before the break that Ms. Perkins called 911, right?

A.   Yes.

Q.   You testified before the break that she was irate while she was on the phone with 911.  Is that your testimony?

A.   That she was very upset, yes.

        MR. GOLDSTEIN:  Ms. Stone, could you please play for the witness the recording of the 911 call that Ms. Perkins made on May 5, 2020.

        MR. CAPITELLI:  We would object, Your Honor.

        THE COURT:  I'm sorry.  What's the objection, sir?

        MR. CAPITELLI:  Not in evidence.  Not authenticated. There's been no foundation laid --

        THE COURT:  Is it not in evidence?

        MR. GOLDSTEIN:  It's being used for purposes of impeachment, Your Honor.  It directly contradicts the statement that the witness made on the stand.  It's a recording of the 911 call that he, in fact, testified was available for calls like these.

        MR. CAPITELLI:  It's not an exhibit in evidence, and he hasn't authenticated it.

        MR. GOLDSTEIN:  Your Honor specifically told the parties that impeachment exhibits were not required to be

**RYAN MORING - CROSS**

listed in evidence on the exhibit list.  That was a directive that we received before trial.  We didn't know we were going to use it until Officer Moring testified in a manner inconsistent with the recording.

THE COURT:  I'm not certain, Mr. Goldstein.  Please refresh my memory if he said that he heard the call.

MR. GOLDSTEIN:  He did testify that he heard the call, both today and at his deposition.

MR. CAPITELLI:  I believe he testified that you could get the recording and hear what was said if you wanted to.

THE COURT:  Okay.

MR. CAPITELLI:  His testimony was that he could get the recording and hear it if he wanted to and that it was available to the public or to counsel in this case, as it clearly was, but he did not testify that he heard exactly what was spoken on the phone when he was testifying about her manner.

THE COURT:  Deputy Moring, could you hear her part of the call when she made the call?

THE WITNESS:  Specifically what was said to 911, no.

MR. GOLDSTEIN:  May I ask an additional follow-up question?

THE COURT:  Of course.  I'm not allowing the exhibit at this time, but I will allow you to proceed.

RYAN MORING - CROSS

BY MR. GOLDSTEIN:

Q.   Deputy Moring, you just testified to Judge Vitter's question that you could not hear the words she used, but you could hear her on the phone with 911, correct?

A.   Yes.  She was in the general area of me when she made that phone call.

Q.   Right.  You understood at the time, on May 5, 2020, that she was speaking with a 911 dispatcher, right?

A.   I believe I remember her just saying something about a supervisor.

Q.   So you could hear her words.  You could hear that she requested a supervisor, right?

A.   Okay.

Q.   Do you agree?

A.   Yes.

Q.   You, in fact, testified earlier that although maybe you didn't hear all the words she said, you could tell that she was acting in an irate manner from the minute you arrived at the scene, right?  That was your testimony?

A.   Yes, sir.  From the instant we showed up, she was upset with us prior to us saying anything.

Q.   There were no times when she spoke in a calm manner?

A.   I'm sure she de-escalated at a certain point, but there was ups and down.  It was a very dynamic situation.

Q.   In fact, one of the downs was when she called 911 to

RYAN MORING - CROSS

calmly request that a supervisor come to the scene, right?

A.    Potentially could have been.

Q.    So your testimony now is that potentially she could have called 911, she could have calmly spoken to the 911 dispatcher, and that she in fact requested a supervisor, which was at least one word that you heard her say on the call with 911?  That's your testimony?

A.    So we know now that, yes, she did call, she did ask for a supervisor, but at the moment I don't recall.

Q.    Then I would like to direct your attention back to the deposition transcript, the January 22 deposition transcript on page 54, line 8 through line 16.  Let me know when you are at page 54.

A.    Okay.

Q.    (Reading:)

        "QUESTION:  And now at one point Ms. Perkins called 911, right?

        "ANSWER:  Yes.

        "QUESTION:  She requested a supervisor be sent out, correct?

        "ANSWER:  Yes.

        "QUESTION:  And she spoke calmly to the dispatcher, right?

        "ANSWER:  Yes."

        Deputy Moring that was your testimony in January of

**RYAN MORING - CROSS**

2022 when I took your deposition in this case, right?

MR. CAPITELLI:  Your Honor, I'm unclear of the use of the deposition at this point.  That's entirely consistent with what he just said.  He is attempting to portray it as impeaching.  He is reading a deposition that's consistent with what he said.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  I don't disagree with that it's there.

BY MR. GOLDSTEIN:

Q.   Thank you.  Now, let's return to the moment when Deputy Hart determined that Ms. Perkins would be placed under arrest.  At that point there was some sort of physical altercation between Deputy Hart, yourself, and Ms. Perkins, correct?

A.   Yes.

Q.   During that altercation, De'Shaun was outside, right?

A.   Yes.

Q.   Jeron was already outside, right?

A.   Yes.

Q.   At that point they were recording, right?

A.   I believe so.

Q.   During that altercation between you, Ms. Perkins, and Deputy Hart, De'Shaun did not attempt to physically interfere, did he?

A.   He grabbed her at one point.  But otherwise, no, he did

RYAN MORING - CROSS

not physically interfere with our attempt to arrest her.

Q.   I want to maybe pull that apart.

A.   We are talking about the whole situation, that question was.

Q.   What did you say he did to her at one point?

A.   He grabs her phone as shown on the video that we watched.

Q.   I see.  So other than grabbing her phone --

A.   Yes.

Q.   -- he did not physically interfere in any way during the physical altercation, right?

A.   With the arrest of Ms. Perkins, no.

Q.   It's your testimony today that grabbing the phone was physical interference?

A.   It's not being a bystander.

Q.   But he did not try to physically impede your effort or Deputy Hart's effort to handcuff his mother, right?

A.   No.

Q.   You did not stop him when he came up to grab the phone, correct?

A.   No.  I was physically involved with an altercation with a resisting subject.

Q.   Deputy Hart did not stop him or ask him not to when he came up to grab the phone, correct?

A.   He was also involved with a physically resisting subject.

Q.   My question is did either of you ask him not to get the

**RYAN MORING - CROSS**

Q.   phone when he approached to get the phone?

A.   No.  We had bigger priorities at the time than cell phones.

Q.   Right.  De'Shaun was not your priority.

A.   At that moment, no.

Q.   Right, because your priority was Ms. Perkins.

A.   Correct.

Q.   So after De'Shaun came up to get the phone from Ms. Perkins, he then backed away, right?

A.   At what point?

Q.   After he got the phone, that's when he backed away, correct?

A.   Yes, he retreated at that point.

Q.   So other than coming to get the phone from Ms. Perkins, De'Shaun did not interfere physically with the attempt to arrest her, right?

A.   No.

Q.   Jeron did not interfere physically with the attempt to arrest Ms. Perkins, did he?

A.   No.

Q.   De'Shaun did not at any point try to free Ms. Perkins from you or Deputy Hart, did he?

A.   No.  We know now that he did not do that, but at that point I did not know that that would have been or not been his intent.

**RYAN MORING - CROSS**

Q.   But standing there on May 5, 2020, as the altercation was unfolding in real time -- you were there, right?

A.   I was there.

Q.   And in real time De'Shaun did not attempt to free his mother from the arrest, did he?

A.   We know that now, yes.  We know that now that he did not attempt to free his mother from her arrest.

Q.   Right, because we are looking back on what happened.  Is that what you mean?

A.   Yes.  We are looking at an incident that we have looked at over time now.

Q.   Right, but --

A.   In the moment you don't know what's about to happen.

Q.   You can never know, as an officer, what's about to happen, right?

A.   Correct.

Q.   All you can look at are the different factors at any scene that might influence the decisions that you make as a law enforcement officer, right?

A.   Correct.

Q.   You can look at how many people are there, right?

A.   Yes.

Q.   You can look at the time of day, correct?

A.   Yes.

Q.   You could look at the relationship between the person who

RYAN MORING - CROSS

is being arrested and the bystanders, right?

A.   That I believe has no factor.

Q.   You could look at whether you are in public or on private property, right?

A.   That depends on the offense.

Q.   You could look at whether there's any weapons on the scene, right?

A.   Known weapons, but yes.

Q.   Right.  There could always be unknown weapons, I guess, but you can actually look at whether there are any known weapons, correct?

A.   Correct.

Q.   You can listen to the language that the bystanders are using in order to determine whether they are interfering, right?

A.   Possibly.

Q.   De'Shaun did not at any point try to block you from arresting Ms. Perkins, did he?

A.   No.

Q.   Jeron at no point tried to block you from arresting or handcuffing Ms. Perkins, did he?

A.   No.

Q.   All De'Shaun and Jeron did was continue to record the arrest?

A.   Yes, other than grabbing a phone and coming closer and

RYAN MORING - CROSS

further during the interaction.

Q.   At this point, while you are in the middle of the interaction, you have no reasonable basis to believe that De'Shaun or Jeron was a threat, right?

A.   At this point?  No, they were not a threat.

Q.   "At this point," you mean while --

A.   No.

Q.   -- you, Deputy Hart, and Ms. Perkins were engaged in the physical altercation, right?

A.   No, I mean at this point four years later we know that they were not a threat to us during the altercation.

Q.   So you would agree with me now we know they were never a threat, right?

A.   No, they weren't.  They did not present one.

Q.   Right, because they were 14-year-old, 15-year-old boys coming out in broad daylight to record an incident involving their mother and the police, right?

A.   So we know that now, as well, that they were 14 and 15, but it's not something that you -- they don't come out with a sign in their hands that says, "Hey, I'm 14 years old."

Q.   I understand.  I understand your job as a law enforcement officer is difficult.  Sitting here today, you will agree with me that they were not a threat?

A.   Yes, I believe I have.

Q.   Now, at some point during the altercation, Deputy Hart was

RYAN MORING - CROSS

able to get Ms. Perkins onto the ground, right?  We have all seen the videos.

A.   Yes.

Q.   At that point you stood up, correct?

A.   Yes.

Q.   Ms. Perkins was on the ground, Deputy Hart was on top of Ms. Perkins, and you stand up, right?

A.   Yes.

Q.   You draw your taser, correct?

A.   Momentarily, yes.

Q.   But you do draw it?

A.   Yep.

Q.   A taser, it's something that could be used to incapacitate a suspect, right?

A.   Temporarily, yes.

Q.   Right.  When the taser is deployed, the suspect or the person that you are aiming the taser at is temporarily incapacitated, right?

A.   Potentially.

Q.   Typically?

A.   Potentially.  Out of the deployments that I have personally had, they honestly don't work more often then they do.

Q.   But it's a dangerous weapon, isn't it?

A.   It can be.

RYAN MORING - CROSS

Q.    It can incapacitate someone?  They can fall to the ground, right?

A.    Possibly.

Q.    During that time law enforcement is able to get control of the situation.  That's what the taser is for, right?

A.    Yes.

Q.    So when you draw your taser, that's one of the outcomes that you might contemplate?

A.    Possibly, yes.

Q.    A taser, I take it, could result in a serious injury to the person who is hit with it?

A.    Yes.  It is a less lethal item.

Q.    But it could still be a lethal item?

A.    There's a small percentage, but yes.

Q.    When you stood up and drew your taser momentarily, Ms. Perkins was at that point handcuffed, right?

A.    Yes.

Q.    At that point when you draw your taser, De'Shaun had not physically interfered with the putting on of the handcuffs, correct?

A.    He did not interfere with the putting on of the handcuffs, but he was advancing towards our position.  I had previously asked him to get back more than once.

Q.    When you stood up and drew your taser, he had not physically interfered with the putting on of the handcuffs?

RYAN MORING - CROSS

That is my question.

A.    Physically he did not interfere, but verbally he was pursuing us.  That's relevant.

Q.    Verbally, he wasn't threatening you.  You have already testified to that, right?

A.    No, but he was acting aggressive and in a verbal manner that could potentially become a physical issue.

Q.    He was telling you that you were arresting his mom, right? That's one of the things he said?

A.    Yes.

Q.    One of the things he said during the incident was that you can't tase a child, right?

A.    Correct.

Q.    Those are the aggressive statements that you were referring to?

A.    I mean, that's not an aggressive statement, but he wasn't saying it in a calm, polite manner that would typically be done during like a normal interview.

Q.    Okay.

A.    Again, this was a very dynamic situation.  I feel like we can agree on that, that there's quite a bit of uncertainty associated with this.

Q.    It was a situation that arose out of a misdemeanor traffic stop, right?

A.    That turned into a felony resisting arrest that we were

22

**RYAN MORING - CROSS**

ultimately convicted of for resisting an officer.

       **MR. GOLDSTEIN:**  Move to strike, and I would ask for an instruction to the jury.

       **THE COURT:**  I will strike it, and I will further advise the jury what I have advised them and they are aware of. The case is not about any claims by Ms. Perkins or any force used against her.  The focus of your role will be any claims by Mr. Johnson against Deputy Moring.

**BY MR. GOLDSTEIN:**

**Q.**   After you stood up, you drew your taser and you pointed it at De'Shaun, correct?

**A.**   Yes.

**Q.**   You physically pushed him backwards, right?

**A.**   Yes, I extended my hand in an effort to move him back.

**Q.**   Well, we have heard a lot about extending one's hand, but you pushed him, right?

**A.**   Ultimately, yes, I moved him.

**Q.**   Would you agree that moving someone is also the same as pushing someone?

**A.**   It is physical force using to move a subject back from a dynamic situation, yes.

**Q.**   I just want to make sure the jury understand and that the record clear.  It's your testimony here today that you did, in fact, push De'Shaun?

**A.**   I did move him back.  I physically moved him back.

RYAN MORING - CROSS

Q.    By pushing him?

A.    I didn't shove him.  I moved him back.

Q.    Right.  You didn't shove him, but you pushed him?

A.    It's verbiage.

Q.    So you don't agree with the word "pushed"?

A.    I did not physically -- you make it sound like I physically pushed him like I pushed him to the ground.  I physically moved him back in an effort to get him to move back from the situation that was occurring directly behind me in which I could hear two subjects screaming at each other.

Q.    Now, at this point that you physically pushed him backwards, Ms. Perkins was on the ground with Deputy Hart, right?

A.    Yeah, we know that now.  Yes.

Q.    Right.  You weren't facing that way, I guess, so you didn't know whether she was on the ground or not?

A.    Yes.  I didn't physically observe it.

Q.    You knew she was handcuffed?

A.    I did.

Q.    Because you waited to stand up until after she was handcuffed?

A.    Correct.  That would make her potentially able for Deputy Hart to be able to deal with her by himself, and then we have two other subjects that are still trying to interact with us.

RYAN MORING - CROSS

Q.   Right.  By "subjects" you are referring to the teenagers who came out of the house to record the incident?

A.   I'm referring to De'Shaun and his cousin, yes.

Q.   Now, at this point Deputy Hart and Ms. Perkins are on the ground.  You are standing and facing De'Shaun.  At this point he was still recording, right?

A.   I believe so.

Q.   You could see his phone was held out in front of him?

A.   Yes.

Q.   You, in fact, used your body, Deputy Moring, to move sideways from side to side and physically block De'Shaun from recording the interaction between Deputy Hart and his mother, right?

A.   I used my body to physically block his actions to potentially get to Deputy Hart.

Q.   You used your body to block him from recording, correct?

A.   It had nothing to do with the recording.

Q.   Your testimony here today is it had nothing to do with the recording?

A.   It did not.

Q.   I would like you to turn to the January 2022 deposition at page 95, line 1.  Are you there on page 95?

A.   Yes.

Q.   Line 1:

        "QUESTION:  At the end of the video, the minor

**RYAN MORING - CROSS**

standing directly in front of you was attempting to move sideways in order to keep recording the interaction between Deputy Hart and Ms. Perkins, right?

"ANSWER:  That's the way it appears.

"QUESTION:  And as he moved to the side, you moved to the side in order to block his ability to record the incident, correct?

"ANSWER:  Correct."

That was your testimony at your deposition in January of 2022, right?

A.    It appears so, but it was a multisided question that had previously been answered.  I believe on page 93 you asked that same question, or at least to some degree there.  You got the same answer twice.  I was asked if I physically tried to block him and that was my intent, and I stated no.  But in the midst of this, it was asked and answered in that manner, yes.

Q.    The transcript is not wrong, is it?

A.    I'm not disputing it.  Like I said, it was a seven-hour deposition.

Q.    Now, during this time when you were moving your body from side to side, you could still hear Deputy Hart and Ms. Perkins audibly even though you could not see them, right?

A.    Yes.  I could still hear a physical encounter still going on behind me.

Q.    So you could hear Ms. Perkins say, "You are choking me,"

RYAN MORING - CROSS

with Deputy Hart, correct?

A.   Correct.

Q.   Now, at some point after you had stood up, moved De'Shaun backwards, drawn your taser, Deputy Hart moved Ms. Perkins away towards the curb, correct?

A.   Yes.

Q.   At that point Ms. Perkins was handcuffed, right?

A.   She was still handcuffed, yes.

Q.   Deputy Hart -- we saw it in the video -- moved her physically towards the curb to the grass, right?

A.   Yes.

Q.   At that point you continued to point your taser at De'Shaun, correct?

A.   At that point, yes.

Q.   From a couple of feet away, right?

A.   Yes.

Q.   His mother is more distance away from you than you are from De'Shaun, correct?

A.   We know that now, but at that point I didn't physically see it.  I was paying attention to the threat that was in front of me.

Q.   At that point of the incident, you knew that Deputy Hart had moved Ms. Perkins towards the curb in handcuffs, right?

A.   I didn't actually see it.  But, yeah, you could tell that there was some kind of movement going on back there.

RYAN MORING - CROSS

Q.   You knew that they had sort of moved away.  You just didn't know to where?

A.   Yeah.  I mean, you can hear it.  You just can't see it because I'm looking at what I'm entertained with.

Q.   You continued to that point to point your taser at De'Shaun?

A.   Yes.

Q.   At one point De'Shaun says to you or maybe at multiple points he says, "You can't tase a child."  Do you recall that?

A.   Yes.  There is no rule that says a juvenile cannot be tased with a taser.

Q.   Right.  Your training allows you to use your taser with a 14-year-old, correct?

A.   It doesn't prohibit us --

Q.   Right.

A.   -- if they are presenting a threat.

Q.   They need to present a threat, right?

A.   Possibly.

Q.   Well, you don't use your taser against individuals who don't present a threat, do you, Deputy Moring?

A.   No.

Q.   De'Shaun was not a threat at that point, with his mother moved away and in handcuffs, was he?

A.   We know that now that, yes, he was not a threat.

Q.   Standing there today, you knew based on all of the

RYAN MORING - CROSS

information before you that he was not threat, correct?

A.   Standing here today, we know that he wasn't a threat. Standing there that day, he was argumentative, and we didn't necessarily know what was going to happen.  At a certain point he ends up disengaging, and at that point my taser goes back and we go to the end of the street.

Q.   But before that point you continued to point your taser at De'Shaun and he says to you, "You can't tase a child," correct?

A.   He says that at one point, yes.

Q.   Then you pointing your taser at him say, "Watch me," right?

A.   Yes.

MR. GOLDSTEIN:  One moment, please.

Thank you, Officer Moring.

I will pass the witness.

MR. CAPITELLI:  Your Honor, I'm going to question Officer Moring during our case in chief.

THE COURT:  All right.  You may step down.

THE WITNESS:  Do I --

THE COURT:  Leave it there.

Mr. Goldstein, do you want to get the deposition?

MR. GOLDSTEIN:  Thank you.

Plaintiff calls Roger Clark as an expert witness.  The examination will be performed by my colleague,

**ROGER CLARK - VOIR DIRE**

Ms. Culotta.

THE COURT:  All right.

**ROGER CLARK,**

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please be seated and then state your name in the microphone for the record, please.

THE WITNESS:  Roger Clark.

THE DEPUTY CLERK:  Thank you.

**VOIR DIRE**

**BY MS. CULOTTA:**

**Q.**   Good morning, Mr. Clark.  Would you please tell us, what is your current employment?

**A.**   I'm a police procedures consultant.

**Q.**   How long have you worked as a police procedures consultant?

**A.**   Since 1993.

**Q.**   That makes about 30 years?

**A.**   Yes.

**Q.**   Could you explain, what does a police procedures consultant do?

**A.**   Well, I, at request, consult with law firms, agencies on police matters, and it's specific to police procedures.

**Q.**   Does that include testifying in matters such as this one that involve law enforcement practices and policies and procedures?

**ROGER CLARK - VOIR DIRE**

A.   When necessary, yes.

Q.   How often have you given such testimony?

A.   So during that time since then, I have given testimony over 1,400 times throughout the country in depositions or in trials, and in trials it would be around 600 times.

Q.   Who retains you in those matters, typically?

A.   So it's a variety of -- there are law firms and there are agencies such as the U.S. attorney, attorney generals, district attorneys, and I have projects with law schools as well.

Q.   In terms of the parties in a case when you testify in court, do you typically represent plaintiffs or defendants or is it a mix?

A.   So for testimony -- I have consulted over 2,400 times, but when cases go into testimony, testimony involves, it turns out, mostly for plaintiffs.

Q.   Do you always testify against law enforcement officers?

A.   No.  I have testified for officers and agencies as well as officers that have been plaintiffs.

Q.   Now, Mr. Clark, do you turn down any cases?

A.   Yes.

Q.   In what circumstances would you turn down a case?

A.   So I have a criteria for accepting a case because I'm retired.  I have a good retirement.  So if in my evaluation -- I evaluate free of charge.  If I consider that it's not part of that criteria, I turn down the case, inform the perspective

**ROGER CLARK - VOIR DIRE**

agency or law firm that I would not be helpful.

Q.   Briefly, can you tell us, what are the criteria that you look for?

A.   So when I retired and the phone started ringing, I determined that it had to be related to the profession and the standards and for the purpose of improving or expressing the proper standard and to keep that standard going.  Let's say it that way.

Q.   So to keep the standards expected of the law enforcement profession up to snuff, is that what you mean?

A.   Exactly, and for the purpose of keeping officers safe, the public safe, etc.

Q.   Mr. Clark, are you paid an hourly rate for your consulting work?

A.   I have a retainer.  Typically, I don't exceed it.  About 15 percent of what I do I calculated one time is pro bono, totally free.  I don't advertise or have a website.  It's been rare to go beyond the retainer except if travel is necessary or testimony is necessary.

Q.   Are you paid an hourly rate regardless of the substance of your testimony?

A.   Yes.

Q.   Now, you have mentioned a few times that you are retired. Let's talk about that.

So before you started your consulting business, were

**ROGER CLARK - VOIR DIRE**

Q.   you employed somewhere else?

A.   Yes.

Q.   Can you tell us a little bit about where you worked.

A.   Yes.  So my career was with the Los Angeles County Sheriff's Department.

Q.   How long were you with the Los Angeles County Sheriff's Department?

A.   I served for 27 1/2 years.

Q.   So would you tell us what positions you held during your 27 1/2 years with the LA County Sheriff's Department.

A.   Sure.  So at the deputy rank, I was six years, promoted to sergeant.  As a sergeant rank, I was six years, and as a lieutenant 15 1/2 years.  I retired out of the department as a lieutenant.

Q.   What kind of responsibilities did you have -- we will focus on your time as a lieutenant -- as an in-the-field officer?

A.   So as a deputy I was two years in custody, two years as a patrol officer, and then two years as a detective at a station.  A station is like a precinct or a division in a police department.

Then as a sergeant I was in communications, worked on a special project, back into patrol as a sergeant, and then four years with a special project, emergency operations, but that put me into the faculty of the patrol school.

**ROGER CLARK - VOIR DIRE**

Then as a lieutenant into custody for two years, went to a station, commanded a station as a station commander, then assigned to a special project with California POST.  Then the last 5 1/2 years I was commander of a specialized surveillance, investigative, and apprehension unit.

Q.    You mentioned a couple of things there.  We will come back to California POST, but can you first tell us what was that specialized surveillance called?

A.    So the unit was called NORSAT.  It stood for the Northern Regional Surveillance and Apprehension Team.  It was federally sworn.  It included federal officers under my command -- an FBI, IRS, DEA, ATF, and a Secret Service agent -- as well as a mix of local police officers and the sheriff's department under my command.  It was assigned specifically for very high level apprehensions and investigations, 500 arrests per year typically, and about 87 percent involving homicides or multiple homicides.

Q.    Did your work with the NORSAT unit involve making arrests in dynamic situations?

A.    Yes.

Q.    Were you trained on the proper techniques to use in those kind of situations?

A.    Yes.  The techniques used, that was what caused the phone to ring when I retired out.

Q.    Briefly, could you describe what your administrative

ROGER CLARK - VOIR DIRE

10:55

responsibilities were during your time with the sheriff's department in terms of the lecturing and training that you have done.

A.    So when I started in particular -- besides patrol school was a four-year assignment.  When working with POST, that assignment was to realign the curriculum for California POST. I could talk more about that, but that got me involved working with that curriculum and starting the lecturing at the academy. So from that point on, '84 to '93, I was accepted lecturer at both the reserve academy and the regular academy.  Up to the time I retired out in '93, I lectured on most often tactics, ethics, use of force, and demographics.

Q.    I want to make sure that we explain what you mean.  What is it that you mean by "POST"?  What does that stand for and what is that?

A.    So "POST" is an acronym.  It stands for Peace Officers Standards and Training.  A lot of my testimony involves POST standards.  There's a national POST, but each state in the country has an equivalent of POST.  In Louisiana, it's Louisiana POST.

It's the curriculum required under the law, both state or federal law, that must be certified in order for an individual to be granted and exercise police powers, so that curriculum is key.  It covers federal requirements as well as state requirements unique to in this case Louisiana.

**ROGER CLARK - VOIR DIRE**

Q.    What are some of the subjects or courses that are taught under a POST curriculum that all officers would have exposure to?

A.    So they are often called learning domains that they include typically in the beginning ethics, dealing with community service, policing in the community, de-escalation, tactical communications -- sometimes it's called verbal judo -- and then moves into what we call the nuts and bolts, the law, how to respond to various calls, including high-risk calls and so forth, and patrol techniques, tactics.  It also typically includes very extensive first aid, how to deliver a baby in the field, etc., and then also intervention requirements, those types of things.

In California, it's 42 specific skills.  It also in every state includes field experience before the certification sets in at whatever level a state requires.  In California, it's called POST basic.  Louisiana has a basic requirement.

Q.    Mr. Clark, did you personally teach any of those topics when you taught the reserves or the academy?

A.    I did.

Q.    Which courses did you teach?

A.    So most of my lecturing was on first ethics, the law, tactics, and response and working on a coordinated basis with regulars when assigned -- LA County had a huge reserve, over a thousand, so it was a big operation.

ROGER CLARK - TRAVERSE

Q.   Did your experiences as a deputy, sergeant, and lieutenant with the LA County Sheriff's Department inform the opinions you are giving here today?

A.   Yes.

         MS. CULOTTA:   Your Honor, I proffer Roger Clark as an expert in police practices and procedures under Rule 702.

         THE COURT:   Any questions on his expertise?

         MR. CAPITELLI:   Just a few.

         THE COURT:   All right.  Go ahead.

                       **TRAVERSE**

BY MR. CAPITELLI:

Q.   Good -- I think it's still morning.

         THE COURT:   It is.

         THE WITNESS:   Good morning.

BY MR. CAPITELLI:

Q.   I'm Andrew Capitelli.  Just a few questions for you.

         My understanding is you have not worked as an officer since 1993.  Is that correct?

A.   You are correct.

Q.   I heard you say you testified mostly for plaintiffs.  You would agree with me that you have testified 90-plus percent of the time on behalf of plaintiffs; is that correct?

A.   When it evolves to testimony, you are correct.

Q.   That's what I said, testimony, right?  Okay.

         I didn't hear.  How much did you charge for your

**ROGER CLARK - TRAVERSE**

11:00

opinion in this matter?

**A.**   When I was asked to and retained, $3,500.  I have not charged beyond that.  I will charge for the travel and the testimony on the stand.

**Q.**   What will that be?

**A.**   I'm at the Doubletree one night.  It will be $350 an hour on the stand, time on the stand.

**Q.**   Has any court ever limited your testimony in any manner?

**A.**   Yeah, there are motions in limine depending on the nature. I have never been excluded.

**Q.**   But you have been limited by courts, correct?

**A.**   Oh, yes.

**Q.**   You have been limited by federal courts, correct?

**A.**   That includes federal courts.

**Q.**   You have been limited by the United States District Court for the Southern District of Houston, Texas, correct?

**A.**   Yes.

**Q.**   You have been limited by the United States District Court for the Northern District of Illinois, correct?

**A.**   I don't recall the case, but I wouldn't disagree with it. They are called motions in limine.

**Q.**   *Estate of Pierre Loury v. City of Chicago*, right?

**A.**   I don't recall the case, but Chicago -- I have done quite a bit in Illinois testimony.

**Q.**   Just so I understand -- I know you are referencing motions

ROGER CLARK - TRAVERSE

in limine.  I know the jury probably doesn't.  What you are saying is that you gave an opinion like you did in this matter, correct, in those cases?

A.    No, it's -- I'm not aware, but what I've been instructed is when the case is honed down to certain issues -- in federal court you write a report -- and my expression of opinions exceeds that limitation, then I'm instructed not to talk about it.  It's formalized often in a rendering by the court that I see, so I'm very careful -- I try to be careful.  As I understand it, it's called a motion in limine.

Q.    So just to be clear, you've rendered opinions that were too broad and the Court narrowed down and said you could only testify on specific topics and that you were not an expert in some of the areas you were attempting to be?

A.    No.  No, that's not accurate.  When I get a case, there are no limitations, so I express based on my training and experience what I think is important.  I'm not the court.  The court determines what's important, and it's never been I'm not qualified to talk about it.

Let me correct.  When such as like medical issues or engineering, I'm not an engineer, I'm not a -- I'm limited.  I will not talk about it because I don't fit that qualification, you are correct.  Otherwise, I've been able -- I've testified.

Q.    To be clear, one of the limits placed on you was that you were not allowed to testify on the law, correct?

ROGER CLARK - TRAVERSE

A.   Of course, and/or the jury instruction.

Q.   Right.  Because that's the providence of the Court, right? The Court instructs the jury on the law.

A.   I have only and I have been permitted and instructed to testify what the training about the law is.  Otherwise, I'm not an attorney.

MR. CAPITELLI:  Thank you.

THE COURT:  Based on the proffer and based on the testimony of Mr. Clark, the Court finds that he should be qualified as an expert in police practices and procedures, and so I will qualify him as an expert in that area.  Let me instruct the jury what that means.

Sometimes when knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that field is permitted to share his opinion on those matters.  I have just qualified Mr. Clark as an expert in police practices and procedures.  However, you are instructed you are not required to accept that opinion.  As with any other witness, it's up to you whether to rely on it. You may accept in whole or reject in whole or in part the opinion which Mr. Clark offers or any opinion offered or expressed by an expert.

The effect and weight to be given expert testimony is within the broad discretion of the jury.  The importance placed upon the testimony is largely dependent upon

ROGER CLARK - DIRECT

the expert's qualifications and the facts that form the basis of his opinion.  Further, the jury may substitute their own common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.

With that, Ms. Culotta, you may further question Mr. Clark.

MS. CULOTTA:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. CULOTTA:

Q.   So, Mr. Clark, you have watched the videos in this case, correct?

A.   Yes.

Q.   Have you also reviewed the testimony of De'Shaun and his mom, Ms. Perkins, from yesterday?

A.   Yes.

Q.   You sat through Deputy Moring's testimony this morning, correct?

A.   Yes.

Q.   Have you formed any opinions as a police procedures expert in this case?

A.   Yes.

Q.   Do the videos and the testimony you reviewed inform those opinions?

A.   Yes.

Q.   Broadly speaking, can you tell us what opinions you are

ROGER CLARK - DIRECT

here to offer.

A.   Yes.  First, officers are trained, as testified, that the Constitution protects individuals for recording or being present at the scene of police activity under the constitutional right, so there is a constitutional right to record.  Secondly, that the restriction of that constitutional right relies on what we call a credible threat or an overarching danger that would prevent that recording.  It's called, in the totality of the circumstance, a credible threat.

Q.   So let's take those opinions one at a time.  In regards to your first opinion, can you briefly explain the training that officers receive on the Constitution and its amendments.

A.   Yes.  Typically it appears right off the bat, the very first set of instructions or training given, because the law enforcement profession is one of the few that requires an oath.  So we take the oath and the oath is to the Constitution, so there's some time taken to explain that.

In the Constitution we are all aware there are ten amendments.  The first is the right of free speech, establishment of religion, and in that First Amendment is the right to be present and record.

Q.   Are officers trained on the types of scenarios in which they might be recorded?

A.   Yes.  So the scenarios are in addition to the -- in all of the experiences at the academy, typically there's lecture and

**ROGER CLARK - DIRECT**

then there's role play or simulated training.  It embeds into the officer an understanding and what we call a conditioned response to the type of situation they are involved in.  In that training includes totality of circumstance, how to evaluate what's necessary and what you're required to do in terms of -- or necessary to do in order to meet your objective.

**Q.**    I will come back to the "totality of the circumstance" phrase that you have just used, but first do the types of scenarios that officers are trained on where they might be recorded include during an arrest, an active arrest scene?

**A.**    Yes.

**Q.**    Are there any other situations where officers might be recorded by bystanders?

**A.**    Oh, yes.  Very typically accidents, that draws a crowd, and in today's world everyone has typically got the means to record it and will.  Other crowd control situations and events, there's recordings done.  Fires.  So there's a variety of things the police response gets attention and will often evolve into people recording them.

**Q.**    Okay.  So let's turn to your second opinion.  Can you please just remind us what that second opinion was.

**A.**    So there are some phrases that are used.  "Totality of circumstance" is a key, "objectively reasonable" is another key phrase, and they combine to create what we call a reasonable action or proper action.

**ROGER CLARK - DIRECT**

So the totality of the circumstance is, as you can imagine from the term, the environment you're in, what's going on, what you're responding to, everything that's happening -- and I can go through some specifics -- and what a reasonably trained officer would do in that circumstance and how you would evaluate that as a threat level, which would then dictate what's necessary to do and what you would be authorized to do.

Q.   So how are officers trained to look at the totality of the circumstances to determine a threat level?

A.   There's another term called "situational awareness" because conditions can evolve.  In the totality of circumstance calculus, it is: What are you going to?  Is it serious?  Is it an accident, as an example, or is it a crime, or is it something you observed?  How serious is that?  You can imagine a bank robbery is totally different than riding a motorcycle without a helmet, for example, as in this case.

What time of day is it?  How many people are around in terms of what kind of a danger do they present or express?  Are there weapons?  Is there a possibility of weapons that would be reasonably calculated as a problem?  What are people saying and doing?  What's the body language?

There are others, but those are all fundamental things that the officer soaks in.  What is the obvious reasonable alternative to de-escalate?  What would I do in terms of the verbal exchange that's occurring, the tactical

ROGER CLARK - DIRECT

communications?  How does that fit in terms of me as a reasonable person dealing with the situation and what's the proper action?

Q.   What's the bottom line, then, an officer is trying to determine when looking at these factors that you mentioned whether -- sorry.  I'll pose the question there.

A.   There's a key issue.

MR. CAPITELLI:  Your Honor, are you asking about training specifically --

MS. CULOTTA:  Yes.

MR. CAPITELLI:  -- or more generally?

BY MS. CULOTTA:

Q.   The question is what are officers trained to look for when they are presented with a potential threat or the possibility of a threat?

A.   In the simulation or the role play as well as the lecture is that everything that is going to be decided or evaluated is objectively reasonable.  There's care taken to make sure the cadet or the prospective officer understands that what is done in the law enforcement profession is articulably, objectively real and not imaginary or fearful in terms of an imagination.  Everything must have a foundation of reality is another way of saying it.

So when an officer evaluates, lots of things are possible, but what the officer does is what is objectively

**ROGER CLARK - DIRECT**

reasonable based on actual occurrence.

Q.    Mr. Clark, am I correct that earlier you testified in your second opinion that the First Amendment right to record should only be -- the officers are trained that the right to record should only be overridden when a credible threat is presented? Was that your opinion?

A.    Right.

Q.    Can you walk us through what -- sorry.  You just noted that it needs to be an objective assessment by the officer, not a subject assessment; is that correct?

A.    You are correct.

Q.    Can you tell us specifically what objective factors do officers look for when determining whether a credible threat is present?

        MR. CAPITELLI:  I object again and ask that that question be phrased in the context of his expertise, which is training.

        THE COURT:  His expertise is police practices and procedures, is what he was qualified as an expert, so I'm going to overrule it.

            You may answer it, sir.

        THE WITNESS:  Thank you.

            I hope I remember the question exactly.  Can you repeat that.

**ROGER CLARK - DIRECT**

**BY MS. CULOTTA:**

**Q.**   Yes.  If I may, I'm going to break it down a little because I think you have actually mentioned these factors.

So one thing that you mentioned was body language. Now, is that something that officers look at when determining whether a credible threat is present?

**A.**   Yes.

**Q.**   Can you explain how that factor of the body language applies in a scenario such as this.

**A.**   Sure.  Because, you know, the profession is dealing with the human condition, and officers learn and are taught about body language.  In detective work, "the body does not lie" is one of the terms.

Does a person have his teeth clinched?  Is he coming at you with fists?  Is he in the posture he wants to fight?  Is he or she coming at you aggressively?  All those things, that's body language, and that combines with what else is going on in this totality of the circumstance.  Age is a factor.  Those types of things.

**Q.**   Mr. Clark, what about verbal statements?  I believe you mentioned that the language that is used can weigh into the credible threat analysis.  How does that factor in?

**A.**   So the verbal communication is key for a couple of reasons -- well, several good reasons.  One is during the verbal communication the officer is taught -- it's called

**ROGER CLARK - DIRECT**

tactical communication.  They are assessing what is going on with the person they are dealing with and how well they are being understood and can they mitigate it; because officers are trained in the de-escalation not to be the source of conflict and that if they create anxiety with their actions unnecessarily, then the ability of the subject to comply decreases proportionately.

You want to gain compliance early.  You listen to what the subject is saying, and the technique is to address that.  "Look, I know you're upset," "I think we have a misunderstanding," "Let's start over again," those types of things often take the air out of anxiety and then start to gain compliance.

Now, if you declare, "You are under arrest," and the person says, "Come and get me," then that's an indication verbally it's not going to go well.  So you listen carefully. That's a key aspect of dealing with the public or the subject and your intent on fulfilling your assignment or whatever you have in mind.

Q.   Mr. Clark, being argumentative with the police, is that considered presenting a credible threat?

A.   No.

Q.   Why is that?

A.   Well, it's because -- in traffic people will get anxious, and that anxious posture often reflects "I didn't do what you

ROGER CLARK - DIRECT

think I did" or "You don't understand me."  That's argumentative in that sense, but it's not threatening, and it's easily dealt with typically between the officer and -- the most common method is: "Look, I know you are upset.  I'm only here just to talk about riding a motorcycle without a helmet.  Let's just do what's necessary."

Q.    Mr. Clark, I want to keep us focused on our plaintiff, De'Shaun.  What about when De'Shaun says, "I'm not moving," is that considered verbal language that would present a credible threat under police practices and procedures?

A.    Right.  So with De'Shaun, as I said, in the totality of the circumstance -- at the house with another youngster his age -- it's very quickly understood this is related at least, and he declares it.  "That's my mom."  That flavors what the officer would typically do next and would address, "I understand that's your mom.  You can stand here and record.  We have to finish this," that type of thing.  So what I listened and watched in the video was not threatening to any officer.

Q.    Does the relationship, the mother-son relationship of the person standing there holding the video recorder, play into the analysis, from the officer's perspective, of whether this was a credible threat?

A.    Oh, yes.

Q.    How so?

A.    Well, because we all have mothers.  That's one thing we

**ROGER CLARK - DIRECT**

all share, we have had mothers, and we would want to be protective, A; and, B, it's understood there would be a concern if something like an arrest is going on with mom.  I will say it that way.  It's clear.  So an officer dealing with someone who wants to video it, which is clear, and nothing further then would be able to deal with it reasonably and, in the light of his right to video it, let it happen.

Q.   And now going back to the factors that you were discussing that weigh on whether a bystander could be a credible threat to an active arrest scene, does proximity to the arrest scene weigh in?

A.   It can if it's interfering, but the proximity here is distant, and there's no reasonable interference with what's occurring because there's sufficient proximity, in my evaluation.

Q.   What about when De'Shaun approaches to take the phone from his mother, does that change the analysis of whether De'Shaun posed a credible threat at the time?

A.   No.

Q.   Why not?

A.   Because they understand it's his mom.  He has heard her say, "Take the phone."  I think it's clear he understood she wants him to have this phone as a piece of protective evidence on her behalf, and they don't interfere with it.  He reaches over and gets it and he retreats.  That's not interfering with

ROGER CLARK - DIRECT

the officer and would not preclude him videoing when he takes the phone.

Q.   Mr. Clark, what about the number of people that were present at this arrest scene?  I believe that you have heard testimony that it was De'Shaun, his cousin Jeron, the neighbor, and then Ms. Zina, a family friend, who were all present at this arrest scene.  How does the number of people at this arrest scene factor in?

A.   The number of people are not a factor because it's the two boys and the mother and two police officers, and the others are too remote.  They are not saying or doing anything that's going to interfere and certainly are not credible -- I'm using that term again -- credible threats to any kind of interference of the officers.

Q.   You mentioned earlier that officers are trained on how to react to bystanders when there's an accident and maybe a large crowd gathers.  How does that differ from the situation that we had here with Ms. Perkins' arrest?

A.   Well, the number of people and the event itself are much different than an accident and officers -- it's typical to have a lot of people around if it's a big event or a serious accident on in the environment where there are a lot of people. This is a remote neighborhood, and there's nobody around that's going to create a problem for the officers in this case.

Q.   Does an officer's analysis of whether a credible threat is

**ROGER CLARK - DIRECT**

present change when the arrestee -- I'm sorry.  Let me start that question again.

Does an officer's analysis of whether a bystander presents a credible threat change when the arrestee has been successfully detained?

A.   So when there's a successful detention and the person is in handcuffs and it's over with, that only would rise -- that concern would only come up if there would be an attempt to take away the arrestee.  The term is called "lynching."  So that is not a factor in this set of facts at all.

Q.   Mr. Clark, are officers trained that it is acceptable to block bystanders from recording the scene of an arrest?

A.   So that is not acceptable because of the right of individuals to record, and interfering with that is interference with that right.

Q.   Are officers trained that it's acceptable to push bystanders who are recording an arrest when that person does not present a credible threat?

A.   That is not acceptable because it interferes with the right to record.

Q.   What about are officers trained that it's acceptable to point a taser at a bystander who is recording an arrest and not presenting a credible threat?

A.   That's also not acceptable and very concerning.

Q.   In what circumstances would it be acceptable for an

**ROGER CLARK - DIRECT**

officer to point a taser at someone who is standing by to record an arrest?

A.   When it's objectively reasonable that there is a credible threat and that they are in danger and need it as a protective instrument, because it's a very significant level of force.

Q.   I'm sorry.  Did you say "subjectively reasonable" or "objectively reasonable"?

A.   Objectively reasonable.  It has to be, everything done, and pointing a taser at someone must be objectively reasonable.

Q.   Is it possible for a bystander who is not a credible threat to interfere with an arrest?

A.   Could you ask that one more time, please.

Q.   Sure.  If a bystander filming an arrest does not pose an objective credible threat, can that person be interfering with the arrest?

A.   No.

Q.   Why not?

A.   Because there is no interference.  The right to record is well known and required for -- the officer has to accommodate that because the officer -- we protect the First Amendment.  So absent any kind of interference, then a person has the right and must not -- must not -- be interfered with.

Q.   Mr. Clark, does an officer have to verbally order someone to stop recording in order for it to be an interference?

A.   No.

ROGER CLARK - CROSS

**Q.**   Why not?

**A.**   Well, they can interfere by simply standing in the way, and they can interfere by telling them you can't be here.  It would be an interference to say, "Stop recording."

**MS. CULOTTA:**  Thank you, Mr. Clark.

I pass the witness.

**THE COURT:**  Mr. Capitelli.

**CROSS-EXAMINATION**

BY MR. CAPITELLI:

**Q.**   Mr. Clark, I know you said you have seen the videos.  I just want to show you as well.  Let's start with Exhibit 1, if we could.  This is the video taken by Mr. Johnson.

(Video played.)

BY MR. CAPITELLI:

**Q.**   In the beginning of this video, both officers are actively engaged with arresting Ms. Perkins, correct?

**A.**   Yes.

**Q.**   She is actively resisting, correct?

**A.**   She is resisting, yes.

**Q.**   She is resisting arrest, right?

**A.**   Yes, actively resistant.

**Q.**   You would agree with me at the beginning of this video De'Shaun is within, at most, 2 to 3 feet of Ms. Perkins?

**A.**   He is close.  He is close enough to reach out and take the phone.

ROGER CLARK - CROSS

Q.   Close enough to reach out and touch Ms. Perkins?

A.   Yes.

Q.   Close enough to reach out and place a weapon in her hand?

A.   Close enough to reach out and what?

Q.   If he is close enough to reach out and take a phone out of her hand, is he not also close enough to reach out and place something in her hand?

A.   Could he -- if he had something to hand her?

Q.   Yeah.

A.   I would suppose so.

Q.   A knife?

A.   My goodness.  If he had something in his hand, he could hand it to her, clearly, but that's evident that that never happened.

Q.   We know that now, right?

A.   No.

Q.   We know that now.

A.   No, we know because it's there and the officers would see it, so it's not something that they discover later.  They see her hand.  They know that nothing is in her hand when they are handcuffing her.

Q.   You would agree with me at the beginning of this, when De'Shaun is within 2 to 3 feet of an active arrest of an actively resisting individual, his left hand is in his pocket?

A.   I'm not sure, but I understand from the dialogue that he

**ROGER CLARK - CROSS**

said that.

Q.   Right.  He admitted his hand was in his pocket, his left hand, for at least part of his encounter, right?

A.   He says that.  I read his testimony.

Q.   Would the officers have any idea what's in his left pocket at this point?

A.   They have no idea exactly what's in his left pocket, but there's been testimony they didn't anticipate anything was. And when his hand came out, there was nothing in his hand.

Q.   You would agree with me that while on the ground, while still struggling to contain an actively resisting Ms. Perkins, that Officer Moring twice instructs Mr. Johnson to get back?

A.   Yes.

Q.   Have you ever heard of the term "reactionary gap"?

A.   I have heard it.

Q.   What is a reactionary gap?

A.   So the reactionary gap is the time it takes for a person to physically make the move based on when the decision is made. It's a gap.  In other words, I think the thought, my body starts to move, that time.  It's an action reaction is often the way it's taught as well, the difference between action and reaction.

Q.   If you had to estimate, if Mr. Johnson was within, let's say, 1 to 3 feet -- he actually reaches out and touches her. Let's give him the one foot.  How long would it take

**ROGER CLARK - CROSS**

Mr. Johnson, if he wanted to interfere with the arrest, to reach the officers?

**A.**   Well, he was right there, they were close, so he could just reach out.

**Q.**   A second?

**A.**   I think it would be pretty quick if he wanted to, but he didn't.

**Q.**   Right.  These are two officers who at one point are both on the ground?

**A.**   You could see it when they were applying the handcuffs.

**Q.**   One of them at one point has their back to him.  He is behind him, right?

**A.**   Yes.

**Q.**   Another point, you would agree with me that Officer Moring's gun side is towards Mr. Johnson?

**A.**   They are both right-handed, so I noted in the video the holster is on the right side.  So whenever the right side presented and if he was in that proximity and he wanted to, he could reach and touch the officer.

**Q.**   Could have had that gun in a second?

**A.**   Oh, no, not that gun.

**Q.**   Could have reached out and hit one of them in the back of the head?

**A.**   No, I can explain about the gun.  The gun is locked into the holster.  He cannot get the gun out.

**ROGER CLARK - CROSS**

Q.   No one could get the gun out?

A.   The officer can get the gun out.

Q.   Officers never have their guns taken?  Is that your testimony?  You can't get it out unless you are an officer?

A.   So what needs to be said is these holsters, they are called safety holsters, and they have two levels of action, things that are on the holster that must be activated in order to release the gun in hand.  You can hang that officer by a rope from that gun.  It will not come out of the holster unless those features are activated.  It's a safety holster.

Q.   My question was simpler.  I know it's been a long time since you were an active officer.

A.   I'm well aware of these holsters and testified many times about the holsters.

Q.   So your testimony today is it's impossible for someone to take an officer's gun from them, only the officer can pull it out?

A.   No, that's not -- I'm sorry.

          THE COURT:  You may answer.

          THE WITNESS:  That's not my testimony.  If a person is skilled and knows the features of the holster and has the ability and agility to activate those features, then they can acquire the gun.  If the officer has deliberately tinkered with the holster or has taken it out and not holstered it properly, it would be loose and in the holster and could be acquired that

**ROGER CLARK - CROSS**

way, but those are all things that are extremely remote and are not part of the calculus and credible threat in this set of facts.

**BY MR. CAPITELLI:**

**Q.** Does a person need a gun to be a credible threat to an officer?

**A.** I'm sorry?

**Q.** Would he have to have a gun to be a credible threat to an officer?

**A.** No. Subjects can be a credible threat without having a gun, but really it's a serious credible threat when the subject has a gun.

**Q.** Right. It's a heightened threat, right? Could they be a credible threat with just their hands?

**A.** If the totality of the circumstance describes a subject and the event as capable, yes.

**Q.** Now, before Officer Moring stands up, we noted -- you agreed -- he warns Mr. Johnson twice simply to move back, right?

**A.** He is told to move back.

**Q.** Look, I went through and counted. He warns him six times to move back. Would you agree with that statement?

**A.** Yes, I would agree with six.

**Q.** Mr. Johnson refuses to move back six times?

**A.** He says he doesn't have to.

**ROGER CLARK - CROSS**

**Q.**   He says, "I'm not moving," right?

**A.**   Things to that effect, yes.

**Q.**   "I'm not moving.  I'm not moving.  I'm not moving.  I'm not moving.  I'm not moving."  He says it five times in a row, right?

**A.**   I didn't count how many times, "I'm not moving," but he certainly says it.

**Q.**   Officer Moring then extends his arm towards Mr. Johnson, right?

**A.**   Yes.

**Q.**   He attempts to move Mr. Johnson back with his arm physically, right?

**A.**   I can't talk about Moring's intent, but he does push, and you can see it in the video the time when that occurs.

**Q.**   He extends his arm and attempts to move Mr. Johnson back?

**A.**   He extends his arm and pushes Johnson.

**Q.**   Does Mr. Johnson stay back that the point?

**A.**   He stayed pretty much in place.

**Q.**   He stayed exactly where he was pushed to, right?  He stayed in place, right?

**A.**   At that point he stayed in place.

**Q.**   So he is resisting the verbal commands, six of them.  He is resisting the next step up, an attempt just to move him back, right?

**A.**   Well, he has moved back.  After he gets mom's phone, he

**ROGER CLARK - CROSS**

moves back, and then he positions himself.  And he doesn't move from then on, as I saw, except right or left.  It looks to me like he is trying to get the camera view.

Q.    That's how it looks to you?  The camera was kind of up against his body at that point, right?

A.    I don't know exactly how he held it other than it was in his hand, and it looked to me and his testimony is such, as I read, he is trying to get it recorded.

Q.    I certainly understand his testimony, but we have the video.  You would agree he is kind of stepping forward?  He is trying to get around the officer one way or another, right?

A.    Well, the jury is going to determine intent, that factual aspect.  I can only say what it looks to me when I see it.  It looks reasonable and I think an officer seeing it would see it as reasonable he is trying to get a view with a camera.

Q.    He could have a view with the camera, right, from just a few feet back?  Correct?

A.    He can have a view with a camera if the camera is not obstructed.

Q.    And the camera was obstructed because he refused to move back.

A.    I think the question is can he get -- if he moved back, would he be able to get a better view?  I don't know.

Q.    My question would be could he have just moved back and continued to video?

**ROGER CLARK - CROSS**

A.   He, I believe in my reading, testified why he stayed where he did.  My testimony is what Moring would consider as a threat at that point, and in my opinion it was not.

Q.   I'm asking you about Mr. Johnson at this point.  Are you aware that Mr. Johnson was using an iPhone that day?

A.   Did he have an iPhone?

Q.   Right.

A.   That's what he said.

Q.   iPhones zoom in?

A.   Well, I have one.  I have never figured it out, but I understand they can.

Q.   So even if he listened, complied, moved back for officer safety, he could have just zoomed in, right?

A.   I suppose so.

Q.   Did you see Officer Moring extend his hand to Jeron Perkins?

A.   No.

Q.   Jeron Perkins was behind De'Shaun Johnson, correct?

A.   That's my understanding.  That's what I think the videos show.

Q.   Just a few feet behind, right?

A.   He was behind enough to get a body view of Mr. Johnson.

Q.   Enough to have a nice video view of the arrest, right?

A.   He sees Johnson certainly, the back, and I think the two combined really help capture the incident as far as

ROGER CLARK - CROSS

interference.

Q.   Was Jeron at such a distance that he wouldn't have been able to record the arrest?

A.   I think he could record from a lot of positions mechanically.

Q.   I agree with you.  So could Mr. Johnson, right?

A.   Yes.

Q.   Including just a few feet back right by his cousin?

A.   If he wanted to, could it work?  My opinion would be it could work that way.

Q.   Now, I know you spoke a little bit about the First Amendment in your training.  You are also aware that the First Amendment must be exercised in a reasonable time, place, and manner, correct?

A.   Yes.

Q.   So that's the corollary to it.  The First Amendment isn't just an unlimited right.  We would agree, right?

A.   There are limits, but the weight of the calculus swings heavily to the right under the Constitution.  When you interfere with it, there's got to be a good reason for it.  That's the training.

Q.   One of the reasons would be that you are at such a close distance that you are risking officer safety, correct?

A.   Well, that's exactly what I've been testifying, is there a credible threat.  So if that's occurring, then it would be a

**ROGER CLARK - CROSS**

threat to the -- reasonable threat and would be one of the overarching prohibitions to the recording.  So having said that, that's why I mentioned there has to be a threat level justifying telling a person you cannot record.

Q.    Now, you used the phrase "successful detention" was over with for Ms. Perkins.  Is it your contention that as soon as Ms. Perkins was handcuffed, at that very moment when Officer Moring stood up, that now we have a successful detention and she is now complying?

A.    Well, I took it from Moring's own testimony that that's why he stood up and turned his attention to Mr. Johnson.

Q.    He said he felt that Officer Hart could handle it from that point, which is why he stood up.  I saw you in here this morning.  That's what he stated.  Now, are you aware that Ms. Perkins continued to kick Officer Hart while she was on the ground?

A.    In terms of keeping Mr. Jackson [sic] from recording?

Q.    No.  I'm asking if --

A.    I don't think I quite understand.

Q.    Sure.

A.    What the testimony is, "I stood up" -- I'm paraphrasing. "I stood up because she was handcuffed.  I turned my back on my partner."

Q.    You are paraphrasing.  He stated, "I stood up because Officer Hart could handle it from this point."

ROGER CLARK - CROSS

A.   He said that --

MS. CULOTTA:  Objection, Your Honor.  I object to counsel testifying to facts not in evidence.

MR. CAPITELLI:  It's in evidence.  There was testimony from today.

THE COURT:  Overruled.  If he can answer.

THE WITNESS:  Sure.

THE COURT:  You may answer if you can.

THE WITNESS:  Thank you, Your Honor.

So he says very clearly, "In fact, I didn't even know what was actually going on behind me."  Well, that's a level of confidence that it's all over with, as far as she is concerned, for him.

BY MR. CAPITELLI:

Q.   He stated he still heard the scuffle going on behind him, right?

A.   I don't recall exactly, but I think it's something like that.

Q.   Were you sitting here this morning and listening to the testimony?

A.   I listened carefully.  I think he was well aware that there was more going on.  I think, as I heard it correctly, he knew that they were moving down the driveway away, expanding the distance between the two.

Q.   Mr. Clark, I just want to be clear here because it seems

ROGER CLARK - CROSS

like you are a little unclear on what was said this morning. Your expert opinion is based on the testimony given in this matter at this trial, correct?

A.   More than that, but you are correct.  I listened to the testimony.

Q.   It doesn't seem like you have a very good handle on what was said this morning.  Would you agree with me?

A.   No, I think I understand it and I remember it.

Q.   It sounds like you are directly contradicting things that were said two hours ago.

A.   I think my understanding of the record is -- I'm confident in it, so I don't know exactly what --

Q.   Successful detention, arrest is over.  Are you aware that Ms. Perkins kicked Officer Hart to such an extent that he fell and lost his balance?

     MS. CULOTTA:  Objection, Your Honor. Mischaracterizes the evidence and it's irrelevant.

     THE COURT:  I'm going to overrule it.  If that is in something that he reviewed and if he is aware of it, he can answer.  If it's not, Mr. Clark can say that.

     MS. CULOTTA:  Thank you, Your Honor.

     THE COURT:  Mr. Clark, overruled.  You may answer that, if you are aware of that.

     THE WITNESS:  I'm aware of the testimony, and I read that kind of testimony from yesterday and her response, the

ROGER CLARK - CROSS

mother's response to it.

**BY MR. CAPITELLI:**

**Q.**   Do you want to amend your statement that successful detention over with, issue over with?

**A.**   No.  My testimony is that once handcuffed, she is detained, and he turns his back and goes to De'Shaun.  That's my testimony.

**Q.**   So we have two individuals recording the scene, one closer in immediate proximity to an active arrest, the other just a few steps back, but it's your testimony that you believe Officer Moring was trying to stop the right to record entirely? That's what he was doing?

**A.**   That appears as an unreasonable act, to restrict the recording, in my opinion, yes.

**Q.**   Did he say to stop recording?

**A.**   He did not say stop recording.

**Q.**   At the beginning of this video, when Mr. Johnson is much further back from the officers, do you hear any instructions to stop recording?

**A.**   No.

**Q.**   To put away a phone?

**A.**   No.

**Q.**   Do you see his hand knock the phone down or tell him put the phone away?

**A.**   No.

**ROGER CLARK - CROSS**

11:48

**Q.**   Now, we can agree that once Officer Moring's verbal commands fall on deaf ears, once Mr. Johnson either remains planted or moving forward, right, once two extensions of an arm haven't worked, that's when Officer Moring points a taser at Mr. Johnson?

**A.**   He points the taser in the sequences depicted, as I think you have described correctly.

**Q.**   You would agree with me that an individual confronting an officer is a factor in whether a person is a credible threat, correct?

**A.**   Confrontation is a factor.

**Q.**   You would also agree that refusing to comply is an indication of a credible threat, correct?

**A.**   Yes, a refusal can be part of the calculus.

**Q.**   Mr. Johnson confronted Officer Moring in this matter, right?

**A.**   Yes.

**Q.**   Mr. Johnson actively refused to comply in this matter, right?

**A.**   He refused to move any further.

**Q.**   Are you aware that while Ms. Perkins was at the scene that she was calling individuals on her cell phone to come to the scene?

**A.**   I'm only aware of what was in the testimony and what I see in the video.

**ROGER CLARK - CROSS**

Q.   Would it surprise you to learn that she called individuals to come to the scene of this what started out as a traffic stop?

A.   I saw it in the testimony.

Q.   An individual calling other individuals, talking about the fact that the stop wasn't appropriate, and trying to bring them to the scene, would that cause an issue?  Would that present a possible threat?

A.   Not in this setting.  If someone is in a crowd being arrested and shouting for others to get in and interfere, yes. That's not what's occurring here.  She is calling, as I saw in the testimony, for information and also to come and observe.

Q.   There are three videos in this matter, right?  Did you review all three?

A.   The number of what?

Q.   Videos, three videos in this matter.

A.   There are three videos.

Q.   There's a video by a neighbor as well?

A.   There's a neighbor video.

Q.   Any action to stop that recording by Officer Moring?

A.   No.

Q.   Did he point his taser at her?

A.   No.

Q.   Did he extend his hand towards her?

A.   No.

ROGER CLARK - CROSS

**MR. CAPITELLI:**  Let's go to Exhibit 1 at 52 seconds.

(Video played.)

BY MR. CAPITELLI:

Q.   Mr. Clark, is this too close to be standing to an arrest?

A.   No.

Q.   No?  Okay.

A.   He is not doing anything.  He is getting the video.

Q.   You have to wait for someone to do something before you can take action to move them back?  Is that your testimony?

A.   I think what you are asking me, is he a credible threat, the answer is because of what he is doing he is not interfering -- by the way, this is his mom, and he is not doing anything other than recording.

Q.   So he would be potentially, in your view, more emotional because his mom was being arrested or less emotional?

A.   It speaks to that he is -- whatever he is attempting is only to record, and the officers would know nobody -- he has not come on me, he has not tried to pull me away, none of that is occurring.

**MR. CAPITELLI:**  Let's go back to Exhibit 10, 37 seconds.  Back it up a little to 35 and play.

(Video played.)

BY MR. CAPITELLI:

Q.   You saw Mr. Johnson there standing on the side, on the gun side of Officer Moring?  Can you see that from this video?

ROGER CLARK - CROSS

A.    Yes.

Q.    Is that too close to be standing to an arrest?

A.    No.  As I said, this is his mother, and he is trying to get it recorded.  He is not doing anything other than getting it recorded, recording it, to the -- I'll wait for the next question.

Q.    We have looked at a foot, 2 feet, 3 feet.  We have looked at him next to the gun side.  It sounds to me like your opinion is you could never be too close to an arrest.  Is that accurate?

A.    Well, if you are trying to peel the officers off your mother, then you are interfering, or if I as a dad, if that was my daughter, but that's not what's occurring here.  What's occurring here is a recording being taken, period.  He's not doing anything else.  He is not even saying anything.

Q.    Mr. Clark, can someone record and also be a credible threat?

A.    That's interesting.  They can record and have hands on and they would be a credible threat.

Q.    Do individuals always announce before they are going to become a credible threat?  "Hey, I'm about to reach out for your gun," "Hey, I'm going to grab the taser," "Hey, I'm going to pull my mom out the way," do they announce these types of things before they act?

A.    So that's a multiple factor, but the answer is when you

**ROGER CLARK - CROSS**

have a situation like this and he is not touching you, even though you are handcuffing mother and he knows it, then he is not a credible threat.

Q.   He has not touched you yet, right?

A.   He had never touched him.  And you are correct, he had not touched me yet and is only recording.

Q.   I just want to be sure that I understand your testimony is for them to have even asked him to move back, he has to take some action towards them.  He has to reach out his hand and try to grab them.  He has to do something before they can even ask him to move back.  That's your testimony?

A.   No, that's not my testimony.  They can ask him to move back.  If they think he is getting in the way, fine, but they cannot prevent the recording.

Q.   I appreciate you admitting it.  They can ask him to move back, right?

A.   Well, sure they can.

Q.   That's what you said, absolutely, and they did ask him to move back.  Simply because he is recording, even though everything else was proper about asking him to move back, now we have a First Amendment violation?

A.   He can record -- I don't quite understand the question.  As I take it, can he -- he does move back after he gets mom's phone.  He postures himself at what he and what I consider to be reasonably away and he is recording.  He wants to record

ROGER CLARK - CROSS

because of what's happening.  I took his testimony as correct, "That was the best I could do, and so I tried to do the best I could."

Q.    So if I wanted to be a credible threat to an officer, it would probably be a good idea for me to just carry around a cell phone before I take an action, right?  Because now they can ask me to move back, but they can't even block wherever my phone happens to be pointing when they are asking me to move back, right?  They can't block my body if I have it in the middle of my body?

A.    So I think what you are asking me is can a person use a cell phone in the recording mode as an object to excuse interfering with an officer and the answer is no.  The right to record is implicit.  The only time you would override that right is if you are a credible threat and you are actively acting to prevent the officer performing their duty in the training.

Q.    So I can flip on my cell phone, hit "Record," walk up as close as I want to anyone being arrested as long as I announce, "I'm just recording.  I'm just recording"?  According to you, I can get within 1 to 3 feet of these officers.  That's the training?

        MS. CULOTTA:  Objection, Your Honor.  Argumentative. Asked and answered.

        MR. CAPITELLI:  It hasn't been answered.

**ROGER CLARK - CROSS**

THE COURT:  Overruled.

THE WITNESS:  Could you repeat it just so I can be precise.

BY MR. CAPITELLI:

Q.    Yes, absolutely.  If I take out my cell phone and I hold it in the middle of my body and I hit "Record," I can now approach officers arresting another individual within 1 to 3 feet without question.  If they even deem that I'm a credible threat, all they can do is ask me to move back, but be careful that they don't get in the way of wherever I decide to put my camera.  Is that your testimony?

A.    That is not my testimony as you have stated.

Q.    It's your opinion that Mr. Johnson was not argumentative; is that correct?

A.    Yes.  His statements, "I'm going to stay here," combines with, "That's my mother," and I did not consider it argumentative.

Q.    "I'm not moving" five times in a row in response to multiple requests to move is not argumentative?

A.    I think he said, "That's my mom," almost an equal number of times as an explanation.

Q.    Now, you said body language is important and you mentioned teeth being clinched.  What else did you mention?  Oh, fists.

A.    There's a variety of factors.  Fists, posturing, being in so close that you could reach out and actually touch or push,

**ROGER CLARK - CROSS**

12:00

those are all factors.

**Q.**   You could see whether or not Mr. Johnson's teeth were clinched in these videos?

**A.**   I didn't see it, but I said this is a factor.  He certainly was so close he could have pulled on any one of the two officers to help his mom, but he didn't.

**Q.**   So we have verbal statements -- I would say argumentative.  Your matter of opinion is they are not argumentative.  You have no way of determining his facial body expressions because he is holding a phone and his cousin is behind him, right?

**A.**   Yeah, you don't see his face in the video.

**Q.**   So we don't know those, but Officer Moring, who he was facing, would know those, right?

**A.**   He would see his face, I would expect.

**Q.**   I think you said weapons and then you said possibility of weapons, right?

**A.**   Reasonable possibility, yes.

**Q.**   He has his hand in his left pocket at the beginning of this matter.  There's no chance he has a weapon in that hand?  We can just rule it out?

**A.**   There is no chance for a weapon in an empty hand.

**Q.**   What about in a pocket?

**A.**   Well, as I said, he could have something in his pocket.  Moring has testified regarding -- my term -- his worry or anxiety about a weapon.

ROGER CLARK - CROSS

Q.   You mentioned the seriousness of the offense and then you said riding without a helmet, but that's not when the issues in this video occurred, is it?

A.   When this occurs, it is degraded to such an extent that it's alleged interfering with an officer.

Q.   It has escalated to resisting an -- resisting two officers, I would note, right?

A.   So this goes to the de-escalation commentary, my earlier testimony.  This is the gasoline that has been tossed on this situation not from -- and the match has been lit, in my opinion.  That's a metaphor.  There is no reason for this to occur this way.

Q.   You mentioned -- a couple of times I think you might have said "14-year-old."  Can you look at that video and tell me the age of Mr. Johnson?

A.   They looked young.  They were not toddlers.  They did not look like, in my feeling, adults.  They looked as they declared, one declared, a son and mother.

Q.   They looked like teenagers.  Is that fair?

A.   I think that any officer -- and if I were there, I would say this is a teenager.

Q.   Teenager.  I just want to be clear.  You said that kind of to reference it.  You would agree with me that a teenager can certainly be a credible threat?

A.   With weapons and so forth, yes.  They can be a credible

ROGER CLARK - CROSS

threat in the totality of the -- the circumstance has to be such that they become a credible threat.  Otherwise, they are kids.

Q.    You said with a weapon.  Can a teenager become a credible threat without a weapon?

A.    Theoretically there can be circumstances, I imagine, but certainly not here, in my opinion.

Q.    Teenagers don't injure people in Los Angeles?

A.    Well, teenagers -- if there was something that these two were doing to indicate it's going to get worse, the situation is getting worse, or they want to have combat with the officers for whatever reason, then they would become a threatening issue.  They are not threatening here.

Q.    Now, would you agree with me that on the date of this incident, Mr. Johnson was approximately the same height as Officer Moring?

A.    I couldn't tell height.  I didn't have the scientific means to calculate size.  I know he's -- and I have heard he has probably grown over a foot and he's gained a lot of weight, but he is definitely a lot smaller in the video.

Q.    Did you consider his height in your opinion?

A.    I considered the both of them and what they were doing in terms of was this a credible threat that a reasonable officer would respond to such as occurred.  I considered they were not.

        MR. CAPITELLI:  Thank you for your time.

ROGER CLARK - REDIRECT

THE COURT: Ms. Culotta.

MS. CULOTTA: Brief redirect, Your Honor.

REDIRECT EXAMINATION

BY MS. CULOTTA:

Q.   Mr. Clark, what we have been talking about with factors like proximity and the number of people, these are all part of the totality of the circumstances analysis that an officer is supposed to look at in determining whether there's an objectively credible threat present; is that right?

A.   Yes.

Q.   Mr. Capitelli focused a lot on the distance between De'Shaun while he was recording and the officers and Ms. Perkins while they were on the ground and engaged, right?

A.   Yes.

Q.   Is distance alone enough for a bystander recording an arrest scene to be a credible threat to those officers?

A.   No.

Q.   Why not?

A.   Well, because it has to combine with other things such as what's being said, what's being attempted within the proximity, in the area of the proximity.  Simply being close doesn't in and of itself justify telling a person they can't record.

Q.   Similarly, does calling different people and alerting them to what's happening, including calling 911, mean that there will be a credible threat at the arrest scene?

**ROGER CLARK - REDIRECT**

**A.**    No.

**Q.**    Why not?

**A.**    Well, because it's benign.  It speaks to a concern the person has, reaching out for some sort of help.

**Q.**    I think a third factor that you have talked about is body language.

         **MS. CULOTTA:**  I just would like, Ms. Stone, if you could pull up Exhibit 6 and just play the first 20 seconds.

                This is the video of the family friend, Ms. Zina, so let's just take a look.

         (Video played.)

         **MS. CULOTTA:**  Thank you, Ms. Stone.

**BY MS. CULOTTA:**

**Q.**    Is there anything that you observe about Mr. Johnson's body language there that would indicate that he presents a credible threat to the officer?

**A.**    There's nothing in the recording that shows he is threatening in any way.

**Q.**    What do you notice about his body language?

**A.**    Well, his hands are down.  He is postured in just a conversational, face-on posture to the officer and then he turns.  His hands are down.  He is not clinched.  He doesn't have his hands up.  He doesn't look prepared to do anything other than stand and talk.

         **MS. CULOTTA:**  Ms. Stone, could you just rewind it

**ROGER CLARK - REDIRECT**

12:09

back to the first second so we can see the image. Maybe play it for just a few seconds until we get to around --

(Video played.)

**BY MS. CULOTTA:**

**Q.** So looking at this image, do you actually see -- one of De'Shaun's hands is up holding his phone, right?

**A.** Right. That's the phone in his right hand, but his left hand is down and is not ready to push or shove or anything. He is just standing there recording.

**MS. CULOTTA:** Thank you, Mr. Clark. Thanks for your time.

**THE WITNESS:** Thank you.

**THE COURT:** You may step down. Thank you, sir.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Perfect time for a lunch recess. It's ten after 12:00 and we are going to recess for lunch. Again, if you brought lunch, you may eat it here or go outside, or get something and bring it back up here, whatever works for you. We will start again at 1:00 -- well, at ten after 1:00 we will start back. Please don't discuss the case. Keep an open mind. That's it. Court is in recess for lunch.

**THE DEPUTY CLERK:** All rise.

(Jury out.)

**THE COURT:** Court is in recess. I would like to see counsel at the side for a moment. I don't need it on the

record.

                (Lunch recess.)

                                        *  *  *

**AFTERNOON SESSION**

**(April 30, 2024)**

THE COURT:  Let me see counsel before we begin.

(Off the record.)

THE COURT:  We are back in court outside the presence of the jury.  Is the jury ready?

THE DEPUTY CLERK:  Yes.

THE COURT:  Is counsel for the plaintiff ready?

MR. COHAN:  Yes.

THE COURT:  Counsel for defendant?

MR. CAPITELLI:  Yes, Your Honor.

THE COURT:  The jury can be brought in.  Thank you.

(Jury in.)

THE COURT:  Please be seated.

The jury is back in the courtroom.  All the attorneys are present.

Counsel for Mr. Johnson.

MR. COHAN:  Your Honor, plaintiff De'Shaun Johnson rests his case.

THE COURT:  Thank you, Mr. Cohan.

Counsel for defendant.

MR. CAPITELLI:  Your Honor, at this time we would make a Rule 50 motion, but we will reserve argument on that motion until the next break.

THE COURT:  Thank you.  I appreciate that.  You will

RYAN MORING - DIRECT

argue it at the next break.  With that, does the defendant wish to call a witness?

MR. CAPITELLI:  Yes.  We are going to call to the stand Officer Ryan Moring.

THE COURT:  Officer Moring, retake the stand, please.

Officer Moring, for the record, you are still under oath.

THE WITNESS:  Yes, ma'am.

RYAN MORING,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CAPITELLI:

Q.   Good afternoon, Officer Moring.  Twice in one day, lucky you.

Could you please give me your full name.

A.   I'm Deputy Ryan James Moring.

Q.   Are you married?

A.   Yes.

Q.   How long have you been married for?

A.   We have been married for 11 years.

Q.   What's your wife's name?

A.   Katlin.

Q.   What does Katlin Moring do?

A.   She is a CPA.

Q.   An accountant?

RYAN MORING - DIRECT

A.    Yes, she is an accountant.  I'm sorry.  Her and her mom actually run a tax accounting firm in Slidell.

Q.    You are just starting to see her again after tax season, I would imagine.

A.    Yes, April 15.

Q.    Do you have any children?

A.    Yes.

Q.    How many children do you have?

A.    We have two, a son and a daughter.

Q.    What's your son's name?

A.    Brady.

Q.    How old is Brady?

A.    He is currently four.

Q.    What's your daughter's name?

A.    Her name is Emory.

Q.    How old is Emory?

A.    She is seven.

Q.    We are almost four years to the day of the incident we are here to talk about.  How old was Brady when this happened?

A.    He would have been around five months old.

Q.    How about Emory?

A.    She would have been three.

Q.    Where were you born?

A.    I was born at Ochsner Hospital in Slidell.

Q.    In what year?

RYAN MORING - DIRECT

A.    In 1989.

Q.    Did you grow up in Slidell?

A.    Yes.

Q.    That's nice.  I guess now you are at least in part working in the community you grew up in.

A.    Yes.

Q.    Did you go to high school?

A.    Yes.

Q.    Where did you go to high school?

A.    I went to Northshore High School in Slidell.

Q.    Did you graduate?

A.    Yes.

Q.    What year?

A.    In 2007.

Q.    Did you go on to college from there?

A.    Yeah.  From there I went to LSU in Baton Rouge.

Q.    How long were you at LSU?

A.    Four and a half years.

Q.    Did you graduate?

A.    Yes.

Q.    What in?

A.    I got a degree in animal, dairy, and poultry science with a concentration in technology.

Q.    Sounds complicated to me.

      Who is your current employer?

RYAN MORING - DIRECT

A.    Right now the St. Tammany Parish Sheriff's Office.

Q.    What's your position and your rank?

A.    I am currently a deputy in the traffic division.  I'm also our hit and run/fatality investigator.

Q.    When were you first employed with the sheriff's office?

A.    September 23, 2013.

Q.    So coming up to 11 years ago.

A.    Coming up.

Q.    Did you have to go through training before becoming a sheriff's officer?

A.    Yes.

Q.    What training did you go through?

A.    So we actually went through the POST academy that started, I believe, in January of that year.

Q.    Did you graduate from that academy?

A.    Yes.  Yes.

Q.    When did you graduate?

A.    In August of that year.

Q.    Were you then offered a job with the sheriff?

A.    Yes.  At graduation I was offered a job for full-time employment.

Q.    Where were you initially assigned with the sheriff's office?

A.    So initially upon graduation, I was technically assigned to the reserve division, which is basically you do a patrolman

RYAN MORING - DIRECT

job for free.  It's a volunteer setup.

Q.    It's like shift work?

A.    Yes.  Well, you can work shifts just like a normal deputy. You can volunteer at football games.  You can go to big events. We use a lot of them at Mardi Gras.  It just depends on where the need arises.

Q.    How long were you in the reserve division?

A.    Only about a month.

Q.    When did you transfer?

A.    So that's whenever I started on September 23 with patrol.

Q.    Criminal patrol?

A.    Yes, in what was then our District 2, which is the Slidell section of our patrol division.

Q.    That's still with the sheriff?

A.    Yes.

Q.    What were your duties in criminal patrol?

A.    So I was just a typical response officer that would go to calls for service.  We would deal with everything from domestic violence to, "My neighbor's dog is in my yard," a disturbance at the Pizza Hut, just anything that -- traffic stops per activity, anything that arises.

Q.    How long were you in criminal patrol?

A.    I was in for a little over three years.

Q.    Did you then transfer within the sheriff's department again?

RYAN MORING - DIRECT

A.    Yes.  Then I transferred to the traffic division.

Q.    Traffic?

A.    Yes.

Q.    When was that transfer, about?

A.    That was in late 2016.  I believe it was in November.

Q.    What were your duties as an officer in the traffic division?

A.    So at that point I was a motorcycle officer, and it kind of geared more towards to traffic response, dealing with regular crashes, hit-and-runs, speeding complaints in neighborhoods, run stop signs, just general traffic issues.

Q.    How long were you in the traffic division?

A.    So from that point I was there until late in May in 2018.

Q.    Then you left the sheriff's department?

A.    Yes.

Q.    Why did you leave?

A.    I was supposed to go to the Louisiana State Police academy.

Q.    Did you attend?

A.    I did not.

Q.    Why not?

A.    Shortly before the academy I actually damaged my knee and I had to get surgery.  The doctor that I had seen told me that there was no way I was going to make it through this academy that was very similar to Marine Corps boot camp.  It's supposed

**RYAN MORING - DIRECT**

to be modeled off of how they do their boot camp.

**Q.** How did you hurt your knee?

**A.** Just general exercise.

**Q.** Did you have surgery to correct it?

**A.** Yes.

**Q.** What did you do next?

**A.** From there I worked for a private security company for 11 months.

**Q.** Did you then return to the sheriff's office?

**A.** Yes.

**Q.** When?

**A.** April 23 of 2019.

**Q.** What was your position or department at that point?

**A.** At that point I resumed my position as a traffic deputy in the traffic division.

**Q.** You still hold that position?

**A.** So, yes, I'm still a deputy in the traffic division.

**Q.** Take me through, if you could, just briefly, what does your typical day consist of?

**A.** So, normal day, I wake up -- my son usually comes and wakes me up at about 5:40. We start getting around. I go make coffee. I turn on some kind of a show just to kind of entertain him because he is all over the place. From there we will start to get my daughter ready for her school. We have to get her going a little early because she actually goes to a

RYAN MORING - DIRECT

dyslexia school that's in Covington.  My wife has to get them together for the carpool.  They meet at a carpool point, and then she ultimately brings them to day care.

From there, we usually leave the house about the same time and I start shift.  Shift typically ends up being a big question mark.  I could start the day and go searching for a hit-and-run suspect.  I could be in a school.  I could get sent to go do what we call show-and-tells.  It's just like how you do a kid interaction, show them everything, what you guys do, the motorcycle.  It's more entertainment for them than anything.  We could also be assigned to go on shift and start doing traffic deputy.  I'll just help the regular shift guys out at this point taking crash reports and doing whatever it is that's needed, for the most part.

Q.    Are you familiar with the matter we are here for today?

A.    Yes.

Q.    What's your understanding of the claims made against you?

A.    At this point that a First Amendment violation has occurred.

Q.    Who is making those claims?

A.    De'Shaun.

Q.    De'Shaun Johnson?

A.    Johnson.

Q.    Before the interaction on May 5, 2020, had you ever seen Mr. Johnson before that date?

RYAN MORING - DIRECT

A.   Not that I know of.

Q.   First time you encountered him, right?

A.   Yes.

Q.   Were you working on May 5, 2020?

A.   Yes.

Q.   Where were you working?

A.   At the St. Tammany Parish Sheriff's Office.

Q.   Were you working in a certain area before that?

A.   I was in the traffic division on the motorcycle.  We were assigned to the Slidell area.

Q.   You say "we."  Who were you working with?

A.   Me and Deputy Hart, Kyle Hart.

Q.   Did y'all ultimately receive a call to respond to?

A.   Yes.  We were actually running radar over on a street called Donya Street.  It's one of our frequent cut-through streets that goes from Browns Village Road and Highway 11 over to Highway 190.  People frequently cut through it to cross through the neighborhood and not have to deal with the highway traffic.  We were running radar there when we received the call.

Q.   When y'all received a call, what call did you receive?

A.   We received a call from central dispatch that said we had a reckless driver on Jay Street and -- it was on Woods, which is also in Slidell.

Q.   Any description of the individual?

RYAN MORING - DIRECT

**A.**    I believe we were told that it was a woman on a blue dirt bike.

**Q.**    Did you respond to the call?

**A.**    Yes.

**Q.**    So take me through what happened next.

**A.**    So from there we arrived on Jay Street.  We didn't necessarily remember the address that was initially given to us even though one was.  We just remembered the blue dirt bike and kind of figured we would see somebody riding through the neighborhood and catch them actively driving on a dirt bike.

Whenever we passed, we initially saw a blue motorcycle.  I believe it was a crotch rocket or -- well, it was a crotch rocket.  I don't remember the kind.  We passed and we were, like, wait a minute, they said a dirt bike.  So we called central dispatch over the radio and said, "Hey, what address did this actually occur at?"  The dispatcher actually told us that it was 2018 Jay Street.

So then we realized, hey, we passed this address up, look at the address.  Hey, they were going up from house to house, so we flipped around.  Then that's where we actively saw Teliah in the street on the motorcycle, and everything progressed from there.

**Q.**    Just so I understand, 2018 Jay Street, that's the home of Mr. Johnson and Ms. Perkins?

**A.**    Yes.

RYAN MORING - DIRECT

Q.   You were actually told that the anonymous caller gave an address where this individual was --

A.   Yes.

Q.   -- this female operating a bike?

A.   Yes.

Q.   Once you turned around after receiving the address, what did you see then?  I think you said you saw --

A.   We ended up seeing her backing out of the driveway on the motorcycle.

Q.   Backing out or moving it, she was in the street on a motorcycle?

A.   Yes.

Q.   She wasn't on the side of it holding it?

A.   No.

Q.   She was on it?

A.   She was actively on it.

Q.   It was on?

A.   Yes.

Q.   How do you know it was on from that distance?

A.   You could hear the engine revving.

Q.   She was revving it up?

A.   Yes.

Q.   What did you and Officer Hart do next?

A.   So from there she ended up pulling into the driveway.  We pulled up next to the -- in front of the driveway in front the

RYAN MORING - DIRECT

house where we were seen pictured.  As soon as we -- we were in the process of getting off of our bikes.  She starts hollering at us, stating that we were only there because she was black.

We get off the motorcycles, start the encounter, tell her, hey, we are here, this is why we here, we got a complaint of this reckless issue.  Because we see her in actual physical control on this motorcycle on this public road, we were, like, well, we have probable cause for a traffic stop, and so we asked her for her driver's license, her insurance, and her registration.

Q.   Did she have a helmet on when she was revving the engine in the roadway?

A.   She did not.

Q.   So you initiated a traffic stop?

A.   Yes.

Q.   Now, as soon as you arrived, she was making claims, you said, that y'all were only there because she was black?

A.   Yes.

Q.   When you get that call over the radio, was race specified?

A.   No.

Q.   But the address was?

A.   Yes.

Q.   You went back to that address?

A.   Yes.

Q.   Now, take me through.  What is your number one goal when

RYAN MORING - DIRECT

you initiate a traffic stop?

**A.**   To go home.

**Q.**   To go home to your kids?

**A.**   Yes.

**Q.**   Your wife?

**A.**   Yes.

**Q.**   When you start the traffic stop, what did you and Officer Hart ask Ms. Perkins for?

**A.**   Driver's license, insurance, and registration.

**Q.**   Did she give you all three of those?

**A.**   She produced a driver's license, she produced a registration that was a temporary registration on a piece of paper that was actually registered to a completely different license plate than what was actually on the vehicle, and she never actually produced insurance for that vehicle and ultimately throughout the encounter.

So our dispatch has a separate program that they can run through the insurance through the State of Louisiana and we can say, hey, either -- we can check a VIN or a tag for a vehicle and say, hey, does this vehicle have insurance, and ultimately they said it was unconfirmed, which means the vast majority of the time that it does not have insurance.

**Q.**   At this part of the traffic stop, how was Ms. Perkins acting?

**A.**   She was very upset with us.

RYAN MORING - DIRECT

**Q.**   Was she yelling?

**A.**   Yes.

**Q.**   Was she cursing?

**A.**   Yes.

**Q.**   Who was present at the beginning of the traffic stop, at least that you could see?

**A.**   At the initial part, it was just me, Deputy Hart, and Teliah.

**Q.**   Now, you said she didn't produce insurance.  Did she ever produce insurance?

**A.**   She did not produce insurance ever.

**Q.**   What efforts did she make to produce insurance?

**A.**   I believe she said she had it on her email.  She stated she was going to make a phone call at one point, and then at another point she had stated that she was going to go inside the house and get it.

**Q.**   Did you let her go inside the house to get it?

**A.**   We did.

**Q.**   Did you let her make a phone call to see if she could get proof of insurance?

**A.**   Yes.

**Q.**   She still never gave you insurance, right?

**A.**   Still did not get insurance.

**Q.**   Why did you let her enter the home at this point?

**A.**   We were trying to give her the benefit of the doubt to be

RYAN MORING - DIRECT

able to potentially prove this so that we knew whether or not to have to tow the bike.

Q.    Did she give you any indication that she was going into the home to look for insurance?

A.    Yes.

Q.    So she made a phone call.  I think you testified earlier, while you didn't hear it, you understand now she made a 911 call for a supervisor, right?

A.    Yes.

Q.    And she made possibly a phone call to obtain insurance, right?

A.    She made that phone call, and then she also made a separate phone call where at some point she had called and asked for somebody to come from Walmart and asked them to come to the scene as well.

Q.    So now you have given her an opportunity to go in the house to get insurance, you have given her an opportunity to try to get an email, make a phone call to get insurance, and instead of doing those things, she is calling people to come to the scene?

A.    Yes.

Q.    Now, during a traffic stop, in your experience, is the subject of that traffic stop just free to leave whenever they want to?

A.    No.

RYAN MORING - DIRECT

Q.    In other words, if you were to pull me over on the side of the road, could I just say, "You know what, I know you think I was speeding, but I'm done with this stop.  I'm leaving"?

A.    No.  You are not allowed to leave.

Q.    Now, you stated initially it's Ms. Perkins, Officer Hart, and yourself.  Did that change?

A.    Yes.

Q.    How did that change?

A.    So ultimately De'Shaun and his cousin exited the house at some point, and there were also two neighbors that exited from their residences.

Q.    So if I understand correctly, we have now got five people, counting Ms. Perkins, at the scene and the two of you?

A.    I believe so, yes.

Q.    We know phone calls were placed for additional people to possibly come.

A.    Yes.

Q.    A neighbor arrived.  What did the neighbor do?

A.    Which one?

Q.    Either.  So two neighbors arrived?

A.    Yes.  I believe one just stayed at her house that was off to the right of the house in question, just like next door, and then the other one came from multiple houses down, down the street, and came down and walked down towards us.

Q.    Were either of these neighbors recording?

RYAN MORING - DIRECT

**A.**    I believe the neighbor Ms. Z was.

**Q.**    Did you instruct her to stop recording?

**A.**    No.

**Q.**    "Turn off your camera"?

**A.**    No.

**Q.**    "Put it away"?

**A.**    No.

**Q.**    Did you ask her to move back?

**A.**    No.

**Q.**    Now, you mentioned that Mr. Johnson and his cousin also came out of the home?

**A.**    Yes.

**Q.**    What were they doing when they came out of the home?

**A.**    They were both presenting phones as if they were recording.

**Q.**    Did you instruct them to stop recording?

**A.**    No.

**Q.**    Put down their phones?

**A.**    No.

**Q.**    At that point, before the arrest of Ms. Perkins, did you ask them to move back?

**A.**    No.

**Q.**    Did the traffic stop continue?

**A.**    Yes.

**Q.**    When did it end?

RYAN MORING - DIRECT

**A.** What do you mean, when did it end?

**Q.** What caused it to end?

**A.** You are talking about going from traffic stop to arrest?

**Q.** Exactly.

**A.** All right. So at that point Teliah made the statement of, "Fuck y'all. I'm going inside," and then shortly thereafter Deputy Hart makes the statement that she was going to be under arrest, and then that's where the video that we have seen picks up.

**Q.** Why couldn't she enter the home?

**A.** Well, because at that point she had made the statement that "I'm leaving" and "I'm leaving this traffic stop," essentially, "and now going inside."

**Q.** Who decided to arrest Ms. Perkins?

**A.** Deputy Hart.

**Q.** You didn't decide to?

**A.** No.

        **MR. CAPITELLI:** Let's go to Exhibit 1, if you have it up.

            I'm not going to play it just yet, but we may in a moment. I know we have seen this a number of times.

**BY MR. CAPITELLI:**

**Q.** Did you assist with the arrest of Ms. Perkins?

**A.** Yes.

**Q.** Was she compliant during the arrest?

**RYAN MORING - DIRECT**

A.   No.

Q.   What noncompliant actions was she taking?

A.   She verbally refused.  We ended up trying to place her in the handcuffs.  Ultimately, she started thrashing her hands like trying to get them in front of her to get them away from us.  We then put her on the ground, ultimately were able to get her in the handcuffs, at which case I discontinued dealing with her and started focusing on De'Shaun.

Q.   So backing it up, taking it piece by piece, did you give any instructions to Ms. Perkins during that arrest period?

A.   Yes.

Q.   Did you warn her, "Don't fight or you are going on the ground?"

A.   I believe Deputy Hart said something about going on the ground.  I said, "Don't fight."

Q.   Why was it necessary to take Ms. Perkins to the ground?

A.   Because she was fighting, and we are taught that the ground is used as an extra point of control because you obviously can't go down.  It makes it to where it's easier to grab a subject's arms when they are not being compliant.

Q.   So if she had complied and just put her hands behind her back, what would have happened then?

A.   She would have had her hands behind her back and it would have been done with.

Q.   Just been handcuffed?

RYAN MORING - DIRECT

A.   Yes.

Q.   While you were attempting to assist with her arrest, was anyone in the immediate vicinity?

A.   Yes.

Q.   Who was?

A.   De'Shaun.

Q.   De'Shaun Johnson?

A.   Yes.

Q.   How close was Mr. Johnson?

A.   He was in pretty close proximity during the arrest.

Q.   1 to 3 feet?

A.   I would say that's fair.

Q.   Did he reach out to Ms. Perkins during the arrest?

A.   Yes.

Q.   Did you tell him, "Yeah, go ahead.  Reach out"?

A.   No.

Q.   I imagine during that time you were occupied with Ms. Perkins, right?

A.   Yes.  We were dealing with Ms. Perkins physically resisting.

Q.   While attempting to handcuff Ms. Perkins, did you give any instructions to De'Shaun?

A.   Yes.  I told him to back up or to get back.

Q.   Move back, get back --

A.   Yeah.

RYAN MORING - DIRECT

Q.    Did you tell him, "Stop recording us"?

A.    No.

          MR. GOLDSTEIN:  I object to leading.

          THE COURT:  Sustained.  Don't lead your witness.

BY MR. CAPITELLI:

Q.    Did you give any other instructions to Mr. Johnson other than simply move back?

A.    No.

Q.    Was he compliant?

A.    No.

Q.    How did he evidence his noncompliance?

A.    He stated he wasn't going to move back.

Q.    At this point -- and we have seen this in the video. "Move back."  "Get back."  "I'm not moving."  "I'm not moving." "I'm not moving."  Who were you talking to?

A.    De'Shaun.

Q.    De'Shaun Johnson?

A.    Yes.

Q.    Now, there was another individual behind Mr. Johnson.

A.    His cousin.

          MR. GOLDSTEIN:  Object to the leading.

BY MR. CAPITELLI:

Q.    Was anyone behind Mr. Johnson?

A.    Yes, his cousin was behind him.

Q.    What was his cousin doing?

**RYAN MORING - DIRECT**

A.   Recording and standing there.

Q.   Did you give any instructions to his cousin?

A.   No.

Q.   Did you instruct his cousin to move back?

A.   No.

Q.   Did you yell out any instructions to a neighbor that was recording?

A.   No.

Q.   What's the concern with Mr. Johnson being that close to you during that arrest?

A.   At that point you have got somebody that's behind you and you don't necessarily know what they are going to do.

Q.   Now, I know you were here and you were present for plaintiff's expert.  I asked him a question about a reactionary gap, and he was talking about a thought process.  What is a reactionary gap?

A.   We are typically taught two.  One, like an interview stance, we are taught with a compliant subject approximately 6 foot is pretty standard and acceptable.  We are also taught another one.  If a subject is within 21 feet, they can run and do harm to you before you are able to withdraw your weapon and actually shoot them, which is typically a second and a half worth of time.  That's for a subject trying to intend harm to you.

Q.   Was Mr. Johnson within 6 feet?

RYAN MORING - DIRECT

A.    Yes.

Q.    He was certainly within 21 feet?

A.    Yes.

        MR. CAPITELLI:  Let's go to Exhibit 10, if you could, and go to 37 seconds.

        (Video played.)

BY MR. CAPITELLI:

Q.    Is that you bending over attempting to assist with the arrest of Ms. Perkins?

A.    Yes.

Q.    What side is your gun on?

A.    My right.

Q.    Where is Mr. Johnson at the time this is taking place?

A.    Back and to my right.

Q.    How many feet from you?

A.    Probably two or three.

Q.    Is that a concern for you?

A.    Yes.

Q.    Why is that a concern?

A.    You don't know what somebody is potentially going to do.

Q.    Are you trained not to allow someone on your gun side?

A.    Yes.

Q.    How tall are you?

A.    I am 6 foot tall.

Q.    Does the threat posed by a person in your immediate area

RYAN MORING - DIRECT

of an arrest differ depending on the size of the person at issue?

MR. GOLDSTEIN:  I object to the leading.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  So, yes, it does.

BY MR. CAPITELLI:

Q.   How does size affect it?

A.   The bigger a person possibly is, then the bigger the threat, just because typically size and strength coincide.

Q.   Size and strength.  How much did Mr. Johnson compare in size to you on May 5, 2020?

A.   I would say he was of similar height.

MR. CAPITELLI:  Let's go to 129 in this video, if we could, and pause it.

(Video played.)

BY MR. CAPITELLI:

Q.   So you are 6 feet tall, right?

A.   Yes.

Q.   I think that's what you said.

A.   Yes.

Q.   You have got some boots on here.

A.   Yes.

Q.   Did you hear De'Shaun's testimony that he was 5 feet 5 inches tall on the day of this incident?

A.   Yes.

RYAN MORING - DIRECT

Q.    Did he appear to you to be 5 feet 5 inches tall on the day of this incident?

A.    I would say that's inaccurate.

Q.    It looks to me like he is standing eye-to-eye with you, correct?

A.    It's pretty close.

Q.    Did you know Mr. Johnson's age at this point?

A.    No.

Q.    Now, you have subsequently learned that he is how old?

A.    At the point of the video, 14.

Q.    At the time how would you have estimated his age?

A.    Just visual appearance.

Q.    Would you have put a range to it?  Was he a teenager?

A.    Yes.

Q.    Can a teenager pose a threat to you?

A.    Yes.

Q.    Now, we are going to move back to the arrest of Ms. Perkins.  Once she was handcuffed, you said you stood up; is that right?

A.    Yes.

Q.    Who did you turn your attention to at that point?

A.    De'Shaun.

Q.    Did you give any further verbal instructions?

A.    To continue to get back.

Q.    What did he say in response?

RYAN MORING - DIRECT

A.   He refused.

Q.   What did you do then?

A.   At that point I extended my hand.

Q.   Did that obtain compliance?

A.   No.

Q.   Did you push Mr. Johnson?

A.   At that point I moved him back and, in an attempt to do that, he hit my hand away.  That's when you see the exchange of me and him talking about hitting each other, the exchange of each other hitting each other's hands.

Q.   Did he hit your hand?

A.   Yes.

Q.   Pushed your hand away?

A.   He just batted it away.

Q.   Where on his body did you push?

A.   Towards his center of mass.

Q.   Center of mass.  Did you push over his cell phone?

A.   No.

Q.   What were you attempting to do?

A.   Get him to move back.

Q.   Were you attempting to stop him from recording?

A.   No.

Q.   Now, at this time you are standing between, what we can see here, Mr. Johnson, and his mother, Ms. Perkins, is on the ground with Officer Hart, correct?

RYAN MORING - DIRECT

A.    Yes.

Q.    Was Ms. Perkins compliant?

A.    No.

Q.    Now, she had been handcuffed already, right?

A.    Yes.

Q.    Did she continue to resist?

A.    Yes.

Q.    How do you know that?

A.    You could hear her screaming and you could hear Deputy Hart yelling, "Stop kicking me."

Q.    Was Mr. Johnson complying with your request to move back?

A.    No.

Q.    How was he evidencing his noncompliance?

A.    He stated he wasn't going to move back.

Q.    Did he move forward?

A.    After, yeah, during the exchange.

Q.    Did he attempt to move side to side?

A.    Yes.

Q.    Was he just standing still recording?

A.    No.

Q.    Now, I've seen the video.  He moves side to side.  We could watch it if we need to.  You seemed to match his movements.  Why?

        MR. GOLDSTEIN:  I object to the testimony by counsel.

        THE COURT:  I'm sorry.  What was the objection,

RYAN MORING - DIRECT

Mr. Goldstein?

MR. GOLDSTEIN:  Counsel appears to be testifying.

MR. CAPITELLI:  It was just an introduction to the question of "Why did you match his movements?"

THE COURT:  All right.  I think he's changed it.

Why did you match his movements?

THE WITNESS:  So we are taught to match movement with movement to be able -- if somebody is trying to get around you, for you to -- you are basically starting to pursue them as they are going one way or the other.

BY MR. CAPITELLI:

Q.    Were you concerned that De'Shaun Johnson was recording?

A.    No.

Q.    Did you attempt to block his phone specifically?

A.    No.

Q.    What were you attempting to block?

A.    Him from being able to get to Deputy Hart.

Q.    Did you make any request into your radio during this interaction?

A.    Yes.

Q.    What did you ask for?

A.    I told the other units to step it up.

Q.    What does that mean?

A.    That means hurry up.  I've got problems.

Q.    Why did you request it?

**RYAN MORING - DIRECT**

**A.**   Just because the situation was starting to deteriorate as we had multiple individuals on the scene that were either still resisting, potentially causing a threat, or posing as if they were.  We also had the phone call of some random person coming from Walmart, and we didn't know if that person was going to show up, bring multiple people with them.  We just didn't know. You don't know.

**Q.**   You and Officer Hart, remind me, you arrived on motorcycles?

**A.**   Yes.

**Q.**   Did you have anywhere to put Ms. Perkins to get her away from the scene?

**A.**   No.

**Q.**   Is that another reason you were asking for a unit to be stepped up?

**A.**   That would be an additional benefit of having a cage to be able to seclude them.

**Q.**   Was Ms. Perkins moved by Officer Hart?

**A.**   Yes, he moved her away.

**Q.**   Do you know where?

**A.**   To near the street.

**Q.**   I think you testified you heard them moving.

**A.**   Yes.

**Q.**   Where were you looking while she was being moved?

**A.**   I was looking at De'Shaun.

RYAN MORING - DIRECT

Q.   You continued looking at De'Shaun?

A.   Yes.

Q.   Did you know exactly where Ms. Perkins had been moved?

A.   Not exactly, not at that point.

Q.   So you weren't sure where she was at that point?

A.   Correct.

Q.   Only that she may have been moved?

A.   Right.

Q.   At this point, while you are still staring at Mr. Johnson -- right?  I know eventually you draw your taser, correct?

A.   Yes.

        MR. GOLDSTEIN:  I object to the leading.

        THE COURT:  Sustained.

BY MR. CAPITELLI:

Q.   Did you draw your taser?

A.   Yes.

Q.   Why did you draw your taser?

A.   Because he was still continuing not to listen.  He was being noncompliant.

Q.   Did you draw your taser because he was recording?

A.   No.

Q.   Once Ms. Perkins was moved, were you obstructing Mr. Johnson's view of Ms. Perkins?

A.   Say it again.  Sorry.

**RYAN MORING - DIRECT**

Q.   She had been kind of moved off to the side.  I'm trying to see were you still obstructing his view, as he claims, once she has been moved?

A.   No, no, I wasn't.

Q.   But you kept your taser on him at this point?

A.   Yes.

Q.   Why?

A.   At that point I still didn't know what we were going to do because he was actually posturing, he was tensed up, had one of his arms behind him, until you could hear the -- I believe it was the neighbor was telling him to go inside, and that's eventually whenever he disengaged, and I was able to put it away.

Q.   Now, it looks to me like two individuals are on the ground at the point of this image.  Is that right?

A.   I believe this is when Teliah and Deputy Hart are on the ground together.

Q.   Who is the only individual facing Mr. Johnson at this point?

A.   Me.

Q.   During this interaction was Jeron or De'Shaun closer to you?

A.   De'Shaun would have been.

Q.   Was De'Shaun's hand in his pocket at least at the beginning of the arrest?

RYAN MORING - DIRECT

A.   Yes.

Q.   Would that also be a concern for you?

A.   Potentially.

Q.   Why?

A.   People carry things in pockets, and sometimes things in pockets can hurt you.

Q.   I've heard a lot about there were no obvious weapons.  Do people always display the weapons they have on them?

MR. GOLDSTEIN:  Object to the testimony by counsel.

THE COURT:  To the extent there was a comment before, the jury should disregard it.

The question was:  Do people always display the weapons they have on them?  You may answer that.

THE WITNESS:  No, they do not.

BY MR. CAPITELLI:

Q.   Just a few questions here at the end.  Did the force you used towards Mr. Johnson during this interaction rise?

A.   Yes.

Q.   Why did it rise?

A.   Resistance.

Q.   Were you attempting in any manner to stop Mr. Johnson from recording?

MR. GOLDSTEIN:  I object to the leading.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Sorry.  Say it again.

RYAN MORING - DIRECT

BY MR. CAPITELLI:

Q.    Were you attempting in any manner to stop Mr. Johnson from recording?

A.    No.

Q.    Were you attempting in any manner to discourage Mr. Johnson from recording?

A.    No.

Q.    Do you agree that citizens are allowed to video police interactions?

A.    Yes.

Q.    And arrests?

A.    Yes.

Q.    Were you trained that citizens are allowed to video police interactions?

A.    Yes.

Q.    And arrests?

A.    Yes.

Q.    Can they interfere while they are doing it?

A.    No.

Q.    Can they compromise officers' safety while they are doing it?

A.    No.

        MR. CAPITELLI:  That's all the questions I have. Thank you, Officer.

RYAN MORING - CROSS

13:54

CROSS-EXAMINATION

BY MR. GOLDSTEIN:

Q.   Good afternoon, Officer Moring.  It's good to see you again.

        I think you testified on direct exam that you left the St. Tammany Parish Sheriff's Office at one point to go seek training for the State Police academy.  Is that right?

A.   I applied for their academy, yes.

Q.   Then you were unable to go because of a knee surgery?

A.   Yes.

Q.   Then after that point you worked in private security, I think you said, for a time period.  Is that right?

A.   Yes, yes.

Q.   Then you rejoined the St. Tammany Parish Sheriff's Office after that?

A.   Yes.

Q.   That was in April of 2019?

A.   Yes.

Q.   Now, you testified on direct examination that the call you received was about a woman riding a dirt bike recklessly on Jay Street; is that right?

A.   Yes, that's what was reported.

Q.   You never observed any person riding a motorcycle recklessly that day, right?

A.   Correct.

RYAN MORING - CROSS

Q.   Not a dirt bike, right?

A.   Not a dirt bike.

Q.   And not a street bike, right?

A.   Not a street bike.

Q.   The bike you observed in front of 2018 Jay Street, that was a street bike?

A.   Yes.

        MR. GOLDSTEIN:  Ms. Stone, could you pull up a demonstrative.  It should be Demonstrative 4 on your end.

BY MR. GOLDSTEIN:

Q.   Officer Moring, does this appear to be an overhead shot of Jay Street in Slidell?

A.   It could be.

Q.   Do you recognize it to be?

        MR. CAPITELLI:  I'm going to object to this demonstrative.  He hasn't laid a foundation for it.  We don't know where it came from.  It's not authenticated.  It's not in evidence.  A number of reasons.

        THE COURT:  Overruled if he can identify it.

            Can you, Officer?

        THE WITNESS:  I mean, it's possible.  It's a gridded neighborhood.  I mean, the left side looks consistent with it. It very well could be.

        MR. GOLDSTEIN:  Ms. Stone, could you put up Demonstrative 5, please.

RYAN MORING - CROSS

BY MR. GOLDSTEIN:

Q.   Does this appear to be a map of Jay Street in Slidell, Louisiana?

MR. CAPITELLI:  Same objection as before.  It's not authenticated.  It's not in evidence.  We don't know where it came from.

THE COURT:  Overruled.

Do you recognize that?

THE WITNESS:  So that's approximately the same area of the block on Jay Street.

BY MR. GOLDSTEIN:

Q.   Right.  You are an officer and you work traffic in Slidell, right?

A.   Yes.

Q.   So you patrol the streets of Slidell, including Thompson Road, correct?

A.   Yes.

Q.   Jay Street runs from Thompson Road, and then the next intersection is Pheasant Street, right?

A.   Yes.

Q.   So if that mark in the middle is 2018 Jay Street, do you recognize Pheasant Street to be the next intersection after Ms. Perkins' home?

A.   That would be that block, yes.

Q.   I want to make sure I understand your testimony.  It's

**RYAN MORING - CROSS**

been a bit -- withdrawn.

I want to make sure I understand your testimony. When you first drove past Ms. Perkins' home, you observed a motorbike parked; is that right?

A.   Yes.

Q.   It was parked in her driveway, correct?

A.   Yes.

Q.   Then you continued down to the first intersection.  That would be Pheasant Street, right?

A.   Yes.

Q.   So it looks like there's maybe six lots between Ms. Perkins' home and Pheasant Street, correct?

A.   Yes.

Q.   As you ride down Jay Street, you radio dispatch?  That was your next step, correct?

A.   Yes.

Q.   To check on which address you had been dispatched to, right?

A.   Yes.

Q.   You perform a U-turn at Pheasant Street, correct?

A.   In that area, yes.

Q.   You go six houses down, you do a U-turn, and you start heading back towards 2018 Jay Street, correct?

A.   Yes.

Q.   By that point Ms. Perkins was on the motorcycle revving

**RYAN MORING - CROSS**

the engine in the roadway?  Is that your testimony?

**A.**   Yes.

**Q.**   If you previously testified that she was facing one direction and now testified that she is facing a different direction, that's just lack of memory?

**A.**   It's been a very long time.  It's literally been four years.

**Q.**   Right.  You remember that you called dispatch.

**A.**   Yes.

**Q.**   You remember that you did a U-turn at Pheasant Street. You remember that you rode by the motorbike on the way to Pheasant Street.  You remember all of those things, right?

**A.**   Yes.

**Q.**   And yet you cannot remember which way the motorbike was facing when you next saw it?

**A.**   When -- wait.  What?

**Q.**   When you performed the U-turn and saw it in the roadway, you don't know whether it was facing towards the driveway or exiting the driveway and heading into the roadway?  You can't remember?

**A.**   When she was on it?

**Q.**   When you say you observed her on it.

**A.**   We are asking about multiple different points at multiple different times.

**Q.**   The only time you have authority to issue a citation for

**RYAN MORING - CROSS**

operating a motorcycle without a helmet is when the rider is on the motorcycle, correct?

A.   On a public road, yes.

Q.   It has to be on a public road.  So if you saw Ms. Perkins on the motorcycle on her driveway without a helmet, you could not issue a citation, right?

A.   Yes.

Q.   If you saw Ms. Perkins standing next to her motorcycle on a public road without a helmet, you also could not issue a citation, right?

A.   Correct.

Q.   So what you say you observed was that Ms. Perkins was on the motorcycle without a helmet on the public road, right?

A.   Yes.  She was on the motorcycle on a public road without a helmet.

Q.   But you can't remember whether she was exiting from the driveway or backing into the driveway or facing east or west or going down the street?  You don't remember that fact?

A.   At what point?  Because I told you earlier that she had backed out of the driveway and made like a K-turn kind of maneuver and then ultimately ended up back inside the driveway.

Q.   I want to understand the instance in which you personally observed her on the motorcycle in the public road without a helmet.  Did you personally observe this K-turn?

         **MR. CAPITELLI:**  I object to the form.  Asked and

RYAN MORING - CROSS

14:00

answered multiple times now.  I know he would like a different answer.

THE COURT:  I will allow one more time.  You may answer.  Overruled.  Did you personally observe her on the motorcycle?

THE WITNESS:  I believe so.

BY MR. GOLDSTEIN:

Q.   I'm sorry.  My question was did you personally observe the K-turn?

THE COURT:  I'm sorry.  Did you observe the K-turn?

THE WITNESS:  I believe so.

BY MR. GOLDSTEIN:

Q.   So in the time it took for you to go to Pheasant Street, do the U-turn, Ms. Perkins had gotten onto the motorcycle, started it, moved it out of the driveway and onto the roadway, and then performed a K-turn that you personally observed between Pheasant Road and her house at 2018 Jay Street?  That's your testimony?

MR. CAPITELLI:  I object to the form.  It misstates his testimony.

THE COURT:  Overruled.

You may answer, sir.

THE WITNESS:  So, yes, we made that route, turned around and then came back, and she had exited the driveway, gotten into the road, and then moved back to the driveway.

RYAN MORING - CROSS

BY MR. GOLDSTEIN:

Q.   Officer Moring, you are not answering my question.  What did you personally observe versus what she must have done? What did you personally see her do?

A.   I personally observed her inside of the road on a motorcycle while it was revving, the public road, Jay Street, in front of the residence at 2018 Jay Street.

Q.   But you did not personally observe the K-turn, correct?

A.   At this point I don't remember.

Q.   Assuming you observed her on the roadway without a helmet, you don't recall whether she was facing you or facing the driveway or facing across the street?

A.   If she completed a K-turn, she had to have turned probably 270 degrees at any given point.

Q.   Sir, I'm not asking you to speculate about a K-turn.  I'm asking you:  You do not recall which way the bike was facing, assuming you saw it on the roadway with Ms. Perkins on it without a helmet?  That is my question.

        MR. CAPITELLI:  I object to the form.  Asked and answered multiple times.  He stated he doesn't know.

        THE COURT:  Overruled.

        MR. GOLDSTEIN:  You can answer.

        THE WITNESS:  Say that again.

        THE COURT:  Which way the bike was facing on the roadway with Ms. Perkins on it, is that what you are asking?

RYAN MORING - CROSS

MR. GOLDSTEIN:  I'm asking him to confirm that he can't actually tell us sitting here today, although he claims to have seen her on the bike, which way that bike was facing.

THE WITNESS:  At this point I don't remember.

BY MR. GOLDSTEIN:

Q.    Thank you.  Now, you testified that Ms. Perkins was yelling and cursing as soon as you arrived at the scene; is that right?

A.    Yes.  She was upset with us.

Q.    Now, you also used curse words during the interaction, correct?

A.    I did not.

Q.    You deny that you used any curse words during the interaction?

A.    I did not.

Q.    Deputy Hart used curse words during the interaction, correct?

A.    I don't remember that.

Q.    You don't remember one way or the other?

A.    I don't remember that he used curse words, but that's something you should probably ask him.

Q.    Thank you.  If the video shows Officer Hart using curse words, then the video would speak for itself, right?

A.    Okay.  Yeah.

Q.    You agree -- we have looked at the videos -- your

**RYAN MORING - CROSS**

interaction with Ms. Perkins, the initial part of it, is not on video, right?

A.    On that video, no.

Q.    On any of the videos that have been presented in court, there's no video of you pulling up to the address and the commencement of the interaction, right?

A.    No.

Q.    So it's possible that you did use curse words, but they are just not on the video, right?

A.    I didn't.  I don't remember using curse words either way.

Q.    Now, you testified on direct examination that Ms. Perkins was making phone calls and that she called someone at Walmart. Do you recall that testimony?

A.    Yes.  I don't remember the context, but I do remember somebody potentially coming from Walmart.

Q.    Right.  So you could hear her conversations with the individuals she was calling on the phone, right?

A.    Yes.

Q.    But you testified earlier today during plaintiff's case that you could not recall specifically what she said to the 911 dispatchers or what the tone of her voice was, right?

A.    That was a separate phone call.

Q.    So you could hear the phone call with the person at Walmart, but you could not hear her 911 call?

A.    I did not hear the entire conversation.

RYAN MORING - CROSS

Q.   In fact, the person at Walmart was Ms. Perkins' mother, right?

A.   I don't know.

Q.   She was asking for her mom to come home to look into the situation with her, right?

A.   I don't know.

Q.   Did you ask?

A.   No.

Q.   Now, you testified on direct that at one point Ms. Perkins, in fact, went into the house, correct?

A.   Yes.

Q.   So I just want to make sure I understand.  This is the portion of the interaction before she is handcuffed.  You would agree with me?

A.   Yes.

Q.   It's before the videos start.  There's no video of her going into the house, right?

A.   Correct.

Q.   So it must have been that time period after you arrived at the scene but before the recordings began, right?

A.   Yes.

Q.   So at that point in the interaction you permitted Ms. Perkins to go into the home, correct?

A.   We did.

Q.   Right.  You weren't afraid she might go into the home and

**RYAN MORING - CROSS**

barricade herself in there, were you?

**A.**   At this point, no, because she was entering the house under the premise that she was supposed to be going to get insurance for her vehicle.

**Q.**   Right.  You weren't afraid that she might go in and get a weapon, correct?

**A.**   At that point, no.

**Q.**   Right.  Because you listen to the words that someone is saying in order to assess whether they might be going to retrieve a weapon, correct?

**A.**   Potentially.

**Q.**   You use other factors.  You don't just automatically assume that if there's a box over there, there's a weapon in it.  You might look at, oh, is it wrapped in wrapping paper, does it look like a gift, right?  Other factors might help indicate whether a weapon is present, correct?

**A.**   Say it again.

**Q.**   I'll rephrase the question.  You look at other factors in determining whether someone might be retrieving a weapon?

**A.**   Other factors do go into it.

**Q.**   Right.  You don't just assume that someone is going to grab a weapon, correct?

**A.**   Unfortunately, in the world that we live in as police officers, we do have to assume that people do potentially have weapons.

RYAN MORING - CROSS

14:07

Q.   But on that day you did not assume that Ms. Perkins was going into her home to retrieve a weapon, right?

A.   We didn't necessarily expect it.

Q.   In fact, it was her own home, right?  So she would have a right to have a weapon there, correct?

A.   Yes.  She also made the statement that she was going to get insurance.

Q.   Right.  She told you repeatedly -- it's on the recordings -- that she was trying to get her insurance information, correct?

A.   Yes.

Q.   You weren't that afraid she was going to flee, were you, at that point?

A.   At that point, no.

Q.   In fact, she called 911 and asked for a supervisor to come out, right?

A.   She did.

Q.   So if someone calls 911 and asks for additional law enforcement to come to the scene, how likely is it that that person is then going to flee that scene?

A.   Likely not, but possible.

Q.   It's less likely that they are a threat to the officers that are there, correct?

A.   No.

Q.   You wouldn't agree with that?

RYAN MORING - CROSS

A.   No.

Q.   Now, there's testimony on direct examination about a neighbor, Ms. Z or Ms. Zina.  Do you recall that testimony? You may not have used her name.

A.   Yeah.  Previously we just knew her as Ms. Z.

Q.   Ms. Z.  So there's Ms. Daphne, who is at the house directly next door, and then there's Ms. Z, who comes down the road taking a recording, correct?

A.   Yes.

Q.   It's your testimony that neither you nor Officer Hart used any swear words with Ms. Z?

A.   No.

Q.   Now, after De'Shaun and Jeron came out of the house but before Ms. Perkins was handcuffed, you asked them to move back to the porch, right?

A.   I did not.

Q.   You did not ask them to go record from elsewhere on the property?

A.   I did not.

Q.   So in the video when Ms. Perkins says they don't need to go back to the porch, you don't recall in real time hearing those words?

A.   I did not say anything about a porch.

Q.   Did Deputy Hart tell Jeron and De'Shaun before Ms. Perkins was handcuffed that they needed to move back to the porch in

RYAN MORING - CROSS

order to record?

A.   He may have.

Q.   So at least one of you, prior to Ms. Perkins being handcuffed, told De'Shaun and Jeron that they could not record from where they were and they needed to move, correct?

A.   It didn't have anything to do with the recording.  I think it was the position of where they were.

Q.   Right, but you asked them to move, correct?

A.   I didn't.  I asked them to get back during the altercation.

Q.   I appreciate that.  Deputy Hart asked them to move, correct, and film from elsewhere?

A.   He may have.

Q.   He may have.  You don't know why he would have said to move or not because you are not Deputy Hart, correct?

A.   I am not Deputy Hart.

Q.   At the time that Deputy Hart asked them to move elsewhere, Ms. Perkins was not a threat, correct?

A.   At what point?

Q.   At the point that Deputy Hart asked them to move elsewhere to record before she was handcuffed.

A.   She shouldn't have been.

Q.   And the boys, I assume you would agree, Jeron and De'Shaun, were not a threat at that point, correct?

A.   No.

RYAN MORING - CROSS

Q.   No one was even under arrest at that point, right?

A.   Not at that point.

Q.   Yet Deputy Hart took it upon himself to ask two teenagers, who had come out of the house to see what was going on, to move back to the front of the house in order to record, right?

A.   He may have asked them to move back to the house, but not necessarily for the purposes of their recording.

Q.   Right.

A.   There was nothing mentioned about recording.

Q.   But they were recording.

A.   They were, but there's intent associated with what you are saying.

Q.   Right, and others can testify as to their intent.  At least from your perspective, they had their phones out, everyone knew they were recording, and Deputy Hart asked them to move elsewhere, correct?

A.   They were recording, and they were asked to move.

Q.   This was, at least with respect to De'Shaun, at his own house where he lived?

A.   Yes.

Q.   He was asked to move from the front driveway or the front sidewalk to a different part of the property by a law enforcement officer who had come onto his property, correct?

A.   I don't know where exactly he was asked to move, but --

Q.   What authority does a law enforcement officer have on

**RYAN MORING - CROSS**

private property to ask an individual who is recording an incident to move when they are not a threat and no one is under arrest?

A.   What authority?

Q.   You don't have authority, right?

A.   You may not.  You can still ask.

Q.   You can ask, but they don't have to comply with the request, right?

A.   At that point, no.

Q.   Because it's not a directive or it's not an order, a directive from a law enforcement officer, right?

A.   Right.  Is that a question?

Q.   Yes.  If they say no, they are allowed to say no, right?

A.   Yes.

MR. GOLDSTEIN:  Now, Ms. Stone, if you could go to Exhibit 6, the video from Ms. Zina, and don't hit "Play" yet. I just want to ask a couple of questions.

BY MR. GOLDSTEIN:

Q.   On direct examination, you were asked some questions about a hypothetical 21-foot distance.  Do you recall that testimony?

A.   Yes.

Q.   If I understood your testimony, 21 feet is the distance one might need, as a law enforcement officer, to ensure that they are safe from threats.  Is that fair?

A.   Potentially, yes.

RYAN MORING - CROSS

Q.   Because if it's less than 21 feet, there's a potential risk that someone could make a decision and move quickly enough that the law enforcement officer could be put in danger, correct?

MR. CAPITELLI:  Object to the form.  It misstates his testimony.  He distinguished 6 feet from 21 feet for two different standards.

THE COURT:  Overruled.  He can answer.

If it's less than 21 feet, there's a potential risk someone can make a decision and move quickly enough that the law enforcement officer could be put in danger; is that correct?

THE WITNESS:  Yes.

BY MR. GOLDSTEIN:

Q.   Right.  So that doesn't apply everywhere, that 21-foot standard, correct?

A.   It does with noncompliant subjects.

Q.   Let's put noncompliant subjects to the side.  If you are at the grocery store, there's no 21-foot rule with respect to a police officer, right?

A.   Typically, no.

Q.   If you are at the park in a crowd with folks playing on the playground and throwing frisbees to their dogs, there's no 21-foot rule, right?

A.   It's not a typical place that a policeman would be hanging

RYAN MORING - CROSS

out on duty.  But, no, there is no 21-foot rule at a park with dogs.

Q.   When you are on patrol as a law enforcement officer, you don't have occasion to visit parks?

A.   You don't go hanging out with the kids on the slide.

Q.   Well, what if you have an investigation to pursue at a bathroom at a park?

A.   It's possible.

Q.   Just a simple hypothetical: During an arrest where there's two people on the sidewalk and one is getting arrested, there's no 21-foot rule that applies, right?

A.   It potentially could.

Q.   But it doesn't necessarily apply, does it?

A.   It depends on what you have.

Q.   Right.

A.   It's purely situational.

Q.   Exactly.  So if there's a situation in which the two individuals on the sidewalk are not presenting a threat to the officer, then there's no 21-foot rule, right?

A.   Correct.

Q.   But if, for example, the two individuals on the sidewalk, one has a weapon and displays it, then I assume in that scenario there would be potentially a buffer zone required for officer safety, right?

A.   Yes.  I mean, they could even be just directly yelling at

RYAN MORING - CROSS

you.  At that point they are displaying behavior that's not passive.

Q.   But you learn in officer training that individuals have a First Amendment right to yell at the cops, don't you?

A.   They can, but it also shows their behavior of their demeanor towards you in saying, hey, I'm not acting like a normal individual here standing here minding my own business recording the police peacefully and that that potentially can become a problem.

Q.   Right.  An individual might try to strike up a conversation with an arresting officer on the one end of the spectrum, right?  Innocuous, I assume you would agree?

A.   Yes, they could possibly try to speak with you.

Q.   On the other end of the spectrum, the second individual, the one who is not being arrested, might say, "I'm going to hurt you if you effectuate that arrest," right?  That's on the other end of the spectrum maybe.

A.   Correct.  That is a problem.

Q.   They might display a weapon, right?  They can display a weapon, too, and say, "I'm going to use this weapon," right?

A.   Possibly.

Q.   But there's a whole middle area where that individual, the person next to the person being arrested, might use their words that wouldn't necessarily require a 20-foot buffer for officer safety, right?

RYAN MORING - CROSS

A.   Possibly.

Q.   They might say, "Hey, that's my mom you are arresting." That wouldn't necessarily justify a 20-foot buffer, would it?

A.   That in and of itself, no.

Q.   They might say, "I'm not backing up.  I'm going to stand right here and record this arrest."  That language would not justify a 20-foot buffer zone, would it?

A.   By itself, no.

Q.   Right.  You would have to pair it with some other factor -- a weapon, belligerent attitude, 3:00 a.m. on the side of the road with other dangerous circumstances -- to justify the 20-foot buffer, wouldn't you?

A.   Possibly.

Q.   Now, you testified on direct -- and I think I heard it right -- that generally speaking a teenager could pose a credible threat to officer safety.  Was that your testimony?

A.   Yes.  Yes, a teenager possibly can pose a threat to a police officer.  We actually have another police officer that was shot by a 13-year-old.

Q.   Okay.  I understand that, and my question was as a general matter -- not talking about specific cases -- a teenager can pose a credible threat?  Can you answer that question?

A.   I would say yes.

Q.   But not all teenagers necessarily pose a credible threat to an officer, correct?

RYAN MORING - CROSS

**A.**   No, not all teenagers do.

**Q.**   The teenager in this case, De'Shaun Johnson, did not pose a threat to officer safety, did he?

**A.**   We know that now, that he was not an active threat during this.

**Q.**   At the time you had no --

        **MR. CAPITELLI:**  I'm going to ask you to let him finish the answer.  He said "during this."

        **MR. GOLDSTEIN:**  I'm sorry.  I thought he had.

        **THE COURT:**  Are you finished your answer?

        **MR. CAPITELLI:**  I ask it be read back to him.  He was interrupted.

        **THE COURT:**  "The teenager in this case, De'Shaun Johnson, did not pose a threat to officer safety, did he?"

        You said, "We know that now, that he was not an active threat during this."

        **THE WITNESS:**  Yeah.  I mean, we know now that he obviously didn't try to hurt me, but we also don't know in the moment what's going to happen.

**BY MR. GOLDSTEIN:**

**Q.**   In the moment --

**A.**   We have no idea.

**Q.**   I'm sorry.  I don't mean to interrupt, but I keep thinking you are done.

        In the moment -- are you with me so far with my

RYAN MORING - CROSS

question?  In the moment.  I'm talking about in the moment.
Yes?

A.   I gotcha.

Q.   You had no reasonable basis to believe that De'Shaun
Johnson was a threat, did you?

A.   He was noncompliant and verbally stated that he wasn't
going to do what I asked him to do multiple times.  That is not
the definition of a noncompliant -- passive individual.

Q.   Sir, is it your testimony here today that De'Shaun Johnson
at that moment during the altercation posed a threat to you?

A.   It is my testimony that at that moment we did not know.

Q.   You were deposed in this case, were you not?

A.   We were.

Q.   We went through that deposition earlier?

A.   We did.

        MR. GOLDSTEIN:  May I approach the bench with a copy
of that deposition, Your Honor?

        THE COURT:  Approach the witness?

        MR. GOLDSTEIN:  Sorry.  Yes.

        THE COURT:  Yes.

BY MR. GOLDSTEIN:

Q.   Officer Moring, I believe you just testified, but I want
to confirm it, that you did think that De'Shaun Johnson could
have been a threat to officer safety that day, May 5, 2020.  Is
that your testimony here today, sir?

RYAN MORING - CROSS

MR. CAPITELLI: Object to the form. It misstates his testimony.

THE COURT: I'm sorry. What was the objection, Mr. Capitelli?

MR. CAPITELLI: It misstates his testimony.

THE COURT: I don't think that was the question he just answered before, but I don't know if you want to ask that now.

MR. GOLDSTEIN: Let me start over, I think. That might be helpful.

BY MR. GOLDSTEIN:

Q.   Officer Moring, on that day, May 5, 2020, De'Shaun Johnson posed no reasonable threat to you, did he?

A.   On that day we now know that, no, he did not pose a threat. In the middle of it, we did not know what he was going to potentially do next.

Q.   Sitting there that day -- I want you to go back in time, get inside your mind. Sitting there on duty that day at Ms. Perkins' house, you had no reasonable basis to believe that De'Shaun Johnson posed a threat to you, right?

A.   He did not specifically pose one at a specific point, but there's not something that would have stopped him from immediately becoming one and us not being able to stop it.

Q.   But he did not pose one, correct? I just want to make sure the record is clear he did not pose one.

RYAN MORING - CROSS

A.   Ultimately, yes, we know that.

Q.   That day you also did not view him as posing a threat to you, did you?

A.   He potentially could have been.

Q.   Then I would like you to go to page 83 of your deposition, line 12.  At your deposition you were asked:

     "QUESTION:  You had no reasonable basis to believe they, meaning De'Shaun and Jeron, were a threat, did you?

     "ANSWER:  Specifically, no."

     Do you see that?

A.   Yes.

Q.   Thank you.

A.   Just before that it specifically says, "Sitting there in your shoes on May 5, did you perceive them as a threat," and I stated, "I did not know," just like I just said.

Q.   Right, but then the next question, which I will just have to read back again, you were asked:

     "QUESTION:  You had no reasonable basis to believe they were a threat, did you?

     "ANSWER:  Specifically, no."

     That was your answer.

A.   That is what we currently -- on April 30 in 2024, yes, we do know that.

Q.   And you knew it then.

     MR. CAPITELLI:  I object to the form.  Asked and

RYAN MORING - CROSS

answered many times now.

THE COURT:  Sustained.

BY MR. GOLDSTEIN:

Q.   You knew it at your deposition in 2022.

A.   That was after May 5, 2020.

Q.   Now, I believe you testified on direct examination that with respect to the portion of the video where the view is blocked by your body -- are you with me so far?

A.   Which video?

Q.   The portion of the recording of the incident taken by Jeron in which your body moves side to side while De'Shaun's body moves side to side, do you recall that portion of the video?

A.   Yes.  Yes.

Q.   You testified on direct examination --

MR. CAPITELLI:  Object to the form, not laying a foundation.  He also went through this exact line of questioning on his case in chief.  It's been asked and answered multiple times now.

MR. GOLDSTEIN:  May I respond?

THE COURT:  Well, I just don't think the question has been asked yet.

MR. CAPITELLI:  He is prepping to go through the same statement in the deposition he went through.  He is trying to retread the same exact ground we already did, and he also

RYAN MORING - CROSS

already answered.

MR. GOLDSTEIN:  Counsel chose not to put on the witness during our case.

It's my right now that he has been called again during your case to cross-examine him on what was put up during the direct examination.

MR. CAPITELLI:  It's not a right to ask the same question again twice in the same trial.

THE COURT:  What is the question being posed right now?

BY MR. GOLDSTEIN:

Q.   The question being posed right now is -- I want to make sure I understand the testimony you just gave on direct with your counsel.  You testified that you moved your body side to side to prevent De'Shaun from getting to his mom.  Do you recall that testimony?

A.   I believe I stated that I prevented him from heading toward Deputy Hart.

Q.   So you moved your body side to side to prevent him from getting to Deputy Hart, that's your testimony?

A.   Yes.

Q.   Now, I would like to direct your attention to your deposition transcript from January of 2022, page 95, line 1.

MR. CAPITELLI:  Same exact ground that was already tread when he pointed out that page 93 says something else.  We

RYAN MORING - CROSS

have been down this road in their case in chief.

THE COURT:  Is that asked and answered?

MR. CAPITELLI:  Asked and answered.

THE COURT:  All you have to say is "asked and answered."

Mr. Goldstein, is this the same thing you asked him about before or not?

MR. GOLDSTEIN:  But then he testified on direct in a different way.  This is my first opportunity to ask him about what he testified to on direct during defendant's case.

THE COURT:  I'm going to allow you.  What page, 95?

MR. GOLDSTEIN:  Page 95, line 1.

BY MR. GOLDSTEIN:

Q.   Are you there on page 95?

A.   Yes.

Q.   (Reading:)

"QUESTION:  At the end of the video, the minor standing directly in front of you was attempting to move sideways in order to keep recording the interaction between Deputy Hart and Ms. Perkins, right?

"ANSWER:  That's the way it appears.

"QUESTION:  And as he moved to the side, you moved to the side in order to block his ability to record the incident, correct?

"ANSWER:  Correct."

RYAN MORING - CROSS

Do you see that testimony.

**A.**   I do.  Like we previously stated, as my counsel just said, on page 93 I also answered very similar questions that asked my intent to block De'Shaun from recording, and I specifically stated that I was not.

**MR. GOLDSTEIN:**  Move to strike the answer incorporating counsel's statements.

**MR. CAPITELLI:**  That's his answer.

**THE COURT:**  No.  He is allowed to fully answer.  The question has been answered.

**BY MR. GOLDSTEIN:**

**Q.**   Now, I just want to make sure I understand the final part of your testimony on direct.  At some point Deputy Hart moves Ms. Perkins towards the curb, right?

**A.**   Towards the street, yes.

**Q.**   Towards the street and she is handcuffed?

**A.**   Yes.

**Q.**   At that point you are facing directly towards De'Shaun with your taser pointed at him, correct?

**A.**   Yes.

**Q.**   I think your testimony was you didn't know where specifically Deputy Hart was moving Ms. Perkins, right?

**A.**   Yes.

**Q.**   But you knew he was moving her away from wherever the interaction, the physical altercation had taken place, correct?

RYAN MORING - CROSS

A.   Yes.

Q.   At that point, I think you testified on direct, you were no longer obstructing De'Shaun's view of the arrest, right?

A.   I believe not.

Q.   Because Deputy Hart and Ms. Perkins had moved from the driveway to the grass near the curb, correct?

A.   Yes.

Q.   So Mr. Johnson could have, in fact, moved his body and still seen what was going on between Ms. Perkins and Deputy Hart, right?

A.   I don't know what camera view it was, but one of the camera views actually does catch that.

Q.   At this point Ms. Perkins is handcuffed, correct?

A.   Yes.

Q.   At this point De'Shaun Johnson is many feet away, maybe 15 feet away, 10 feet away from his mom, correct?

A.   From his mom?  I would say yes.

Q.   He is further away from his mom than he was previously, correct?

A.   Yes.

Q.   Mr. Johnson was still recording, correct?

A.   He is still recording at that point.

Q.   At that point he was pointing the camera at you, the officer that was pointing a taser at him, correct?

A.   Yes.

RYAN MORING - CROSS

Q.   You continued, while he recorded, to point a taser at him, correct?

A.   I did.

Q.   His mother was nowhere near him, correct?

A.   She was by the street with Deputy Hart.

Q.   She was further away than she was before, right?

A.   Yes.

Q.   She was handcuffed?

A.   Yes.

Q.   There had been no weapons displayed, right?

A.   No weapons displayed.

Q.   Additional officers were on their way to the scene, right?

A.   Yes.

Q.   You even testified about how you needed a car to take Ms. Perkins away, right?

A.   Yes, we asked for one.

Q.   Yet you stood there on the front yard of De'Shaun Johnson's house pointing a taser at him, right?

A.   Yes, for a couple of seconds after they walked away.

Q.   Well, it was for more than a couple of seconds, wasn't it?

A.   I mean, I'm sure you could look at the video and determine the specific time, but it wasn't an excessive period of time.

Q.   Is there any amount of time for which it's acceptable to point a potentially lethal weapon at a 14-year-old using his phone to record events on his own front porch?

RYAN MORING - REDIRECT

A.   Again, being actively engaged in a dynamic situation, it's not necessarily the easiest thing just to pull back and stop all of the sudden and flip a switch while you are still being currently engaged with the subject.

Q.   It was no longer a dynamic situation at that point, was it, Officer Moring?

A.   It was de-escalating.

Q.   Right.  And you still pointed the taser at De'Shaun Johnson while he filmed you, right?

A.   I mean, at what point is acceptable -- what is an acceptable amount of time to hold a stopwatch and say, yes, you can do this for an extra 5 seconds and then -- where is that threshold at?

        MR. GOLDSTEIN:  No further questions for this witness.

                Thank you, Officer Moring.

                      REDIRECT EXAMINATION

BY MR. CAPITELLI:

Q.   Officer, I only have a few follow-ups for you because I think it kind of presents a different picture here.

        When you had the taser pointed at Mr. Johnson, who were you looking at?

A.   De'Shaun.

Q.   Was your focus on Mr. Johnson?

A.   Yes.

RYAN MORING - REDIRECT

Q.    During your direct examination, I asked you if you knew if Ms. Perkins had been moved away, and you said you knew, right?

A.    Yeah.  You could hear the scuffle moving away, but you didn't necessarily know exactly where.

Q.    Now, you know exactly where because we have seen these videos multiple times throughout this trial, right?  Now we know --

A.    Now we know.

Q.    -- exactly where.  At the time, though, you didn't know exactly how far and at what point Ms. Perkins had been moved far enough away from Mr. Johnson?

        MR. GOLDSTEIN:  I object to the leading.

        THE COURT:  Sustained as to leading.  You can rephrase it, Mr. Capitelli.

        MR. CAPITELLI:  Absolutely.

BY MR. CAPITELLI:

Q.    We have established you had your taser pointed at Mr. Johnson, correct?

A.    Yes.

Q.    Once Ms. Perkins is moved away, did you continue to keep your taser pointed at Mr. Johnson?

A.    For a period of time, yes.

Q.    Did you know how far away she had been moved at that moment in time, May 5, 2020?

A.    No, we didn't necessarily in the moment.

RYAN MORING - REDIRECT

14:30

**Q.**   Is that because you were focused on Mr. Johnson?

**A.**   Yes.

**Q.**   Your whole attention was on him?

          **MR. GOLDSTEIN:**  I object to the leading.

BY MR. CAPITELLI:

**Q.**   Had you asked him to move back?

**A.**   Prior to that, yes.

**Q.**   Was your focus on him until he moved back?

**A.**   Yes.

**Q.**   Once he moved back, what did you do with your taser?

**A.**   I ended up mounting it in my holster.

**Q.**   At that point you turned back to Ms. Perkins?

**A.**   Yes, and then I went and finished dealing with the scene with Deputy Hart.

**Q.**   If you have a noncompliant subject and you have a taser pointed at him and they have refused your commands multiple times, knocked your hand away, or at least not let you push him back, what's going to happen if you take your attention off of him and turn to see where Ms. Perkins is at this point?  What's the danger?

**A.**   You are possibly going to get hit in the back of the head.

**Q.**   Now, we heard a lot of questions about 21 feet.  What is the reactionary gap that we discussed during direct?

          **MR. GOLDSTEIN:**  Objection.  That's asked and answered.

RYAN MORING - REDIRECT

BY MR. CAPITELLI:

Q.   Is it 21 feet?

THE COURT:  Sustained.  You changed your question?

MR. CAPITELLI:  Yes, I did.

BY MR. CAPITELLI:

Q.   Is it 21 feet or did you mention 6 feet?

A.   So it's typically 6 feet for compliant subjects like interview stance and it's 21 feet for a dangerous event, essentially.

Q.   Now, counsel asked some questions about Officer Hart and what you recalled Officer Hart stating at the scene.  Right before the video picks up, what had Ms. Perkins indicated?

A.   Right before the video started, she had said, "Fuck y'all.  I'm going inside."

Q.   Was it possibly at that point, as she was walking back towards the house, that Officer Hart made a statement for them to move back?  In other words, where was Ms. Perkins walking when she said, "Fuck y'all.  I'm leaving"?

A.   Shortly after that is when she started walking inside or walking towards the residence.

Q.   Towards the house, towards De'Shaun, towards Jeron?

A.   Yes.

Q.   Now, you were asked about some statements during your deposition.  Do you still have your deposition in front of you?

A.   Yes.

**RYAN MORING - REDIRECT**

MR. GOLDSTEIN:  I would like to request a sidebar to the extent this is going where I think it may be going.  Can you proffer what you are doing with the deposition?

MR. CAPITELLI:  I'm going to ask him some questions in response to your questions which showed one side of the testimony.

THE COURT:  You have to ask the question before you go to the deposition.

MR. CAPITELLI:  I will.

BY MR. CAPITELLI:

Q.   Do you remember testifying on January 21, 2022, in this matter?

A.   Is that the day -- yes.  I'm sorry.

Q.   Counsel asked you about a statement moving side to side in order to block his ability to record.  Did you make any other statements during that deposition --

MR. GOLDSTEIN:  I don't know what question Counsel --

MR. CAPITELLI:  About the ability to record.

THE COURT:  Wait.  Excuse me.

MR. CAPITELLI:  I haven't finished the question.

THE COURT:  What is the question?

BY MR. CAPITELLI:

Q.   Did you make any other statements during that deposition about moving or trying to block his ability to record?

MR. GOLDSTEIN:  I object to the hearsay.

RYAN MORING - REDIRECT

THE COURT:  I think he is asking him what he testified to during the deposition.

MR. GOLDSTEIN:  He can't offer the deposition testimony into evidence at trial.

THE COURT:  No, it has nothing to do with the deposition.

Did you testify during the deposition about why you moved back side to side?

THE WITNESS:  Yes, I did.

BY MR. CAPITELLI:

Q.   What did you say?

MR. GOLDSTEIN:  Objection.  It's hearsay.

THE COURT:  Why is it hearsay?

MR. GOLDSTEIN:  The witness is sitting here in front of us testifying under oath as to his recollection of the events.  The deposition testimony was used by us for purposes of impeachment to show that what he said at the deposition was inconsistent with his testimony here today, but he cannot offer his own deposition testimony from that prior deposition in lieu of the testimony he has offered today.  It's hearsay.

THE COURT:  You can ask him a question about why he did what he did, Mr. Capitelli.  Sustained.

MR. GOLDSTEIN:  Thank you, Your Honor.  I would ask the witness to move the deposition transcript out from in front of him while he testifies in court today.

RYAN MORING - REDIRECT

THE COURT:  He is not using the transcript.

You may ask him any questions.

BY MR. CAPITELLI:

Q.   Is it your testimony today and has it been your testimony that you moved to match Mr. Johnson's movements?

A.   Yes.

Q.   Has that been your consistent testimony?

A.   Yes.

Q.   Do you believe that's the way you testified during your deposition?

A.   That's what I intended.

Q.   Despite an out-of-context quote taken by counsel?

A.   Yes.

Q.   In fact, you pointed out there were other quotes in your deposition that said the exact opposite?

MR. GOLDSTEIN:  Objection to the characterization.

THE COURT:  Sustained.  Sustained.  Any comments about -- that's improper.  Sustained.

BY MR. CAPITELLI:

Q.   You were also asked if you believed Mr. Johnson was a threat.

MR. GOLDSTEIN:  Same objection.  I can't tell if counsel is asking about his testimony today --

MR. CAPITELLI:  I'm asking about his testimony today.

MR. GOLDSTEIN:  Then I don't think it's a proper

RYAN MORING - REDIRECT

redirect.

MR. CAPITELLI:  It is.  You tried to impeach him on it.  I'm showing his other statements.

MR. GOLDSTEIN:  A prior consistent statement, he can't use that.  It's hearsay.  If the defendant wants to offer his prior deposition testimony as substantive evidence in the case, that's a different story, but I --

THE COURT:  The prior deposition is not coming in. Are you asking did he testify earlier today --

MR. CAPITELLI:  Earlier today.

THE COURT:  You may ask that question.  What is the question?

BY MR. CAPITELLI:

Q.   Did you testify earlier today as to whether or not you perceived Mr. Johnson as a threat?

A.   Yes.

Q.   You said potentially?

A.   That he was potentially a threat.

Q.   You said we know --

A.   Now that he was not, but in the moment we did not know.

Q.   Do you believe that testimony has been consistent throughout this matter?

A.   Yes.

MR. CAPITELLI:  That's all we have.

Thank you, Officer.

KYLE HART - DIRECT

THE COURT:  Thank you.  You may step down.

Mr. Goldstein, would you get the deposition, please.

MR. GOLDSTEIN:  Yes.

THE COURT:  Mr. Capitelli, next witness.

Ms. Fisher.

MS. FISHER:  The defense is going to call Officer Hart.

THE COURT:  Officer Hart.

KYLE HART,

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Thank you.  Please be seated and then state your name in the microphone, please.

THE WITNESS:  Kyle Hart.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. FISHER:

Q.   Good afternoon, Officer Hart.  Do you know what you are here to testify about today?

A.   Yes, ma'am.

Q.   We will get to that in a moment, but first we will go through a bit of background.

Where did you go to high school?

A.   Slidell High.

Q.   Any education after high school?

KYLE HART - DIRECT

A.   Yes.   I had vocational schooling for firefighter, home inspector, insurance, and several other smaller courses.

Q.   Firefighter was one of them?

A.   Yes, ma'am.

Q.   Who is your current employer?

A.   St. Tammany Parish Sheriff's Office.

Q.   What is your current rank?

A.   Sergeant.

Q.   How long have you been a sergeant?

A.   Two years.

Q.   When did you first start with the sheriff's office?

A.   2010 I went through POST academy and graduated in May of 2011.

Q.   Have you received any additional training since you started with the sheriff's office?

A.   Yes.

Q.   Could you tell us briefly about some of that, what the regular training you experienced looks like.

A.   Yeah.   Normal training for every year is basic ethics and a few other classes that they require you to have through the state and then just extra training that I've gone through just since I've been an instructor over there, several classes of PBCTE, baton, pepper spray, taser training, stuff like that.

Q.   Traffic?

A.   Traffic, yes.

KYLE HART - DIRECT

Q.    You, yourself, train people; is that correct?

A.    Yes.  I'm an instructor now.

Q.    What is your role as an instructor for the St. Tammany Parish Sheriff's Office?

A.    To teach new officers and current officers either yearly training or new training like the POST academy, POST academy instructor.  So I teach all the new cadets basic police officer skills and techniques.

Q.    Is that training that you conduct part of some sort of promotion that you have received --

A.    Yes.

Q.    -- or does any cop start and start training?

A.    No, ma'am.  It's something I was promoted to.

Q.    When did you start training?

A.    Two years ago.

Q.    When you became sergeant, it came with the training?

A.    Yes, yes.

Q.    You stated whenever you began that you are familiar with the May 5, 2020, incident we are here for today, correct?

A.    Yes, ma'am.

Q.    What was your involvement in that incident?

A.    Initially I was the backup officer along with Deputy Moring, as a backup officer to a call for service.

Q.    You guys were patrolling that day; is that correct?

A.    Yes.

KYLE HART - DIRECT

Q.   There are no claims against you in this matter; is that correct?

A.   No, ma'am.

MR. GOLDSTEIN:  Objection.  I would ask for the same limiting instruction.

THE COURT:  While the witness has answered no, I will just instruct the jury what I instructed you earlier.  The only claims that you are to consider in this case are the claims that Mr. Johnson has brought against Deputy Moring.  Those are the only claims in the case at all.

BY MS. FISHER:

Q.   When did you first see Teliah Perkins on May 5, 2020?  Do you remember?

A.   Yes.  As we both turned down Jay Street, we actually passed her house and saw her standing outside next to a motorcycle.

Q.   When you say "we," you mean you and Officer Moring?

A.   Myself and Deputy Moring, yes, ma'am.

Q.   You said as you turned onto Jay Street you saw her --

A.   As we proceeded down Jay Street, yes, ma'am.

Q.   I'm sorry.  I didn't want to put words into your mouth. Standing in the driveway, is that what you said?

A.   Correct.  Yes.  Standing next to a motorcycle.

Q.   So she wasn't sitting on her porch eating a snack?

A.   No, ma'am.

KYLE HART - DIRECT

**Q.** Did you wave at her as you drove by?

**A.** I did.

**Q.** Did she wave back at you?

**A.** I don't believe so.

**Q.** Did you initiate the traffic stop with Ms. Perkins?

**A.** I didn't initiate it.  I was the backup with Deputy Moring.

**Q.** I just wanted to be clear.  Do you remember the reason for that traffic stop?

**A.** The reason we were there initially was because of a reckless rider of a motorcycle driving recklessly on Jay Street.  As far as the stop itself, as we passed the house, Deputy Moring contacted central dispatch to find out the address of the complaint, and we realized that we had actually passed the house up.  So as we were turning around on our motorcycles, we noticed Ms. Perkins in the middle of the roadway on her motorcycle revving the motor, revving the engine without a helmet on.

**Q.** We are going to break that up just a little bit.  You said there was a complaint.  Did you know anything about that complaint at the time that the stop was initiated?

**A.** Due to us being on our motorcycles, we don't have our computers open or anything like that, so we just go by what they tell us over the radio.  They just kind of give us a gist of what the problem is, and that was a female on a motorcycle

KYLE HART - DIRECT

riding recklessly.

Q.   Did you know who made that complaint?

A.   No, ma'am.  I think it was anonymous, I think.

Q.   I believe you stated a moment ago that when you made that loop to the address, she was in the roadway on her motorcycle. Is that correct?

A.   Yes, ma'am.

Q.   You viewed her in the roadway on her motorcycle?

A.   Yes.

Q.   You heard the engine revving?

A.   Yes.  It was a pretty loud motor.

Q.   Was she wearing a helmet?

A.   No, ma'am.

Q.   What happened at that point?

A.   Myself and Deputy Moring pulled up in front of her house. As we were dismounting our motorcycles, she started yelling slurs and stuff at us, that we were there just because of her neighbors being racist or something to that effect.  Actually, like I said, we didn't even get a chance to get our helmets off before she started just yelling at us from the driveway.

Q.   Did y'all ask her for anything?

A.   Deputy Moring asked for her driver's license, insurance, and registration.

Q.   To your knowledge, did she provide any of those three?

A.   As far as I know, the driver's license was the only thing

KYLE HART - DIRECT

that she provided at the initial time, because I believe he went over to what they call NCIC and did a check on her driver's license.

Q.   Was she able to provide registration for the motorcycle?

A.   I found out later, when I was doing the paperwork, no, she never provided a registration.  It was just some kind of temporary registration docket piece of paper that was a receipt, basically, from the dealership.

Q.   Is it fair to say that whatever she handed over in lieu of registration, it was registration for someone else?

A.   Yeah, I believe it was somebody else's name on the registration as well.

Q.   No insurance, correct?

A.   No insurance.  No insurance.

Q.   To your knowledge, did she ever produce proof of insurance for the motorcycle?

A.   No, ma'am.

Q.   What did she do instead?

A.   Instead of getting the documents that we needed, she started making phone calls to different people to either come to the house or saying that the police were here again, to come here.  From what I could understand, some of it was somebody at Walmart, from what I could understand.

Q.   How would you describe the scene at that point, when she began making phone calls?

KYLE HART - DIRECT

A.   She was irate, I mean, just yelling and screaming, saying stuff like, "The police are her again.  Get over here," stuff like that.

Q.   She was upset with you?

A.   Upset with both of us, I guess, because of the police being her at her residence.

Q.   So is it fair to say that the scene was getting tense?

A.   Yes.

Q.   You mentioned the word "irate."  Did she raise her voice at you?

A.   From the moment we got there, she was raising her voice at us.

Q.   Just yelling instead of speaking?

A.   Yes.

Q.   Did she curse at you?

A.   Yes.

Q.   Did she curse at you more than once?

A.   Several times.

Q.   Now, during a traffic stop, is the subject free to leave the scene?

A.   No, ma'am, not until we are finished conducting whatever we have to do, issue a citation, issue a warning, whatever.

Q.   Is there ever a scenario in which the subject of a lawful traffic stop is able to leave the scene?

A.   No, ma'am.  No.

KYLE HART - DIRECT

**Q.**   Ms. Perkins tried to, correct?

**A.**   Yes.

**Q.**   Do you remember, Officer Hart, when you first saw Mr. De'Shaun Johnson?

**A.**   Yes, I do.

**Q.**   When was that?

**A.**   As we were in the driveway waiting for paperwork and stuff, she left and went to the front door and yelled inside and said, "Y'all come out here.  The police are here again."  I think it was something to the effect of, "Y'all come out and video.  The police are here."

**Q.**   You said "y'all."  Do you know who she was summoning or who ultimately came?

**A.**   No.  I just saw two men -- two gentlemen coming out of the house.

**Q.**   So the two gentlemen are the only ones who responded to her request?

**A.**   Inside the house, correct.  Yes.

**Q.**   That's what I mean.  Thank you.

         What did they do once they came out?

**A.**   It appeared that they were holding phones up like they were recording the interaction between ourselves and Ms. Perkins.

**Q.**   At that point did you or Officer Moring ever instruct them not to record?

KYLE HART - DIRECT

**A.**   No, I did not.

**Q.**   Did you or Officer Moring ever instruct them to go back into the house?

**A.**   No, we did not.

**Q.**   Did you ask the young men to move backwards towards the porch at some point?

**A.**   Yes.  I kind of motioned to go back towards that way, to not come so close to us.

**Q.**   That was before an arrest had ensued, correct?

**A.**   Correct.

**Q.**   That was as soon as the gentlemen exited the home --

**A.**   Yes.

**Q.**   -- and were coming towards the driveway; is that correct?

**A.**   Correct.  Yes.  We don't normally let people just from anywhere come into our -- while we are conducting an investigation.

**Q.**   What happened next after the two gentlemen exit the home and they appear to be recording?

**A.**   Ms. Perkins still was on the phone calling whoever.  He was allowing her to try to pull up her insurance on her phone to no avail.  She was just calling people instead.  So then she said -- I believe it was that she was going to the house to get her insurance out of a file cabinet or something.  When she did, she didn't produce anything when she came back.

**Q.**   Then what happened?

KYLE HART - DIRECT

A.    As far as like the events of -- after that?

Q.    I'm sorry.  So when she went into the home to get insurance, she came back out, she was still unable to provide proof of insurance, and an arrest ensued; is that correct?

A.    That was the first time, and then the second time she went back up to the house had one of the younger guys to go inside and grab a helmet and bring the helmet out.  He actually sat it down next to the motorcycle.  Then shortly thereafter, we requested -- she was not producing any insurance or registration.  So I went to my motorcycle, grabbed my clipboard and my citation book, walked back to Deputy Moring's motorcycle and began to fill out the paperwork for the citation in the record sheet.

Q.    What was Ms. Perkins doing at that point?

A.    At that point she is still walking around the driveway, and then at one point she says, "Fuck y'all.  I'm going back inside."  Shortly thereafter, as I was writing the stuff down, it registered in my head that she said she was going back inside again.  That's when I said, "No, at this time you are going to be placed under arrest for trying to leave the scene of a traffic stop."

Q.    Those actions that you just described, does that constitute fleeing a lawful arrest?

A.    Yes.

Q.    Once the arrest ensued, why was it ultimately necessary to

KYLE HART - DIRECT

take Ms. Perkins to the ground?

A.   Because she was actively resisting, and one of the things that we learn in handcuffing somebody is to try to get them in the prone position on their stomach to get their handcuffs behind their back.

Q.   So she was still resisting at that point, correct?

A.   Yes.

Q.   You were forced to get down on the ground to manipulate her hands behind her back; is that correct?

A.   Yes.  Correct.

        MR. GOLDSTEIN:  I object to the leading.

        THE COURT:  Sustained.  It's your witness.

BY MS. FISHER:

Q.   We have seen the videos multiple times today.  Do you remember saying anything to Ms. Perkins at that point when you were trying to cuff her?

A.   "Stop resisting."

        THE COURT:  One moment, Sergeant.

        MR. GOLDSTEIN:  I object to the question.  The witness wasn't here for the earlier parts of the trial.  I think the question itself was fine, so maybe rephrase it as what he recalls.

        THE COURT:  I'm going to overrule that.

        Do you remember saying anything to Ms. Perkins at the time you were trying to cuff her?

KYLE HART - DIRECT

THE WITNESS:  Besides, "Stop resisting," and -- yes.

BY MS. FISHER:

Q.    Would you say that you were struggling to get Ms. Perkins in handcuffs?

A.    Yes, we were both struggling.  I was struggling at first, and then Deputy Moring came to assist me.

Q.    In that process of struggling to get her into handcuffs, do you remember saying something?

A.    I remember saying several things.  I remember that it was hot that day.  We were all sweaty.  I remember saying maybe something is slippery, "Stop resisting," stuff like that.

Q.    That's what I was getting at.  When you said something was slippery, were you referring to Ms. Perkins?

A.    No.

Q.    At any point did you call Ms. Perkins slippery in that video?

A.    No.

Q.    While you were proceeding with her arrest, was anyone in that immediate vicinity?

A.    Yes.

Q.    Who was that?

A.    At the time I didn't know who he was, but DJ is what they referred to him as.

Q.    Were you concerned with DJ's presence there?

A.    Yes, ma'am.

**KYLE HART - DIRECT**

Q.   How close was De'Shaun?  Sorry.  We have been referring to him as De'Shaun in this trial.

A.   Oh, I'm sorry.  He was really close because he ended up taking a cell phone out of Ms. Perkins' hand as we were actively trying to put her in handcuffs.  So he was within touching her along with us.  Extremely close.

Q.   Did you personally interact with De'Shaun through the May 5 incident?

A.   Just the initial part of telling him to kind of stay back out of our scene, that was about it.

Q.   That was before the arrest, correct?

A.   Yes, ma'am.

Q.   So you continued with the arrest through up until where we are now on the scene?

A.   Yes.

Q.   Could you hear Officer Moring interacting with De'Shaun at that point?

A.   While we were struggling on the ground?

Q.   Yes.

A.   Yes.  I could hear him saying, "Stay back.  Stay back."  I don't know who he was talking to at the time.  I just remember struggling with her at the time and hearing him saying something about stay back.

Q.   While you were engaged in the arrest and you remember hearing him at least make the "stay back" statement, what did

KYLE HART - DIRECT

you observe?

A.   While I was on the ground, I remember somebody being close to him about approximately the same size as him as he stood up to have that person step back away from us.

Q.   Was that someone De'Shaun?

A.   I haven't seen him in four years.  I later learned, like I said -- I learned him as DJ.  It was DJ.  De'Shaun.

Q.   That's fair.

A.   Sorry.

Q.   I believe you stated a moment ago you saw someone approaching and you didn't know who at that time, but he was as big as Officer Moring.  Were those your words?

A.   Yes, ma'am.

Q.   De'Shaun, even in 2020, was about the same size as Officer Moring?

A.   It appeared so as I was on the ground, yes, ma'am.

Q.   Did De'Shaun comply, to your knowledge, with the orders Officer Moring was giving him?

A.   No, ma'am.

Q.   Did he refuse to comply?

A.   Yes, he did.

Q.   Was his mother ordering him to refuse to comply?

A.   Yes, she was.

Q.   At any point through this interaction, as we have gone through it so far, were you concerned about De'Shaun recording

KYLE HART - DIRECT

the incident?

**A.**   No, ma'am, not at all.

**Q.**   Is it your understanding that after -- up until this point Officer Moring was forced to display his service taser?

**A.**   Yes, he was.

**Q.**   Did you think that was appropriate?

**A.**   Yes, ma'am.

**Q.**   Do you still think today that that was appropriate?

**A.**   Yes, I do.

**Q.**   At this time up until the point of the scene where Officer Moring was forced to display his service taser to keep De'Shaun back, was Ms. Perkins complying?

**A.**   No.

**Q.**   Were you still trying to arrest her?

**A.**   Yes.  Well, place her in custody, yes.  Uh-huh.

**Q.**   What was she doing at this point?

**A.**   As I was placing the handcuffs on her, I was double-locking them because whenever you -- there's this feature on the handcuffs that you have to double-lock so they don't crush hands any further or your wrists.  In the process of double-locking the handcuff, she flipped over on her back and was still, like, going back and forth resisting and kicking and stuff.

As I started to get up, she kicked me.  I fell back down.  I placed my hands somewhere on her shoulder, somewhere

**KYLE HART - DIRECT**

up in that area.  As I caught myself, went to stand up again, she kicked me again.  I don't know if y'all are familiar with the boots that we wear in traffic.  They go up to our knees and they are really cumbersome and hard to stand up on.  As she kicked me, it wasn't much that I could do to stay up and fall back down.

Q.   At any point through the altercation did you ever choke Ms. Perkins?

A.   No, I did not.

Q.   Did anyone ever choke Ms. Perkins?

A.   No, ma'am.

Q.   You were eventually able to get her into handcuffs; is that correct?

A.   That is correct.

Q.   Did Officer Moring initially assist you in getting her handcuffed?

A.   Initially, yes.

Q.   Once that was secured, is it correct that he stood up to turn his attention elsewhere?

            MR. GOLDSTEIN:  I object to the leading.

            THE COURT:  Sustained.

            THE WITNESS:  Once the handcuffs --

            THE COURT:  You don't need to answer.  She is going to rephrase and ask you another question.

            THE WITNESS:  I'm sorry.

KYLE HART - DIRECT

BY MS. FISHER:

Q.   So Officer Moring assisted you with getting her handcuffed; is that correct?

A.   That is correct.

Q.   At what point did Officer Moring turn his attention from assisting you to De'Shaun?

A.   Once the handcuffs were on her and I had them secured on her, he addressed his attention to De'Shaun and tried to get him to go back, back up from being so close to us, right on top of us.

Q.   At that point, is that when you were trying to secure the double-lock?

A.   Yes, ma'am.

Q.   I just wanted to be clear on that.

        Now, once you have gotten her double-locked in the handcuffs, you were eventually able to get her to stand up; is that correct?

        MR. GOLDSTEIN:  I object to the leading.

BY MS. FISHER:

Q.   Did you ever get Ms. Perkins to stand up?

A.   Yes, I assisted her to stand up.

Q.   Once she was cuffed and standing, did you move her?

        MR. GOLDSTEIN:  I object.  It's still leading.

BY MS. FISHER:

Q.   Did you move her --

KYLE HART - DIRECT

**MS. FISHER:**  I'm just trying to follow the story.

**THE COURT:**  What did you do after you got her cuffed?

**THE WITNESS:**  After I stood her up, I tried to escort her to the street to get her away from everything that was going on over there with De'Shaun and the other person that was out there.  As I was escorting her, she pulled away from me and started leading me into the grass.  I was actually trying to get her out to the end of the driveway waiting on another unit to show up to be able to secure her in that unit.  But as we did, she was still struggling and pulling away, so we ended up in the grass.  Actually, I tried to get her to the end of the driveway until the next unit showed up.

**BY MS. FISHER:**

**Q.**   Why did you have to wait for that unit to show up?

**A.**   Due to us being on our motorcycles, we don't have what we call a unit with a partition, known to the police as a cage in the vehicle, so we had to wait for somebody with that.

**Q.**   Was it important for you to separate her from the scene?

**A.**   Yes.

**Q.**   Can you explain why that was important.

**A.**   Because she was still telling De'Shaun and them to come whatever, not to listen to us and to still interfere with us.  So I was trying to de-escalate the situation by moving her away from creating more of, I guess, a scene than what was already happening there.

KYLE HART - DIRECT

Q.   Following this altercation, were you ultimately able to get her into the unit?

A.   Yes.

Q.   Did it require assistance?

A.   Yes.  We had several officers there at this time.

Q.   What happened after Ms. Perkins was placed into the unit?

MR. GOLDSTEIN:  Objection to relevance.

MS. FISHER:  It's part of the story.

THE COURT:  I'm sorry?

MR. CAPITELLI:  It goes to her ongoing resistance throughout this entire encounter, as well as the fact that they pointed out why Officer Moring continued to have a taser on him.

THE COURT:  I believe the question was after she got into the unit.  Everything ends before the unit is even there.  Sustained.

Was that the question, Ms. Fisher, that you asked?

MS. FISHER:  Somewhat.  I will rephrase it.

BY MS. FISHER:

Q.   Did Ms. Perkins' resistance end once she was in the unit?

MR. GOLDSTEIN:  Same objection.

THE COURT:  Sustained.

BY MS. FISHER:

Q.   Did you suffer any injuries on that day?

**KYLE HART - DIRECT**

**A.**    Yes, I did.

**Q.**    Can you tell the jury about those, please.

**A.**    I had abrasions to my fingers, my knuckles, and both knees, and I also had a pair of motorcycle pants that are actually Kevlar that were ruined that day because the knees were messed up on them.

        **MS. FISHER:**  I pass the witness.

        **THE COURT:**  Mr. Goldstein.

        **MR. GOLDSTEIN:**  Shall I commence, Your Honor?  Yes?

        **THE COURT:**  Yes.  Go ahead.

        **MR. GOLDSTEIN:**  Good afternoon, Officer Hart.

        **THE COURT:**  Oh, I'm sorry.  I'm going to interrupt you.

        Would y'all like a break now?  Yes, I see some nodding.  I realized the time all of the sudden.

        Do you mind if we do the cross-examination after a 15-minute break?  I think that makes sense to stretch their legs.

        **MR. GOLDSTEIN:**  Thank you, Your Honor.

        **THE COURT:**  Jurors, keep an open mind.  Please don't discuss the testimony.  We will take a 15-minute break until 3:15.

        **THE DEPUTY CLERK:**  All rise.

        (Jury out.)

        **THE COURT:**  You may step down.  Don't discuss your

KYLE HART - CROSS

testimony in the middle of this, and we are going to come back at 3:15.

(Recess.)

**THE COURT:**  You may bring the jury in.  Thank you.

(Jury in.)

**THE COURT:**  Please be seated.  The jury is back in. The witness remains on the stand.  The parties are present. The attorneys are present.

Mr. Goldstein, we are ready for cross-examination of Sergeant Hart.  Please proceed.

**MR. GOLDSTEIN:**  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. GOLDSTEIN:

**Q.**   It's "Sergeant Hart"?  I just want to make sure I use the right title.

**A.**   Yes, sir.

**Q.**   Good afternoon, Sergeant Hart.

**A.**   Good afternoon.

**Q.**   During your direct examination, you testified that after you performed a U-turn on Jay Street, you observed Ms. Perkins in the roadway revving her engine on the motorcycle.  Is that accurate?

**A.**   Yes.

**Q.**   She wasn't wearing a helmet at the time?

**A.**   Correct.

KYLE HART - CROSS

Q.    You had previously passed by the driveway and seen the motorcycle parked on the driveway; is that correct?

A.    Yes, with Ms. Perkins standing next to it.

Q.    Right.  So in the time it took you to drive to the end of the block, do the U-turn, and return towards her home, the motorcycle was turned on, moved into the roadway, and she was revving the engine.  Is that fair?

A.    Correct.

Q.    She was, I think -- I don't know if you testified on direct examination.  Which way was the motorcycle facing when you observed it on Jay Street?

A.    Perpendicular to Jay Street.

Q.    So in a --

A.    Across the street like towards her neighbor across the street, I guess.

Q.    So she was facing towards her neighbor's driveway and not the direction that she could drive along Jay Street?

A.    I don't believe there was a driveway right across the street.  I don't particularly remember a driveway across the street.  If you are looking out the front door of her house, the house directly across the street from her.

Q.    So if you are looking out her front door, you would see her motorcycle facing towards the street to the house across the street from her, correct?

A.    Correct.

KYLE HART - CROSS

Q.    If she drove, she would have driven into the curb or the driveway across the street, right, if she drove forward?

A.    Like I said, I don't know if there was a driveway across the street.  I believe there's ditches on the other side of the driveway.

Q.    So if it was a ditch, if she had driven forward, she would have driven into the ditch?

A.    Yes.  Yes, I would say so.

Q.    So it's not as if she could have driven out towards the intersection at the end of Jay Street or the intersection at the other end of Jay Street, right?

A.    I mean, if she would have turned, she could have turned towards one of those ends of the street, yes.

Q.    Right.  But when you observed her on Jay Street revving the engines, she was facing towards the opposite side of the street or a ditch, right?

A.    Correct.

Q.    Then you observed her back-pedaling the motorcycle onto her own driveway?

A.    Back into her driveway, yes.

Q.    So the misdemeanor offense of operating a motorcycle without a helmet, it requires the motorcycle to be moved; is that right?

A.    Operating on a public roadway, correct.

Q.    It has to move?

KYLE HART - CROSS

A.    It was moved, yes.

Q.    It's the physical act of back-pedaling with her feet the motorcycle onto her driveway that qualifies as operating?

A.    No.  It was the motion of her driving forward and then backing up and revving the motor.

Q.    Did you observe her driving forward?

A.    No.

Q.    Right.  I want to talk about what you observed.  You turned around, did a U-turn, and you observed a motorcycle facing perpendicular to the road, correct?

A.    Correct.

Q.    You didn't see it move forward, right?

A.    Just seen her moving backwards with it.

Q.    You had seen it parked on her driveway.  In the time it took for you to do the U-turn, it had been turned on and moved into the street; is that right?

A.    Correct.

Q.    Then you observed her personally back-pedaling with her feet the motorcycle back onto the driveway, right?

A.    Correct.

Q.    It's that act of back-pedaling with her feet the motorcycle onto her driveway that is the misdemeanor offense of operating without a helmet?

A.    It's operating a motorcycle on the street without a helmet.

KYLE HART - CROSS

Q.   Right.   But she didn't drive forward without a helmet on, right?

A.   She had to have to get out in the middle of the street.

Q.   That you saw, right?

A.   How else would she get it out in the street without operating it forward?

Q.   You only have authority to make arrests or issue citations that you personally observe, right?

A.   Personally observe?   Well, yes.

Q.   You never saw her driving forward from the driveway to the street, right?

A.   Correct.

Q.   In fact, when you drove by the first time, the motorcycle was parked, correct?

A.   Correct.

Q.   So what you personally observed was Ms. Perkins back-pedaling the motorcycle from the street back onto her driveway, correct?

A.   Revving the motor, correct.

Q.   While revving the motor?

A.   Yes.

Q.   You never saw her move from the driveway to the street?

A.   No.

Q.   Now, when you pulled up to her house at 2018 Jay Street, did you use your siren?

KYLE HART - CROSS

**A.**   No.

**Q.**   Did you turn on your emergency lights?

**A.**   No, not on our fully marked unit motorcycles, no.

**Q.**   But typically for a traffic stop you would initiate those indicators, right?

**A.**   Not necessarily, no.

**Q.**   Sometimes you would?

**A.**   Sometimes, yes.

**Q.**   That's one indicator to a driver or a motorcycle operator that they are being stopped, right?

**A.**   Or us telling them to pull over, because we do what we call step-outs or walk-outs, when we are doing traffic enforcement, where we have the motorcycle parked using a stationary radar.  We will actually step out into traffic, tell the people to slow down, stop, to pull to the side of the road, and we don't activate lights and sirens and all that stuff.

**Q.**   Right.  In those circumstances, they are passing by and you wave them to stop, right?

**A.**   Could be, yes.

**Q.**   In this circumstance, Ms. Perkins was at her own home, and you and Deputy Moring pulled up and parked next to her driveway, right?

**A.**   Correct.

**Q.**   Now, when you arrived at her house at 2018 Jay Street, she provided her identification to you, right?

KYLE HART - CROSS

**A.**   Not to me personally, it was to Deputy Moring.

**Q.**   She provided her identification to Deputy Moring?

**A.**   Yes.

**Q.**   At some point I think you testified De'Shaun, who you refer to sometimes as DJ --

**A.**   Yes, sir.

**Q.**   -- and Mr. Jeron Perkins, another teenager, came out of the house, right?

**A.**   Correct.

**Q.**   When they came out of the house, you did not ask them for their names, did you?

**A.**   No, sir.

**Q.**   You did not ask them who they were?

**A.**   No, I did not.

**Q.**   At one point I think you testified Ms. Perkins summoned them out of the house.  Is that right?

**A.**   Correct.

**Q.**   You understood that there was some sort of familial relationship between Mr. Perkins and at least one or both of the teenagers, right?

**A.**   I had no idea who they were with her.

**Q.**   You didn't even ask, did you?

**A.**   No.

**Q.**   You didn't say, "Hey, who are you?  Why are you here?  What's your relationship to this person that we have a traffic

KYLE HART - CROSS

stop with?"  Right?

A.    No, sir.  We were dealing with Ms. Perkins.

Q.    At the time this was private property, right?

A.    Yes.

Q.    The two individuals that came out, one of them was De'Shaun Johnson, sitting right here, correct?

A.    Yes.  I don't recognize him, but yes, sir.

Q.    You have no reason to dispute that?

A.    No, sir.  No.

Q.    Mr. Johnson did not threaten you, did he?

A.    No.

Q.    He did not display any weapons, did he?

A.    No, sir.

Q.    Nor did Jeron, the other teenager?  He didn't threaten you, did he?

A.    No.

Q.    He didn't display any weapons?

A.    No.

Q.    Neither Jeron nor De'Shaun ran towards you, did they?

A.    No, sir.

Q.    Neither of them made any sudden movements, right?

A.    What would you consider sudden movement?  I mean, actively moving towards us while we were dealing with Ms. Perkins that's actively yelling at us -- I mean, if somebody walks briskly towards you, would that be a sudden movement?  I don't know

KYLE HART - CROSS

what your sudden movement is compared to mine.  Anybody approaching me, I would consider that sudden if I'm dealing with something separate.  I don't want somebody else approaching me while I'm dealing with something here.

Q.   I see.  So they did approach you?

A.   Eventually, yes, sir.

Q.   The way that they approached you was they came out of the house and they watched or recorded your interactions with Ms. Perkins, right?

A.   Yes.  At first, yes.

Q.   They never came up in your face, did they?

A.   No, sir.

Q.   They never waved their arms around in a menacing manner, did they?

A.   No, sir.

Q.   They never darted side to side, right?

A.   No, sir.

Q.   They never hid behind the bushes, right?

A.   No.

Q.   They never hid behind the car that was parked in the driveway, did they?

A.   No.

Q.   Right.  They were there.  You saw them, correct?

A.   Yes.

Q.   They made no sudden movements that would cause you some

KYLE HART - CROSS

concern about the level of threat they presented, correct?

A.    At the very beginning, no, sir.

Q.    Right.  When they came out of the house?

A.    No, sir.  Yes.

Q.    Now, I believe you testified on direct examination that Ms. Perkins went into the house two times.  Is that right?

A.    Yes.

Q.    One time you testified she went in to seek or to gather what she said were her insurance papers; is that right?

A.    Yes.

Q.    You permitted her to go into the house, correct?

A.    I was the backup officer.  I had no dealings with that part of it at all.  So as a backup officer, I just kind of sat there and assisted Moring as he requested those items that she was supposed to get.

Q.    Officer Moring permitted her to return into the house, correct?

A.    Yes.

Q.    He didn't tell her not to do it, correct?

A.    No.

Q.    He knew she was going into the house, correct?

A.    To retrieve some paperwork, yes.

Q.    This was after she had already raised her voice at you upon your arrival at the scene, correct?

A.    Correct.

KYLE HART - CROSS

Q.    I don't know what word you used, but it was heated, right?

A.    Correct.

Q.    So notwithstanding that it was heated and that she had raised her voice, Officer Moring, your partner allowed her to go into the house, correct?

A.    I believe it was more towards the front doorstep.  I don't particularly remember -- it's been four years now -- if she actually stepped into the house or just at the doorstep.  I remember one of the times was she went -- the very beginning, I think you skipped over that.  She actually went up there and called the two young men outside and said, "Hey, the police are here again.  Y'all come out and record this."  I think that was the first time maybe that she was supposed to retrieve some paperwork.  Instead she just called them outside.

Q.    So the first time she went to the house, she said she was going to retrieve her paperwork, but she went to the house and she invited the two teenagers to come out of the house and record?

A.    Correct.

Q.    Is that fair?

A.    Yeah, it sounds fair.

Q.    The second time she went up to the house was later in the interaction?

A.    Yes.

Q.    That time was to retrieve the helmet?

KYLE HART - CROSS

A.   It was still to retrieve paperwork.  She said sometime during that that her helmet was inside.  Actually, she asked one of the young men to go grab the helmet instead of the paperwork.  He produced the helmet and later sat it down next to the motorcycle.

Q.   You understood, because she told you, that she was trying to procure her insurance papers, right?

A.   She said that several times, but instead she was calling other people to come there from either Walmart or somewhere down the street.  At one time we had a lady approaching us from -- which is Thompson Road, which is the main highway off of Jay Street, had a lady approaching us from there and then had another lady come from next door.  So, yeah, instead of getting insurance or whatever else she was trying to get off of her phone, she was instead calling people to come over there.

        MR. GOLDSTEIN:  I move to strike as nonresponsive.

BY MR. GOLDSTEIN:

Q.   The question was you understood that she was trying to get her insurance papers, correct?

A.   Yeah, but that was never given to us.

        MR. CAPITELLI:  He answered that question --

        THE COURT:  Yes.

        MR. CAPITELLI:  -- and he provided an explanation.

        THE COURT:  Okay.

KYLE HART - CROSS

BY MR. GOLDSTEIN:

Q.   You understood that she was making phone calls, correct?

A.   Correct.

Q.   You understood that one of those phone calls was to her insurance agent to get the insurance paperwork that you were asking for?

A.   She never called her insurance agency that we are aware of.  It was instead she was calling people saying, "Hey, get over here.  The police are here again."  During that conversation, I heard something about come from Walmart or something from Walmart or by Walmart, something to that effect, but instead of calling the insurance company -- which I never heard her say anything to the effect that, "Hey, I need my insurance sent to me."  Instead she was calling people over there because the police were there again.

Q.   You understand that she was calling her mom, who was at Walmart, right?

A.   I have no idea who she was calling.  I didn't look at her phone, nor did I ask her who she was calling.

Q.   You didn't ask her who she was calling?

A.   Nope.

Q.   So you could have asked her, "Hey, are you calling your insurance agent to seek this information that we are asking you for?"

A.   Is her mother her insurance agent?  I don't know.  Instead

KYLE HART - CROSS

of calling the insurance company, she is calling her mother to come to the scene.

Q.   Would it surprise you to learn that there's been testimony in this case that she called her insurance broker?

A.   She never provided anything that day for insurance.

Q.   Right, but she told you -- it's on video -- she was trying to get her insurance information, right?

A.   Instead she was calling other people from what we gathered that day.

Q.   My question was she told you she was trying to get her insurance information?  What did she tell you --

A.   She also told us her insurance was inside, which she never produced from inside.

Q.   Deputy Moring allowed her to go inside on two occasions, right?

A.   To retrieve the information, yes.

Q.   Because notwithstanding that she was raising her voice, you didn't view her as a threat at that point?

A.   Everybody is a threat on a traffic stop.

Q.   But if she had been a threat, you would not have allowed her to return inside the house, correct?

A.   It wasn't my traffic stop.  I was just the assisting officer on that.

Q.   If she had been a threat, your partner on the traffic stop would not have allowed her to return into the house, right?

KYLE HART - CROSS

A.   That was his judgment.

Q.   So you can't say --

A.   I can't say whether -- it's his call.  It's not my call.

Q.   It's your testimony that she, in fact, returned to the house on two occasions, right?

A.   She did, yes.

Q.   That she was permitted to do so, correct?

A.   Not by my permission.  Yes, correct.  It was his traffic stop.

Q.   No one stopped her from doing it, right?

A.   Correct.

Q.   You didn't stop her from doing it, correct?

A.   Like I said, I was there as the assistant deputy helping him out.  So, no, I did not.

Q.   There's not a rule or regulation that says that the assistant on a --

A.   No.

Q.   -- traffic stop doesn't have authority to ask someone, the potential arrestee, from moving around, right?

A.   No.

Q.   There's no rule on that?

A.   No, sir.

Q.   So you could have told her, "Hey, don't go in the house," right?

A.   I could have, yes, sir.

KYLE HART - CROSS

**Q.**    Deputy Moring never told her, "Don't go in the house," right?

**A.**    Not that I have heard, no.

**Q.**    Now, when De'Shaun and Jeron came out of the house, they were recording, correct?

**A.**    It appeared that way.  They were holding their phones up as they appeared to be recording.

        **MR. GOLDSTEIN:**  Ms. Stone, could you put up Exhibit 10.

        **THE WITNESS:**  You asked me -- I'm sorry.

BY MR. GOLDSTEIN:

**Q.**    I'm sorry.  I was speaking to our paralegal, Ms. Stone. She is going to put an exhibit in front of you.

        Do you see it either on the big screen or on the screen in front of you?

**A.**    I have to get my glasses on.  Yes.

**Q.**    Do you recognize -- it may be hard to see -- this to be an image from inside Ms. Perkins' home looking out towards the driveway?

**A.**    That's correct.

        **MR. GOLDSTEIN:**  Now, Ms. Stone, if you could just play with sound the first part of the video.

        (Video played.)

BY MR. GOLDSTEIN:

**Q.**    Sergeant Hart, in that portion of the video, Exhibit 10,

KYLE HART - CROSS

that we just watched, Ms. Perkins is not yet under arrest, correct?

A.    At this point, no.

Q.    Right.

A.    She is being detained.

Q.    I'm sorry?

A.    She is being detained during a traffic stop.

Q.    There is a traffic stop, but she is not under arrest?

A.    Correct.

Q.    At least as the video shows, we don't hear Ms. Perkins say, "F y'all.  I'm going inside," correct?

A.    It just so happens this video skips around a little bit, and then right before that or right during that skip around it, it was when that was said.  Like I said earlier in my testimony that I was busy writing her information down and the motorcycle information down on the sheet or the citation and it took a second to register.  When I noticed out of my peripheral that she was starting to walk away again, it registered that she was discontinuing the traffic stop.

Q.    On the video we don't hear, "F y'all.  I'm going inside," correct?

A.    I couldn't hear it on the video, no.

Q.    Right.  What you can see on the video is that Ms. Perkins is moving back and forth on the driveway, right?

A.    Back and forth, yes, and then at this point where it's

**KYLE HART - CROSS**

paused is she is walking away.

Q.   Right.  When you walk back and forth, you walk toward something and then you walk away from something, correct?

A.   Could be depending on who is walking around, I mean, how you walk around.

Q.   Is it fair to say that prior to the arrest, Ms. Perkins was walking up and down the driveway?

A.   According to the video, yes.

Q.   Right.  She had walked up the driveway at least twice to go inside the house, correct?

A.   Correct.

Q.   She had walked down the driveway at least twice to go back to the traffic stop, correct?

A.   Correct.

Q.   At least as far as the video shows in this portion, she was walking up and down the video separately from those two instances in which she went into the house, right?

A.   Correct.

Q.   Then she says on the video that we just reviewed, Exhibit 10, "It's their driveway.  They don't have to go to their porch."  Did you hear that in the video?

A.   Sounds something like that, yes.

Q.   What did you understand Ms. Perkins to mean at that moment?

A.   That means they could stand wherever they want and don't

KYLE HART - CROSS

have to go away from the traffic stop.

Q.   Right.  In fact, you testified on direct that you had previously asked them to move back to the house, correct?

A.   Correct, away from -- because originally it seems like we were closer to the house than that, before the video.

Q.   So Ms. Perkins at least on the video says, "It's their driveway.  They don't have to go to their porch," as opposed to, "F y'all.  I'm going inside."  That's what video shows, right?

        MR. CAPITELLI:  I object to the form.  It misstates his testimony.  It misstates the evidence.  I just want to know is he talking about the portion of the video that's fast-forwarded or the portion that we see.

        THE COURT:  To the extent it's talking about that portion, if you can answer that, you can answer it.

        THE WITNESS:  Yes, ma'am.  At the portion of the video paused right here, it doesn't have that in there.  But like I said, it took me a few seconds to register while I was writing and noticing that she is walking away from me in my peripheral right before that saying what she said.

        MR. GOLDSTEIN:  Ms. Stone, if you could start Exhibit 10 again from the beginning.

        (Video played.)

        THE COURT:  Could we turn it up?

        MR. GOLDSTEIN:  That is beyond my pay grade.  Is

KYLE HART - CROSS

there a way to turn up the volume on the Court's end?

THE DEPUTY CLERK:  Start playing it.

(Video played.)

BY MR. GOLDSTEIN:

Q.   Is this the moment when you first arrest Ms. Perkins?

A.   Told her she was being placed under arrest, yes.

Q.   Directly before this moment that's now frozen on the frame, Ms. Perkins said, "It's their driveway.  They don't have to go to their porch," right?

A.   Sounds like it, yes.

Q.   Not "F y'all.  I'm going inside," at least in the portion of the video that we just watched?

A.   Not in that portion, correct.

Q.   At that moment you determine that it's time to arrest Ms. Perkins, correct?

A.   As she was walking away, yes.

Q.   Right.  You were the assistant or the second in command on the traffic stop, but that was your decision, right?

A.   At this point I think I started doing the paperwork to kind of take the report myself.

Q.   At this point, at least, you are authorized to make the decision to arrest, correct?

A.   Correct.

Q.   You made that decision directly after Ms. Perkins told De'Shaun and Jeron to keep recording, right?

KYLE HART - CROSS

A.   It is after that in the video, yes.

Q.   Now, Ms. Perkins wasn't breaking any law by telling them that they could continue to record, was she?

A.   No.

Q.   It's, in fact, something that you learn or train in officer training that individuals have a right to record the police, correct?

A.   Yes.

Q.   That includes the right to record an arrest, right?

A.   That's correct.

Q.   It includes the right to record police conduct --

         (Video played.)

         MS. STONE:  I'm so sorry.

         MR. GOLDSTEIN:  That's okay.

BY MR. GOLDSTEIN:

Q.   Police conduct at city hall, right?

A.   Correct.

Q.   Or police conduct at a parade?

A.   Correct.

Q.   But it does include the right to record the police during an arrest, right?

A.   That's correct.

Q.   Now, I think you testified on direct that you referred to this concept of Ms. Perkins being slippery.  Was that your testimony?

KYLE HART - CROSS

A.   I said slippery.  I wasn't in context of talking about her.  Something was slippery, either my hands, my handcuffs, somebody's arm.  I'm not sure exactly.  I can't speak back to four years ago, but I never said that she's slippery or Ms. Perkins is slippery.  I said something is slippery.

Q.   Did you curse during this interaction at all?

A.   It's possible.  It's possible, yes.

MR. GOLDSTEIN:  Ms. Stone, can you go to Exhibit 1, please, at around 35 seconds.  Maybe back a little.  Go to 30, please.

(Video played.)

MR. GOLDSTEIN:  I think I had my time stamps wrong.

BY MR. GOLDSTEIN:

Q.   It's your testimony, though, that you may have cursed during the altercation?

A.   Yes.

Q.   That would be on the video?  We could watch the video and --

A.   That's fine, yes.

Q.   -- the jury could determine for themselves what you did.

A.   That's fine.  Yeah.  It's possible.

Q.   Now, you testified on direct examination that at some point -- I think it was after you had moved Ms. Perkins to the grass or the curb -- that she was telling De'Shaun to keep interfering.  Do you recall that testimony?

KYLE HART - CROSS

A.   I didn't move her to the grass.  She dictated which way we were going by pulling, actively still resisting.  I mean, there was no reason for me to bring her to the grass.

Q.   Let's put that issue to the side.

A.   Okay.

Q.   After she was there, however she got there, did you testify that she continued to tell De'Shaun to keep interfering?

A.   Keep interfering or keep recording?  I'm not sure what --

Q.   Well, I'm trying to understand your testimony.  At any point did Ms. Perkins encourage De'Shaun to interfere with the arrest?

A.   Just by recording?  I don't think that's interference. Are you asking to keep recording -- I remember her saying, "Keep recording.  Y'all don't have to stop recording," if that's what you are asking.  I don't remember hearing her ever say stop interfering.  I just don't remember off the top of my head.

Q.   Let's back up.

A.   Okay.

Q.   She told the boys to keep recording, correct?

A.   Yes, correct.

Q.   That is not a form of interference, recording the arrest, right?

A.   Being close to us is interfering, yes.  Being within arm's

KYLE HART - CROSS

reach of us is interfering, correct.

Q.   Telling the boys to record?

A.   No, there's nothing wrong with that.

Q.   She never encouraged De'Shaun to interfere in any other way with the arrest, did she?

A.   From what I remember, she just said, "Don't stop recording," or something to that effect.

Q.   Now, I think you testified on direct examination that you understood that Deputy Moring had pulled his taser and was pointing at De'Shaun, right?

A.   Correct.

Q.   You saw him do that?

A.   Yes.

Q.   That was from either on the driveway or then once you moved with Ms. Perkins elsewhere on the front yard, right?

A.   Yes.  Sometime during that, yeah.

Q.   So you personally observed that day, May 5, 2020, your partner pointing his taser at De'Shaun, correct?

A.   At the time I don't remember him actually looking up and seeing him pointing the taser because I was dealing with Ms. Perkins.  There was so much I was dealing with there. Whatever my deposition says, it would be a clearer mind from two or three, four years ago.

Q.   Well, I'm just trying to recall what you testified on direct examination.  Did you see or did you not see

KYLE HART - CROSS

Deputy Moring point the taser at De'Shaun?

A.   At the point of being on the ground, I don't recall that. I just remember seeing him dealing with him off to the side. I don't recall seeing the taser. I don't remember off the top of my head.

Q.   At any point do you recall one way or the other seeing the taser?

A.   I don't recall. I don't recall right now.

Q.   You just don't recall right now.

Now, you were not filming the incident that day, were you?

A.   No, sir.

Q.   Officer Moring was not filming the incident that day, was he?

A.   No, sir.

Q.   Recordings of the police can be helpful to show what happens on any given day, right?

A.   I love body cameras. I mean, they are the best thing that's ever been put out there for police officers.

Q.   In fact, your sheriff's office now uses body cameras, right?

A.   That's correct, yes.

Q.   So had this arrest occurred sometime later than May of 2020, it would have been recorded by the sheriff's office, right?

KYLE HART - CROSS

A.   We wouldn't be sitting here today.

Q.   Well, we might be sitting here today, but not for, I guess, the claim we are here for today.

You testified on direct examination about some injuries you suffered that day?

A.   Yes.

Q.   Those injuries didn't prevent you from missing any work, did they?

A.   No, sir.

Q.   Those injuries did not prevent you from enjoying any of your hobbies?

A.   No, sir.

Q.   It was like abrasions to your fingers and your knees?

A.   Yes, sir.

Q.   Nothing more serious than that, no long-term consequences?

A.   No, sir.

Q.   Other than abrasions, no bodily injury that you suffered that day, right?

A.   No, sir.

Q.   You don't know the extent to which Ms. Perkins suffered any injuries that day, right?

A.   No, sir.

Q.   You don't know the extent to which De'Shaun suffered injuries from that day, May 5, 2020, right?

A.   No, sir.

KYLE HART - CROSS

Q.   All you know is that you suffered a couple of scrapes?

A.   Myself and Deputy Moring.

Q.   Well, you know that Deputy Moring suffered from scrapes?

A.   Some scrapes on his hands and stuff.

Q.   Now, are you familiar with an arrest affidavit?

A.   Yes.

Q.   You, in fact, completed the arrest affidavit --

A.   Correct.

Q.   -- for Ms. Perkins, right?

A.   Correct.

Q.   That's a document that you fill out after the fact to describe what happened, right?

A.   Correct, correct.

Q.   You signed that arrest affidavit because what you say in it is important, right?

A.   It's a digital signature, yes, sir.

Q.   It's your stamp of approval on that?

A.   Correct.

Q.   You include in the arrest affidavit whatever is of relevance to that altercation or arrest, correct?

A.   Correct.

Q.   Now, in the arrest affidavit that you completed, you described De'Shaun and Jeron as two males.  Do you recall that?

A.   Yes.

Q.   You don't describe them as teenagers, right?

KYLE HART - CROSS

A.   No, sir.

Q.   You don't describe them as family members, right?

A.   No, sir.

Q.   You intentionally describe them simply as two males that exited the residence, right?

A.   Correct.

Q.   You also state that the males were approaching the deputies and that you requested for them to stay on the porch; is that right?

A.   It's possible I said towards the porch, but those exact words, probably so -- yeah, stay where they were at originally, correct.

Q.   Now, the affidavit that you complete for an arrest, that happens after the fact, right?  You have some time to sort of --

A.   There's two different forms.  You have to do a probable cause sheet, which is sent to the judge to sign off on, and then you do the actual report, which is it could be several days later or a couple days later.

Q.   You have an opportunity, when you fill out that final report, to talk about it with your partner who was at the scene, right?

A.   Correct, yeah.

Q.   The affidavit that you signed describing this incident on May 5, 2020, doesn't even mention Deputy Moring's display of a

KYLE HART - CROSS

taser, right?

A.   I don't believe it does, no.

Q.   You had an opportunity to include that information or solicit it from Officer Moring and you didn't do that?

A.   Correct.

Q.   You, in fact, have a duty as an officer to describe any display of a taser during an arrest, don't you?

A.   Yeah.  It's possible, like I said earlier, that I didn't see it that day or realize that he had it out that day.

Q.   You have a duty to report it when you know, right?

A.   If there's a use of force, correct.

Q.   Including the display of a taser, correct?

A.   Officer presence is a use of force.  There's levels of force.  Display of a taser doesn't necessarily have to be documented if it's not used.  If it is used as deployed, then, yes, that would be definitely documented because that's a use of force.

Q.   If it's used to move someone on the scene from one place to another, it needs to be described in the arrest affidavit, right?

A.   Again, if it's deployed, yes, there would be definitely documentation on that.  But if it's just displayed, then there's no -- it's not necessarily needed to be put into a report.

Q.   It's a detail you can choose to include in a report,

KYLE HART - CROSS

right?

A.   It could be, yes.

Q.   Here you chose not to include the detail in your report that Officer Moring pointed his taser at a 14-year-old during this arrest, right?

A.   At the time, like I said, I may have not even known about the taser being out.

MR. GOLDSTEIN:  One moment, please.

BY MR. GOLDSTEIN:

Q.   That report also doesn't describe the physical push by Officer Moring against De'Shaun Johnson, right?

A.   It also doesn't describe the physical push against Deputy Moring from De'Shaun either.  I wasn't aware of that until the video surfaced.

Q.   Because you didn't see it at the time.  To the extent it happened, you didn't see any push by De'Shaun towards Officer Moring?

A.   I didn't see the video prior to making the report.

Q.   Right.  But when you made the report, you could have included the detail that there was a physical altercation --

A.   If I would have known about it.

Q.   Please let me finish.  A physical altercation involving both Officer Moring, your partner, and De'Shaun, you could have included that?

A.   If I would have known about it at the time, yes, I could

KYLE HART - CROSS

have.

Q.   Right.  You could have learned about it by asking Officer Moring, right?

A.   At the time, yes, I could have, but that was not brought up.

Q.   But you could have asked him?

A.   I didn't know there was any altercation between the two besides the asking of him to step back and not to interfere.

Q.   Well, you didn't know there was any physical touching between Officer Moring and De'Shaun?

A.   At the time of my report, no.  I didn't know that until the video surfaced.

Q.   You didn't know that he pointed the taser at De'Shaun, that's your testimony?

A.   I don't know.  At the time?  I don't remember right now. Whatever I put in my report is what I remembered at the time.

Q.   If the videos show you seeing the taser, then the videos will speak for themselves, right?

A.   Who's to say what I'm looking at when I'm dealing with Ms. Perkins flailing about all over the place.

        MR. GOLDSTEIN:  I pass the witness.

             Thank you.

        MS. FISHER:  Your Honor, how would we like to handle the proffering of exhibits?  At this time we would like to proffer the photos of Deputy Hart's injuries.

KYLE HART - REDIRECT

MR. GOLDSTEIN:  Those were excluded from evidence.

MR. CAPITELLI:  That's why we are proffering them.

MS. FISHER:  That's why we are proffering them and not publishing --

THE COURT:  We will do that out of the presence of the jury, if that's what you are asking.

### REDIRECT EXAMINATION

BY MS. FISHER:

Q.   You testified that you were injured in this matter, correct?

A.   That's correct.

MS. FISHER:  Afterwards we will proffer the exhibits.

MR. GOLDSTEIN:  I'm sorry.  I don't understand what they are being proffered for.

THE COURT:  We will discuss this.  I will advise the jury right now.

Sometimes the Court has to make determinations about exhibits that come into evidence or don't come into evidence.  The exhibits that you will be given for your consideration, you can consider.  As I have told you many times, all the testimony will come from the witness stand or from exhibits.  To the extent you have heard anything about something that may exist but you are not given, you are not to consider it.

We will discuss it outside of the presence of

KYLE HART - REDIRECT

the jury.

     MS. FISHER:  Yes, Your Honor.

BY MS. FISHER:

Q.   Sergeant, a couple of quick follow-ups.  You testified briefly about Officer Moring allowing Ms. Perkins to go into the home; is that correct?

A.   That's correct.

Q.   Did you make that call?

A.   No, ma'am.

Q.   Officer Moring made that call, right?

A.   That's correct.

Q.   Did he have to allow her -- did he have to permit her to go into the house at all?

A.   No, not at all.

Q.   He could have told her no from the beginning?

A.   That's correct.

Q.   Could she have been arrested as soon as she failed to provide proof of insurance?

     MR. GOLDSTEIN:  Object to the leading.

     THE COURT:  Sustained.

BY MS. FISHER:

Q.   Could she have been arrested prior to that point?

A.   As far as the resisting part, yes.  I'm not quite I follow you.

Q.   That's okay.

KYLE HART - REDIRECT

A.   We don't usually arrest people for no insurance.

Q.   I meant prior to that, but he did not have to let her go into the house at all, right?

A.   No, ma'am.  No, ma'am.

Q.   But he chose to give her two tries; is that right?

A.   Yes, ma'am.

        MR. GOLDSTEIN:  I object to the continuing leading.

        THE COURT:  It's your witness.  You can't lead your witness.

        MS. FISHER:  Yes, Your Honor.

BY MS. FISHER:

Q.   Was a taser deployed on May 5, 2020?

A.   No, it was not.

        MR. GOLDSTEIN:  Objection.  He just testified that he doesn't know one way or the other.

        MS. FISHER:  He testified that he did not remember seeing the physical display, but he knows that it was not deployed.  That was his testimony.

        THE COURT:  His testimony speaks for itself.  I don't need either attorney to say what his testimony is.  Sustained.

        MR. GOLDSTEIN:  It's sustained.

        MS. FISHER:  I heard her.  I'm processing how to get around it.

BY MS. FISHER:

Q.   Did you deploy a taser on May 5?

KYLE HART - REDIRECT

A.    There was no deployed taser that day.

Q.    If you had deployed a taser on May 5 or if it had been done, would you have reported it?

A.    Yes.

THE COURT:  What is "deployed"?  What do you mean?

MS. FISHER:  Firing it.

THE WITNESS:  Yes, ma'am.

MS. FISHER:  No further questions.  Thank you for your time, Sergeant Hart.

THE WITNESS:  Thank you.

THE COURT:  You may step down.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you.

THE WITNESS:  Thank you, ma'am.

THE COURT:  Ms. Fisher or Mr. Capitelli, call your next witness.

MR. CAPITELLI:  I'm going to grab her real quick. She went out in the hall.

THE COURT:  Is it Ms. Wright?

MR. CAPITELLI:  Yes.

ERIN WRIGHT,

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Thank you.  Please be seated and then state your name in the microphone for the record, please.

THE WITNESS:  Erin Wright.

ERIN WRIGHT - DIRECT

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. CAPITELLI:

Q.   Good afternoon, Ms. Wright.

A.   Good afternoon.

Q.   My name is Andrew Capitelli.  I'm an attorney for the defendants in this matter.

     Could you tell me a few details about yourself.  Are you married?

A.   Yes.

Q.   Who are you married to?

A.   Ryan Wright.

Q.   Do you have any children?

A.   I do.  We have three.

Q.   What are their names and ages?

A.   Miles, 18; Brody, 13; and Adalyn, 6.

Q.   Where did you live in May of 2020?

A.   Slidell.

Q.   What was your address?

A.   2017 Jay Street.

Q.   Were you directly across the street from Ms. Perkins and De'Shaun Johnson?

A.   Yes.

Q.   You lived directly across the street from them on May 5, 2020?

**ERIN WRIGHT - DIRECT**

**A.**   Yes.

**Q.**   Were you home on that day?

**A.**   Yes.

**Q.**   Take me through what you first recall about May 5, 2020.

**A.**   I was working from home.  It was during COVID, so it was just myself and my daughter.  I was working at the kitchen table on my computer.  I heard some screaming and yelling from outside, which caught my attention, and I looked out the window.  I saw the neighbor across the street and several deputies.

**Q.**   Prior to that moment, had you been outside that day with your daughter?

**A.**   I was outside.  I usually take our daughter out front. She likes to -- at that time she was three years old.  We were out front just, you know, letting her do her thing.  The neighbor across the street had started revving up the crotch rocket really loudly.  I mean, it's loud in general.  At that time my gut instinct was that we needed to get inside, which we did.

**Q.**   Why?

          **MR. COHAN:**  Objection.  Excuse me, Your Honor.  Could we have a sidebar briefly?

          **THE COURT:**  Very briefly.  One moment, please.

          (The following proceedings were held at the bench.)

          **THE COURT:**  What's the objection?

**ERIN WRIGHT - DIRECT**

MR. COHAN:  The objection is on relevance.  Where it sounds like this is going is to question the witness about what happened well before the officers arrived on the scene or De'Shaun appeared on the scene to smear and vilify Ms. Perkins.

THE COURT:  Relevance.

MR. CAPITELLI:  First of all, she hasn't said well before.  She is an eyewitness to the incident and the immediate before.  It goes to the credibility of Ms. Perkins, who we believe has not been truthful throughout this matter.  It's an independent eyewitness to both the immediate before the officers arrived as well as to that.  She has testified herself she didn't rev her engine, she wasn't driving recklessly, this has nothing to do with her.  That's a credibility determination.

They had an opportunity to depose her, which they did, so they know that there's no surprise.  She is allowed to testify to what she saw that day.

THE COURT:  She has been deposed?

MR. COHAN:  Yes.

MR. CAPITELLI:  By them.

MR. COHAN:  Your Honor, that's why I believe that her testimony will not be relevant.  In her deposition testimony, she said that the revving of the motorcycle happened 30 to 40 minutes before the deputies arrived.

MR. CAPITELLI:  Ask her about it.  Cross-examine her.

ERIN WRIGHT - DIRECT

THE COURT:  Right now, just because he hasn't put a time frame, I'm going to overrule it.  You can cross-examine her about that and about the time frame.  It possibly will make a difference.  I'm going to allow her to testify.  You may object as to relevance now that I know the background of it, and we will go from there.

(The following proceedings were held in open court bench.)

BY MR. CAPITELLI:

Q.   I think you said you had felt unsafe or that you needed to move inside with your daughter.  Is that fair?

A.   Yes, sir.

Q.   Why?

A.   Crotch rockets, you know, if you rev them up and you are careless on them, there could be an accident that could happen, and I felt like -- I went with my gut instinct and I took my daughter inside to avoid any potential injury or anything like that or problems.

Q.   Was it your feeling that Ms. Perkins was operating her motorcycle recklessly?

A.   Yes.

Q.   Had you seen her operate her motorcycle recklessly before?

A.   Yes.

MR. GOLDSTEIN:  Objection.  Relevance.

THE COURT:  Sustained.  Sustained.  The jury is not

ERIN WRIGHT - DIRECT

to consider that.

BY MR. CAPITELLI:

Q.   How long did this occur before you then heard the officers outside your home?  I should say heard the incident outside your home.

A.   From the time that we went inside, I would say maybe 20, 30 minutes, give or take in there.  I can't tell you exactly.

Q.   When you went back inside, you and your daughter both went inside?

A.   Yes.

Q.   Was anybody else in the home with you?

A.   My oldest son.

Q.   Did you call 911 on Ms. Perkins?

A.   No.

Q.   Have you ever called 911 on Ms. Perkins?

A.   No.

Q.   So while you were inside, you said you heard -- I'll say commotion, but feel free to say what you would like to say.  Did you hear a commotion?

A.   Yes.

        MR. COHAN:  Objection.  Relevance.

BY MR. CAPITELLI:

Q.   What did you hear?

        THE COURT:  You changed your question.

        MR. COHAN:  Objection.  Relevance.

ERIN WRIGHT - DIRECT

**BY MR. CAPITELLI:**

**Q.**   What did you hear?

          **THE COURT:**  When are we talking about now?

          **MR. CAPITELLI:**  I'm talking about her hearing the actual yelling for the incident itself.

          **THE COURT:**  Overruled.

                What did you hear?

          **MR. COHAN:**  Objection.  Lacks foundation.

          **MR. CAPITELLI:**  She stated before --

          **THE COURT:**  Is this when the officers are on the scene?

          **MR. CAPITELLI:**  Yes.

          **THE WITNESS:**  Yes.

          **MR. COHAN:**  She hasn't stated that she has seen the officers on the scene or anything about --

          **THE COURT:**  I thought she might have, but --

          **MR. CAPITELLI:**  She did before I asked her if she went outside before that and talked about being outside.

          **THE COURT:**  Ask again, Mr. Capitelli, please, for context.

**BY MR. CAPITELLI:**

**Q.**   What did you observe next on that day, after going inside, regarding Ms. Perkins and Mr. Johnson?

**A.**   I heard yelling.  That is when it grabbed my attention.  I looked out the front window where the living room was and I saw

ERIN WRIGHT - DIRECT

Ms. Perkins and a few deputies.

**Q.**   Who was yelling?

**A.**   Ms. Perkins.

**Q.**   Were the officers yelling?

**A.**   No.

**Q.**   Was Ms. Perkins cursing?

**A.**   Yes.

**Q.**   Was it loud enough for you to hear inside your home?

**A.**   Yes.

**Q.**   Is that a yes?

**A.**   Yes.

**Q.**   Did you hear anything else?

**A.**   It was cussing.  It was just a lot of commotion, a lot of yelling on Ms. Perkins' behalf.

**Q.**   What window were you at in your home?

**A.**   The first window that I looked out was the living room, and then I went into my bedroom window on the first floor.

**Q.**   Did you continue to watch across the street?

**A.**   Yes, I did, in my bedroom.

**Q.**   What did you observe?

**A.**   Ms. Perkins was resisting the officers.  It was pretty chaotic.  Deputies were trying to control the situation the best that they could, I felt the best that they could.

**Q.**   Did you observe the arrest of Ms. Perkins?

**A.**   Yes.

ERIN WRIGHT - DIRECT

Q.   What do you recall about that?

A.   Once deputies were able to get Ms. Perkins in handcuffs, again there was yelling.  At that time, that's when I saw -- there were several people videotaping the incident.  I remained inside.  One of the people that was recording the incident I believe was her son.

In the midst of Ms. Perkins getting arrested, her son was videotaping it.  By the body language from the deputy, body language was telling the son to kind of, you know -- not to stop recording, but to be at a safe distance, to not get in the mixup of it.

Q.   Now, there are three recordings in this trial.  Have you ever seen those recordings?

A.   No.

Q.   Never watched them?

A.   No.

Q.   This is all based on your personal observation?

A.   Yes.

Q.   Did I show you the recordings?

A.   No.

Q.   Did I tell you how to testify today?

A.   No.

Q.   Did we talk about your testimony today?

A.   No.

Q.   I did give you a subpoena to appear at trial today?

ERIN WRIGHT - DIRECT

A.   Yes.  I volunteered to come pick it up.

Q.   Did you observe any other interaction across the street from you that day?

A.   Between all that, no.  It was just cut-and-dry.

Q.   Now, you have got a young daughter at home at the time, right?

A.   Yes.

Q.   It's fair to say you didn't watch every moment outside?

A.   I didn't watch every minute of every second because I was trying to entertain a toddler, you know, trying to keep her happy and whatnot.  So, no, I did not watch every second, every minute of the incident.

Q.   Now, sitting here is Officer Ryan Moring.  Do you know Officer Moring?

A.   No.

Q.   Had you ever met him before May 5, 2020?

A.   No.

Q.   Have you ever spoken to him since May 5, 2020?

A.   No.

Q.   The individual who just testified in the court was Sergeant Kyle Hart.  Did you know Sergeant Hart before May 5, 2020?

A.   No.

Q.   Did you ever speak to him after May 5, 2020?

A.   No.

ERIN WRIGHT - DIRECT

Q.   But you do come from a law enforcement family.  Is that fair to say?

A.   Yes.

Q.   Who was a police officer in your family?

A.   My father was NOPD, a commander.  My pawpaw, which is my dad's dad, he was also NOPD.  I have a couple of cousins who are also in law enforcement, a lot of friends as well.

Q.   What about your husband?  Was your husband --

A.   And my husband too.  Whoops.

Q.   He was formerly law enforcement?

A.   Yeah.  He was a police officer in Wisconsin.  His dad is an investigator still in Wisconsin.

Q.   Are you proud of their service?

A.   Yes.

Q.   Do you support law enforcement?

A.   I do.

Q.   Does your support of law enforcement affect your testimony in this matter?

A.   No.

Q.   Why not?

A.   Right is right and wrong is wrong.

        MR. CAPITELLI:  Thank you, Ms. Wright.

        MR. COHAN:  Your Honor, may I approach the witness with a copy of her deposition transcript before I begin?

        THE COURT:  Just so she has it?

ERIN WRIGHT - CROSS

MR. COHAN:  Yes.

THE COURT:  You may.

You don't need to refer to it.  He is just going to put it on the desk.

CROSS-EXAMINATION

BY MR. COHAN:

Q.   Good afternoon, Ms. Wright.  My name is Keith Cohan, and I'm one of the lawyers for the plaintiff in this case, De'Shaun Johnson.

A.   Uh-huh.

Q.   Now, the time of the incident was May 5, 2020, correct?

A.   Yes.

Q.   You said at the time you lived at 2017 Jay Street; is that correct?

A.   Yes.

Q.   That's right across the street from Ms. Perkins' house, correct?

A.   Yes.

MR. COHAN:  Ms. Stone, could you bring up Exhibit 1 at around the 4-second mark and just pause it there.  You don't need to play it.

BY MR. COHAN:

Q.   So you see Deputy Moring and Sergeant Hart right there?

A.   Based off of seeing their faces today, I believe so.

Q.   Then in the background there's a house.  Is that your

ERIN WRIGHT - CROSS

house?

A.    That's my house.

Q.    I don't see anybody outside of that house.  As you testified earlier, you were not outside your house at any part of this incident, were you?

A.    I was outside prior to the deputies arriving.  I was out front with my daughter.  Even our chocolate Lab was out front as well too.

Q.    Ms. Wright, when I refer to "this incident," I'm referring to the one with the plaintiff in this case, De'Shaun Johnson. You were not outside of your house at all while De'Shaun Johnson was outside of his house, correct?

A.    No, I was not.

Q.    Once the deputies had arrived on the scene, you were not outside of your house at all, were you?

A.    I was not outside.

Q.    You were inside the whole time, right?

A.    I was inside.

Q.    So once the deputies arrived, you didn't go outside to look at what was going on.  You looked outside your window for part of it, correct?

A.    You can see the window behind one of the deputies, that's the living room window, and then to the right in that image is my bedroom window.

Q.    As you've admitted, you did not observe the entire

**ERIN WRIGHT - CROSS**

interaction between Ms. Perkins and the officers, correct?

A.   Not minute for minute, no.

Q.   You could not hear everything that was said, correct?

A.   I could hear the yelling clearly.

Q.   Well, that wasn't my question.  You couldn't hear everything that was said, correct?

A.   Not everything, no.

Q.   You were in and out, correct?

A.   Can you rephrase that, please.

Q.   You were in and out paying attention and not paying attention of what was going on, correct?

A.   Yes.

Q.   You were trying to keep your toddler daughter entertained, correct?

A.   Yes.

Q.   You were trying to keep your two dogs under control, correct?

A.   The dogs were perfectly fine.  It was just my daughter.

Q.   Okay.  Is it your testimony now that you weren't trying to keep your dogs under control at the time or curtailed at the time?

A.   I mean, dogs are dogs.  What do you want me to -- to control the toddler and the dogs, yes.

Q.   You did observe some things, though, right?

A.   Yes.

ERIN WRIGHT - CROSS

16:11

**Q.** You eventually observed that the son, De'Shaun Johnson, was there, correct?

**A.** Yes.

**Q.** One thing you observed was one of the deputies instructing the son, De'Shaun, to go inside, right?

**A.** With body language, yes.

**Q.** With body language?

**A.** I couldn't hear the deputy say, "Hey, go inside." It was I could tell by the body language that he was directing him to go inside.

**Q.** So you could tell, whether it was through body language or words or whatever it was, that the officers were instructing De'Shaun to go inside?

**A.** Yes.

**Q.** As I believe you testified earlier, you could also observe that De'Shaun was recording the incident; is that correct?

**A.** Yes.

**Q.** Were the officers instructing De'Shaun to go inside while De'Shaun was recording the incident?

**A.** The body language, I think, was more or less -- I didn't get the feeling that the deputies were telling him to stop recording. It was the fact of, hey, remain at a safe distance was what it was.

**Q.** Well, it was to go inside at least?

        **MR. CAPITELLI:** I object to the form. Asked and

ERIN WRIGHT - CROSS

answered.  Objection.  I'm sorry.  Asked and answered.

THE COURT:  I'm sustaining it based on speculation.

MR. COHAN:  Okay.

THE COURT:  You can testify to what you saw and what you heard.

Go ahead, Mr. Cohan.

BY MR. COHAN:

Q.   So you couldn't hear what was being said regardless, right?

A.   No.

Q.   You could see body language?

A.   Yes.

Q.   You could hear yelling?

A.   Yes.

Q.   One other thing you observed was that a neighbor of Ms. Perkins also came outside, correct?

A.   Correct.

Q.   Her next-door neighbor, correct?

A.   Yes.

Q.   Her name was Ms. Daphne, correct?

A.   I am horrible with names.  So if that is her name, then yes.

Q.   Spatially, if you are looking at her house --

A.   She's catty-cornered to mine.

Q.   -- to the right?

ERIN WRIGHT - CROSS

A.   Yes.

Q.   You agree that that neighbor -- I'll call her Ms. Daphne -- is super sweet, correct?

A.   We have done the friendly neighbor "Hey, how are you" kind of thing, but that's about it.  So from that, I mean, yes, she seemed --

Q.   She's someone you would refer to as super sweet if you were describing her, correct?

A.   I don't really know her.

Q.   If we could, you provided an interview with the St. Tammany Parish Sheriff's Office after this incident, correct?

A.   Yes.

Q.   As part of that interview, did you discuss that neighbor? Did you describe her?

A.   If I'm going off of memory right now, I think the neighbor that I was referring to is, if you look at this image up here, you see that house to the left?

Q.   Yes.

A.   Again, I'm very horrible with names, so I really truly apologize.  There was an older, elderly couple that lived there, and they were super sweet.  I do know them fairly well because we would help them out every now and then if they needed it.

Q.   Was that the neighbor who was outside during the incident?

16:15

A. No.

Q. I would like to play you part of your interview recording from that just to refresh your recollection.

**THE COURT:** What's the relevance of this?

**MR. COHAN:** That the neighbor who was outside she acknowledged was a sweet lady.

**THE COURT:** I'm not going to have the recording played to the jury. Do you have a transcript of it? If you want to refresh her recollection, she needs to read or hear it outside the presence of the jury.

**MR. COHAN:** There is no transcript. There is just a recording.

**THE COURT:** Then it's not proper. I can't allow you to refresh her recollection with it.

**MR. COHAN:** That's fine.

**BY MR. COHAN:**

Q. When you were at your home, you said you were able to hear Ms. Perkins when she operated her motorcycle; is that correct?

A. Yes.

Q. It was very clear, when living across the street, when Ms. Perkins was operating her motorcycle; is that correct?

A. Yes.

Q. But you didn't hear Ms. Perkins operating her motorcycle while the deputies were at her house, correct?

A. She was revving it up beforehand. I went inside and went

ERIN WRIGHT - CROSS

about my business doing work.  Next thing I hear is yelling, and I looked out the window.

Q.   Right.  That was about 30 to 40 minutes before the deputies arrived; is that correct?

MR. CAPITELLI:  Objection.  Misstates her testimony.

THE COURT:  I'm sorry.  Go ahead.

MR. CAPITELLI:  Misstates her testimony.

THE COURT:  She can answer.

Was that about 30 or 40 minutes before the deputies arrived?

THE WITNESS:  I said about 20.  I said, if I could remember correctly, it was about 20 to 30 minutes.  That is what I said.  I did not say --

BY MR. COHAN:

Q.   So your testimony now is that it was about 20 to 30 minutes before the officers arrived that you heard Ms. Perkins on her motorcycle?

A.   Give or take is what I stated earlier.

Q.   Whether it's 10 minutes or 20 minutes or 30 minutes or 40 minutes, it was before the officers arrived that you heard Ms. Perkins operating her motorcycle.  Is that fair?

A.   State that one more time.  Just ask the question again.

Q.   My question is while the deputies were there, did you hear Ms. Perkins operate her motorcycle?

A.   While the deputies were there?

**Q.**   Yes.

**A.**   No, I don't believe so.

**Q.**   While they were on Jay Street, did you hear Ms. Perkins operate her motorcycle?

**A.**   I don't -- I'm replaying --

       **MR. CAPITELLI:**  He is asking her to speculate at this point.

       **THE COURT:**  Overruled.

           Don't speculate.  The question is while the deputies were on Jay Street, did you hear Ms. Perkins operate her motorcycle?

       **THE WITNESS:**  To answer it fairly, I don't have the exact time of when the deputies arrived.  I wasn't looking at the time when she was revving her crotch rocket or her motorcycle.  I wasn't looking at the time or anything like that.  So was she revving it before?  Yes.  During when the deputies were there?  I don't -- I wasn't watching at the time that the deputies had arrived.

**BY MR. COHAN:**

**Q.**   So I believe your testimony earlier today was that you would guess it was about 20 or 30 minutes before the deputies arrived, right?  There was a period of time, whether it was --

**A.**   If I had to guess.  I said give or take.

**Q.**   It is your testimony, though, that when you were at your home, whether you were inside or outside, if Ms. Perkins was

ERIN WRIGHT - CROSS

revving her motorcycle, you could hear it?

A.   Yes.

Q.   So you're not sure if it was 20 minutes or 30 minutes, but you think it was about that time?

A.   Give or take.

Q.   You never observed Ms. Perkins backing up her motorcycle right before the incident happened, correct?

A.   No.

Q.   I think, as you mentioned earlier, you are very closely connected to law enforcement, correct?

A.   Yes.

Q.   Your father spent his career in law enforcement?

A.   Yes.

Q.   And your pawpaw?

A.   Yes.

Q.   And your friends?

A.   Yes.

Q.   It's kind of like a family business, I believe you said?

A.   I wouldn't call it a family business.  I would call it -- I mean, if they are interested in being law enforcement, they are in law enforcement.  I can't --

Q.   So your testimony today is that it's not like a family business?

A.   I mean, if somebody wants to be a law enforcement officer, they have the right and choice to be a law enforcement officer.

ERIN WRIGHT - CROSS

I can't help decide -- if that's what my dad decided to do, that's what he decided to do.  If that's what my friend decided to do, that's what they decided to do.  I just know people, family, and friends that are in law enforcement.

**Q.**   You have had your deposition taken in this case.  Correct, Ms. Wright?

**A.**   Yes.

**Q.**   That deposition was taken on February 7, 2022?

**A.**   If that was the date, yes.

**Q.**   That deposition, you were under oath when you were providing your testimony there?

**A.**   Yes.

**Q.**   If you could turn to page 25 of the deposition transcript in front of you, and if you go to page 25, line 23:

> **"QUESTION:**  What other family members were in law enforcement?
>
> **"ANSWER:**  My pawpaw.  I have a cousin.  I have obviously friends.  So, yeah, it's been, you know, yeah, law enforcement.
>
> **"QUESTION:**  It's kind of the --
>
> **"ANSWER:**  Worked for the DA's office.
>
> **"QUESTION:**  It's kind of the family business?
>
> **"ANSWER:**  Yes, sir."

You believe that -- actions taken against law enforcement really bother you.  Correct, Ms. Wright?

ERIN WRIGHT - CROSS

A.    Rephrase that question.

Q.    Action taken against law enforcement really bother you?

A.    Right is right and wrong is wrong.

Q.    It's something you posted about on Facebook, correct?

A.    What did I -- are you talking about I support law enforcement?

Q.    The war against law enforcement must end, that's something you posted on Facebook?

A.    Yes, I did.

Q.    You have said you feel bad for all deputies now?

A.    I do.  At that time I was very scared for them.

Q.    You, in fact, told the St. Tammany Parish Sheriff's Office during your interview that you would do whatever you can to support law enforcement?

A.    I support law enforcement.

Q.    You would do whatever you could to help them in this case?

A.    That's not what I meant.  That's taken out of context.

Q.    I believe you said earlier that you have never spoken to Deputy Moring before.  Is that correct?

A.    Yes.

Q.    Just clarifying, that's still your testimony?

A.    I want to retract that.  No.  I do remember -- I think there was an attorney or somebody who called me about this case.  I was unfamiliar with it, so I did call the sheriff's office.  I believe Deputy Moring, is it, said -- I explained

ERIN WRIGHT - CROSS

who I was, and then that's whenever he took my name and number and then got me in direct contact.  So that was it.

Q.    So you have talked to Deputy Moring?

A.    Yes.

Q.    Is there anyone else you have talked to from the St. Tammany Parish Sheriff's Office about this case?

A.    Captain -- it starts with an R.

Q.    Ripoll?

A.    Yeah.

Q.    Anyone else?

A.    I don't believe so.

Q.    Anyone else from the Milling Benson law firm you have talked to about this case?

A.    The law firm?  Yes.

Q.    Yes?

A.    I guess the law firm, yeah.  The attorneys, yeah.

Q.    You talked to the attorneys about this case?

A.    When I had to go in for a deposition, that's where I took my deposition.  I went to the office to pick up my subpoena.  I volunteered.  And then I also volunteered to pick up a copy of my deposition -- or I didn't volunteer.  I asked for a copy of it.

Q.    Have you talked to anybody else in preparation for this testimony today?

A.    No.

**ERIN WRIGHT - REDIRECT**

**MR. COHAN:**  Nothing further.  Thank you.

**MR. CAPITELLI:**  Very brief.

**REDIRECT EXAMINATION**

BY MR. CAPITELLI:

**Q.**   Ms. Wright, what was the substance of your conversation with Officer Moring?

**A.**   Like I said, I received a call from, I want to say, like an attorney referring to this case or Ms. Perkins' case, and you don't often get those phone calls.  So I called the sheriff's office, and Ryan Moring -- I was able to get in touch with Deputy Moring.  Honestly, it was, "Hey, I received this call from this law firm attorney."  He said, "I'm going to take your name and number," and left it at that.  It was maybe a 30-, 45-second conversation.

**Q.**   Did he talk to you about the substance of this case?

**A.**   No.

**Q.**   Now, you did talk to someone with internal affairs at the sheriff's department, Ripoll, correct?

**A.**   Yes.

**Q.**   That was because he was interviewing you in connection with the investigation of this matter, correct?

**A.**   Yes.

**MR. COHAN:**  Objection.  Leading.

**THE COURT:**  Sustained.

ERIN WRIGHT - REDIRECT

BY MR. CAPITELLI:

Q.   Why did you speak to Officer Ripoll?

A.   I wanted to speak the truth.

Q.   What did you two discuss?

A.   What I saw.

Q.   Was he interviewing you?

A.   There was a few questions.  I wouldn't say it was -- I mean, there were questions about the case.  So I was honestly giving him honest answers about what I saw.

Q.   Was it your understanding that it was in connection with an internal affairs investigation?

A.   Yes.

        MR. CAPITELLI:  Ms. Wright, that's all I have for you.  Thank you for your time today.

        THE COURT:  You may step down.

            Is this a good stopping point for the day?

        MR. CAPITELLI:  Yes.

        THE COURT:  Let's stop a little early today.  It's been a long day.

            Members of the jury, an overnight break.  From speaking with the attorneys, it does appear that we are on time to conclude the case tomorrow, so I will ask you to come back in.  I don't know if y'all have talked to Cherie or Melissa. Does 8:30 still work for everybody?  Again, don't panic if you are not here.  Nobody is starting without you.

We are about to take another overnight break. Remember, please do not discuss the case with anyone.  We are getting close to the end of the case, but we are still not at the end of the case.  The defense is still presenting its case. You have not heard all of the evidence in the case.  Keep an open mind until that time and until you hear the instructions from me.

I don't think there will be any news reports, but if you heard anything about it on the news, please do not listen to it.  Again, don't do any independent research on the case, and do not speak with anyone about it.

If there's anything we can do for you for tomorrow, please let the CSO or Cherie or Melissa know.  With that, you are recessed for the evening.

Counsel, stay.

THE DEPUTY CLERK:  All rise.

THE COURT:  Your notebooks will be safe in here. Nobody will touch them.

(Jury out.)

THE COURT:  Please be seated.

We are still on the record.  The jury has been excused for the evening.  There was going to be a proffer of exhibits.

Ms. Fisher.

236

**MS. FISHER:** Your Honor, at this time the defense with like to offer, file, and introduce as a proffer Defense Exhibit 1, which is the seven photos of Deputy Hart's injuries.

**THE COURT:** What is the purpose? What are you proffering them for, what purpose?

**MS. FISHER:** We just want them on the record.

**MR. CAPITELLI:** I think, Your Honor, what we would like to say is that it shows the level of active resistance going on, the difficulty of the scene, the safety issues imposed, our contention that plaintiff was interfering, and the concerns that there's physical injuries to the officer on the ground that are photographed. It again shows the difficult nature of the scene. I understand it was ruled it couldn't come into evidence, but we would maintain that we can proffer it for review by the Fifth Circuit, if needed.

**THE COURT:** Mr. Goldstein, you are standing up.

**MR. GOLDSTEIN:** We continue to object. We objected in the pretrial order. We briefed the issue in motions in limine. The Court excluded the evidence from the record. I don't think proffering them for purposes of an appellate record is appropriate. There is other evidence that the Court excluded, including evidence that the plaintiffs sought to admit, and so I don't think it's appropriate. I think it's prejudicial that the jury was even asked questions about these photographs when defendant knew they had been excluded from

evidence, so we would continue to object.

THE COURT:  I am going to allow them into the record, not to be shown to the jury in any way.  They are in the record for appellate purposes.  I'll be clear as to why I excluded them because I was already clear.

I advised the parties that Sergeant Hart could testify to his injuries, but that it would be cumulative evidence and a waste of time for the photographs to be introduced, especially because it was not an issue and remains not an issue about Ms. Perkins' resistance.  In fact, I believe there is going to be some stipulation or jury instruction, as I have advised the jury several times, Ms. Perkins' resistance has been established by her plea of guilty as well as by the Fifth Circuit.  That is not the issue in the case, so this was cumulative testimony and cumulative exhibits, which is why I excluded them.

I will further say I don't know if it was intentional for you to bring up what they were when you offered that proffer, but it was inappropriate.

MS. FISHER:  I do apologize to the Court.  My intent was just to ask the Court if at that time that was your policy or your procedure to proffer them.  When there was kind of a delayed stare between us, I kind of just offered to you what they were.  It was not malicious or improper intent.  I wasn't sure what, with the delayed reaction, you were requesting from

me.

THE COURT:  I appreciate that response.  I will let you know for future -- I don't think it was intentional, but when you proffer something, the entire proffer -- and especially in this case -- was to keep it out of the jury and for other reasons, to put it in the record for review by somebody else.

When you stated on the record that it was photographs of injuries that he alleges that he sustained, which you knew that I had excluded and we had discussed in some time, you know, to motions in limine, I just wanted to point out that was inappropriate.  You have explained yourself, and I understand that.

MS. FISHER:  I genuinely appreciate that.  It was my understanding that they were excluded from publishing to the jury, not that --

THE COURT:  When something is excluded as an exhibit, it can't be discussed.

MS. FISHER:  Noted.  Thank you, Your Honor.

THE COURT:  Second issue.  Mr. Capitelli, you had a Rule 50 motion.  Let's hear arguments on that.  I'm doing this now while we have Toni, the court reporter, because then we have other things.  I want her to be able to go.

MR. CAPITELLI:  Got it.  Understood.

Your Honor, we would move for dismissal of

plaintiff's intentional infliction of emotional distress claim. I would note Mr. Johnson's testimony at page 78 of the record. Hold on one second.

THE COURT:  One moment.

MR. CAPITELLI:  Page 77.

THE COURT:  One moment.

I will allow you right now to make an argument, but I just want to point out that what you are referring to as a transcript, in fact, I know that the court reporter has pointed out is not a final transcript.  It has not been deemed final and accurate.

Make your argument.

MR. CAPITELLI:  Absolutely.  Intentional infliction of emotional distress is a high standard, as we are aware.  The Louisiana Supreme Court and other courts have routinely recognized that extreme burden placed on a party here, Mr. Johnson, who is attempting to advance it.  We were clear at the outset of this matter, Your Honor, that all claims related to use of force, including for Mr. Johnson, have been dismissed in their entirety.

We then debated with the Court -- or I say "debated."  We discussed with the Court and with counsel whether or not an intentional infliction of emotional distress claim remained regarding the First Amendment, the single claim left by the Fifth Circuit.  We said yes as it relates to the

First Amendment claim, which as we all know is about his ability to record, not about the force used upon him or the force used upon his mother.

Intentional infliction of emotional distress by the Louisiana Supreme Court in *White v. Monsanto*, 585 So.2d 1205, at 1209:

"One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, such bodily harm.

"Thus, in order to recover for intentional inflection of emotional distress, a plaintiff must establish: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."

We have a causation issue here, Your Honor. Again, I continue on from *White*:

"The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Liability does not extend to mere insults, indignities, threats, annoyances, petty

oppressions, or other trivialities.  Persons must necessarily be expected to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind.  Not every verbal encounter may be converted into a tort; on the contrary, 'some safety valve must be left through which irascible tempers may blow off relatively harmless steam.'"

My questioning at page 77 of Mr. Johnson was specifically related to this issue.  I wanted to understand, as I noted, what he attributed his PTSD to.  He is the only one that can testify as to what he attributed it to.

He was at first confused.  I asked him again what he attributed it to.  He noted he was scared and upset, scared and upset of the force that the officers used.  This is at page 78, lines 9 to 10:

"The force, right?  The force itself?"

"No, the force that was used on me," answer by Mr. Johnson.

"That's what I mean, the force that was used on you, right?"

"Yes, sir."

Then he goes on to say that he doesn't even know himself what to attribute it to.

"The extension of the hand being one of those types of force?"

16:39

"The taser being pulled and that it all comes into play."

"So it was the use of force itself that caused your PTSD?"

"I can't really explain what caused the PTSD.  I still don't know to this day what really caused it.  I just know after that, it was very hard for me to sleep peacefully," and he continues on.

Mr. Johnson was given a full opportunity in his case in chief to present and establish the elements needed for causation for his PTSD as it relates to his one remaining claim, and he has failed to do so.  It must be dismissed.  It is a legal issue.  It cannot go to the jury.

THE COURT:  Mr. Goldstein.

MR. GOLDSTEIN:  Thank you.  It's not a legal issue. Under Rule 50(a), all inferences at that stage of the case -- and I understand we are making this argument after defendants began their case, but when plaintiff rests, all inferences must be drawn in favor of the plaintiff, De'Shaun.  The Court cannot make credibility determinations, and the question is could a reasonable jury looking at the evidence possibly find for the plaintiff.

Here, Your Honor, Mr. Capitelli recited the elements of the claim.  It is, in fact, a claim available under Louisiana law.  Evidence in the record would support a jury

finding as to intentional infliction of emotional distress.

During the pretrial proceedings in this matter, the parties discussed how certain of the uses of force by Officer Moring -- pointing of the taser, pushing De'Shaun -- were also the retaliatory conduct in connection with his recording of the police.  So I don't think it's fair to characterize the pointing of the taser purely as a use of force when, in fact, the testimony that defendants cited, De'Shaun confirms that the pointing of the taser -- and that use of force included the pointing of the taser.  Exhibit 11 is in the record in which Mr. Johnson stated to his treating doctor that his chief complaint was the pointing of the taser.

On the standard, sure, mere insults, petty oppressions, hardened to rough language, those are instances in which an IIED claim is not available, but that's not the evidence that this jury has seen on film, and that's not the evidence that De'Shaun and his mother and Officer Moring, frankly, testified about.

The conduct here is the pointing of a taser and the pushing of a teenager at point-blank range on his own property in the middle of the day for doing nothing wrong.  That is outrageous.  Certainly a jury could find that it's outrageous, and a jury could find the conduct is a cause -- a cause -- of De'Shaun Johnson's emotional and pain and suffering.  For those reasons we would ask the Court to deny

plaintiff's motion for judgment as a matter of law under Rule 50(a).

**MR. CAPITELLI:** Just quickly, and I think you mentioned defendant's motion for judgment of law. I think you said plaintiff's.

**MR. GOLDSTEIN:** Thank you. Thank you, Mr. Capitelli.

**MR. CAPITELLI:** Your Honor, the jury cannot determine that because the only individual who can tell us what he attributes his PTSD to has testified and has stated two things: (1) "It was the use of force"; (2) "I can't really explain what caused the PTSD."

We don't have a therapist testifying. They don't have their psychiatrist, who he claims to have seen numerous times. We have one record that references the police, references his mother, references PTSD. That's it, that's what we have, and a taser, according to their transcript that's objected to.

At the end of the day, it's Mr. Johnson who has to prove it's more likely than not that he met the intentional infliction of emotional distress. Causation is a key element of that. He has testified to causation and has confirmed that he can't say what caused his PTSD. A jury cannot conclude, based on that testimony, that he meant something else or that he must have meant to say something else. They are bound by the record, and that issue would be reversible on appeal.

**THE COURT:** Well, it won't be the first time in this case, now, will it?

Did he testify differently at any other time during his testimony?

**MR. CAPITELLI:** No. I read his entire transcript. Not once.

**THE COURT:** Wait.

**MR. GOLDSTEIN:** I may respond, if you would like, but I'm happy to not.

**THE COURT:** Go ahead, Mr. Goldstein.

**MR. GOLDSTEIN:** He was very clear during the testimony that defendant cited that he was not attributing his symptoms to seeing his mother get arrested or to be put on the ground. That was what he was testifying to. Drawing that fine distinction between whether it was retaliation and having the taser pointed at him for his recording versus pure use of force by an officer, that's not a line that De'Shaun was being asked to draw on cross-examination.

His testimony was clear. He tried to record the arrest. He faced significant consequences due to trying to record the arrest, including a taser in the face, and a threat, I will add; a threat to use it when Officer Moring said, "Watch me."

We referenced Exhibit 11, but just to have it in front of the Court, if this works.

16:44

**MR. CAPITELLI:** Are we going back and will have another opportunity, or did you just want to make one point?

**MR. GOLDSTEIN:** I'm making one, but --

**THE COURT:** Mr. Capitelli, I'm going to let you have the last words since it's your motion.

**MR. GOLDSTEIN:** The medical record that's in evidence clearly states at Exhibit 11: "Sheriff's department came to mother's house, pushed mother on the ground, and when patient tried to record the incident, officers threatened him with tasing." That's on page 11.4 of Exhibit 11, and that the chief complaint was threatened with tasing by police.

**MR. CAPITELLI:** Your Honor, he had this exhibit at his disposal and discussed this exhibit on the stand. My question was not limited to his mother. My question was very simply, "I want to understand what you attribute it to."

I will note as well that this record says, "Sheriff's department came to mother's house." Is that what it is? Is it that they pushed his mother? Is it that she was on the ground? Is it when the patient tried to record? Is it that the taser was shown, the use of force itself? We have no idea. This record can't contradict his own testimony as to what he attributed it to.

**THE PLAINTIFF:** I said that.

**MR. CAPITELLI:** He has not met his burden. We have a causation problem.

THE COURT: Mr. Johnson, you are well represented. Your attorneys will speak for you.

Rule 50 allows the Court to enter judgment as a matter of law if a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.

Counsel for the defendant cites *White v. Monsanto* in giving the elements of intentional infliction of emotional distress. I will acknowledge and agree that *White v. Monsanto* is probably the seminal case in Louisiana on intentional infliction of emotional distress. Almost verbatim what you cited as to what the jury has to find and the elements of intentional infliction of emotional distress will be included in the jury instruction to the jury that I'm going to give.

Rule 50 also allows the Court to defer ruling on such a motion until after the jury has been given the opportunity to determine it, and so I will defer ruling on that motion until the jury makes its decision.

Is there anything else that we need to put on the record? I do need to meet with the attorneys to give you the final jury verdict form that we went over yesterday and I think we all agreed on and the final jury instructions, but I don't believe we need our court reporter here. Let me hear

16:47 from counsel.

MR. CAPITELLI: Yes, just one quick note. We had discussed -- it's up to y'all to decide -- not calling Trinity Graves but putting Exhibit 13 in. I can do it in front of the jury, but I think your request was that at this point we not do it in front of the jury. I am just trying to see how the Court wants to handle that.

THE COURT: Didn't I already allow Exhibit 13?

MR. CAPITELLI: You did, but it had not been introduced by them. I was going to offer, file, and introduce it. I understand they weren't going to object to that exhibit. That was at least our initial discussion.

THE COURT: Mr. Cohan.

MR. COHAN: Yes. I think it's the Court's procedure that you usually don't allow documents into evidence that have been objected to. I agree with Mr. Capitelli. In order to save the Court's time and the jury's time, if we could avoid another witness and allow the document into evidence, that's acceptable to the plaintiff.

THE COURT: Let's do that in front of the jury tomorrow, so that will come in. Anything else that we need while the court reporter is here?

Mr. Cohan?

MR. COHAN: I don't believe so.

THE COURT: Mr. Capitelli?

**MR. CAPITELLI:**  No, Your Honor.

**THE COURT:**  With that, Court is in recess until tomorrow.

(Proceedings adjourned.)

\* \* \*

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled matter.

_s/ Toni Doyle Tusa_
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter