UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

TELIAH C. PERKINS, et al.      *      Docket 21-CV-879
                               *
versus                         *      Section D
                               *
KYLE HART, et al.              *      May 1, 2024
                               *
* * * * * * * * * * * * * * * * *

DAY 3
JURY TRIAL BEFORE
THE HONORABLE WENDY B. VITTER
UNITED STATES DISTRICT JUDGE

Appearances:

For the Plaintiff:          ACLU Foundation of Louisiana
                            BY:  E. BRIDGET WHEELER, ESQ.
                                 NORA S. AHMED, ESQ.
                            1340 Poydras Street, Suite 2160
                            New Orleans, Louisiana 70112

For the Plaintiff:          Reid Collins & Tsai, LLP
                            BY:  KEITH Y. COHAN, ESQ.
                                 EMMA CULOTTA, ESQ.
                                 RYAN M. GOLDSTEIN, ESQ.
                                 SEAN D. JOHNSON, ESQ.
                            1301 S. Capital of Texas Highway
                            Suite C-300
                            Austin, Texas 78746

For the Defendant:          Milling Benson Woodward, LLP
                            BY:  ANDREW R. CAPITELLI, ESQ.
                                 SARAH A. FISHER, ESQ.
                            68031 Capital Trace Road
                            Mandeville, Louisiana 70471

Official Court Reporter:         Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
                                 (504) 589-7778


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

**I N D E X**

PAGE

John Ryan

    Voir Dire By Ms. Fisher    11
    Traverse By Ms. Culotta    20
    Direct Examination By Ms. Fisher    26
    Cross-Examination By Ms. Culotta    43

Rule 50 Motion    59

Closing Arguments

    Keith Y. Cohan, Esq.    70
    Andrew R. Capitelli, Esq.    81
    Keith Y. Cohan, Esq.    84

Jury Instructions    87

Jury Verdict    115

<u>**MORNING SESSION**</u>

**(May 1, 2024)**

(Call to Order of the Court.)

**THE COURT:**  Good morning.  Please be seated.

Counsel is present.  Plaintiff is not present, although defendant is.

Can we proceed with some preliminary matters without your client?

**MR. COHAN:**  We may, Your Honor.

**THE COURT:**  For the past two evenings, counsel for both parties and the Court have gone over the proposed verdict form, the Court's verdict form, proposed jury instructions by each party, and the Court's jury instructions.

As to the verdict form, which I provided to both parties last night as a final verdict form, after going over it for two days, any objections by counsel for plaintiff?

**MR. COHAN:**  No, Your Honor.

**THE COURT:**  By defendant?

**MR. CAPITELLI:**  No, Your Honor.

**THE COURT:**  The jury instructions, I gave each party an opportunity to submit an additional jury instruction on how, or why, or whether the jury should consider any information regarding or between the officers and Ms. Perkins.

I have just handed you what I would propose to be added to Jury Instruction 10.  Jury Instruction 10 was

previously the first two sentences about discontinuance as to some parties, and what I have added is:

"You have heard testimony and argument about the incident between the two officers and Ms. Perkins. The lawfulness of the arrest of Ms. Perkins, the reasonableness of the force used against her by the officers, and whether Ms. Perkins unlawfully resisted arrest are not issues for you to decide. The only claims for you to decide are those made by plaintiff De'Shaun Johnson against defendant Ryan Moring."

The next jury instruction goes into those specific claims, and I have to say what you both proposed was very similar to that. Any objection by either party?

Plaintiff?

MR. COHAN: No, Your Honor.

THE COURT: Mr. Capitelli?

MR. CAPITELLI: Your Honor, just to note the same objection we noted yesterday, which is that we would suggest there should also be an instruction that any and all actions by Officer Hart should not be considered in assessing fault on the part of Officer Moring as they were at one point separate defendants. Officer Hart has been dismissed. The only claim that's remaining is against Deputy Moring.

THE COURT: I think this makes it clear enough -- and I say it several other times -- that they are only to decide claims made by Mr. Johnson against defendant Ryan Moring. I

think that makes it clear.  You may certainly use that in argument, and I will be clear to everybody.  If you want to use any part of the jury instruction, you have been given it.  If you want to advise the jury, "You will hear from Judge Vitter that is the only claim, and you are not to consider anything that Deputy Hart did," that may be appropriate.

This is what they are going to be instructed.  And they are going to be instructed several times, as you have received, that the only claims they are to decide are those by Mr. Johnson against Deputy Moring.

MR. COHAN:  I just have one question for the Court.  Will the charge conference be before or after closing argument?

THE COURT:  They will be after.  I'm glad you said that.  They will be after.  The jury instructions are put on the screen.  I find it easier for those like Mr. Capitelli and myself, who are visual.  I like to see it.  I've started doing that.  They also get a hand copy of it, printed copy.  So closing arguments, then jury instructions, just so you are aware of that.

MR. COHAN:  Thank you.

THE COURT:  A couple of other things that we noticed in finalizing the jury instruction.  I would suggest we delete three instructions that I don't think are needed.

Jury Instruction 7 was "Witness Not Called," and it had a placeholder:  "Blank" was available to both sides.

Plaintiff/defendant cannot complain that "blank" was not called to testify because either of them could have called "blank."

Nobody has ever suggested anybody.  I suggest we remove this completely.  Any objection?

**MR. COHAN:**  No objection.

**MR. CAPITELLI:**  No objection, Your Honor.

**THE COURT:**  The second one is Jury Instruction 9.  It was on page 10, "Charts and Summaries."  That is not demonstrative evidence.  That is just charts and summaries.  I didn't see any charts and summaries used throughout this trial, so I would propose that we remove that one.  Do we agree?

**MR. COHAN:**  No objection.

**MR. CAPITELLI:**  No objection, Your Honor.

**THE COURT:**  The final one was Jury Instruction 12, "Stipulations of Fact."  There are no stipulations.  There is an agreement that Deputy Moring was acting under color of state law, which I will put where we discussed last night, and I put that as an agreement.  I didn't use the word "stipulation."  I don't see that it's needed, but I will hear from you.

**MR. COHAN:**  No objection.

**THE COURT:**  No objection to removing?

**MR. CAPITELLI:**  No objection, Your Honor.

**THE COURT:**  Counsel for plaintiffs caught another typographical error last night where in two places it said "constitutionally permissible activity" where it should have

said "constitutionally protected activity."  They are correct. It should say "constitutionally protected activity," and I have corrected both of those.

We are printing those out so that you have the full final version.  You will have it this morning, one for each side.  As I said, it will be shown during this time.

With that, anything else that we need to discuss, Mr. Cohan?

**MR. COHAN:**  Not from plaintiff.

**THE COURT:**  Mr. Capitelli?

**MR. CAPITELLI:**  No, Your Honor.

**THE COURT:**  I don't think all the jurors are here yet.  The CSO just opened the door, and I thought he said four. Did he say four?  As soon as they are here, we will begin.

Your witness is here, Mr. Capitelli?

**MR. CAPITELLI:**  He is, Your Honor.  Mr. Ryan is here.

**THE COURT:**  Safe travels.  We are glad to see you.

**MR. RYAN:**  Thank you, Your Honor.

**MR. COHAN:**  One question, Your Honor.  Is it okay if Ms. Perkins stays in for the defendant's expert or -- if not, I will ask her to remove herself.

**THE COURT:**  Well, let's just be clear.  That will mean that you may not call her.

**MR. COHAN:**  As a rebuttal witness.

**THE COURT:**  -- as a rebuttal witness.

MR. COHAN: That's fine.

THE COURT: Mr. Capitelli?

MR. CAPITELLI: We would maintain that she was sequestered and the sequestration should remain in effect. She is not a party to this matter.

THE COURT: She is sequestered, so if he is going to object --

MR. COHAN: I appreciate it. Thank you, Your Honor.

THE COURT: She may be in for closing arguments. Everyone may be in for closing arguments.

Court is in recess until we have all the jurors, and then we will begin.

THE DEPUTY CLERK: All rise.

THE COURT: Thank you.

(Recess.)

THE COURT: I understand the jury is here. Ready to proceed?

MR. COHAN: Yes, Your Honor.

MR. CAPITELLI: Yes, Your Honor. I would just note that we do have the sequestration, I believe, still in effect.

THE COURT: Ms. Perkins, go ahead and step out. Thank you, ma'am.

Ready for the jury.

(Jury in.)

THE COURT: Good morning. Jurors, y'all sit. We

stand for y'all out of respect for you.  A little late for me to be telling you that on our last day, isn't it?

Please be seated everybody.

The jury is back in the courtroom.  The parties are present.  Counsel is present.  I hope you had a good evening.

Mr. Capitelli, call your next witness.

**MR. CAPITELLI:**  Actually, Your Honor, just before we did that, just one quick note about introducing an exhibit now, if I could.

**THE COURT:**  Yes, of course.  Proceed.

**MR. CAPITELLI:**  Just very briefly, Your Honor, we would like to move at this time to offer, file, and introduce Exhibit 13 into the record, which is the policy for the St. Tammany Sheriff's Office.  I know plaintiff's counsel has agreed to it.  We hope it will eliminate the need for one of the witnesses, leaving just one witness for this morning.

**MR. COHAN:**  No objection.

**THE COURT:**  Without objection, Exhibit 13, which is part of the St. Tammany policy manual, is admitted into evidence.

**MR. CAPITELLI:**  Thank you, Your Honor.

**THE COURT:**  You're welcome.

**MS. FISHER:**  Your Honor, at this time the defense will call our expert, Mr. John "Jack" Ryan.

08:56

THE COURT:  Mr. Ryan, come on up, sir.

**JOHN RYAN,**

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Thank you.  Please be seated, and then state your name in the microphone for the record, please.

THE WITNESS:  Yes.  It's John J. Ryan, R-Y-A-N.

THE DEPUTY CLERK:  Thank you.

THE COURT:  Ms. Fisher, you may proceed.

**VOIR DIRE**

**BY MS. FISHER:**

**Q.**   Good morning, Mr. Ryan.

**A.**   Good morning.

**Q.**   Will you please state your occupation for the jury, please.

**A.**   So I'm actually currently co-director of a group called the Law Enforcement Risk Management Group.  It actually goes by LLRMI, Legal and Liability Risk Management Institute.

**Q.**   How long have you been with that organization?

**A.**   It's changed names over the years, but the same owner has owned it, a guy by the name of Jim Alsup.  Since 2001, I've been with that group.

**Q.**   Will you briefly explain for the jury what it is you do in that role.

**A.**   Yes.  I do a variety of things.  One, I provide training throughout the United States to law enforcement.  I do that on

**JOHN RYAN - VOIR DIRE**

a very regular basis.

I also do, for lack of a better term, audits. Sometimes an agency wants an outside set of eyes to come in and look at their operations, their policies, their training, and make recommendations as to how they could do things more professionally.  Sometimes it comes on the back side of a problem.  So sometimes whether it be a judge, whether it be the attorney general, it may be somebody else that wants an agency looked at -- it might be city leadership, it might be county leadership wants an agency looked at because of some problem they have had, and I do those as well.

I also get involved in writing policies -- I think I write policies in 24 states now -- related to all of the high-risk tasks in law enforcement.

I also get involved in litigation, where I look at cases for attorneys, starting as a consultant to determine what issues might be raised from a police practices standpoint, and then many times they ask me to write a report and be available to testify in those cases, as I am here today.

Q.   Thank you.  Will you tell us a little bit about your education, please.

A.   Yes.  So I have a bachelor's degree in administration of justice from Roger Williams University in Bristol, Rhode Island.  I have a master's degree from Salve Regina University in Newport, Rhode Island, also in administration of

**JOHN RYAN - VOIR DIRE**

justice.  Then I have my law degree from Suffolk University Law School in Boston, Massachusetts.

Q.    So you are both a police officer or a former police officer and an attorney?

A.    Correct.  I passed the bar and was licensed in 1994, so a good part of my career I was also an attorney.

Q.    How long have you been practicing in this particular field?

A.    I don't practice law.

Q.    Oh, no.  I'm sorry.  I meant the law enforcement side.

A.    That's okay.  So with my career as a law enforcement officer and what I do today, it's over 40 years.  About 43 years, I guess.

Q.    Do you hold any certifications in addition to your education?

A.    Well, certainly I hold a license to practice law.  Even though I don't practice law, I maintain that license. Rhode Island doesn't have a license per se for law enforcement, but certainly I would still hold my ability to be a law enforcement officer in Rhode Island if I chose to be.

Q.    It's correct that you are certified with a taser by the Indiana police department?

A.    Yes.  So somewhere along the way -- I do a lot of training on the "when to."  There's a difference in training.  There's the "when to" and then there's the "how to."  Most of the

JOHN RYAN - VOIR DIRE

training out there is the "how to," how to use the taser itself, depending upon what model it is.

I felt it was important that I should go through a program, since I teach officers in a use of force format, when to use the taser, when it's appropriate to draw the taser, when it's appropriate to use what they call a drive stun versus the probe mode. I actually went through and got certified in the use of the taser several years ago.

Q. Will you tell us about some of your experience and the positions that you have held since the completion of your education in addition to those that have already been discussed.

A. Well, you know, a lot of my education was while I was a police officer. When I went on the department, I started as a patrol officer just like everyone else, worked in a district responsible for handling calls, responsible for handling accidents, all of those things.

Maybe two or three years in I was moved to what they call a tactical unit that focused on high crime. It was really focused on arrests as opposed to handling 911 calls. So we focused on high crime areas, also quality of life issues. So, you know, if street drug dealing was a problem, then we would work corners and things like that. We could work both in plain clothes and uniform.

After that, shortly after that, that unit got

JOHN RYAN - VOIR DIRE

disbanded because of a minimum manning clause that was put in the contract.  It sent overtime though the roof.  I was already on the detectives list, so I was a detective for a year.

Then I made sergeant, went back to patrol, which was by contract you had to.  I was responsible for a district of officers, 10 officers that I supervised on the road on a regular basis.

A couple of years after that -- and I don't have all my years down.  I don't have them committed to memory.  Then I made lieutenant.  As a lieutenant, I was responsible as basically the watch commander for the whole city.  Because I worked nights, there was nobody that outranked a lieutenant, so I was responsible for the entire city as opposed to just a district.  Then in 1996 or '97, I made captain.

During that time as a lieutenant, I was also the director of training.  I got taken out of patrol, sent to the police academy as the director of training.  So I had responsibility for all the training for the department, both in-service training for officers that were already on as well as the basic academy.  We have our own academy in Providence, so I actually wrote the curriculum for that academy.  I wrote curriculum for all the in-service training and was responsible for all training probably from 1994 to 2000, even though I held other positions as well.

As a captain, I was in the administrative staff

JOHN RYAN - VOIR DIRE

division, where I again wrote policies, oversaw internal affairs investigations, oversaw a number of different units related to the administrative staff.

Q.    I believe you mentioned a little bit earlier that part of your current position sometimes involves getting involved in litigation.  Is that correct?

A.    That's correct.

Q.    That litigation sometimes involves testifying; is that correct?

A.    That's correct.

Q.    How often generally would you say that you have been involved in litigation and specifically testified in certain matters?

A.    You know, at this point, over the last 20 years, I've looked at certainly over a thousand cases.  Testimony, I would say certainly at trial at least a hundred times.  I don't track it, but it's at least a hundred times.  Deposition would be much more than that, but I don't have a complete number.

Q.    Who do you provide these testimony services for?

A.    Generally, you know, an attorney either on the defense side -- and largely, you know, I run about, I would say, 80/20. I'm about 80 percent on the defense side, 20 percent on the plaintiff side.  I don't track that, but attorneys have told me that, and I don't dispute it because I have to maintain a list.

        Usually, it's an attorney that calls me and asks me

**JOHN RYAN - VOIR DIRE**

to look at a case, usually as a consulting expert first to see if I have any opinions about the law enforcement practice that occurred in the case.

Sometimes when I reach those opinions after reviewing materials, they will ask me to write a report.  If I write a report, many times I get deposed in a deposition, and sometimes I actually come in and testify at trial.

Q.   Have you ever been prohibited by a court from testifying in this area?

A.   I've never been disqualified as an expert, but like every expert out there, there's sometimes limitations that courts put on the testimony for a variety of reasons.  One, it might be that issues that I had opinions on are now out of the case, so that happens.  Some judges will allow an expert to testify on what they call the ultimate issue, some do not, and it's certainly their discretion.  So there's been cases where courts have limited what I could testify to.  That certainly has happened.

Q.   In addition to getting involved in litigation and testifying sometimes, is teaching and lecturing also a part of what you do in your field?

A.   Yeah.  I train on a regular basis.  Just in the last few weeks, I did a use of force certification program for instructors in use of force in Las Cruces, New Mexico.  From there, I went -- I got back from there on a Friday.  On Monday,

JOHN RYAN - VOIR DIRE

I was with the Maryland chiefs -- I'm sorry.  Tuesday I was with the Maryland chiefs doing a program on all of the high-risk liability areas for the Maryland chiefs association.

Then I did a program that weekend in Washington, D.C., for attorneys.  It happened to be municipal attorneys that are city attorneys throughout the United States.  Actually, it's international, but throughout the United States.  So I spoke with that because I regularly do some what they call CLEs for attorneys, too, on these topics.  I had a good friend, Karen Blum, who was my professor in law school, and she kind of started me on that circuit, and I've been on it for a long time now.

Q.   I apologize if you have already mentioned some of them, but what are some of the subjects that you regularly teach and lecture on?

A.   So I do a lot on what I would refer to as the high-risk tasks, but I do an awful lot on use of force.  I do an awful lot of programs on SWAT operations.  I do a lot of programs on riots, protests, and demonstrations.  So all of these areas, whether they be -- and, again, not from a legal standpoint, but certainly the areas of search, seizure, and arrest, use of force, certainly areas related to, for lack of a better term, First Amendment issues, freedom of speech and the right to protest and things of that nature, and how the police can respond to those events.

JOHN RYAN - VOIR DIRE

Q.    Do you ever teach and train on something like de-escalation techniques or whatever in law enforcement you would call that?

A.    Yes.  I have both online training that I have done that is used throughout the country on de-escalation and I train de-escalation in all my use of force programs.

Q.    It's my understanding you have quite a few publications in these areas.  Is that correct?

A.    I do.  You know, I have a couple of books that I keep up.  One is in, like, its sixth edition.  It's law and best practices for a successful law enforcement operation.  It's largely summaries of cases that have been decided already by the courts that inform law enforcement of what they can do and what can't do, and that may vary depending on the circuit that the courts are in.

Then I do another book that we call a -- it's a guide for officers on, like, when they can search a vehicle, when they can stop somebody, when can they frisk somebody, when do they have to give Miranda warnings, all the things that you kind of see in law enforcement that go on, but that's a guide to give them clear guidance as to what they can do and what they can't do.

Q.    So given all of that together, it's safe to say that you are pretty versed on law enforcement standard operating procedures?

JOHN RYAN - TRAVERSE

A.   I would say I am, particularly in light of the fact that I do write policies, as I said, in I think 24 different states.

Q.   Does that cover officer safety?

A.   Absolutely.  And certainly the training covers officer safety throughout, particularly the use of force training programs, SWAT training programs, things of that nature.

MS. FISHER:  Your Honor, at this time the defense would like to tender Mr. John Ryan as a qualified expert witness, pursuant to Federal Rule of Evidence 702, in the field of generally accepted policies, procedures, and training for law enforcement officers.

THE COURT:  Policies, procedures, and training of law enforcement.  All right.

Any traverse of his qualifications, Ms. Culotta?

MS. CULOTTA:  Briefly, Your Honor.

THE COURT:  Please.

TRAVERSE

BY MS. CULOTTA:

Q.   Good morning, Mr. Ryan.

A.   Good morning.

Q.   My name is Emma Culotta.  I'm counsel for the plaintiff. I just want to ask you a few questions.

A.   Sure.

Q.   So you mentioned that you are the co-director of the Legal and Liability Risk Management Institute; is that correct?

JOHN RYAN - TRAVERSE

09:10

**A.**   Yes, ma'am.

**Q.**   You have a law degree; is that correct?

**A.**   That's correct.

**Q.**   But you are not here today to testify as an attorney, right?

**A.**   No.

**Q.**   You are -- sorry.

**A.**   Go ahead.  I'm sorry.  As a police practices expert, yes.

**Q.**   So you will not be instructing the jury or giving the jury what the law is to be applied in this case, correct?

**A.**   No, the judge is going to give you have what the law is. That's not what I do.

**Q.**   You said that you write certain publications on the topics that we are discussing here, police procedures and tactics, correct?

**A.**   Correct.

**Q.**   Are those publications written to help inform law enforcement officers about developments in the law?

**A.**   Many of them are.  So, you know, there's always updates that I write if there's changes particularly.

**Q.**   So despite not practicing law, you do follow updates on how the law is changing as it applies to law enforcement; is that correct?

**A.**   I have to because their policies have to be consistent with legal standards, of course.

JOHN RYAN - TRAVERSE

09:11

Q.   Mr. Ryan, you were not retained in this case until January 11, 2022, correct?

A.   I would have to look at a document to figure that out, so if you have a document -- I'm not sure of the date, to be honest with you.

Q.   That's fair.  Do you recall generally when you were retained?

A.   I don't.  I know it was some time ago, but I don't recall when.

Q.   Do you recall that you signed a 44-page expert report for this case?

A.   Absolutely.

Q.   Do you recall that you were able to develop your opinions and issue that 44-page report in only 16 days between being retained and issuing the report?

A.   That I don't know.

Q.   You are paid for your work consulting and testifying on these matters, correct?

A.   Absolutely.

Q.   In this case you're receiving a flat rate plus additional expenses and charges; is that correct?

A.   Yes.  So LLRMI charges a flat rate fee and then I get a portion of that, yes.

Q.   That flat rate fee in this case is $8,500; is that correct?

JOHN RYAN - TRAVERSE

A.    If that's what you have.  I know they have gone up recently.  It's more than that today.

Q.    Then you or your firm charges an additional $2,500 for work away from Providence; is that correct?

A.    Absolutely.

Q.    So you are making roughly at least $12,000 for this case; is that correct?

A.    Not me personally.  LLRMI is.  I don't own LLRMI.  I would get $6,000 of the $8,500.  I would get $2,000 of the $2,500 for being here today, for being gone from my house for more than 24 hours, yes.

Q.    Mr. Ryan, you have, in fact, been barred from testifying as an expert by several courts; isn't that correct?

A.    I've been limited.  I've never been disqualified, not to my knowledge.

Q.    In at least one case, a court found that you were inappropriately making credibility determinations; isn't that right?

A.    You would have to remind me of the case.  I don't recall that.

Q.    That case was *Sanders v. City of Chicago Heights*, correct?

A.    I think that's a case where -- and, again, I would have to remember the facts, but certainly the way the plaintiff presented my testimony, it looked like I was making credibility determinations, but I was not.  What I was doing was I was

JOHN RYAN - TRAVERSE

talking about what we train officers to look at when they are trying to determine whether or not witnesses are credible, but I think the court did bar me from that testimony, yes.

Q.   Another case, *Rochelle v. Ross*, the court excluded your opinions as unreliable in that case; is that correct?

A.   That was a gun case, and I had no opinions on the gun being held to the subject's head.  Because of that, the court didn't let me testify because I didn't have an opinion on the gun being held to the subject's head.

Q.   So you were completely barred in that case?

A.   I did not testify in that case, no.

Q.   You were partially excluded from testifying as recently as four months ago, in January of this year; is that correct?

A.   You would have to remind me.  I'm sorry.

Q.   There was the *Clark* case pending in Louisville, Kentucky. Does that sound familiar?

A.   *Clark* I'm still going to testify in.  I think there's certain aspects that I can't testify to because the judge ruled that some of them were the ultimate issue, legal issues.  So there's aspects that I can't testify to, but to my knowledge I'm still testifying in the case.

        MS. CULOTTA:  Thank you, Mr. Ryan.

            I pass the witness.

        THE COURT:  Ms. Fisher, anything else on his qualifications?

JOHN RYAN - TRAVERSE

**MS. FISHER:** Nothing else on his qualifications.  We would just at this point like to tender him.

**THE COURT:** Jury, I will instruct you just as I did for the previous expert.  I do find and will qualify Mr. Ryan as an expert in policies, procedures, and training of law enforcement officers.

Just as I instructed you before, when knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his opinion on those technical matters.  You are not required to accept that opinion.  Just as with any other witness, it's up to you to decide whether to rely on it.

You may accept or reject, in whole or in part, the opinion expressed by any expert.  The effect and weight to be given to that expert testimony is within the broad discretion of you, the jury.  The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion.  Further, if appropriate, the jury may substitute its own common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.

I have qualified Mr. Ryan as an expert, and you may proceed.

**MS. FISHER:** Thank you, Your Honor.

JOHN RYAN - DIRECT

DIRECT EXAMINATION

BY MS. FISHER:

Q.   Mr. Ryan, how did you first become involved in this case?

A.   I would have gotten a call from an attorney asking me if I would be willing to take a look at materials and then called them back and let them know if I had any opinions on the law enforcement practices involved in the particular event.

Q.   You ultimately decided to take this case; is that correct?

A.   Ultimately, you know, one of the things -- and this happens, that sometimes I will have documents sent to me, and I will call the attorney back and they are not happy with the opinions that I have about the police practices, whether I say they were good, whether I say they were bad, depending upon what side of the case I'm on.  In those cases, the attorney generally does not have me write a report.

Q.   So when you decided to take this case, what were you asked to do?

A.   I was asked to review documents.  I was asked to review, I think, three videos, a number of documents that included statements from officers, it included reports, and I reviewed those documents to reach my conclusions.

Q.   Did the information that was provided to you provide sufficient facts for you to form certain opinions in this case?

A.   Between that information and also I was able to review the transcript from the last two days in court of the witnesses as

JOHN RYAN - DIRECT

well, so yes.

Q.   Generally speaking, what were the conclusions that you reached in this case?

A.   My conclusions were that the officers appropriately handled the call itself in responding.  They made attempts to de-escalate the event, gave Ms. Perkins an opportunity to get insurance, let her actually, I think, go in the house to get that.

So they took steps to try to de-escalate the event. They gave her a voice, essentially, by letting her explain why she didn't have her insurance, why there were issues with the registration, and then following through with at a certain point their handling of Mr. Johnson when he approached the scene of the arrest of Ms. Perkins.

Q.   So, in all, you found that generally accepted police policies and procedures were followed in this matter?

A.   Yes.

        MS. CULOTTA:  Objection.

        THE COURT:  I'm sorry.  What is the objection, Ms. Culotta?

        MS. CULOTTA:  Leading.

        MS. FISHER:  He is an expert.

        MS. CULOTTA:  He is your witness.

        THE COURT:  Overruled.

JOHN RYAN - DIRECT

**BY MS. FISHER:**

**Q.**   So, Mr. Ryan, we have covered a lot of the training that you were involved with and that you conduct so far.  What is it that you teach specifically, when you are teaching new officers or even experienced officers, about policies and procedures for law enforcement?

**A.**   Well, you have to teach them what the generally accepted practices are, what they can do and what they can't do. There's two types of training.

There's the skills training, how to do something.  So when we talk about new officers, when I was the director of training, we would have to take them out to the shooting range and teach them how to shoot the gun.  We would sometimes have new recruits that never shot a gun before, so we would have to teach them the skill, how to shoot.  More important than the skill, though, is the "when to," when can they shoot a gun, when is it appropriate to use deadly force, things of that nature.

So I do both.  I have done a lot of skills training over the years.  I do less of that now.  Now my focus is really on the decision-making training, the "when to" do certain tactics.

**Q.**   Are officers trained that they will be recorded?

**A.**   Absolutely.

**Q.**   Are they trained that there are certain limitations on a

JOHN RYAN - DIRECT

civilian's right to record the police?

**A.**    Yeah.  I do a long piece that lets officers know that a citizen has the right to record them in a public place. There's no question about that.  It's not a choice.  In a public place, a citizen has the right to record them.

But like everything else, they have to be consistent. The officers can take enforcement action based on reasonable time, place, or manner.  So there's times when an officer can limit the ability of a citizen to record, and we talk about two specific aspects of that in the training that I do.

So we talk about, one, if the person closes in on the officer's safety zone, that might pose a threat to the officer or to the person the officer is dealing with.  That's number one.

Number two is if the person intrudes in such a way and comes so close that they hinder the officer's ability to carry out the call, whatever it is they are doing, whether it be investigating an accident, whether it be writing a ticket, whether it be making an arrest.  If the person diverts the officer's attention from that, then now the officer is hindered from carrying out the mission that has to be carried out.

So those are the aspects, those are the reasonable time, place, and manner that we train officers on, that there's times when they can restrict a person not from recording, but from being in close proximity to them or in interfering with

JOHN RYAN - DIRECT

the mission that they are carrying out.

Q.   So you just mentioned two things there, distance and proximity.  How far is generally considered reasonable when it comes to distance and proximity to an arrest?

A.   When we start talking about distance, even when there's not an arrest -- so an arrest the distance would be greater, but any time an officer -- for example, we have a training that we do, particularly for new officers, that we call the interview stance.  We have officers throughout the police academy practice the interview stance, and there's a couple things.

One, we want them to be 6 to 8 feet away from the person, so that if the person all of a sudden -- you know, things happen unpredictably in law enforcement.  If for some reason the person suddenly charges the officer, the officer has an opportunity to react even in the nonhostile situation.

So we want the officer -- if ever you see an officer with somebody stopped, you will see them kind of with their gun side turned away.  That's part of the interview stance.  We want their hands above their waist; not in a threatening manner, not a fighting manner, but just maybe talking to the person with their hands above their waist so that they are prepared to react within that reactionary gap that everybody has.

Q.   Can you go into that a little bit more, the reactionary

**JOHN RYAN - DIRECT**

09:24

gap and why that's important for officer safety.

A.    Yeah.  The explanation that's probably easiest to help understand this reactionary gap is that everybody has some form of reactionary gap.  So, for example -- and I don't know if anybody has ever hit another car from behind, or maybe didn't hit it but at least come upon somebody stopped short in front of them.  You have to observe that.  "Oh, my God, the car is stopped short."  You have to orient to it.  "I might hit this car."  You have to decide what to do.  "Should I steer around it?  Should I hit the brakes?"  Then you have to physically undertake the action.

Now, what's happened in that time frame, from first observing until you actually hit the brakes or steer around it, everything has changed position, and in some cases we actually hit the car.  So there's a reactionary gap.  Everybody has a reactionary gap.

We see it in shooting cases.  I've done drills on the range, for example, where I will give a stimulus for officers to commence firing and then we time them.  We get sometimes a second and a half to three seconds for some officers before they get that first shot off.  It's the same thing on the back side.  We give them a stimulus to stop shooting.  Sometimes they fire extra shots after we give them that stimulus because it takes the brain the time -- and it's split seconds.  It's not a long period of time, but there's always a reactionary

JOHN RYAN - DIRECT

gap, so that's why we want officers to create a safety zone.

You know, there's been some studies done -- it's not a rule, but there's been some studies done that when a person, for example, has a knife and they're within 21 feet, they can close that gap 50 percent of the time before the officer would be able to get their gun out of the holster and fire, 50 percent of the time.

So we are not saying to officers, hey, that somebody 21 feet or closer always gets shot.  No, that's not what we are saying.  That's not the rule.  We are saying that the officer has to understand there's a reactionary gap, which is why we teach this interview stance as well.

Q.    Is part of the idea under training and enforcing that reactionary gap to law enforcement officers the idea that civilians cannot obstruct police actions?

A.    Correct.

MS. CULOTTA:  Objection, Your Honor.  Leading.

MS. FISHER:  He is an expert.  I'm getting him to his opinions in this case.

THE COURT:  He can state his opinions.  It doesn't mean you can lead him there.  Sustained.

BY MS. FISHER:

Q.    What is one of the concerns faced if that reactionary gap is violated?

A.    Well, the first concern is safety.  If the officer doesn't

JOHN RYAN - DIRECT

have time to react to somebody who might for whatever reason assault them, attack them, unfortunately, you know -- you know, the officer has a number of weapons on their belt.  When the officer is trying to deal with one issue, a person could grab one of those weapons.  In fact, 15 percent of officers feloniously killed in the line of duty are killed with their own gun.  So when you think about that, that's why you need this space.

So the first thing is safety, but the other one I mentioned right at the start is that a person can't get so far close to the officer in interfering with the officer with their actions that the officer can't carry out their function.  Remember, there's a safety issue there, too, because now the officer's attention is diverted in two directions, the person they are trying to arrest and now the person they are trying to deal with that's closed in on them and is within their physical space.

Q.    Are police officers allowed to ask people to move?

A.    Absolutely.  So, you know, as part of the training on officers having to let people film in a public place, one of the things I always tell them is the first step you take is to tell the person to move back, not that they have to stop filming.  You tell them to move back and that way you create that safe distance, but they still get to film.

Q.    Does the fact that an arrest is occurring in someone's own

**JOHN RYAN - DIRECT**

driveway affect the analysis at all when it comes to reactionary gap?

A.   I wouldn't say that it affects the reactionary gap depending on how many people you are dealing with.  You know, one of the problems when you are in somebody's driveway is there may be other people that are sympathetic to that person who may come out and intervene in some way.  So we do train officers part of the threat analysis with, for example, use of force is persons present.  So persons present that may be sympathetic to the arrestee, you know, it's certainly a huge safety concern because the officer is trying to deal with the arrestee, and now there's the potential that the officer could be assaulted.

Q.   What is one of the first maneuvers that is taught when it comes to de-escalating that type of situation?

A.   So, you know, the first step in any kind of law enforcement interaction is what we call officer presence.  For example, let's suppose that you were on your way to work one day and you are running late, and you are driving a little bit faster than the posted speed limit.  All of the sudden you see a marked police car.  What do you do?  Everybody does the same thing.  If you are going the speed limit, sometimes you step on the brakes because you think you might be going over the speed limit, right?  That's officer presence.

          Almost all persons, when they see just the visual

JOHN RYAN - DIRECT

symbol of legal authority, they automatically comply their behavior.  They automatically comply their behavior to what's expected.  That's the least intrusive form of force that officers use.  They just show up.  Many times they are called to show up, right?  Sometimes it's self-initiated contact.  When they are called to show up, they have no choice but to go and to investigate what the dispatcher has told them to investigate.

Q.   If police presence does not achieve their end, what is one of the next steps that they can take or some of the next steps that they can take?

A.   So, you know, the next step they can take and consistent with officer presence -- and some states actually have this in statewide policy -- is a show of force.  So there's times when a show of force, for example, even a brandishing of a firearm is a low-level force to try to achieve compliance without physically firing the gun, without any of that.  So, again, that's called constructive authority.

But then the next step that virtually everyone has is verbal commands.  "Hey, stop."  The verbal command may be actual voice or it might be the siren on the police vehicle, right, that pulls somebody over to stop on a traffic violation. The next one is verbal, right?  Verbal contemplates a little bit more than just voice, but verbal commands.

From there we generally go to what's called soft

JOHN RYAN - DIRECT

empty-hand control.  So if we don't achieve compliance by verbal commands, the next step is soft empty-hand control.  It might be a push.  It might be grab ahold of somebody's arm and move them.  It might be grab ahold of somebody's arm and handcuff them.  It can be any one of those things.  Then, from a use of force standpoint, it proceeds up the chain all the way to deadly force.

Q.   One thing I want to clarify with you that you said a moment ago, did I hear you right that showing a gun to a civilian is actually considered lower force than saying stop?

A.   In certain states.  So, for example, in New Jersey, constructive authority -- pointing a gun at somebody is considered just constructive authority, so it's a low-level use of force.  It's not the same as shooting somebody.  There's two different things.  So the state attorney general has a use of force policy that identifies it as constructive authority.

You still have to have a justification for doing it.  You can't point a gun when there's no threat whatsoever, don't take it too far, but it's recognized that that's nowhere near what deadly force would be.

Q.   In your review of this case, there was no firearm, was there?

MS. CULOTTA:  Objection, Your Honor.  I would maybe request a sidebar to the extent that this line of questioning is going where I think it's going.

MS. FISHER:  For what it's worth, Your Honor, that was my only question to that end.

THE COURT:  So is your objection awaiting next question?

MS. CULOTTA:  Yes, ma'am.

THE COURT:  I can't rule on that.

You may proceed.

BY MS. FISHER:

Q.   Based on your review of the materials in this case, there was no firearm, correct?

A.   No, ma'am.

Q.   Thank you.  Now we will move on to the report that you wrote in this matter.

You remember writing that report, as Ms. Culotta questioned you on; is that correct?

A.   Yes, ma'am.

Q.   Are you generally familiar with the First Amendment?  I believe you said you do some training on it.

A.   I do a lot of training on it, both in my regular programs but also in that protest, demonstration, and riot program.

Q.   In that respect, what are some of the findings that you have, based on your report in this case, that you found upon reviewing the materials provided?

A.   Well, my finding is that when a person gets close to, as Mr. Johnson did based on the video that I saw -- when they get

JOHN RYAN - DIRECT

close to a police officer and get into the officer's face, it creates a dramatic danger.  That's the time when the officer can take action not to stop them from filming, but to get them to move back and get them to move out of the way and make sure they don't get around the officer so that they become a part of the equation.

One of the things that we say from a force standpoint is control gained early will help eliminate the need for more serious force down the line.  There's a lot of training out there, including training that I do for officers, that when an officer fails to take control early in an event, then there's a domino effect, and the event can then escalate to a point where the officer could have used even more significant force to get control of the event.

Q.   How did your experience and your understanding of the reactionary gap play into the facts of this case specifically?

A.   Well, it's the safety issue.  We have got, you know, Mr. Johnson coming right up to the officer.  At one point he is actually in contact with his mom, and obviously that's a significant threat because the officer doesn't know what he is going to do.

So we judge the threat from the perspective of the officer not what we know with 20/20 hindsight, not with what was the subject of intent of Mr. Johnson, but what did the officer know at the time.  The officer knows he has a number of

JOHN RYAN - DIRECT

people out there.  The officer knows that they are trying to make an arrest.  The officer knows now he has at least one other subject injecting himself into the arrest, and that's the only person that the officer gives orders to is that person that came close and then is moving in where the officer is.

As I said, one of the things that's widely trained, widely recognized is that when a person gets close to the officer, they are going to have access to the officer's weapon systems, whether it be their taser, whether it be their gun, whether it be their baton, whatever they have on their belt.

**Q.** In this matter did Mr. Johnson's size play into your analysis as a factor?

**A.** Not necessarily.  Certainly, you know, smaller people can cause harm to officers.  We have seen it happen.  I was involved in an investigation many years ago where a 13-year-old committed a murder, so no.  I mean, anybody can pose a threat, but certainly the more significant the size is -- remember something I said earlier.  One of the threat assessments is officer/offender size and ability.

So if you have two people of equal size, that's one thing.  I sometimes show a slide in my training of officer -- she's actually a sergeant now, Sergeant Michelle Teller, who is just about 5 feet, and I have her standing next to 6-foot-4 Bill Hutchinson, and so I talk about threat assessment based on size.  It can be a factor, but it's not always a factor.

**JOHN RYAN - DIRECT**

**Q.**    Did Mr. Johnson's refusal to comply with police orders in this matter play into your analysis of the officer's actions and that reactionary gap?

**A.**    Of course.  Noncompliance is always a factor.  As part of the training, we train officers that when they get noncompliance to verbal commands, then they can escalate to the next level of force to accomplish what needs to be accomplished.

**Q.**    Did the position of Officer Moring's gun side affect your analysis?

            **MS. CULOTTA:**  Objection.

            **THE COURT:**  I don't think that's leading.  You can't lead your witness, but that doesn't automatically prompt a yes or no answer only.  Overruled.

            **MS. CULOTTA:**  Thank you.

            **THE WITNESS:**  Again, any time a subject gets close to an officer -- and it goes back to what I said a minute ago. The officer's weapon system is within reach of the subject if they get close enough, or if they are close enough to move in quickly.  That's why we train this 6-foot interview stance even when there is not a hostile situation.  So, yes, to the extent the gun is exposed.

            Remember what I said about the interview stance. Officers are trained to try to keep their gun side away from whoever they are talking to, if that's possible.  If you are in

JOHN RYAN - DIRECT

the middle of the arrest, sometimes that's not possible, so of course that's a factor.

**BY MS. FISHER:**

**Q.**   What did you feel about the appropriateness of the amount of time it took Officer Moring to reholster his taser after this encounter?

**A.**   You know, one of the things that is trained throughout the country is something called the 10 deadly errors in law enforcement, and one of them is relaxing too soon.  So as long as the subject is still there and engaged and could return, then there would be no issue with maintaining vigilance, if you will.  That's the word we use with officers, maintain vigilance until you are certain the threat is passed.  Certainly once Mr. Johnson disengages, then absolutely you want to reholster that taser; but until that time, then vigilance should be maintained.

**Q.**   It was one of your ultimate conclusions in this case that appropriate policies and procedures for law enforcement were followed; is that correct?

**A.**   Absolutely.

**Q.**   Is the same true for the display of the taser?

**A.**   Absolutely.

**Q.**   Was the same true for the display of the arm?

**A.**   For trying to create distance by a push?  Absolutely.

**Q.**   In your view of the materials, Mr. Ryan, was anyone harmed

JOHN RYAN - DIRECT

in this matter ultimately?

**A.**    No, I know of no injury to Mr. Johnson.

**Q.**    Are you familiar with Mr. Roger Clark?

**A.**    Yes.

**Q.**    Can you explain how you are familiar with Mr. Roger Clark.

**A.**    You know, I've been against him in some cases.  I have had a couple of cases where I have had some plaintiffs' attorneys call me and I didn't have opinions that were favorable to them. I knew that Mr. Clark had given opinions on those topics before, so I passed him on that that's somebody they might want to use even though I believed the officers acted correctly.

**Q.**    You are aware that Mr. Clark rendered opinions in this matter, correct?

**A.**    Yes, ma'am.

**Q.**    Have you reviewed his report?

         **MS. CULOTTA:**  Objection, Your Honor.  The reports are not the evidence in this case.  Mr. Clark's testimony was the evidence offered in this case.

         **THE COURT:**  Sustained.

BY MS. FISHER:

**Q.**    Have you reviewed his testimony in this case?

**A.**    I did.

**Q.**    Do you agree with Mr. Clark's assessment of this case?

**A.**    No, I don't, not at all.

**Q.**    Can you tell the jury why.

JOHN RYAN - CROSS

A.    Well, because Mr. Clark doesn't recognize the threat that's recognized throughout law enforcement training when a person gets too close to an arrest situation.  He doesn't recognize that.

One of the other things, I think, I'm certain he said in his testimony -- and you guys heard his testimony.  I'm not trying to feed you his testimony.  He said you needed both obstruction and a threat.  You don't.  Either one is sufficient for the officer to take action and reasonable time, place, and manner, so those.

Secondly, in my opinion, he compared taking the taser out of the holster to actually deploying the taser.  Those are two different things.  One is a show of force.  One is a use of force.  They are two very different things.  The taser was never deployed in this case, so there was no significant response with the taser other than taking it out as a show of force to try to gain compliance.

MS. FISHER:  That's all I have right now.  Thank you.

THE COURT:  Ms. Culotta.

CROSS-EXAMINATION

BY MS. CULOTTA:

Q.    So, Mr. Ryan, I believe you testified that one of your opinions is officers are trained that in a public place a citizen has a right to record them.  Is that right?

A.    Absolutely, with those caveats that I have added.

JOHN RYAN - CROSS

Q.   I believe that you phrased those caveats in terms of subject to -- in terms of officers may restrict that right in certain -- let me start that question again.

I believe your testimony was that officers are trained that civilians have a right to record the police subject to certain time, place, and manner restrictions.  Did you give that testimony?

A.   Yes, ma'am.

Q.   You understand that the concept of time, place, and manner restrictions is a legal concept that's at issue in this case, correct?

A.   It's also a legal concept, but it is the concept that we train officers as well.  It goes in both directions.  I wasn't referring to it as the legal concept.  I was talking about what we train officers as to when they can take enforcement action.

Q.   So you would agree that when it comes to deciding what constitutes a time, place, and manner restriction, the jury is to look to the judge and the jury instructions that the judge will give on what constitutes time, place, and manner restrictions, correct?

A.   From the law as the judge describes it.  From the police practices standpoint, reasonable time, place, and manner restriction is what kicks in from a training perspective as to when the officer can take enforcement action.

Q.   You would agree that officers sometimes become frustrated

JOHN RYAN - CROSS

and emotionally charged when being recorded during an adversarial event, correct?

A.   Oh, I've seen videos where officers do where there's no arrest taking place, where officers just get frustrated because of recordings.  I've seen all kind of videos on that, yes.

Q.   In fact, you wrote an article in which you discussed this, the fact that officers often get frustrated, but that at the end of the day, the ultimate message to officers about whether they can be recorded is: Get over it.  Citizens have the right to record the police.  Correct?

A.   Correct.  Subject to those restrictions that I have outlined, yes.

Q.   You said there's little or nothing that can be done about citizens recording law enforcement officers in a public place or any place the citizens have the right to be; is that correct?

A.   Absolutely, other than subject to those restrictions.

Q.   You would agree officers are trained that members of the public have a right to verbally criticize and challenge the police's conduct, correct?

A.   Absolutely.  I've written articles on that as well, that people in a public place can do that as long as they don't compromise officer safety, anybody else's safety, or obstruct the officer's ability to carry out the mission.  Yes.

Q.   You testified that there are certain factors that an

**JOHN RYAN - CROSS**

officer should look for in determining whether they are justified in prohibiting a citizen from recording an arrest, correct?

A.   Correct.

Q.   Two of those factors that you talked about were distance to the arrest scene and -- well, I believe it was -- I wrote proximity and distance, so were those two of the factors?

A.   Yes, but as they relate to safety, so it's the closeness. In other words, for example, in the verbal criticism, if you look in that article, I say, look, the guy was across the street when he is yelling at the officers.  He is not in any way a threat to the officers.  If he came over and stood next to the officers and started yelling, that would be a very different case.  So distance as it relates to safety of the officer and what's going on at the time, yes.

Q.   Right.  So the distance between the bystander recording and the officer might be an indication that there's a threat posed to the officer, but it's not a guarantee that there's a threat posed to the officer, correct?

A.   No, I think we train that if the person is close enough that they could reach the officer within the reactionary gap, then the threat would exist.

Q.   So is it your testimony that there's this at least 6-foot bubble around police officers that bystanders recording an arrest cannot encroach upon?

JOHN RYAN - CROSS

A.    I think that that would be very reasonable to say that from the standpoint of training, yes.

Q.    Now, I believe you testified that if someone comes so close that they hinder the ability of the officers to carry out their mission, then that's when the safety concern comes into play.  Didn't you say that?

A.    No, you are mischaracterizing it.  So I said there's two different things: One is the safety issue; one is the hindering.  So there's two different justifications on which officers can take enforcement action.  If the person is recording in such a way that the officer can't -- and the example I use in training is this.

Let's suppose that the officer is trying to do a field sobriety test on a suspected drunk driver, and some other motorist comes along and comes up and stands right near the officer and says, "Officer, I'm going to start," and now the officer can't speak to the person he is giving the field sobriety test to.  Well, now the officer can't carry out the function.  So that's another method -- it's not because the person is filming.  It's because the person is hindering their ability to carry out the mission.

Q.    Mr. Ryan, you are aware that there's no field sobriety test at issue in this case, correct?

A.    No, there's something even more serious.  There's an arrest taking place.

JOHN RYAN - CROSS

Q.   You would agree there's an arrest taking place on private property, on someone's front driveway, with their teenage son observing, correct?

A.   Absolutely.

Q.   That's a different scenario than somebody pulled over on the side of the highway and another random bystander comes up and starts trying to talk to the officers while they are conducting a field sobriety test, correct?

A.   Correct.  It's even more dangerous because of the fact that the person is likely sympathetic to the person being arrested.

Q.   You reviewed the transcript from previous testimony in this case, right?

A.   I did.

Q.   So you reviewed testimony from multiple witnesses that De'Shaun Johnson did not pose a threat to the officers during Ms. Perkins' arrest, correct?

A.   At various points I think the officers testified that he did not.  At other points the officers identified the safety issue of him being so close to them and the fact that the attention was diverted particularly for this officer that was problematic.

Q.   You testified that proximity can create a safety issue to officers, correct?  That's what we have been talking about?

A.   Proximity always creates a safety issue for officers.

JOHN RYAN - CROSS

Q.   Officers are trained to react to safety concerns, correct?

A.   Correct.  They are trained to move the person back, tell the person to get back to open up that space so that they are not compromised, sure.

Q.   You have seen the video evidence that when Mr. Johnson approaches to take the cell phone from his mother's hands, neither of the deputies says anything to Mr. Johnson to say, "Whoa.  Safety concern.  Please move back"?  You have seen that?

A.   I've seen that.  They were in the process of making the arrest.  Yes, I did see that.

Q.   So Mr. Johnson's approach to retrieve his mother's cell phone for that brief moment didn't cause a safety concern for the officers.  Wouldn't you agree?

A.   I wouldn't agree with that at all.  I think the officers are focused on trying to make the arrest, and certainly should have if it didn't.  I can't read their mind, but it certainly should have created a dramatic safety concern.  That person could be handing a weapon off.  That person could be doing any number of things when they get that close.

Q.   What an officer is reasonably permitted to do is based on what they actually perceive, correct?  It's not based on some imaginary threat that could possibly exist in the world, right?  That's the training that you have testified to today.

A.   No, it's based on an articulated threat.  That's why we

JOHN RYAN - CROSS

have the articulated threat here of the person moving in close. That's trained in every police academy in the country.

Q.   If this jury reviews all of the evidence presented in the case and finds that actually nobody thought that De'Shaun Johnson presented an articulable threat to the officers, then there is no safety concern, correct?

A.   You have to decide the facts of the case.  I don't decide the credibility of the witnesses.  You have to decide what the facts are.  You guys are the fact finders.  Absolutely, you get to decide those facts.  The only thing I can tell you is that when a person gets in the proximity that I see in that video to an officer, then the training is that that is an extreme threat to the officer who is making an arrest.  That's what I can tell you.  You have to decide the credibility of the witnesses and what the facts are.

Q.   You have seen the testimony that Mr. Johnson made no sudden movements toward the officers during the arrest, correct?

A.   I saw all of those questions.  The movement is moving close to the officers who were in the process of making the arrest, not complying with the orders to move back.  That's the safety issue.

Q.   So is it your testimony and your opinion that anybody that is a bystander to an arrest just has to stand at least 6 feet back at all times during the arrest or they are interfering

JOHN RYAN - CROSS

with the arrest?

A.    If they compromise the officer's safety within those 6 feet, then the officer is well within their enforcement authority by training, by practice, by policy to tell them to move; and if they fail to move, to take action.  Yes.

Q.    By that logic, if they do not compromise the officer's safety and if this jury finds that De'Shaun Johnson did not compromise the officer's safety, then there is no justification for forcing the bystander to move back, correct?

A.    If the jury disregards the safety that is always present when a person gets close to an officer, particularly a person that is sympathetic to the person being arrested, if you disregard that and disregard that police practice, then absolutely.  You decide the facts.

Q.    You would concede that there's been no testimony or video evidence that there was a weapon or a knife present at the scene in Mr. Johnson's possession, correct?

A.    I think the officers have testified that they never saw a weapon.  There was a point where a hand was in the pocket.  So that's always a concern for law enforcement until they have the opportunity to determine that there's not, particularly in an event like this that's moving quickly and they are trying to make an arrest.  I don't think at the end of the day there's any weapon involved.

Q.    You have seen the video evidence that shows that

JOHN RYAN - CROSS

Mr. Johnson's hand was in his pocket for a couple of seconds at the beginning of the arrest?  Is that what you are referring to?

A.   Yes.

Q.   Mr. Ryan, you testified that you worked for the Providence police department, and I believe that was from the early '80s until June 2002.  Is that correct?

A.   June of 2002, correct.

Q.   Did you tell the jury why you left the department?

A.   I did not.  Would you like me to?

MS. FISHER:  Your Honor, we would like to object and request a sidebar based on where we anticipate this line of questioning is going.

THE COURT:  Approach the sidebar, please.

(The following proceedings were held at the bench.)

THE COURT:  Ms. Fisher, you have an objection?

MS. FISHER:  We do.  We would like to inquire about where this line of testimony is going because we have an idea.

MR. CAPITELLI:  There's a seriously prejudicial, completely irrelevant issue.  We would like to know if she is planning to approach when she gets to excluded evidence every time this expert has testified.

THE COURT:  What's the issue?

MS. CULOTTA:  We will be inquiring, should Your Honor permit it, into the witness' propensity to testify truthfully.

JOHN RYAN - CROSS

Under 608(b), he may be cross-examined about specific instances of his conduct that indicate prior bad acts of deceit.

THE COURT:  The witness?

MS. CULOTTA:  He is a witness, and he was the subject of an FBI investigation into his conduct at the Providence --

THE COURT:  One at a time.

MS. CULOTTA:  There was a grand jury investigation and an FBI investigation about conduct involving a cheating scandal in the Providence Police Department.  Mr. Ryan was interviewed multiple times by the FBI, granted immunity, and pled the Fifth in front of a grand jury regarding this investigation.  It relates directly to his role as a police officer, an administrator in the police department, and as a person in charge of the training of that police department.  He provided the test answer keys to promotional candidates.

THE COURT:  He provided what?

MS. CULOTTA:  He stated to the FBI that he provided test answer keys to promotional candidates that were his preferred and his boss' preferred candidates, and the FBI put it in a public report that I have.

THE COURT:  When did this occur?

MS. CULOTTA:  2000 --

MR. CAPITELLI:  Thirty-plus years ago.

THE COURT:  2000 when?

MS. CULOTTA:  I believe the bad conduct occurred in

JOHN RYAN - CROSS

the late '90s, the FBI began investigating in around 1999, and then the report was issued in 2004, I believe.

THE COURT:  Let me hear from Mr. Capitelli or Ms. Fisher.

MR. CAPITELLI:  Your Honor, very briefly, what she is referencing are 302 notes from the FBI, which are the FBI officer's unsworn handwritten notes.

Let me say this as well: not a target of the investigation, never charged with anything, never arrested for anything, never indicted for anything, never convicted for anything.

They questioned him in relation to a mayor in Providence they believed was improper.  Felonies within the last 10 years are not admissible.  They want to talk about an FBI questioning and the FBI's notes regarding Mr. Ryan?  It's absolutely improper.

I will note, Your Honor, it has been raised against him -- we are aware of the issue.  Except when no objection was made by counsel, every single federal court has excluded any reference to it as unduly prejudicial.

THE COURT:  Let me hear from Ms. Culotta.

MS. FISHER:  The alleged scandal, I believe, happened in 1997.

THE COURT:  Ms. Culotta, what were you going to say?

MS. CULOTTA:  It goes directly to the witness'

JOHN RYAN - CROSS

credibility to testify truthfully.  It goes directly to his credibility as a law enforcement officer.  It is permitted under Rule of Evidence 404(a)(3), which allows under 608(b) for a witness to be cross-examined about specific instances of his conduct that did not result in a conviction but that bear on his truthful or untruthful nature, though no extrinsic evidence will be --

MR. CAPITELLI:  Completely unduly prejudicial.  I'm sorry.  Go ahead.

THE COURT:  I don't think it meets that standard. You haven't given me any specifics as to how it bears on his credibility.  He pled the Fifth when he was called before the grand jury, and we are talking about something -- I can't do math -- 25, 30 years ago.

MR. CAPITELLI:  Exactly.

MR. GOLDSTEIN:  It's the conduct itself.  As the law enforcement officer in charge of training within the police department, Mr. Ryan admitted to the FBI that he procured test keys, the answers to tests, and provided them to preferred candidates for promotion.  He admitted that to the FBI.  As far as we can tell --

MR. CAPITELLI:  They got an unsworn FBI note.

MR. GOLDSTEIN:  That's what cross-examination is for. It's a specific act of deceit that goes to his character for truthfulness.

JOHN RYAN - CROSS

THE COURT:  I'm excluding it.  I find it unduly prejudicial.  I don't even think it's relevant.  Even if it got over that, I find it is unduly prejudicial, and it is so far removed in time from anything we are talking about here, for that reason as well.

MS. CULOTTA:  Understood.

THE COURT:  Further, what was the question that you just asked?

MS. CULOTTA:  I think it was, "Did you tell the jury why you left the police department?"  He said, "No.  Would you like me to?"

THE COURT:  I am going to instruct the jury that only testimony and exhibits that are introduced are to be considered by them.

MS. CULOTTA:  Yes, ma'am.

THE COURT:  Anything else?

MR. CAPITELLI:  No.

THE COURT:  Let's move on.

(End of bench conference.)

MS. CULOTTA:  No further questions, Your Honor.

Thank you, Mr. Ryan.

THE WITNESS:  Thank you.

THE COURT:  Anything further, Ms. Fisher?

MS. FISHER:  We have no further questions, Your Honor.

**THE COURT:**  You may step down, Mr. Ryan.

**THE WITNESS:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

I will take the opportunity to remind the jury what you have heard throughout these 2 1/2 days, that only evidence introduced as an exhibit in trial or testimony that's come in through trial may be considered by the jury.

Mr. Capitelli or Ms. Fisher.

**MR. CAPITELLI:**  No further witnesses from our side, Your Honor.

**THE COURT:**  The defense rests?

**MR. CAPITELLI:**  The defense rests.

**THE COURT:**  Mr. Cohan, Mr. Goldstein, or --

**MR. COHAN:**  I hand it to Mr. Goldstein.

**MR. GOLDSTEIN:**  Your Honor, we would like to make a motion.

**THE COURT:**  Outside the presence of the jury?

**MR. GOLDSTEIN:**  Yes.  Thank you.

**THE COURT:**  Could I see counsel one more time, please.

(The following proceedings were held at the bench.)

**THE COURT:**  Just to be clear because I want to instruct the jury, we are going to handle a legal matter and then we are going to go right into closing, right?

**MR. GOLDSTEIN:**  Yes, that's right.

THE COURT: So how much time would y'all like after we do this?

MR. GOLDSTEIN: As a break before closing?

THE COURT: Correct.

MR. COHAN: I would like to print something off. I don't know. 15, 20 minutes, if that's okay.

THE COURT: I just want to let the jury know that this will be a sort of long break because then they are going to listen to closing and instructions, which really should work well for lunch. Depending on how long y'all argue -- knowing the parties here, this could be a long time -- I will give you at least 20 minutes after that.

(End of bench conference.)

THE COURT: Ladies and gentlemen, I have to handle a legal matter with the parties outside of your presence. As you just saw, I have conferred with them. Following that legal matter and a break, we are going to go right into closing arguments, and then you will have the case.

We are going to take a little bit of a longer break right now because then you are going to be sitting through closing arguments and jury instruction, which should work out well for you to get the case right around lunchtime and have your lunch.

It is 10:05. We are going to do 20 minutes. Come back at 10:25, and we will go right into closing arguments

at that time.

One more reminder -- and you have been an excellent jury.  Both sides, the attorneys, have pointed that out.  You have been paying attention throughout the whole case.

You have heard the testimony.  You have not necessarily seen all the exhibits because I know the defense introduced an exhibit earlier this morning that you haven't seen.  You haven't seen all the exhibits.  You will be given those when you go to deliberate, but you don't know the law yet that I'm going to give you.  To that extent, please don't start discussing it with each other.  Keep an open mind because until you know the law to apply to the evidence, it would be unfair to make up your mind.  You are almost there.

Thank you.  The jury is excused for 20 minutes.

**THE DEPUTY CLERK:**  All rise.

(Jury out.)

**THE COURT:**  Please be seated.

Mr. Goldstein.

**MR. GOLDSTEIN:**  Thank you, Your Honor.

Plaintiff moves under Rule 50(a) for judgment as a matter of law on his First Amendment retaliation claim, Section 1983 First Amendment retaliation claim, and on defendant's qualified immunity defense.

Rule 50(a) allows for either party to move at the close of evidence on either claims or defenses.  As we

discussed yesterday, the inferences must be drawn in favor of the nonmoving party, and the Court is not permitted to make credibility determinations.

Turning first to the First Amendment retaliation claim, there are three elements to the claim under *Keenan v. Tejada*, the Fifth Circuit case: whether De'Shaun engaged in constitutionally protected activity, whether defendant Moring's actions caused plaintiff De'Shaun Johnson to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity, and whether defendant's actions were substantially motivated by plaintiff's constitutionally protected activity. Here a reasonable jury could not find on any of the three elements in favor of defendant.

First, constitutionally protected activity, recording the police is constitutionally protected conduct. The only way in which it is not is where a time, place, and manner restriction -- a reasonable time, place, and manner restriction -- applies.

Here the jury cannot find that there was a reasonable time, place, and manner restriction because there is no evidence from which they could find that De'Shaun Johnson interfered with, hindered, or impeded his mother's arrest. There was testimony from various witnesses, including the defendant, that he was not a threat. De'Shaun Johnson was not

a threat.  From that testimony alone, a jury must find that he was engaged in constitutionally protected activity.

In particular, during the portion of the interaction when Deputy Moring continued to point the taser at De'Shaun after his mother had been moved away, at that point there is absolutely no reasonable time, place, and manner regulation from which the jury can find for the defendant.

On the second element, injury, any similarly situated person, when faced with a taser in their face, would be chilled from continuing that activity.  The injury here, although it is substantial, need not be substantial, and so no jury could find for defendant on the second element.

On the third element, substantially motivated, again pointing to that final phase of the interaction, Officer Moring continued to point the taser at De'Shaun while he recorded, and we heard testimony about it this morning.  He did not stop pointing that taser at De'Shaun until De'Shaun ceased the activity.  From that evidence, a jury must find that Officer Moring's actions were substantially motivated -- not solely motivated, but substantially motivated -- against De'Shaun's constitutionally protected activity.

Accordingly, the Court should grant judgment as a matter of law on the First Amendment retaliation claim in favor of the plaintiff.

Turning to the qualified immunity defense, which

the plaintiff does bear the burden on, there is no dispute that under *Turner* from the Fifth Circuit, retaliating against a citizen who is recording the police violates clearly established law. Moreover, as stated in *Keenan*, the Fifth Circuit case, "Government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable." That's at 290 F.3d 261. If the jury finds -- and they must find based on the prior argument -- that De'Shaun was engaged in constitutionally protected speech and that Officer Moring retaliated against him, then they necessarily have rejected the qualified immunity defense, which would only apply if an officer standing in Officer Moring's shoes acted in an objectively reasonable manner, but the Fifth Circuit has rejected that exact argument in *Keenan*.

In addition, as a matter of law and to preserve error, qualified immunity has no basis in the law. It's in the draft jury instruction. We noted in an objection to the draft jury instruction that the Fifth Circuit is, I think, in the process of reevaluating Section 1983 qualified immunity defense. A number of judges in the en banc decision in *Villerreal* stated that they do not believe there is a basis in law. So in order to preserve error, we would not agree to a qualified immunity jury instruction here.

For those reasons, the Court should grant judgment as a matter of law in favor of plaintiff on his

First Amendment retaliation claim.  Thank you.

        **THE COURT:**  Thank you, Mr. Goldstein.

        **MR. CAPITELLI:**  Your Honor, the testimony, evidence, record of this matter are replete with evidence that directly contradicts the baseless Rule 50 motion made by plaintiff.  In fact, it's not just that one of their elements of their First Amendment retaliation claim fails; it's that all three of the elements fail.

        We have clearly established that -- he claimed no evidence that he interfered with or hindered.  There is absolutely evidence in the record that he interfered or hindered.  Officer Moring stated that he wasn't a threat.  We know that now.  We didn't know it then.  They testified about the hand being in the pocket.  They testified about the refusal to comply.  He testified about the 6-feet safety zone, the 21-foot rule that an individual can close with a weapon.  They talked about extending the arm and Mr. Johnson's knocking back of his hand two times.  He had to escalate all the way to a level of a display of his taser in order to get him to comply.

        Let's remember, this is while his mother is actively on the ground resisting.  He has had to divert his attention.  How could you say it's not a hindrance when we see in the video he has to warn him twice and has to immediately get up to go and address Mr. Johnson?  Where does that leave his partner, Officer Hart, to at the scene?  To being kicked by

Ms. Perkins, falling down, and struggling with her.  He even testified yesterday, Officer Hart, that as he led her away, she pulls him into the grass, further hindering the arrest.  The display of the taser ceased the moment he complied with his simple request to move back.

You will also remember Officer Moring's testimony that at the time Mr. Johnson was engaged with him, he is looking directly at the plaintiff.  He is not noting exactly how far Ms. Perkins has been moved behind him.  As Jack Ryan just testified, the expert, he diverts his attention even for a moment to look to where Ms. Perkins is, that's an opportunity for Mr. Johnson to advance on him, a person that was at least his size if not larger than him, who was not being interfered with.  His recording rights were not being interfered with in any manner, Your Honor.

In fact, three people recorded the matter, one who was just a few feet back from Mr. Johnson, who was never instructed to move, no hand is extended to, and no taser is displayed to.  Why?  Because the motivation for Officer Moring was not to stop, infringe upon, impede, chill the First Amendment right; it was to move him back from interfering and for officer safety.

I will note that he actively interfered as he attempted to move around the officer, as he took steps forward to get around him.  It's clear.  He has testified and admitted

he could have just stepped back.  He could have just zoomed in. None of this would have had to occur, but his moving and advancing forward on his mother's arrest is entirely inappropriate and is not a constitutionally protected activity.

The causing of injury remains at issue here.  As I pointed out yesterday in our Rule 50 motion, which we believe is well-founded for the intentional infliction of emotional distress, Mr. Johnson is not able to say what caused an injury, period.  Was it the use of force?  Was it the being upset of the lawful arrest of his mother?  He absolutely didn't articulate that it was the First Amendment issue that caused him injury.

The substantial motivation, the third factor, fails as well.  Officer Moring has testified time and again his motivation was not to stop the recording.  His motivation was to move one of three individuals recording back from the scene, back from interfering and hindering, and back for officer safety.  As soon as Mr. Johnson disengaged, as soon as he walked away, that's when the taser gets reholstered.

Qualified immunity absolutely applies as well, and there's no basis to argue otherwise.  We faced a similar challenge from them which was denied.  It's clear.  To determine whether a public official is entitled to qualified immunity, we decide whether the facts that the plaintiff has alleged make out a violation of a constitutional right.  At

issue, hotly contested based on what I have just noted.

Whether the right at issue was clearly established at the time of the defendant's alleged misconduct, as we noted, there's a factual inquiry there.  Reasonable time, place, and manner, that's how it has to be exercised.  It's not an unimpeded right to record in any manner.

As I noted during the testimony of Roger Clark, that would essentially allow anyone who wants to approach any officer in any situation to simply pull up their cell phone, start recording, and start advancing apparently-- the plaintiff's contention -- even as an active arrest is going on.  Even as an active arrest of somebody you personally know, who you are upset about being arrested is going on, you are allowed to approach and they have to make sure, as Mr. Clark said, to get out the angle of that camera, right?  That's what they are saying they are entitled to?  Of course, a reasonable officer, as Mr. Ryan testified to, could interpret Mr. Johnson's actions as either a threat or interfering with the arrest or both and that he reacted accordingly.  The Rule 50 motion is entirely without merit.

THE COURT:  Mr. Goldstein, anything else?

MR. GOLDSTEIN:  Just briefly, Your Honor.

I think there's a lot of hypotheticals.  The evidence in many ways speaks for itself.  That was, in fact, the defendant's argument during our interlocutory appeal to the

10:17

Fifth Circuit, which they then won on.  I think the Court, in reviewing this motion, based on the argument I raised previously, Exhibit 6, the Ms. Zina video, the first 10 seconds, I think that --

THE COURT:  You said it too fast.  Which one?

MR. GOLDSTEIN:  Exhibit 6, the video taken by Ms. Zina from the other angle, that evidence on video shows the First Amendment retaliation that is at issue in this case. There's no threat at that point.  There's no active arrest. There's no screaming.  There's no weapon.  All there is is an officer, a law enforcement officer on De'Shaun's property pointing a taser in the face of a 14-year-old boy there to film his mother's arrest.  When does Officer Moring put down the taser?  Only after De'Shaun turns around to go inside and stop recording.  Thank you.

THE COURT:  The question before the Court is whether a reasonable jury would have a legally sufficient evidentiary basis to find for the defendant in this case, since it's plaintiff's motion that they are making, on the First Amendment retaliation claim.

Mr. Goldstein, you just pointed the Court to Exhibit 6, which is the neighbor's video.  What the neighbor's video shows, if you want to rely on that, is Officer Moring pointing a taser at Mr. Johnson.  What a reasonable jury could find in that exhibit is that it does not support whether he was

doing that to prohibit Mr. Johnson from videotaping his First Amendment right, and that is one of the most significant issues here, as to whether Deputy Moring was motivated in any of his actions to prohibit Mr. Johnson from exercising his constitutional right to videotape his mother's arrest.

On that issue we have competing expert testimony on the safety concerns that were faced by the officers, and we also have Deputy Moring's testimony. His testimony was, that I recall, that none of his actions were to prohibit the filming. He gave a different basis for his actions.

Again, it's not a determination for me to make. At this juncture the question is would a reasonable jury, the eight members that we have, have a legally sufficient evidentiary basis to find for the defendant, and thus I should deny your motion.

I find a reasonable jury would have a legally sufficient evidentiary basis to support a finding against the plaintiff and for the defendant on the First Amendment retaliation claim. What they do is completely up to them. There are credibility issues, there are expert issues, there are fact issues in dispute, and so I do find there is a legally sufficient evidentiary basis.

As to your second argument as to qualified immunity, you made clear that you are doing that to preserve the record in the event the Fifth Circuit or the Supreme Court

at some point in the future rules that qualified immunity is no longer a valid defense, but I am bound by current Fifth Circuit precedent and United States Supreme Court precedent.

Current Fifth Circuit and United States Supreme Court precedent is that qualified immunity exists. That precedent has also given me the proper jury instruction and guided me on how to instruct the jury on qualified immunity. So that issue, as we have discussed before once the case came back from the Fifth Circuit, will go to the jury based on that precedent. I deny your motion.

With that, I have taken up your time, so I'm going to give y'all at least 15 minutes to prepare for closing arguments, and then we will get the jury back.

Anything further, Mr. Goldstein or Mr. Cohan or anyone else?

**MR. COHAN:** No.

**THE COURT:** Counsel for defendant, anything else?

**MR. CAPITELLI:** No, Your Honor.

**THE COURT:** All right. Court is in recess for 15 minutes.

**THE DEPUTY CLERK:** All rise.

(Recess.)

**THE COURT:** Back in. The jury is not in yet. Everybody ready for closing?

**MR. COHAN:** Yes.

THE COURT: Mr. Cohan?

MR. CAPITELLI: Yes, Your Honor.

THE COURT: All right.

(Jury in.)

THE COURT: Please be seated.

The jury is back in the court. The parties are present. Counsel is present. We are ready for closing arguments.

Mr. Cohan.

MR. COHAN: Thank you, Your Honor.

Good morning. I want to start off by thanking you for taking the time to sit on this jury. You have been away from your children and your families. You have missed important work projects, and you have even delayed moves to be here for this. I thank you sincerely. I know it's not easy, but exercising your civic duty here is important in two fundamental ways.

First, it's extremely important for the 14-year-old boy in this picture. He had his life turned upside down from the shocking actions of a reckless police officer who stepped out of bounds. De'Shaun did what we should all preach. He acted bravely to protect himself and his mother not by acting violent toward police, not by threatening the police, but by exercising his First Amendment right to record the police, by trying to hold government officials accountable, and

by doing so on his own property, and who as a result of all of this suffered over three years of nightmares, sleepless nights and panic attacks; missed out on school, a happy teenage social life, and years of playing basketball, his true joy; and developed a lifelong fear of the police that's going to live with him forever.

But this case isn't just about De'Shaun; it's about all of us.  It's about holding the government accountable by protecting the First Amendment right to record the police.  It's about protecting our rights in one of the most fundamental and basic ways imaginable, with a child recording his own mother's violent arrest in his own driveway, in broad daylight, while there was no credible threat to the officers.

The defense proposes a world where the police can see a threat where none exists; where police can order around a citizen on his own property for no good reason; where police can draw a taser on a barefoot child just because he says no to unconstitutional demands or just because you never know; where police can approach a private citizen recording them, say the citizen is too close, and push them and hold a taser in their face.

You know what this case is not about?  Safety.  Not because officer safety is not important.  Of course it is.  Of course it is.  Why?  Because just as I told you in my opening statement, the evidence has shown that De'Shaun did not

threaten the officers, he did not hinder the arrest, and he did not interfere with the arrest.  Here you can see the testimony:

"You had no reason to believe that he was a threat, correct?

"He did not present one, no.

"Right, he wasn't a threat.

"Correct."

We see this over and over and over throughout the trial.

You know what else this case isn't about?  Ms. Perkins.  As I said in opening statement, the defense would do the best they could to smear Ms. Perkins and vilify her and make this case about anything except for De'Shaun, and what did they do?  They had Erin Wright come up here and provide irrelevant testimony about Ms. Perkins' crotch rocket.  They created a story about Ms. Perkins revving her engine in the street without a helmet, which was directly contradicted by Ms. Wright, who never heard the engine revving while the officers were there.

They told an outlandish story about Ms. Perkins saying, "F y'all.  I'm going inside," when you can see with your own eyes on the video that's not why they arrested her.  She didn't say that.  She was pacing back and forth on the video.  You will have the videos to watch as many times as you want in the jury deliberation room.  You have seen them a lot

already, and it's your job as the trier of fact to make those determinations.

So what is this case about?  This case is about De'Shaun's two claims, First Amendment retaliation and intentional infliction of emotional distress.

Now, you may have watched *Law and Order* and heard about the prosecution having to prove claims beyond a reasonable doubt, and that's true in criminal cases.  This isn't a criminal case.  We are not trying to criminally charge Deputy Moring.  This is a civil proceeding.  It's not the standard here, beyond a reasonable doubt; it's preponderance of the evidence.  De'Shaun only needs to prove his case by a preponderance of the evidence, which means that it's more likely than not that he is right and the defense is wrong.  He doesn't need to score a touchdown; he just needs to get to the other side of the 50-yard line to win his claims.

Let's start with the First Amendment claim. De'Shaun must prove by a preponderance of the evidence: One, he was engaged in a constitutionally protected activity; two, defendant Moring's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and, three, defendant Moring's actions were substantially motivated by his constitutionally protected activity.  De'Shaun has easily proved all three of these elements.

First, De'Shaun has proved he was engaged in a constitutionally protected activity.  As the judge will instruct you, De'Shaun was engaged in constitutionally protected activity, filming the police, so long as he didn't interfere with, hinder, or impede the arrest of his mom.

As discussed above, the evidence has shown that De'Shaun did not interfere with, hinder, or impede the arrest, especially proven by the fact that defendant Moring continued to point the taser directly in his face at point-blank range even after his mother had been taken away, moved close to the street on the grass away from De'Shaun.

De'Shaun did not try to peel the officers off of him.  He did not push the officers.  He did not try to touch the officers.  We have seen this when De'Shaun tries to grab the phone from his mother.  She says, "Here, De'Shaun, come take my phone," and he says okay and then he retreats.  Is this what we are going to call a threat to the police that they can hold a taser in a 14-year-old boy's face?  No.

Second, defendant Moring's actions caused De'Shaun to suffer an injury that would chill a person from ordinary firmness from continuing to record the police.  As the judge will instruct you, for De'Shaun to prove this, he must only show that his exercise of free speech was curtailed.  The effect on freedom of speech may be small, but since there is no justification for it, it need not be great to be actionable.

It is not just whether De'Shaun's rights were chilled; it is whether Moring's actions would chill a person of ordinary firmness. Here the evidence has shown that De'Shaun's rights were curtailed.

Defendant Moring pushed De'Shaun back not once, but twice, and pointed a taser directly in his face. If that is not enough to chill a person of ordinary firmness from continuing to exercise their First Amendment right to record the police, what is?

Additionally, the video evidence and testimony has shown defendant Moring physically blocked De'Shaun from recording. That alone is enough to have curtailed De'Shaun's First Amendment right to record the police, and again here's the slide we showed in opening. You can see what De'Shaun could record on the right versus what his cousin Jeron would record on the left.

Now, they have argued it's not a violation. Jeron could record. The cousin could record. This isn't Jeron's lawsuit. This is De'Shaun's lawsuit. This is De'Shaun's First Amendment right, and we are here for him. We need to quit hiding the ball.

Third, the evidence has shown that defendant Moring's actions were substantially motivated by De'Shaun recording. As the judge will instruct, the recording doesn't have to be the sole or only motivation for defendant Moring's

action, just a substantial motivation.

This is clear from the evidence.  As the evidence has shown, defendant Moring moved from side to side to block the recording, which indicates that he was actively trying to block the arrest.  Again, look at Exhibit 10 with your own eyes.  It's quite obvious what is happening here and you, as the trier of fact, get to determine that.

Additionally, while defendant Moring has tried to sing a different tune at this trial, he has previously admitted under oath that he moved to block De'Shaun's ability to record.  You have heard this multiple times during his examination.  The testimony was:

"And as he moved to the side, you moved to the side in order to block his ability to record the incident, correct?

"Correct."

Additionally, defendant Moring's motivation is shown by the fact that he continued to point his taser at De'Shaun even after his mom had been moved away.  De'Shaun was not hindering an arrest.  He was not impeding an arrest.  He was not interfering with an arrest.  He was recording. Defendant Moring continued to point his taser at him until guess what?  He stopped recording.

Additionally, there is no qualified immunity in this case.  De'Shaun has proved that defendant Moring is not

entitled to that immunity.  As the judge will instruct, police are presumed to know the clearly established constitutional rights of individuals they encounter, and it is clearly established law that a police officer cannot retaliate against a private citizen for exercise of his First Amendment rights.

The testimony of plaintiff's expert, Roger Clark, makes clear that no reasonable officer could have believed that defendant Moring's actions were lawful in light of the clearly established law.  Officers are specifically trained that the Constitution protects the individual's right to record and be present at the scene of police activity.

Officers are also trained that restricting that constitutional right requires the presence of a credible threat that would justify preventing a person from recording, and the officer must be objectively reasonable -- have an objectively reasonable basis for that.  Again, we can't live in this constant world of what-ifs.  If an officer is constantly thinking, "This person is standing within 6 feet of me.  He may be a threat.  I better hold a taser in his face," it's not objectively reasonable, and that's the clearly established law.

It will be up to you to determine what damages should be awarded to De'Shaun.  There are three potential categories of damages you can award: One, compensatory damages for emotional distress or mental pain and suffering; two, punitive damages; and, three, nominal damages.

First, let's talk about compensatory damages. That's the amount of money to fairly compensate De'Shaun for the pain and suffering he has endured. As the judge will instruct, De'Shaun doesn't have to prove the amount with mathematical precision, but only with so much definiteness as the circumstances present. The evidence of mental anguish need not be corroborated by doctors or psychologists, but in this case it was. The evidence could not be clearer of De'Shaun's pain and suffering.

Within weeks of this incident, he went to his primary care doctor because he was so miserable with the conditions he was suffering. The doctor referred him to a psychiatrist, who diagnosed him with post-traumatic stress disorder. The testimony showed that lawyers didn't send him to this doctor four years ago. He went because he was suffering, and he was diagnosed with severe anxiety and PTSD. He was prescribed medication.

He continued to see the psychiatrist, as he testified. He continued to take the medication for years. You heard him and his mother talk about the terrible nightmares he has endured, about the fear of the police he suffered, about how he was no longer able to engage in the same social activities that he had before, how he would find himself crying and have to call his mom to pick him up from school, how his mom would keep the door open and comfort him at night when he

10:57

would wake up by laying down in bed with him.

It's awful this happened to De'Shaun, and it's up to you to determine what to compensate him for that pain and suffering. It's completely up to you. Whether that amount be $50,000 or $500,000 or whatever it is, it's for you to decide.

The next category of damages you can award is punitive damages. As the judge will instruct you, you may award these damages if you find that defendant Moring acted with reckless indifference or knowingly violated De'Shaun's rights. The purpose of punitive damages is not to compensate De'Shaun for his injury. It's to deter this from happening again, to make sure that the next 14-year-old boy who tries to protect his mom by recording the police doesn't find a taser in his face, to send a message.

This isn't saying all police are bad. Of course it's not. De'Shaun held up signs for the St. Tammany Parish Sheriff, Randy Smith. He supported him. This is about an officer who stepped out of bounds and went too far. It's time to send a message on that.

Even if you believe De'Shaun himself was not injured, you are entitled to provide punitive damages to send that message. Here in this case the evidence has shown that defendant Moring's actions pointing a taser directly at a 14-year-old's face and threatening to use it is so shocking and reprehensible, this is the type of conduct deserving punitive

damages.

Finally, the last category of damages you can provide is nominal damages. As the judge will instruct you, you award these damages if you think there was a technical violation of De'Shaun's constitutional rights but that he didn't suffer an actual injury. We don't think these are proper here. We think De'Shaun was very clearly injured -- from the evidence, testimony, documents, and videos presented in this case -- but if you do choose to provide nominal damages, it's a small amount to compensate him for his constitutional violation.

In addition to De'Shaun's First Amendment claim, he also has an intentional infliction of emotional distress claim. As the judge will instruct, the claim requires: One, extreme and outrageous conduct; two, severe emotional distress; and, three, knowledge from the defendant that severe emotional distress would be substantially certain from the conduct.

As you have seen throughout this case, that is exactly what happened here. Pushing and pointing a taser at a 14-year-old boy on his own property for recording his own mother's arrest is extreme and outrageous conduct. You could hear De'Shaun say, "That's my mom." "You can't tase a child." You could hear defendant Moring say, "Watch me." Such conduct is sure to create severe emotional distress, exactly as it did here. For that you can provide compensatory damages just as I

explained before.

Thank you so much for serving on this jury and exercising your civic duty.  I will reserve the rest of my time for rebuttal.  Thank you.

**THE COURT:**  Mr. Capitelli.

Mr. Cohan, I think your PowerPoint is still up. Thank you.

**MR. CAPITELLI:**  Safety.  When we started this trial together, I let each of you know that this matter is about safety, the ability to control the scene and to ensure safety. I made you a few promises during that opening.  One that I promised you was that I wasn't going to pull quotes out of context or misrepresent testimony.  I promised I would not stand up here and tell you what to think based on the testimony and evidence that was before you, the jury.  I'm not going to go back on that promise.

I ask that each of you recall the testimony and the evidence that you saw in this case.  I ask that you reflect on the testimony of Mr. Johnson, of Ms. Perkins, of Mr. Johnson's cousin Jeron Perkins, and from Deputy Ryan Moring, Sergeant Kyle Hart, and our witness Erin Wright.

I ask that you evaluate the testimony in light of the three recordings we have in this matter.  Don't worry, I'm not going to show you any of the recordings again.  I think you have all seen them more than enough at this point.

I'm also confident that you have seen what I predicted when we started this trial together.  Deputy Moring never asked Mr. Johnson to stop recording.  He never covered his phone or knocked it out of his hands.  The videos, even the one edited by Jeron Perkins, do not show any action at all that was directed toward the right to record.  Indeed, there was also never any action or statement by Deputy Moring towards the other two individuals recording that day, including one that was standing just a few feet behind Mr. Johnson out of the reaction gap.

Deputy Moring also did not act with any intent to cause Mr. Johnson distress or to inflict the harm Mr. Johnson alleges caused him to attend his single documented psychiatric appointment.  Deputy Moring simply asked him to move back.  He repeated this request six times in the face of six refusals.  When the verbal instructions prove ineffective and when Mr. Johnson continued to persist in compromising officer safety and interfering with the arrest of his mother, Deputy Moring extended his arm and attempted to move Mr. Johnson back twice.

When Mr. Johnson continued to try to get past him, Deputy Moring mirrored his movements to block Mr. Johnson's body and displayed his taser.  Deputy Moring remained engaged with Mr. Johnson until he followed the simple direction, move back.  He then turned his attention back to

Ms. Perkins without any concern to whether or not he was being recorded.

We know the plaintiff's expert believes that you can get as close to an active arrest as you want as long as you are holding a cell phone. The law, which the Court will instruct you on, however, is different.

You have heard Deputy Moring admit that there is a right to record the police and that is true, but it must be done in a reasonable time, place, and manner. No right is absolute. You cannot yell "fire" in a crowded movie theater, you cannot scream "bomb" on a plane, and you cannot stand so close to an actively resisting individual who is being arrested that you compromise officer safety and hinder the arrest. Holding a cell phone cannot be used as a shield to prevent an officer from acting on safety concerns.

As you reach your decision, I ask that you remain focused on the issue and scene before you. While it is true that you are not issuing a judgment against Ms. Perkins, it is also true that her actions are a part of the incident before you. Her actions provide context for the interaction, and they present one of the reasons why safety was a concern that day. As you reach your decision, please place yourself in the shoes of all those involved, especially Deputy Moring, who noted that his goal in any police encounter is simply to go home safely. Thank you for your time.

**MR. COHAN:** Defendants are right.  You cannot yell "fire" in a crowded theater, you cannot yell "bomb" on an airplane, but you can stand in your own driveway with your cell phone and record your mother as officers take her down and come toward you.

You can stand like this without rushing towards the scene.  That's what the evidence in this case has shown.  De'Shaun did not charge towards the scene.  He did not rush the officers.  He was not a credible threat.  That's what the videos show, and that's why the officers did not have the right to infringe his fundamental First Amendment constitutional right to record the police, which is what the Constitution uses to protect the citizens of this country against government intrusion.

There's a parade of horribles that defendants have brought where people are just going to walk around like this around police officers whenever they are arresting people and getting in their face.  That's not what we have seen here.  That's not believable or what could happen.

What's believable is an officer coming onto someone's own property getting into his face, pushing him back while he is standing still, barefoot, with his hands out, without clinched fists.  It's obvious enough for any reasonable officer to know that that is not a threat.

The what-ifs are just too much in this case.

Soon you will go back and you will receive the verdict form, and I would advise you to go through and answer like this:

The first question is: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring violated plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights?  Yes.

Question 2: It is plaintiff De'Shaun Johnson's burden to prove by a preponderance of the evidence that defendant Ryan Moring is not entitled to qualified immunity.

No.  Defendant Moring is not entitled to qualified immunity.

Question 3: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring committed a technical violation of plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights, but that plaintiff De'Shaun Johnson sustained no compensatory damages as a result of the technical violation?

No.  He has suffered from post-traumatic stress disorder and continued to see his psychiatrist, Dr. Dowling, and take medication for years and suffered in the way that he and his mother described.

Question 4, you can skip it.  That's on nominal damages if you answer no to Question 3.

Question 5: What amount, if any, do you award to plaintiff De'Shaun Johnson as compensatory damages for his First Amendment retaliation claim?  That is for you to decide.

Question 6: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring acted with malice or reckless indifference to the constitutional right of plaintiff De'Shaun Johnson to be free from retaliation for exercising his First Amendment rights?  Yes.

Question 7: What amount, if any, do you award to plaintiff De'Shaun Johnson as punitive damages for defendant Ryan Moring's malicious or reckless indifference to plaintiff De'Shaun Johnson's constitutional rights?  That is for you to decide.

Question 8: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring took actions that constitute intentional infliction of emotional distress under Louisiana law?  Yes.

Question 9: What amount, if any, do you award to plaintiff De'Shaun Johnson in compensatory damages for his intentional infliction of emotional distress claim?  That is for you, the jury, to decide.

Once again, two fundamental, important things in this case: One, De'Shaun Johnson's suffering from the violation of his First Amendment right to record; and, two, this

country's constitutional rights.  Thank you.

**THE COURT:**  Thank you.

Ladies and gentlemen, I will now instruct you on the law.  You will have a copy of the entire jury instructions when you go into the back.

It is my duty and responsibility to instruct you on the law you are to apply in this case.  The law contained in these instructions is the only law you may follow.  It's your duty to follow what I instruct you the law is regardless of any opinion that you may have as to what the law ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard that impression.  If I have given you the impression during the trial that I have an opinion about the facts of the case, you must also disregard that impression.  You are the sole judges of the facts of this case.  Other than my instructions to you on the law, you should disregard anything that I may have said or done during the trial in arriving at your verdict.  You should consider all of the instructions about the law as a whole and regard each instruction in light of the others without isolating a particular statement or paragraph.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence.  The statements of counsel, the attorneys, are not evidence.  They are only arguments.  It is important for you to

distinguish between the arguments of counsel and the evidence on which those arguments rest.  What the lawyers say or do is not evidence.  You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in the trial supports the arguments.

You must determine the facts from all the testimony that you have heard and the other evidence submitted. You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you.  You are required by law to decide the case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom.  You may not be influenced by passion, prejudice, or sympathy you might have for the plaintiff or the defendant in arriving at your verdict.

Plaintiff De'Shaun Johnson has the burden of proving his case by a preponderance of the evidence.  To establish by a preponderance of the evidence means to prove something is more likely so than not so.  If you find that plaintiff De'Shaun Johnson has failed to prove any element of his claim by a preponderance of the evidence, then he may not recover on that claim and your verdict should be for the defendant, Ryan Moring.  It is sufficient to award a verdict for the defendant if the plaintiff does not prove by a preponderance of the evidence all of the elements required by

law.

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence.  One is direct evidence, such as testimony of an eyewitness.  The other is indirect or circumstantial evidence.  Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists.  As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he may have, and the consistency or inconsistency of his testimony considered in the light of the circumstances.  Has the witness been contradicted by other credible evidence?  Has he made statements at other times and places contrary to those made here on the witness stand?  You must give the testimony of

each witness the credibility you think it deserves.

Even though a witness may be a party to the action and, therefore, interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed. Witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact even if a greater number of witnesses testified to the contrary if, after considering all of the other evidence, you believe that witness.

As to expert witnesses, when knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his opinion on those technical matters.

We had two expert witnesses in this case, Mr. Clark and Mr. Ryan. As with any other witness, it is up to you to decide whether to rely on it. You may accept or reject in whole or in part the opinions expressed by an expert. The effect and weight to be given expert testimony is within the broad discretion of you, the jury. The importance placed upon

such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion.  Further, the jury may substitute their own common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.

If the testimony of a witness in court is inconsistent with a prior statement he or she has made, you have to decide if the testimony of the witness in court should be rejected because it is inconsistent with his prior statements.  If you decide that the testimony has been discredited, then you must decide what weight, if any, to give the testimony.

In determining the weight to give to the testimony of a witness, consider whether there was evidence at some other time the witness said or did something or failed to say or doing something that was different from the testimony given at the trial.  A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it.  People may forget some things or remember other things inaccurately.

If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake.  The significance of that may depend on whether it has to do with an important fact or only an unimportant detail.  If you find that a witness has

testified falsely as to any material fact, then you have the right to reject the entire testimony of the witness or to reject only part of the testimony based upon how much you are impressed with the truthfulness of the witness.

As to law enforcement officer testimony, you are required to evaluate the testimony of a law enforcement officer as you would the testimony of any other witness. No special weight may be given to his testimony because he is a law enforcement officer.

The fact that a person has brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit by itself does not in any way tend to establish that claim and is not evidence.

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.

Certain parties are no longer involved in this trial. As jurors, it is your duty to consider the issues among the remaining parties. In this matter the jury is instructed that the only parties are plaintiff De'Shaun Johnson and defendant Ryan Moring and only issues pertaining to those parties are to be considered.

You have heard testimony and/or argument about the incident between the two officers and Ms. Perkins. The lawfulness of the arrest of Ms. Perkins, the reasonableness of the force used against her by the officers, and whether Ms. Perkins unlawfully resisted arrest are not issues for you to decide. The only claims for you to decide are those made by plaintiff De'Shaun Johnson against defendant Ryan Moring.

Plaintiff De'Shaun Johnson is seeking damages resulting from the events that occurred on May 5, 2020, in Slidell, Louisiana. You may wonder why this matter is proceeding to trial now, in May of 2024. You are instructed that you are not to hold that delay against either the plaintiff or the defendant. Suffice it to say that COVID and other court issues kept it from being brought to trial earlier.

Plaintiff De'Shaun Johnson claims that defendant Ryan Moring violated his constitutional rights under the First Amendment by retaliating against him for filming the arrest of his mother, Teliah Perkins, and committed a Louisiana state law tort on May 5, 2020.

Plaintiff De'Shaun Johnson's two claims were as follows: One, a Section 1983 claim for violation of his First Amendment right to be free from retaliation for exercising his First Amendment rights; and, two, a Louisiana state law claim for intentional infliction of emotional distress. Defendant Ryan Moring denies liability as to all of plaintiff De'Shaun

Johnson's claims and argues that his conduct relative to plaintiff De'Shaun Johnson was in accordance with the United States Constitution and Louisiana state law.  It's for you, the jury, to decide the facts in this case from the evidence presented to you.

Section 1983 of Title 42 of the United States Code provides that any citizen may seek redress in this court by way of damages against any person who, under color of state law or custom, intentionally deprives that citizen of any rights, privileges, or immunities secured or protected by the Constitution or the laws of the United States.  In this case the parties have agreed that Ryan Moring acted under color of state law, and you must accept that fact as proved.

Plaintiff De'Shaun Johnson claims that defendant Ryan Moring violated his constitutional right under the First Amendment of the United States Constitution to be free from retaliation for exercising his First Amendment right.  In order to prevail on his Section 1983 claim of First Amendment retaliation against defendant Moring, plaintiff Johnson must prove by a preponderance of the evidence: One, that defendant Ryan Moring committed an act that violated plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights; and, two, that defendant Ryan Moring's acts were the cause of plaintiff De'Shaun Johnson's damages.

If you determine that plaintiff De'Shaun Johnson has proven his claim of a First Amendment violation by a preponderance of the evidence, I will later instruct you on the types of damages that you may consider awarding.

As to the First Amendment retaliation claim, the First Amendment to the United States Constitution guarantees among other things the right to freedom of speech and of the press. A government official, such as a police officer, may not retaliate against an individual for exercising their First Amendment rights.

Here plaintiff De'Shaun Johnson claims that defendant Ryan Moring unlawfully retaliated against plaintiff De'Shaun Johnson for exercising his right to film the police. An individual has the First Amendment right to record the police subject only to reasonable time, place, and manner restrictions.

To establish a claim for First Amendment retaliation, plaintiff De'Shaun Johnson must show: One, that he was engaged in constitutionally protected activity; two, that defendant Ryan Moring's actions caused plaintiff De'Shaun Johnson to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and, three, that defendant Ryan Moring's actions were substantially motivated by plaintiff De'Shaun Johnson's constitutionally protected activity.

As for the first element, constitutionally protected activity, the right to record or film the police, subject only to reasonable time, place, and manner restrictions is constitutionally protected activity under the First Amendment to the Constitution.

It is undisputed that plaintiff De'Shaun Johnson was filming the arrest of his mother, Teliah Perkins.  You, therefore, must determine whether the restrictions defendant Ryan Moring placed on plaintiff De'Shaun Johnson's ability to film the encounter were reasonable time, place, and manner restrictions under the circumstances.  Any such restrictions must be narrowly tailored to serve a significant governmental interest.  Prohibiting an individual filming the police from interfering with, hindering, or impeding an arrest is a reasonable time, place, and manner restriction.

You, the jury, must determine whether plaintiff De'Shaun Johnson interfered with, impeded, or hindered the police's ability to perform their duties as there is a line between filming the police, which is legal, and hindering the police, which is not.  If you find that plaintiff De'Shaun Johnson interfered with, impeded, or hindered the arrest of his mother, Teliah Perkins, then plaintiff De'Shaun Johnson was not engaged in constitutionally protected activity.  However, if you find that plaintiff De'Shaun Johnson did not interfere with, hinder, or impede the officers' arrest of his mother,

then plaintiff De'Shaun Johnson was engaged in constitutionally protected activity, that is, the right to film the police.

Regarding the second element, for plaintiff to prove an injury, plaintiff De'Shaun Johnson must show that his exercise of free speech was curtailed. The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable. You must determine what actions defendant Ryan Moring took with respect to plaintiff De'Shaun Johnson and whether such actions could have a deterrent effect on citizens who wished to exercise their First Amendment rights.

Your focus should be on whether a person of ordinary firmness would be chilled from continuing to engage in the protected activity rather than whether this particular plaintiff was chilled. If you conclude as a matter of fact that defendant Ryan Moring took action with respect to plaintiff De'Shaun Johnson that would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights, then plaintiff De'Shaun Johnson has satisfied the second element of this claim.

With respect to the third element, plaintiff De'Shaun Johnson must establish that defendant Ryan Moring's actions were substantially motivated against plaintiff's exercise of constitutionally protected activity. Plaintiff

De'Shaun Johnson need not show that defendant Ryan Moring's actions were solely motivated against plaintiff's exercise of his First Amendment rights.  Rather, plaintiff De'Shaun Johnson need only show that defendant Ryan Moring's actions were substantially motivated against plaintiff's exercise of his First Amendment rights.

If you find that plaintiff De'Shaun Johnson's recording played a substantial part in defendant Ryan Moring's actions against plaintiff De'Shaun Johnson, then I am instructing you that defendant Ryan Moring's actions were substantially motivated against plaintiff De'Shaun Johnson's exercise of his constitutionally protected conduct.  If you find this to be true, plaintiff will have established the third element of this claim.

If you find that plaintiff De'Shaun Johnson has proved these three elements by a preponderance of the evidence, then defendant Ryan Moring violated plaintiff's constitutional protection from retaliation, in violation of the First Amendment, and you must then consider whether defendant Ryan Moring is entitled to qualified immunity, which I will explain next.  But if you find that plaintiff De'Shaun Johnson failed to make this showing, then defendant Ryan Moring's conduct was not unconstitutional, and your verdict will be for defendant Ryan Moring on the First Amendment claim.

I will now instruct you on the law of qualified

immunity, which I mentioned earlier. If you have determined that plaintiff De'Shaun Johnson has proved his claim for violation of his constitutional rights by a preponderance of the evidence, you must then consider whether defendant Ryan Moring is entitled to what the law calls qualified immunity.

Qualified immunity bars the defendant's liability even if he violated plaintiff De'Shaun Johnson's constitutional rights. Qualified immunity exists to give government officials breathing room to make reasonable but mistaken judgments about open legal questions. Qualified immunity provides protection from liability for all but the plainly incompetent government officers or those who knowingly violate the law. It is plaintiff De'Shaun Johnson's burden to prove by a preponderance of the evidence that qualified immunity does not apply in this case.

As to the claim of First Amendment retaliation, qualified immunity applies if a reasonable officer could have believed that defendant Ryan Moring's actions toward plaintiff De'Shaun Johnson, including but not limited to pointing his service taser at the plaintiff, were lawful in light of clearly established law and the information defendant Moring possessed. But defendant Ryan Moring is not entitled to qualified immunity if at the time of the May 5, 2020, incident a reasonable officer with the same information could not have believed that his actions were lawful in light of clearly established law.

Law enforcement officers are presumed to know the clearly established constitutional rights of individuals they encounter.

In this case, the clearly established law at the time was that a First Amendment right to record the police exists subject only to reasonable time, place, and manner restrictions. In addition, it is clearly established law that a government official, such as a police officer, cannot retaliate against a private citizen for the exercise of his First Amendment rights.

If after considering the scope and discretion and responsibility generally given to police officers in performing their duties and after considering all of the circumstances of this case, as they would have reasonably appeared to defendant Ryan Moring at the time of the incident, you find that plaintiff De'Shaun Johnson did not prove by a preponderance of the evidence that no reasonable officer could have believed that defendant Moring's actions were lawful in light of the clearly established law, then defendant Ryan Moring is entitled to qualified immunity, and your verdict must be for defendant Ryan Moring on that claim. But if you find that defendant Ryan Moring violated plaintiff De'Shaun Johnson's constitutional rights and that defendant Ryan Moring is not entitled to qualified immunity, then your verdict must be for plaintiff De'Shaun Johnson.

I will now instruct you on Mr. Johnson's Louisiana state law claim of intentional infliction of emotional distress.  Plaintiff De'Shaun Johnson claims defendant Ryan Moring intentionally inflicted emotional distress upon him.  Under Louisiana law, one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress; and if bodily harm to the other results from it, for such bodily harm.

In order to recover for intentional infliction of emotional distress, plaintiff De'Shaun Johnson must establish: One, the conduct of defendant Ryan Moring was extreme and outrageous; two, the emotional distress suffered by plaintiff De'Shaun Johnson was severe; and, three, that defendant Ryan Moring desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

By extreme and outrageous conduct, I mean conduct which is so extreme in degree and so outrageous in character as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

When I say that the injury must be shown to have been caused by the defendant Ryan Moring's conduct, I don't mean that the law recognizes only one cause of an injury

consisting of only one factor or thing or the conduct of only one person.  On the contrary, a number of factors may operate at the same time, either independently or together, to cause injury or damage.

You have to decide whether plaintiff De'Shaun Johnson probably would not have suffered the injury or damage in the absence of defendant Ryan Moring's conduct towards the plaintiff.  If plaintiff De'Shaun Johnson probably would have suffered the injury no matter what the defendant did to him, then you will have to decide that the injury was not caused by the defendant and render a verdict for the defendant.  If, on the other hand, plaintiff De'Shaun Johnson probably would not have suffered injury in the absence of defendant Ryan Moring's conduct towards him, then you will have to decide that the defendant's conduct did play a role in the plaintiff's injury.

Consider damages only if necessary.  If plaintiff De'Shaun Johnson has proved one or both of his claims against defendant Ryan Moring by a preponderance of the evidence, you must determine the damages to which plaintiff De'Shaun Johnson is entitled.  You should not interpret the fact that I am giving instructions about damages as any indication that I believe that plaintiff De'Shaun Johnson should or should not win this case.  It is your task first to decide whether defendant Ryan Moring is liable for damages.  I am instructing you on damages only so that you have guidance in

the event that you decide that defendant Ryan Moring is liable and that plaintiff De'Shaun Johnson is entitled to recover money from defendant Ryan Moring.

You should consider the following elements of damages to the extent you find them proved by De'Shaun Johnson by a preponderance of the evidence: One, compensatory damages for emotional distress or mental pain and suffering; two, nominal damages; and, three, punitive damages.  I will now instruct you further on each category of damages.

As to compensatory damages, if you find that defendant Ryan Moring is liable to plaintiff De'Shaun Johnson, then you must determine an amount that is fair compensation for all of De'Shaun Johnson's damages.  These damages are called compensatory damages.  The purpose of compensatory damages is to make De'Shaun Johnson whole; that is, to compensate De'Shaun Johnson for the damages that he has suffered.

Compensatory damages are not limited to expenses that plaintiff De'Shaun Johnson may have incurred because of his injury.  You may award compensatory damages only for injuries that Deputy Moring proves were proximately caused by Ryan Moring's allegedly wrongful conduct towards him.  The damages that you award must be fair compensation for all of De'Shaun Johnson's damages, no more and no less.  You should not award compensatory damages for speculative injuries, but only for those injuries that De'Shaun Johnson has actually

suffered.

If you decide to award compensatory damages, you should be guided by dispassionate common sense.  Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.  On the other hand, the law does not require that De'Shaun Johnson prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.  You must use sound discretion in fixing an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

As to compensatory damages for emotional distress or mental pain and suffering, to recover compensatory damages for mental and emotional distress, plaintiff De'Shaun Johnson must prove that he has suffered a specific discernible injury with credible evidence.  Hurt feelings, anger, and frustration are part of life and are not the types of harms that could support a mental anguish award.  Evidence of mental anguish need not be corroborated by doctors, psychologists, or other witnesses, but plaintiff De'Shaun Johnson must support his claims with competent evidence of the nature, extent, and duration of the harm.  Damages for mental or emotional distress must be based on the evidence at trial.  They may not be based on speculation or sympathy.

As to nominal damages, nominal damages are an

inconsequential or trifling sum awarded to a plaintiff when a technical violation of his constitutional rights has occurred but the plaintiff has suffered no actual loss or injury.  If you find from a preponderance of the evidence that plaintiff De'Shaun Johnson sustained a technical violation of his constitutional rights but that plaintiff De'Shaun Johnson suffered no actual loss as a result of this violation, then you may award plaintiff De'Shaun Johnson nominal damages on his First Amendment retaliation claim.

As to punitive damages, if you find that the defendant is liable for plaintiff De'Shaun Johnson's injuries, you must award plaintiff De'Shaun Johnson the compensatory damages that he has proved.  You may, in addition, award punitive damages if you find that defendant Ryan Moring acted with malice or with reckless indifference to the rights of others.  A person acts with malice when one purposefully or knowingly violates another's rights.  One acts with reckless indifference to the rights of others when one's conduct under the circumstances manifests a complete lack of concern for the rights of another.

Plaintiff De'Shaun Johnson has the burden of proving that punitive damages should be awarded by a preponderance of the evidence.  The purpose of punitive damages is to punish and deter, not to compensate.  Punitive damages serve to punish a defendant for malicious or reckless conduct

and, by doing so, to deter others from engaging in similar conduct in the future.  You are not required to award punitive damages.

If you do decide to award punitive damages, you must use sound reason in setting the amount.  Your award of punitive damages must not reflect bias, prejudice, or sympathy toward any party.  It should be presumed that plaintiff De'Shaun Johnson has been made whole by compensatory damages, so punitive damages should be awarded only if defendant Ryan Moring's misconduct is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

If you decide to award punitive damages, the following factors should guide you in fixing the proper amount: One, the reprehensibility of defendant Ryan Moring's conduct, including but not limited to whether there was deceit, cover-up insult, intended or reckless injury; and, two, the ratio between the punitive damages you are considering awarding and the amount of harm that was suffered by the victim or which the victim was threatened.

Punitive damages may be awarded even if the violation of the plaintiff's rights resulted only in nominal damages; that is, even if plaintiff De'Shaun Johnson can show no damages or other injury as a result of defendant Ryan Moring Morgan's actions, if these actions towards plaintiff De'Shaun

Johnson were deliberate, willful, or made with reckless disregard of plaintiff De'Shaun Johnson's rights, punitive damages are appropriate.

Statements of any attorneys in this case as to his or her estimate of dollar amounts to be awarded for any claims are not evidence and you should disregard them.  The determination of damages is solely your function, and your decision must be based upon competent evidence and not solely upon figures suggested by attorneys.

Ladies and gentlemen, it is now your duty to deliberate and to consult with one another in an effort to reach a verdict.  Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

During your deliberations, do not hesitate to reexamine your own opinions and change your mind if you are convinced that you are wrong, but do not give up on your honest beliefs because the other jurors think differently or just to finish the case.  Remember at all times: You are the judges of the facts.

You have been allowed to take notes during the trial.  Any notes that you took during this trial are only aids to your memory.  If your memory differs from your notes, you should rely on your memory and not on the notes.  The notes are not evidence.  If you did not take notes, rely on your

independent recollection of the evidence, and do not be unduly influenced by the notes of other jurors.  Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

When you go into the jury room to deliberate, you may take with you a copy of this charge, the exhibits that I have introduced into evidence, and your notes.  You must first select a jury foreperson to guide you in your deliberations and to speak for you here in the courtroom.  Your verdict must be unanimous.  All eight of you must agree.

After you have reached a unanimous verdict, your jury foreperson will fill out the answers to the written questions on the verdict form and sign and date it.

Further, after you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

I'm now going to go over the verdict form.

Melissa, can you pull it up.

**THE DEPUTY CLERK:**  Yes, ma'am.

**THE COURT:**  Thank you.  Can you do one page at a time.

**THE DEPUTY CLERK:**  Sure.

**THE COURT:**  Thank you.  The attorneys and I have worked hard to make the verdict form as easy for you to read and to make it a road map as to what to do after answering each

question.  The first part has to do with Mr. Johnson's First Amendment retaliation claim.

"Question 1: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring violated plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights?"

You may answer yes or no.  The instruction follows each question.  If you answered yes, you then proceed to Question 2.  If you answer no to Question 1, proceed to Question 8.  For now I'm going to go over all the questions.

"Question 2: It is plaintiff De'Shaun Johnson's burden to prove by a preponderance of the evidence that defendant Ryan Moring is not entitled to qualified immunity.  Do you find that defendant Ryan Moring is entitled to qualified immunity as to the claim alleged in Question 1; that is, did defendant Ryan Moring reasonably believe that his actions taken on May 5, 2020, were lawful in light of the clearly established law and the information he possessed?"

You may answer yes, he is entitled to qualified immunity, or no, he is not entitled to qualified immunity.  Next are instructions.  If you answer yes to Question 2, please proceed to Question 8.  If you answer no to Question 2, please proceed to Question 3.

"Question 3: Do you find that plaintiff De'Shaun

Johnson proved by a preponderance of the evidence that defendant Ryan Moring committed a technical violation of plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights, but that plaintiff De'Shaun Johnson sustained no compensatory damages as a result of the technical violation?"

You may answer yes or no, then you have a road map.  If you answered yes to Question 3, please proceed to Question 4.  If you answered no, please skip Question 4 and proceed to Question 5.

"Question 4: What amount do you award to plaintiff De'Shaun Johnson as nominal damages for defendant Ryan Moring's technical violation of plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights?"

You will fill in an amount that you think is appropriate.  Now go back to the other question.  You have filled in an amount.  You proceed to Question 5.

"Question 5: What amount, if any, do you award to plaintiff De'Shaun Johnson as compensatory damages for his First Amendment retaliation claim?"

I think I just skipped over the instruction for Question 4, and I'm sorry.  If you answered yes to Question 3 and then you answered Question 4 and filled in an amount, you will then skip Question 5, but otherwise you answer Question 5.

"Question 5: What amount, if any, do you award to plaintiff De'Shaun Johnson as compensatory damages for his First Amendment retaliation claim?"

Fill in any amount that you think is appropriate, then you proceed to Question 6.

"Question 6: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring acted with malice or reckless indifference to the constitutional right of plaintiff De'Shaun Johnson to be free from retaliation for exercising his First Amendment rights?"

You answer yes or no.  If you answered yes to Question 6, you then proceed to Question 7.

"Question 7: What amount, if any, do you award to plaintiff De'Shaun Johnson as punitive damages for defendant Ryan Moring's malicious or reckless indifference to plaintiff De'Shaun Johnson's constitutional rights?"

If you answered no to Question 6, you skip Question 7 and proceed to Question 8.

So those first questions have to do with the First Amendment retaliation claim.  Question 8 has to do with Mr. Johnson's claim for intentional infliction of emotional distress under Louisiana law.

"Question 8: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that

defendant Ryan Moring took actions that constitute intentional infliction of emotional express under Louisiana law?"

You decide whether to answer yes or no. If you answered yes, you proceed to Question 9.

"Question 9: What amount, if any, do you award to plaintiff De'Shaun Johnson in compensatory damages for his intentional infliction of emotional distress claim?"

If you answered no to Question 8, it says -- if you answer no -- stop. You have completed your deliberations. Have the jury foreperson sign and date and alert the court staff that you have reached a verdict. If you answered yes to Question 8, you then filled in Question 9, and you have now completed your deliberations. Please have the jury foreperson sign and date below and alert the court staff that you have completed your deliberations.

Again, you will have the jury instructions and the verdict form with you. If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry or question on a piece of paper, which Melissa will give to you, and give it to the court security officer. After consulting with the attorneys here in court, I will respond either in writing back to you, the jury, or I will call you in open court and meet with you here. Keep in mind, however, that you must never disclose to anyone, not even to me, your numerical division on the question. You should just simply

write whatever question it is.

Counsel for Mr. Johnson, is there anything further you would like me to add or change regarding the instructions?

**MR. COHAN:**  No, Your Honor.

**THE COURT:**  Counsel for Officer Moring?

**MR. CAPITELLI:**  No, Your Honor.

**THE COURT:**  Let me just look at one matter, please.

Ladies and gentlemen, you may now proceed to the jury room to begin your deliberations.  The jury is excused.

(Jury out.)

**THE COURT:**  Ladies and gentlemen, we have cell phones for whoever you want us to communicate with?  Make sure we have cell phones.  I will let you know that the jury is being given lunch at noon.  I have no prediction on how long they will be, but I do know that much.

Both parties are reviewing the verdict form before it goes to the jury.  Anyone in court may be seated if you would like.

Both agreed?

**THE DEPUTY CLERK:**  Yes, ma'am.

**THE COURT:**  Ladies and gentlemen, court is in recess until we hear from the jury.

(Lunch recess.)

* * *

**AFTERNOON SESSION**

**(May 1, 2024)**

**THE COURT:**  Before the jury comes out, I am seeing there is a verdict from the jury.  I understand it is not a question, that it is a verdict.

I know the attorneys know, but I will explain to anyone else in court.  When the jury comes in, I will ask if they have reached a verdict.  I'm assuming they will say yes and that this is the verdict.  I will open it up here on the bench and look at it, make sure it is a legal verdict; if not, the attorneys and I will meet and discuss that.  I will hand it to my case administrator, who will read it.

To those in court on both sides, it is emotional for everybody, but we always respect the jury's verdict, however it comes out.  We respect their verdict.  I will thank them for their service.  If it's a legal verdict, we will let them leave, and then you can speak with your attorneys, and your attorneys can explain anything to you.

(Jury in.)

**THE COURT:**  Please be seated.

All right, ladies and gentlemen.  The jury is back in court.  The parties are present.  The attorneys are present.  I've been handed an envelope with the jury verdict form.

Who is the jury foreperson?

THE FOREPERSON:  (Raises hand.)

THE COURT:  Ms. Levy, has the verdict reached a verdict?

THE FOREPERSON:  Yes, ma'am.

THE COURT:  Was the verdict unanimous?

THE FOREPERSON:  Yes, ma'am.

THE COURT:  You may be seated.

I'm going to look at the verdict, as I have already told the attorneys.  I need to review it and make certain it is a legal verdict, so please give me a couple of minutes to do that.

The Court finds it is a legal verdict, and I am going to have Melissa read it.

THE DEPUTY CLERK:  In the matter of *De'Shaun Johnson, et al. v. Ryan Moring, et al.,* Civil Action 21-879:

"I.  First Amendment Retaliation Claim:

"Question 1: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring violated plaintiff De'Shaun Johnson's constitutional right to be free from retaliation for exercising his First Amendment rights?  No."

Question 2, no answer.  Question 3, no answer. Question 4, no answer.  Question 5, no answer.  Question 6, no answer.  Question 7, no answer.

"II.  Intentional Infliction of Emotional

Distress Under Louisiana law:

"Question 8: Do you find that plaintiff De'Shaun Johnson proved by a preponderance of the evidence that defendant Ryan Moring took actions that constitute intentional infliction of emotional distress under Louisiana law?  Yes."

"Question 9: What amount, if any, do you award to plaintiff De'Shaun Johnson in compensatory damages for his intentional infliction of emotional distress claim?  $185,000."

Signed New Orleans, Louisiana, this 1st day of May 2024, signed by the jury foreperson.

**THE COURT:**  Does either side ask that the jury be polled that this is their verdict?

Counsel for Mr. Johnson?

**MR. COHAN:**  No, Your Honor.

**THE COURT:**  Counsel for defendant?

**MR. CAPITELLI:**  No, Your Honor.

**THE COURT:**  I believe Ms. Levy already said that it was a unanimous verdict.

Jurors, thank you for your very dedicated work here.  You took a long time.  Obviously, you thought about it and thought about the issues in the case and the resolution of the case.  On behalf of the parties and the attorneys, I thank you for your attention and for your service.  It is just so important to the administration of justice.  I very much thank you.

I'm going to ask that you go back into the jury room one last time so I can come back and thank you personally. I will let you know that I will not speak about the case or answer any questions about the case, but I would like to know that you were comfortable here and you felt respected at all times. So I would just like to thank you and give you your jury services and envelopes advising that you served on a jury for the last three days.

Thank you very much. The jury is recessed for the last time.

**THE DEPUTY CLERK:** All rise.

(Jury excused.)

**THE COURT:** Counsel, as I advised, I am going to give them their attendance notes and a survey that I give to all the jurors. I will not discuss the case. I will have my case administrator and law clerk with me. I will be right back out to talk to counsel and the parties.

(Recess.)

**THE COURT:** Counsel, thank you for the professionalism you have shown to the Court and to each other. I know it is not the verdict that probably either of you wanted completely, but I do appreciate their service. I think the jury made a wise decision in what they did. I'm sure we will have post-trial briefing.

I have a ruling on your Rule 50 motion to the

defendant.  I had that pending while the jury was deliberating. I now deny your Rule 50 motion and will wait to see what happens post-trial.

MR. CAPITELLI:  Understood.

THE COURT:  Anything else?  Thank you.

MR. COHAN:  Thank you, Your Honor.

THE COURT:  Mr. Johnson, best of luck to you as you start your college career.  I wish you very good luck.

THE PLAINTIFF:  Thank you.

THE COURT:  I hope you realize that the administration of justice works and that the people who work on behalf of law enforcement, whether in a court, whether in a uniform, are there really to protect and to serve, and so move forward in a positive way in your life.

THE PLAINTIFF:  Thank you.

THE COURT:  Hopefully this is a step in that direction.  Thank you.  Court is in recess.  Safe travels home.

(Proceedings adjourned.)

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled matter.

*s/ Toni Doyle Tusa*
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter